**2024-1686**

# United States Court of Appeals for the Federal Circuit

GENUINE ENABLING TECHNOLOGY LLC,

*Plaintiff-Appellant*,

*v.*

SONY CORPORATION, SONY INTERACTIVE ENTERTAINMENT LLC,

*Defendants-Appellees*.

*Appeal from the United States District Court for the District of Delaware, in Case No. 1:17-cv-00135-MSG*

## BRIEF OF APPELLANT

Devan V. Padmanabhan
Paul J. Robbennolt
Padmanabhan & Dawson, PLLC
9800 Shelard Parkway, Ste. 120
Minneapolis, MN 55441
Telephone: (612) 444-3601
devan@paddalawgroup.com
paul@paddalawgroup.com

*Attorneys for Appellant*

June 11, 2024

## UNITED STATES PATENT NO. 6,219,730

## CLAIM 10

10. A user input apparatus operatively coupled to a computer via a communication means additionally receiving at least one input signal, comprising:

user input means for producing a user input stream;

input means for producing the at least one input signal;

converting means for receiving the at least one input signal and producing therefrom an input stream; and

encoding means for synchronizing the user input stream with the input stream and encoding the same into a combined data stream transferable by the communication means,

wherein the input means is an input transducer.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2024-1686

**Short Case Caption** Genuine Enabling Technology LLC v. Sony Corporation

**Filing Party/Entity** Genuine Enabling Technology LLC

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/11/2024

Signature: /Devan V. Padmanabhan/

Name: Devan V. Padmanabhan

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☒ Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☒ None/Not Applicable |
| Genuine Enabling Technology LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Bayard, P.A. | Stephen B. Brauerman | Ronald P. Golden, III |
| Womble Bond Dickenson LLP | Dana Kathryn Severance | Fitzpatrick, Cell, Harper & Cinto |
| Giancarlo Scaccia | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☒ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iv

STATEMENT OF RELATED CASES ................................................................ vii

JURISDICTIONAL STATEMENT ........................................................................ 1

STATEMENT OF THE ISSUES ........................................................................ 2

STATEMENT OF THE CASE ........................................................................ 3

I. THE '730 PATENT AND THE TECHNOLOGY AT ISSUE ........................ 5

A. The '730 Patent and the District Court's Construction of the Framer Limitations ........................................................................ 5

B. The Invention of the '730 Patent: a User Input Device That Transmits Two Different Types of Signals Using a Single Computer Resource ..... 8

C. Mr. Nguyen's Resolution of the Collision Problem By Using a Framer to Synchronize the Two Data Streams and Encode Them Into a Combined Data Stream ........................................................................ 11

D. The Novel "Framer" of the '730 Patent ........................................................ 13

II. THE ACCUSED DEVICES ........................................................................ 14

III. DR. FERNALD'S OPINION THAT THE ACCUSED CONTROLLERS INCORPORATE THE "FRAMER" LIMITATIONS OF THE ASSERTED CLAIMS ........................................ 16

IV. THE DISTRICT COURT'S *DAUBERT* ORDER BARRING DR. FERNALD FROM TESTIFYING TO HIS ULTIMATE CONCLUSION ON STRUCTURAL EQUIVALENCE ........................... 18

SUMMARY OF THE ARGUMENT ........................................................................ 23

ARGUMENT ........................................................................ 24

I. STANDARD OF REVIEW ........................................................................ 24

II. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT OF NONINFRINGEMENT BECAUSE DR. FERNALD'S EXPERT ANALYSIS AND TESTIMONY SUPPORTS A FINDING OF STRUCTURAL EQUIVALENCE ............ 26

A. The Sole Basis for the District Court's Summary Judgment Determination Is Its Holding that Genuine Enabling Cannot Prove the "Way" Prong of the "Function-Way-Result" Test for Equivalence........................................................................26

B. Dr. Fernald's Analysis of the "Way" the Framer of the '730 Patent Synchronizes the Two Data Streams ..................................................29

C. Dr. Fernald's Analysis of the "Way" the Logic in the Bluetooth Modules of the Accused Controllers Synchronizes the Two Data Streams ..............................................................................32

1. It is Undisputed that The Logic in the Bluetooth Modules of the Accused Products Synchronizes the Two Data Streams by Synchronizing Both Data Streams to a Common Bit-Rate Clock......................................................................32

2. It is Undisputed that Logic Designs that Perform the Same Function in the Same Way are Equivalent to Persons of Ordinary Skill In the Art..........................................................................34

3. It is Undisputed that the Framer of the '730 Patent and the Logic in the Bluetooth Modules of the Accused Controllers Perform the Same Operations: Synchronize the Two Data Streams to a Common Bit-Rate Clock..............................................................38

D. Dr. Fernald's Analysis of the "Encoding" Function..............................40

III. THE DISTRICT COURT ERRED IN CONCLUDING THAT GENUINE ENABLING COULD NOT PROVE STRUCTURAL EQUIVALENCE ..........................................................................42

A. The District Court Incorrectly Concluded that Dr. Fernald's Testimony Regarding Equivalence in Digital Logic Design Is Insufficient to Establish Equivalence ..........................................................................42

1. The District Court Erroneously Discounted Dr. Fernald's Testimony About Equivalence in the Field of Logic Design ........42

2. Dr. Fernald Did Find That the Logic in the Bluetooth Modules Is Equivalent to the Relevant Components of the "Logic Design at Block 34 in Figure 4A"..................................................................46

3. The District Court's "Paperclip and Paperweight" Analogy is Fatally Flawed..........................................................................49

4. The District Court's Reliance on *VLSI Tech. is Erroneous*...........50

B. The District Court Incorrectly Required Dr. Fernald to Perform a Component-by-Component Analysis ....................................................52

C. The District Court Incorrectly Rejected Dr. Fernald's Definition of the "Way" the Structures Synchronize the Data Streams as a Matter of Law ………………………………………………………………………...56

IV. THE DISTRICT COURT ERRED IN EXCLUDING DR. FERNALD'S ULTIMATE CONCLUSION ON STRUCTURAL EQUIVALENCE ............................................................................................61

CONCLUSION AND RELIEF SOUGHT .............................................................62

# TABLE OF AUTHORITIES


**Cases** **Page(s)**

*Absolute Software, Inc. v. Stealth Signal, Inc.*,
659 F.3d 1121 (Fed. Cir. 2011) ....25

*Advanced Steel Recovery, LLC v. X-Body Equip., Inc.*,
808 F.3d 1313 (Fed. Cir. 2015) ....25

*AFG Indus., Inc. v. Cardinal IG Co., Inc.*,
375 F.3d 1367 (Fed. Cir. 2004) ....26

*Anchor Wall Sys., Inc. v. Rockwood Retaining Walls. Inc.*,
340 F.3d 1298 (Fed. Cir. 2003) ....25

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ....25

*Applied Med. Resources Corp. v. U.S. Surg. Corp.*,
448 F.3d 1324 (Fed. Cir. 2006) ....59

*Brilliant Instruments, Inc. v. GuideTech, LLC*,
707 F.3d 1342 (Fed. Cir. 2013) ....59

*Charles Mach. Works, Inc. v. Vermeer Mfg. Co.*,
723 F.3d 1376 (Fed. Cir. 2013) ....59

*Chiuminatta Concrete Concepts. Inc. v. Cardinal Indus. Inc.*,
145 F.3d 1303 (Fed. Cir. 1998) ....25

*Genuine Enabling Tech., LLC v. Nintendo Co., Ltd., et al.*,
Case No. 2:19-cv-00351-JNW (W.D. Wa.).... vi

*In re Hayes Microcomputer Prods. Inc. Patent Litigation*,
982 F.2d 1527 (Fed. Cir. 1992) .... 55, 57

*Intendis GMBH v. Glenmark Pharms. Inc., USA.*,
822 F.3d 1355 (Fed. Cir. 2016) ....58

*National Presto Indus., Inc. v. West Bend Co.*,
76 F.3d 1185 (Fed. Cir. 1996)....................58

*Odetics, Inc. v. Storage Tech. Corp.*,
185 F.3d 1259 (Fed. Cir. 1999) .................... 34, 53, 57

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003) ....................25

*Optical Disc Corp. v. Del Mar Avionics*,
208 F.3d 1324 (Fed. Cir. 2000) ....................25

*Overhead Door Corp. v. Chamberlain Grp., Inc.*,
194 F.3d 1261 (Fed. Cir. 1999) .................... 26, 44, 45

*Prima Tek II, L.L.C. v. Polvpap, S.A.R.L.*,
318 F.3d 1143 (Fed. Cir. 2003) .................... 25, 28

*Sage Prods., Inc. v. Devon Indus., Inc.*,
126 F.3d 1420 (Fed. Cir. 1997) ....................26

*Sell v. Ingersoll-Rand Co.*,
136 Fed. Appx. 545 (3d Cir. 2005)....................26

*Solomon Techs., Inc. v. International Trade Comm'n*,
524 F.3d 1310 (Fed. Cir. 2008) ....................54

*Sound View Innovations, LLC v. Hulu, LLC*,
33 F.4th 1326 (Fed. Cir. 2022) ....................26

*Spancrete Mach. Corp. v. RH & M Mach. Co.*,
34 F.3d 1080, 1994 WL 424620 (Fed. Cir. 1994)....................57

*Toro Co. v. Deere & Co.*,
355 F3d 1313 (Fed. Cir. 2004) ....................54

*VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332 (Fed. Cir. 2023).................... 50, 52

**Statutes**

28 U.S.C. § 1295(a)(1) .......................................................................................1

28 U.S.C. §§ 1331 ..............................................................................................1

## STATEMENT OF RELATED CASES

This is an appeal from an order and final judgment of the United States District Court for the District of Delaware granting summary judgment of noninfringement in favor of Appellees Sony Corporation and Sony Interactive Entertainment LLC (collectively, "Sony") in case number 1:17-cv-00135-MSG. No other appeal in or from the same civil action or proceeding was previously before this or any other appellate court.

There is one other case known to counsel to be pending in this or another court or agency that may directly affect or be directly affected by this Court's decision in this appeal. Appellant Genuine Enabling Technology LLC (hereinafter, "Genuine Enabling") has asserted that Nintendo Co., Ltd. and Nintendo of America, Inc. (collectively, "Nintendo") have infringed the same patent at issue in this case (U.S. Patent No. 6,219,730 ("the '730 Patent")) in *Genuine Enabling Tech., LLC v. Nintendo Co., Ltd., et al.*, Case No. 2:19-cv-00351-JNW (W.D. Wa.). That matter was previously appealed to this Court in *Genuine Enabling Technology LLC v. Nintendo Co., Ltd.,* Case No. 2020-2167 (Fed. Cir.). The district court case remains pending in the United States District Court for the Western District of Washington.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a). This Court has jurisdiction under 28 U.S.C. § 1295(a)(1), because this is an appeal from a final decision of a district court of the United States in a civil action arising under the Patent Act.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in concluding that Genuine Enabling failed to raise a dispute of fact as to whether the logic in the Bluetooth modules of the Sony Accused Controllers synchronizes the user input stream with the input stream in the same way as the logic design at block 34 in Figure 4A of the '730 Patent, where it is undisputed that two logic designs that perform the same operation are considered to be equivalent by persons of ordinary skill in the art.

2. Whether the district court erred in its Section 112, paragraph 6 equivalents analysis when it required Genuine Enabling to conduct a component-by-component analysis.

3. Whether the district court erred in its Section 112, paragraph 6 equivalents analysis when it redefined the "way" the logic design at block 34 in Figure 4A of the '730 Patent synchronizes the user input stream with the input stream.

4. Whether the district court abused its discretion in excluding the expert testimony of Genuine Enabling's technical expert, Dr. Kenneth Fernald, regarding his ultimate conclusion that the logic in the Bluetooth modules of the Accused Controllers is structurally equivalent to the logic design at block 34 in Figure 4A of the '730 Patent.

## STATEMENT OF THE CASE

This appeal presents a single issue for this Court to decide: can Genuine Enabling present sufficient evidence to support a finding that the digital logic in the Bluetooth modules of the Sony accused game controllers (the "Accused Controllers") is equivalent to the "logic design" of the "framer" of the invention of the '730 Patent? The district court answered that question in the negative and therefore granted summary judgment of noninfringement. But that determination was erroneous. The expert testimony and supporting evidence that are **undisputed for purposes of summary judgment** clearly support a jury finding of structural equivalence and, therefore, infringement. Accordingly, this Court should reverse the district court's summary judgment determination and remand the case for trial.

The heart of the invention of the '730 Patent is a "framer" that synchronizes two (or more) signals of different types and encodes them into a combined data stream for transmission to a computer. The district court construed "framer" to be a means-plus-function limitation and identified the corresponding structure as the "logic design at block 34 in Figure 4A." Genuine Enabling's technical expert, Dr. Kenneth Fernald, opined that the relevant structure in Sony's Accused Controllers is the digital logic in the Bluetooth modules of those controllers. Dr. Fernald determined that the logic in the Bluetooth modules performs the same functions as the framer, and does so in substantially the same way to achieve substantially the

same result. Dr. Fernald also analyzed the structures of the "framer" and the logic in the Bluetooth modules—both of which are digital logic designs—and concluded that they are equivalent to persons of ordinary skill in the art.

The key components of Dr. Fernald's equivalence analysis are undisputed for purposes of summary judgment:

- **Undisputed**: The logic in the Bluetooth modules of the Accused Controllers performs the same functions as the logic design of the "framer" of the '730 Patent: synchronizing the two data streams and encoding them into a combined data stream. Appx10.

- **Undisputed**: The logic in the Bluetooth modules achieves substantially the same result as the logic design of the "framer": a "combined data stream." Appx10.

- **Undisputed**: The "way" the logic design of the "framer" synchronizes the data streams is by synchronizing both data streams to a common bit-rate (or bit) clock. Appx1808 at ¶ 16.

- **Undisputed**: The logic in the Bluetooth modules synchronizes the data streams in the same "way," by synchronizing both data streams to a common bit-rate clock. Appx11; Appx1811 at ¶ 23.

In other words, **every element** of the function-way-result test is undisputed for purposes of summary judgment. That alone is sufficient to defeat summary judgment of noninfringement and require a jury trial. The district court, however, determined that, because Dr. Fernald did not have schematics for the Bluetooth modules and therefore did not know the specific logic gates and connections therein, Dr. Fernald could not establish that any differences between the two logic designs are insubstantial.

But this conclusion, too, is erroneous based on the undisputed testimony of Dr. Fernald regarding the equivalence of digital logic design:

- **Undisputed**: The "logic design at block 34 of Figure 4A" and the Bluetooth modules of the Accused Controllers are both comprised of digital logic. Appx1807 at ¶ 12.
- **Undisputed**: To persons of ordinary skill in the art, the equivalence of logic design relies on a comparison of the operations performed by the two logic designs, rather than a gate-by-gate, connection-by-connection comparison. Appx1589 at ¶ 64; Appx1814 at ¶ 29.
- **Undisputed**: To persons of ordinary skill in the art, two logic designs that perform the same operation are structurally equivalent regardless of the precise logic gates and connections in the logic designs. Appx1604-1610 at ¶¶ 124-135; Appx1814 at ¶ 29.
- **Undisputed**: Here, the logic in the Bluetooth modules performs the same operation as the logic design at block 34 of Figure 4A: synchronizing the two data streams to a common bit-rate clock. Appx1605-1610 at ¶¶ 127-135; Appx1814 at ¶ 29.

In granting summary judgment, the district court failed to consider or even address Dr. Fernald's undisputed testimony regarding logic design equivalence. Because Dr. Fernald's testimony unequivocally would support a jury finding of structural equivalence, and therefore infringement, this Court should reverse the district court's summary judgment determination and remand this matter for trial.

# I. THE '730 PATENT AND THE TECHNOLOGY AT ISSUE

## A. <u>The '730 Patent and the District Court's Construction of the Framer Limitations</u>

Nghi Nguyen, the sole inventor of the '730 Patent, filed his patent application on June 20, 1998; the '730 Patent issued on April 17, 2001. Appx161 at

1. Genuine Enabling asserts that Sony infringes eight claims of the '730 Patent: claims 10, 14, 16-18, and 21-23 (the "Asserted Claims"). Claim 10 is representative:

> 10. A user input apparatus operatively coupled to a computer via a communication means additionally receiving at least one input signal, comprising:
>
> user input means for producing a user input stream;
>
> input means for producing the at least one input signal;
>
> converting means for receiving the at least one input signal and producing therefrom an input stream; and
>
> encoding means for synchronizing the user input stream with the input stream and encoding the same into a combined data stream transferable by the communication means,
>
> wherein the input means is an input transducer.

Appx174 at claim 10. [1]

Each of the Asserted Claims recites a limitation requiring a structure that synchronizes the user input stream with the input stream and encodes the two data streams into a combined data stream. In claim 10, the "encoding means" recites this requirement. Claim 14 recites a "means for synchronizing and encoding a user

---

[1] Claim 10 is a dependent claim that depends from claim 1. The reproduction above and on the inside cover of this brief incorporates the limitations of claim 1 into claim 10.

input stream and at least one additional input signal into a combined data stream," claims 16 through 18 recite a "framer synchronizing the user input stream with the input stream and encoding the same into a combined data stream," and claims 21-23 recite a "framer for keeping the user input stream and the at least one digital input signal in synchrony and encoding the same into a combined data stream." Appx174-175. These limitations, referred to collectively here as the "framer" or the "framer limitations," are central to the issues raised in this appeal.

The district court construed the framer limitations to be synonymous and as means-plus-function limitations. Appx4. The district court identified the functions as "synchronizing the user input stream with the input stream and encoding the user input stream and the input stream into a combined data stream." *Id.* The district court identified the corresponding structure from the specification as "the logic design at block 34 in Figure 4A and equivalents thereof." *Id.*

Logic, or digital logic, which describes the structure associated with the "framer" limitations, refers to the electronics that underlie computer technology. "Logic gates" are "small circuit[s] that would be used in may different ways to make a large circuit [or] large logic design" that would be used in computer technology. Appx1852. "A logic design would be … some collection of gates connected in a certain way to perform a certain operation." Appx1853.

### B. **<u>The Invention of the '730 Patent: a User Input Device That Transmits Two Different Types of Signals Using a Single Computer Resource</u>**

Before the '730 Patent, the advancement of computer technology resulted in more and more sources and ways of inputting data into the computer. Appx171 at 1:32-36. For example, users could input data using a keyboard, a mouse, a pressure tablet, or other devices. *Id.* at 1:14-19. Additional input data could come from a microphone, a modem, or other sources. *Id.* at 1:19-22. The input data could be transmitted to the computer through a wired connection or wirelessly, using one of several available communication protocols, such as RS-232 or Universal Serial Bus ("USB"). *Id.* at 2:34-41. In order to receive data from the various input sources, the computer needed dedicated computer resources for each source to handle the reception. The proliferation of input sources created problems due to limited computer resources and the handling of such sources became cumbersome. *Id.* at 1:24-29. As shown in the graphic below, in the prior art, each source of signals to be transmitted to the computer (such as speakers, microphone, mouse, or keyboard) required its own port for receiving its signal:




As popular uses of computers spread, input sources multiplied, and the efficient use of computer resources became critical. Appx171 at 1:32-36.

This was the state of the art prior to 1998, when Mr. Nguyen first conceived of his invention. At that time, Mr. Nguyen conceived of a device that combined the functions of a computer mouse, allowing users to input data by moving the mouse or clicking buttons, with a microphone, allowing users to input data by speaking. Such a device would not only be convenient for the user, it would also conserve computer resources. Instead of requiring separate resources for the mouse signals and the microphone signals, as shown above, Mr. Nguyen's device could combine the data from the mouse and the microphone into a single data stream for

transmission to the computer using only a single resource, *see* Appx171 at 1:14-44, as depicted in Figure 1B of the '730 Patent:




Appx163. This increased efficiency by reducing the number of separate resources needed at the computer.




The '730 Patent describes Mr. Nguyen's solution to the resource problem through a user input device that transmits two or more signals of different types to the computer on the same wired or wireless communication link using the single computer resource, thereby reducing the computer resources required for multiple

input sources and increasing the efficiency and reliability of the computer. Appx161 at abstract; Appx171 at 1:46-57; 2:17-22.

### C. Mr. Nguyen's Resolution of the Collision Problem By Using a Framer to Synchronize the Two Data Streams and Encode Them Into a Combined Data Stream

Mr. Nguyen realized that combining the data streams was not a simple matter. In particular, if the data streams were of different types—*i.e.*, if one data stream was "slow-varying" like the button and motion information from a mouse, and the other was higher frequency, like the audio signal from the microphone—then the streams would "collide" when they were combined, damaging the integrity of the data. Appx281-282. This collision problem is illustrated below:



Mr. Nguyen's solution to the collision problem was to use a structure he called a "framer" to synchronize the two data streams and encode them into a combined data stream for transmission to the computer, Appx172 at 4:1-26, as shown below:




The computer thus receives the combined data stream uncorrupted and is then capable of recovering the data intact from the multiple input sources. Appx161 at Abstract; Appx171 at 2:63-67. That was the subject matter of the '730 Patent: an invention that is capable of combining two different types of data streams—where one is slow-varying and one is of audio frequency or higher—**from any source** by synchronizing the data streams to one another and encoding them into a combined data stream.

It is this framer that is at the heart of the invention of the ‘730 Patent. The patent examiner recognized this during prosecution: “Your invention, as far as I understand it, is a user interface (UI) with a novel framer that combines 2 different signals from 2 different sources. The resulting combined data stream can be sent and recovered using only one resource.” Appx357.

### D. The Novel “Framer” of the ‘730 Patent

The ’730 Patent describes and depicts one embodiment of the framer that synchronizes the two data streams and encodes them into a combined data stream. Figure 4A depicts “one logic design” of an embodiment of the invention:

FIG. 4A



Appx168. Block 34, outlined with a dashed line, is the framer. Appx173 at 5:4-6. Several components of the "logic design" of the framer 34 are depicted as boxes, including the "data selector 50," the "clock generator 62," and the two flip-flops "FF 1" and "FF 2." Each of these components are logic design blocks that are themselves made up of binary logic gates and are part of the logic design at block 34, although the logic gates that make up those components are not shown in Figure 4A or described in the '730 Patent. Appx1806 at ¶ 8. *See also* Appx1857; Appx2185 at ¶ 34. Figure 4A also shows a handful of logic gates, denoted with these symbols:  .

## II. THE ACCUSED CONTROLLERS

Genuine Enabling accuses three Sony game controllers with two corresponding game consoles of infringing the Asserted Claims: the DualShock 3 controller, the DualShock 4 controller, and the Sony Move controller (collectively, the "Accused Controllers"). Appx1258. The Sony Move and the DualShock 3 can be used with Sony's PlayStation 3 console; the DualShock 4 can be used with Sony's PlayStation 4 console. *Id.* The Sony Move, DualShock 3, and DualShock 4 controllers are shown below:








Each of these Accused Controllers incorporates buttons that allow the user to control features of the game they are playing on the Sony console. Each Accused Controller also incorporates one or more accelerometers that sense the movement of the players' hands in time. This feature allows the gamer to use the controller as if it were a real component of the game: when the user physically moves the controller, a character (or other feature) in the game will move correspondingly. Finally, the DualShock 4 controller includes a port into which a headset (with microphone and speakers) can be connected; the controller transmits the user's voice data from the microphone to the console so the user can speak to other gamers or control the game. Genuine Enabling contends that the data from the buttons of the Accused Controllers satisfy the "user input stream" of the Asserted Claims, and that the data from the accelerometers and microphone satisfy the "input signal" of the Asserted Claims. Genuine Enabling contends that the Bluetooth modules in the Accused Controllers combine the button data with the

accelerometer and microphone/voice signals into a combined data stream that is transmitted to the console via a Bluetooth communication link.

Sony's success would have been impossible without the invention described and claimed in the '730 Patent. That novel framer of that invention allows Sony to combine user-input data (from the buttons and on the Accused Controllers) with at least one input signal (from the accelerometers or the microphone) into a single combined data stream that can be communicated over the same communication link. The framer synchronizes the button data and the accelerometer and voice signal and encodes them into a combined data stream to be transmitted to the console.

## III. DR. FERNALD'S OPINION THAT THE ACCUSED CONTROLLERS INCORPORATE THE "FRAMER" LIMITATIONS OF THE ASSERTED CLAIMS

Genuine Enabling's technical expert, Dr. Fernald, opined on the infringement of the Asserted Claims by the Accused Controllers. With respect to the "framer" limitations, Dr. Fernald opined that each of the Accused Controllers incorporates structures that satisfy the district court's construction. Specifically, Dr. Fernald opined that the logic in the Bluetooth modules of each Accused Controller is structurally equivalent to "the logic design at block 34 in Figure 4A," and thus literally satisfies the "framer" limitations. Appx1617-1625 (Move

controller); Appx1626-1629 (DualShock 3 controller); Appx1630-1635 (DualShock 4 controller).

Dr. Fernald provided detailed analysis to support his opinions. **First**, because the structures **on both sides** of the comparison are digital logic, Dr. Fernald provided an explanation of "digital logic design" and the understanding of a person of ordinary skill in the art (a "POSITA") regarding equivalency of logic design. Appx1585-1589 at ¶¶ 53-64. **Second**, Dr. Fernald conducted a "structural comparison" of "Block 34" to the Accused Products. Appx1590-1616 at ¶¶ 101-144. With respect to the framer of the '730 Patent, Dr. Fernald noted that block 34 "contains logic to generate a frame" and to "synchronize a user input stream (from the 'UI means' block) with the input stream (from the 'CODEC' block) and encode the two streams into a combined data stream." Appx1591 at ¶ 102. He further explained that, as "illustrated in Figure 4B, the two streams are combined in a specific way to generate the combined data streams, i.e., by placing the stream values into predetermined locations in the combined data stream …." *Id.* Dr. Fernald then conducted a detailed analysis of the logic of the Bluetooth modules of the Accused Controllers, explaining how they performed the same functions—synchronizing the two data streams (Appx1604-1610 at ¶¶ 124-135) and encoding them into a combined data stream (Appx1593-1604 at ¶¶ 107-123)—in substantially the same way to achieve substantially the same result. Based on his

analysis, Dr. Fernald opined that the logic in the Bluetooth modules of the Accused Controllers are structurally equivalent to the "logic at block 34 in Figure 4A" of the '730 Patent, and therefore literally satisfy the "encoding means" limitations.

## IV. THE DISTRICT COURT'S *DAUBERT* ORDER BARRING DR. FERNALD FROM TESTIFYING TO HIS ULTIMATE CONCLUSION ON STRUCTURAL EQUIVALENCE

Sony moved to exclude Dr. Fernald's equivalence analysis on the grounds that he did not analyze the "way" prong of the function, way, result test. Appx1495-1497. In support of its requested relief, Sony attacked Dr. Fernald's analysis of the "way" prong on the grounds that he did not cite any schematics of the Bluetooth modules of the Accused Controllers and "fail[ed] to analyze critical components of Figure 4A," namely, the "flip-flop FF2," the "OSC (oscillator), or the clock generator 62." Appx1486-1489.

The district court agreed with Sony that Dr. Fernald had not provided any analysis of "where or how in the Bluetooth module the streams become synchronized" and did not "address whether the Bluetooth module contains components that are similar to a CODEC and a data selector, or operate similarly to a CODEC and a data selector." Appx31-32. The district court therefore barred Dr. Fernald from testifying at trial to his "ultimate conclusion that Block 34 of Figure 4A and the accused Bluetooth modules meet the function-way-result test for structural equivalency." Appx33. The district court, however, did not bar Dr.

Fernald from testifying regarding the substance of his opinions, including his opinions concerning his "description of Block 34 of Figure 4A, his description of the Bluetooth technology, and his inferences about what features must be contained in the accused Bluetooth modules to implement the specification." *Id. See also* Appx1839-1840 (district court permitted Dr. Fernald to testify to everything in his report other than his ultimate conclusion on structural equivalence).

Genuine Enabling filed a motion for reargument of the *Daubert* motion. Appx1789-1809. Genuine Enabling argued that, in its *Daubert* order, the district court had incorrectly defined the "way" the logic design at block 34 synchronizes the two data streams to require two specific components, a data selector and a CODEC (which is not within block 34). Appx1796. Genuine Enabling argued that the district court's definition of the "way" prong was improper, because the "way" in which the function is performed is a question of fact for the jury. Appx1796-1799. Genuine Enabling also argued that the district court's analysis improperly required a component-by-component analysis of equivalence, which this Court's precedent does not require. Appx1799-1801. Based on these arguments, Genuine Enabling requested that the district court permit Dr. Fernald to testify to his ultimate conclusion on structural equivalence.

The district court denied Genuine Enabling's motion for reargument, and barred Dr. Fernald from testifying to his ultimate conclusion. Appx62-77. The district court reconfirmed that Dr. Fernald would not be barred from providing testimony on any of the substantive issues addressed in his report: "I have not excluded any of Dr. Fernald's testimony of a technical or factual nature about how the claimed and accused structures operate or his opinions about how equivalence is viewed in the art." Appx77 at n.9. *See also* Appx6 ("I granted Sony's motion in part, agreeing with Sony that Dr. Fernald's analysis was incomplete and excluding Dr. Fernald's ultimate conclusion that the accused Bluetooth module was equivalent to block 34 of Figure 4A. However, I did not preclude Dr. Fernald from testifying that the accused Bluetooth module does in fact synchronize certain data streams to a common bit-rate clock.").

## V. THE DISTRICT COURT'S GRANT OF SUMMARY JUDGMENT OF NONINFRINGEMENT

Sony subsequently moved for summary judgment of noninfringement on the grounds that Genuine Enabling had insufficient evidence as a matter of law to prove that the logic in the Bluetooth modules of the Accused Controllers is equivalent to the "framer" limitations of the Asserted Claims. Appx1942-1946.[2]

---

[2] Sony moved for summary judgment on additional grounds as well, but the district court did not reach those grounds. Appx15 at n.2.

Echoing the district court's *Daubert* order, Sony argued that Dr. Fernald's testimony was insufficient to establish that the Accused Controllers synchronize the two data streams and encode them into a combined data stream in the same "way" that the framer of the '730 Patent does so: "Dr. Fernald's analysis shows only that the Bluetooth module must achieve a certain result—data streams synchronized to a common bit-rate clock—to satisfy other requirements of the system, and does not show how, i.e. the 'way,' that result is achieved …. Absent a demonstration of how the Bluetooth module achieves data streams synchronized to a common bit-rate clock, a conclusion that the claimed and accused structures function in substantially the same way cannot reliably follow." Appx1945.

The district court granted Sony's motion for summary judgment of noninfringement for the same reasons it excluded Dr. Fernald's ultimate conclusion on structural equivalence: "the same principles that warranted the partial exclusion of Dr. Fernald's equivalency analysis compel the conclusion that Genuine Enabling lacks sufficient evidence to prove that block 34 and the accused Bluetooth module synchronize signals in substantially the same 'way.'" Appx11-12.

The district court's summary judgment decision rested entirely on the "way" prong of the function/way/result test. The district court expressly found that Genuine Enabling could prove that the Bluetooth modules in the Accused

Controllers perform the identical defined functions: “There is no dispute that Genuine Enabling could prove that the accused Bluetooth module performs the same ‘function’ as block 34 of Figure 4A: that is, synchronizing and combining the two data streams.” Appx10. The district court also expressly found that Genuine Enabling could prove that the Bluetooth modules of the Accused Controllers achieve substantially the same result as the “framer” of the ‘730 Patent: “it is also not disputed that Genuine Enabling could prove that the Bluetooth module achieves substantially the same ‘result as block 34 of Figure 4A: a combined data stream.” Appx10. However, because the district court found that Genuine Enabling could not prove that the Bluetooth modules of the Accused Controllers performed the synchronizing and encoding functions in the same “way” that the “framer” of the ‘730 Patent performs those functions, the district court held that Genuine Enabling lacks sufficient evidence to establish that the Bluetooth modules of the Accused Controllers are structurally equivalent to the logic diagram disclosed in the ‘730 Patent. Appx2.

## SUMMARY OF THE ARGUMENT

The district court granted summary judgment of noninfringement on the grounds that Genuine Enabling could not prove structural equivalence between the logic design of the "framer" of the '730 Patent and the logic in the Bluetooth modules of the Accused Controllers as a matter of law. Specifically, the district court held that, because Dr. Fernald did not know the precise details of the logic design of the Bluetooth modules of the Accused Controllers, Dr. Fernald could not establish that the logic of the Bluetooth modules was structurally equivalent to the logic design of the "framer." That conclusion, however, ignores Dr. Fernald's detailed—**and undisputed**—analysis of equivalence in digital logic circuits. Dr. Fernald opined and testified that persons of ordinary skill in the art would understand that "logic structural equivalence relies on a comparison of the operation performed by the two logic designs, rather than a gate-by-gate and connection-by-connection comparison." Appx1589 at ¶ 64. Here, it is undisputed that the "logic design at block 34 in Figure 4A" and the logic in the Bluetooth modules of the Accused Controllers perform the **same operation**: synchronizing the two data streams to a common bit-rate clock. Based on Dr. Fernald's undisputed testimony, therefore, a jury could reasonably conclude that the two logic designs are equivalent. The district court's failure to consider and address this

evidence renders its summary judgment determination erroneous and mandates reversal of that determination and remand for trial.

The district court also made a legal error when it held that Dr. Fernald's testimony was insufficient to support a finding of equivalence because Dr. Fernald did not conduct a component-by-component analysis of equivalence. This Court's precedent clearly establishes that there is no requirement for a component-by-component analysis.

Finally, the district court made a second legal error when it rejected Dr. Fernald's definition of the "way" the logic design of the framer synchronizes the two data streams as a matter of law. This Court's precedent holds that the "way" in which inventions and devices operate, and the definition of the "way," are fact questions that require jury determination. The district court's rejection of Dr. Fernald's definition of the "way" erroneously took that question from the jury.

Because the district court erred in granting summary judgment of noninfringement, Genuine Enabling respectfully requests that this Court reverse the summary judgment determination and remand this case for a trial by jury.

## **ARGUMENT**

### I. STANDARD OF REVIEW

This Court reviews the district court's "grant of summary judgment de novo, without deference to the district court's determination." *Omega Eng'g, Inc. v.*

*Raytek Corp.*, 334 F.3d 1314, 1320 (Fed. Cir. 2003). "[W]e independently evaluate the evidence to determine whether there is a genuine issue of material fact and, if there is not, whether the party that moved for summary judgment is entitled to judgment on those facts." *Id.* at 1244. In determining whether there is a genuine issue of material fact, "the evidence must be viewed in the light most favorable to the party opposing the motion, with doubts resolved in favor of the opponent." *Prima Tek II, L.L.C. v. Polvpap, S.A.R.L.*, 318 F.3d 1143, 1147-48 (Fed. Cir. 2003), *quoting Chiuminatta Concrete Concepts. Inc. v. Cardinal Indus. Inc.*, 145 F.3d 1303, 1307 (Fed. Cir. 1998). The Court must draw all justifiable inferences in the nonmovant's favor. *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls. Inc.*, 340 F.3d 1298, 1306 (Fed. Cir. 2003). Summary judgment is proper only when no "reasonable jury could return a verdict for the nonmoving party." *Optical Disc Corp. v. Del Mar Avionics*, 208 F.3d 1324, 1333 (Fed. Cir. 2000), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Patent infringement, "whether literal or under the doctrine of equivalents, is a question of fact." *Advanced Steel Recovery, LLC v. X-Body Equip., Inc.*, 808 F.3d 1313, 1317 (Fed. Cir. 2015), *quoting Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1129-30 (Fed. Cir. 2011). "[E]quivalence is a factual matter normally reserved for a fact-finder, and the district court should grant summary judgment only "where no reasonable fact-finder could find equivalence"; this is a

"lofty standard." *Overhead Door Corp. v. Chamberlain Grp., Inc.*, 194 F.3d 1261, 1269 (Fed. Cir. 1999), *quoting Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1423 (Fed. Cir. 1997). A trial court "cannot reach a conclusive finding of noninfringement if the record shows some evidence supporting a finding of noninfringement and some evidence to the contrary." *AFG Indus., Inc. v. Cardinal IG Co., Inc.*, 375 F.3d 1367, 1371 (Fed. Cir. 2004).

This Court reviews a district court's decision to exclude expert testimony for an abuse of discretion. *Sound View Innovations, LLC v. Hulu, LLC*, 33 F.4th 1326, 1337 (Fed. Cir. 2022); *Sell v. Ingersoll-Rand Co.*, 136 Fed. Appx. 545, 546 (3d Cir. 2005).

## II. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT OF NONINFRINGEMENT BECAUSE DR. FERNALD'S EXPERT ANALYSIS AND TESTIMONY SUPPORTS A FINDING OF STRUCTURAL EQUIVALENCE

### A. The Sole Basis for the District Court's Summary Judgment Determination Is Its Holding that Genuine Enabling Cannot Prove the "Way" Prong of the "Function-Way-Result" Test for Equivalence

The district court's summary judgment determination rests upon a single limitation of the accused claims: the "framer" limitations. The district court construed the framer limitations to be means-plus-function limitations, construed the required functions to be "synchronizing the user input stream with the input stream and encoding the user input stream and the input stream into a combined

data stream," and identified the corresponding structure from the specification as "the logic design at block 34 in Figure 4A and equivalents thereof."

Dr. Fernald did not opine that Sony's accused products incorporated the exact structure of the logic design at block 34. Appx1804 at ¶¶ 4-5. Instead, he opined that the accused products incorporate structures—binary logic in Bluetooth modules—that are structurally equivalent to the logic design at block 34. *Id.* at ¶¶ 4-5; Appx1807 at ¶ 11. His conclusion was based on his analysis of the two structures under the "function, way, result" test. *Id.*; Appx1590-1610 at ¶¶ 101-135. Based on his testing and analysis of the Accused Controllers, Dr. Fernald concluded that the logic in the Bluetooth modules performs the same functions required by the district court's construction of "framer," and does so in substantially the same way to achieve substantially the same result.

Dr. Fernald's conclusions that the logic in the Bluetooth modules of the Accused Controllers performs the same functions as the framer of the '730 Patent, and achieves substantially the same result, is undisputed:

> There is no dispute that Genuine Enabling could prove that the accused Bluetooth module performs the same "function" as block 34 of Figure 4A: that is, synchronizing and combining the two data streams. It is also not disputed that Genuine Enabling could prove that the Bluetooth module achieves substantially the same "result" as block 34 of Figure 4A: a combined data stream.

Appx10. The sole basis for the district court's noninfringement determination is the district court's conclusion that Genuine Enabling and Dr. Fernald could not present evidence sufficient to prove that the logic in the Bluetooth modules of the Accused Controllers synchronizes and encodes the data streams **in substantially the same way** that the framer of the '730 Patent does.

The district court's conclusion is wrong. Dr. Fernald provided significant, detailed testimony and analysis to establish that both the framer of the '730 Patent and the logic in the Bluetooth modules of the Accused Controllers synchronize the two data streams to one another by synchronizing both data streams to a common bit-rate clock, and **this analysis and testimony is undisputed**. Dr. Fernald also presented detailed testimony and analysis establishing that the structures that perform the required functions in the Accused Controllers—**logic** in the Bluetooth modules—is equivalent to the identified structure in the '730 Patent: the "**logic design** at block 34 in Figure 4A." As Dr. Fernald explains, to persons of ordinary skill in the art, all logic designs that perform the same operations are equivalent, regardless of the precise logic gates and connections used to create those logic designs. All of this evidence must be viewed in the light most favorable to Genuine Enabling, with doubts resolved in Genuine Enabling's favor. *Prima Tek*, 318 F.3d at 1147-48.

Because it is undisputed that the logic in the Bluetooth modules of the Accused Controllers performs the same operations (synchronizing and encoding the two data streams) in the same way (synchronizing the two data streams to a common bit-rate clock), Dr. Fernald's testimony provides sufficient evidence to support a finding that the logic in the Bluetooth modules of the Accused Controllers is structurally equivalent to the logic design at block 34 in Figure 4A of the '730 Patent. Therefore, Genuine Enabling respectfully requests that the Court reverse the district court's grant of summary judgment of noninfringement and remand this case for trial.

### B. Dr. Fernald's Analysis of the "Way" the Framer of the '730 Patent Synchronizes the Two Data Streams

Dr. Fernald began his structural equivalence analysis with an analysis of the framer of the '730 Patent and the way in which it synchronizes the two data streams.[3] The identified structure is "the logic design at block 34 in Figure 4A and equivalents thereto," reproduced below.

---

[3] Naturally, Dr. Fernald also addressed the way in which the framer of the '730 Patent encodes the two data streams into a combined data stream. In both its *Daubert* order and its summary judgment order, however, the district court focused its discussion on the synchronizing function because it "best illustrates" the issues. Appx24. Therefore, Genuine Enabling focuses here on the analysis of the "synchronizing" function. Because the district court did not explicitly discuss the encoding function in its orders, Genuine Enabling will only briefly address that function below.




As Dr. Fernald stated, "block 34" is indicated by the dashed line. Appx1805-1806 at ¶ 7. The figure depicts a handful of binary logic gates, such as these symbols:



. *Id.* Dr. Fernald noted that other components in block 34 are simple boxes identified by name, such as two flip-flops (FF 1 and FF 2), an oscillator (OSC), a clock generator (item 62), and a data selector (item 50). *Id.*

Dr. Fernald explained that nearly all[4] of the named boxes in block 34—the data selector, clock generator, and the rest—are simply binary logic components that are themselves made up of binary logic gates. Appx1806 at ¶ 8. That is why both the '730 Patent and the district court's construction of the "framer" refer to "**the logic design**" at block 34. *Id.* The same is true, at least in part, of the CODEC, which appears in Figure 4A outside of block 34. *Id.*

After describing and explaining block 34, Dr. Fernald proceeded to explain the way in which the logic at block 34 synchronizes the two data streams. Appx1808 at ¶ 14; Appx1604-1605 at ¶¶ 124-125. Dr. Fernald concluded that the "way" that block 34 of Figure 4A synchronizes the two data streams is by **sampling both streams using a common bit clock, thereby synchronizing the streams to one another**: "The logic of block 34 … accomplishes this synchronization by sampling both streams using a common bit-rate clock …." Appx1604 at ¶ 124. *See also* Appx1605 at ¶ 125 ("[T]he logic of block 34 … synchronizes each of the bits of the input stream and user input stream (UI above) to the rising edge of the BCLK clock (shown at the top), thereby synchronizing the two streams together."); Appx1808 at ¶ 15; Appx2180 at ¶ 19 (Nguyen testimony). The only "component" (other than the bit clock) of block 34 that plays a role in

---

[4] Though the OSC block (an oscillator) can be designed using only logic gates, it is much more common for such oscillators to be an analog circuit. Appx1806 at n.1.

synchronizing the two data streams is the "data selector 50," which "selects" or "samples" the data streams, thereby synchronizing the data streams to a bit clock. Appx1605 at ¶ 125-126. Notably, Dr. Fernald's testimony on this point **is undisputed.** Appx1808 at ¶ 16.

### C. Dr. Fernald's Analysis of the "Way" the Logic in the Bluetooth Modules of the Accused Controllers Synchronizes the Two Data Streams

#### 1. It is Undisputed that The Logic in the Bluetooth Modules of the Accused Products Synchronizes the Two Data Streams by Synchronizing Both Data Streams to a Common Bit-Rate Clock

Dr. Fernald next turned to his analysis of the "way" in which the relevant structures of the Accused Controllers synchronize the two data streams. Dr. Fernald concluded that the logic in the Bluetooth modules of the Accused Controllers synchronizes the two data streams "by synchronizing both streams to a common bit clock": that is, in substantially the same way that the logic design at block 34 in Figure 4A does. Appx1605-1608 at ¶¶ 127-131; Appx1810 at ¶ 20. Dr. Fernald described his analysis in detail. Appx1605-1610 at ¶¶ 127-135. His investigation determined that the Accused Controllers use particular formats of Bluetooth packets when transmitting the payload data, which includes the data from the buttons, the accelerometers, and the microphones (that is, the user input stream and the input stream). When the logic in the Bluetooth modules implements the Bluetooth protocol, it processes the bitstream in several ways, including for

CRC generation and for whitening. Appx1605-1607 at ¶¶ 127-129. For these processes to work properly, the data "must be synchronized to the same bit clock …." Appx1607-1608 at ¶ 131. Thus, the logic in the Bluetooth modules necessarily synchronizes the data streams to a common bit clock prior to such processing. Appx1589 at ¶ 64; Appx1810 at ¶ 20.[5]

Dr. Fernald's analysis on this point, too, **is undisputed**. Neither Sony nor its expert disputed that the Sony accused products all incorporate Bluetooth modules, that the Bluetooth modules are comprised of logic, or that the logic in the Bluetooth modules synchronizes the data streams by synchronizing the streams to a common bit-rate clock. Appx1807 at ¶¶ 12; Appx1811 at ¶ 23. As the district court recognized in its summary judgment memorandum:

> Genuine Enabling responds that it will prove that the accused Bluetooth module and block 34 of Figure 4A synchronize data streams in the same "way" because both synchronize data streams to a common bit-rate clock as opposed to by some other method, such as synchronizing the data streams directly to each other without a clock. **Sony does not dispute the factual accuracy of this assertion**, and, indeed, my prior Daubert ruling did not preclude Dr. Fernald from offering this testimony.

Appx11 (emphasis added).

---

[5] Mr. Nguyen's testimony, which is not disputed by Sony, confirms this analysis. Appx2176-2177 at ¶ 10. His analysis is at Appx2178-2181 at ¶¶ 17-21.

2. It is Undisputed that Logic Designs that Perform the Same Function in the Same Way are Equivalent to Persons of Ordinary Skill in the Art

Having compared the "way" both structures synchronize the two data streams, and having concluded that both structures synchronize the two data streams in substantially the same way, Dr. Fernald analyzed the **structures themselves** to determine whether "a person of ordinary skill in the art would find that any differences between the two are 'insubstantial.'" Appx1590-1610 at ¶¶ 101-135. *See also* Appx9, citing *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999) ("[s]tructural equivalence under §112, ¶ 6 is met only if the differences are insubstantial").

As Dr. Fernald's analysis and testimony make clear, all of the relevant structures in this comparison are logic components or logic designs made up of binary logic gates. The district court identified the structure associated with the framer limitations as the "**logic design** at block 34 in Figure 4A," Appx4, Appx9 (emphasis added), correctly reflecting the inventor's description of Figure 4A as showing "one **logic design** of [an] embodiment of the invention." Appx172 at 3:16-17 (emphasis added). *See also id.* at 4:4 (referring to "a framing logic means called framer 34"). Although Figure 4A shows boxes identified as "data selector 50," "clock generator 62," "CODEC," and the like, Appx168 at Figure 4A and Appx173 at 5:1-64, it is undisputed that those components are also digital logic.

Appx1806 at ¶ 8. It is also undisputed that the relevant structures in the Accused Controllers are digital logic: specifically, logic in the Bluetooth modules of the Accused Controllers. Appx1807 at ¶¶ 12; Appx1811 at ¶ 23.

Because the structural equivalence analysis in this case requires a comparison of two logic designs, Dr. Fernald provided the district court with detailed expert analysis and evidence regarding how persons of ordinary skill in the art evaluate equivalence of digital logic design. Appx1585-1589 at ¶¶ 53-64. Dr. Fernald first taught the district court that the "design of digital logic is a process by which a desired operation is accomplished through a combination, as needed, of logic gates to perform various Boolean operations, and memory gates to provide digital state storage." Appx1585 at ¶ 53. Dr. Fernald also identified commonly-used logic gates and the Boolean equations and notation used to textually describe operations performed by logic gates. Appx1585 at ¶ 54.

Dr. Fernald then opined that, to persons of ordinary skill in the art, "two logic designs could be structurally equivalent without the two logic designs using the exact same types of logic gates connected in the exact same manner." Appx1586 at ¶ 55. To persons of skill in the art, structural equivalence of logic designs does not depend on a comparison of the logic gates, but instead on a comparison of the **operations performed by the logic designs**: "a POSITA would understand that logic structural equivalence relies on a comparison of the operation

performed by the two logic designs, rather than a gate-by-gate and connection-by-connection comparison." Appx1589 at ¶ 64. In other words, to persons of ordinary skill in the art, two logic designs are equivalent if they perform the same operation. *Id.*; Appx1610 at ¶ 135; Appx1814 at ¶ 29; Appx2185 at ¶ 34 (Nguyen testimony).

Dr. Fernald's conclusion regarding the nature of equivalence between logic designs was not based on his ipse dixit; Dr. Fernald cited substantial authority supporting his opinion testimony. As Dr. Fernald stated, "the most fundamental laws and theorems in digital logic design provide the foundation for this understanding by a POSITA." Appx1586 at ¶ 55. Although there are "dozens of such laws and theorems," Dr. Fernald focused "on a few select examples" that he documented with three textbooks or treatises. Appx1586-1589 at ¶¶ 55-63 and n.7 through n.13.

For example, Dr. Fernald cited "the distributive law" and provided examples of logic designs that are equivalent even though they are made up of different logic gates in different configurations, such as:



Appx1586-1587 at ¶¶ 56-58. Although these three logic designs use the same types of logic gates, they are arranged and connected in different configurations; they are nevertheless equivalent because they perform the same operations. *Id.* Dr. Fernald also explained an "even more powerful theorem, called the De Morgan theorem," which equates logic designs that perform the same functions even if they have no gates in common, such as this example:




Appx1587 at ¶¶ 59-60. In fact, as Dr. Fernald explained, an "interesting artifact of the dozens of laws and theorems relating to equating various digital logic designs is the conclusion that ***any digital function*** can be implemented using only NOR gates or only NAND gates. … [T]wo identical computers could be designed, one using only NOR gates and one using only NAND gates. The result would be two logic designs which implement the exact same computer instructions, yet would not share a single gate type in common." Appx1587-1588. at ¶ 61.

Based on these “logic design laws, theorems, and design conventions,” Dr. Fernald concluded and opined that a person of ordinary skill in the art would “understand that logic structural equivalence relies on a comparison of the operation performed by the two logic designs, rather than a gate-by-gate and connection-by-connection comparison.” Appx1589 at ¶ 64. Remarkably, Dr. Fernald’s analysis of logic design structural equivalence and his conclusions **were not disputed by Sony or its expert witness**. Appx1814 at ¶ 29. Thus, it is undisputed that if the “logic design at block 34 in Figure 4A” and the logic in the Bluetooth modules of the Accused Controllers perform the same operations to synchronize the user input stream with the input stream, then the two logic designs are equivalent, *i.e.*, any differences between the two structures are insubstantial.

3. It is Undisputed that the Framer of the ‘730 Patent and the Logic in the Bluetooth Modules of the Accused Controllers Perform the Same Operations: Synchronizing the Two Data Streams to a Common Bit-Rate Clock

After explaining equivalence in the field of logic design to the district court, Dr. Fernald proceeded to compare the logic in the Bluetooth modules of the Accused Controllers to the “logic design at block 34 in Figure 4A” to determine whether they were structurally equivalent. Through that analysis, Dr. Fernald determined that the logic in the Bluetooth modules of the Accused Controllers performs the same functions in substantially the same way as the logic design of

block 34 in Figure 4A. Appx1604-1610 at ¶¶ 124-135. *See also* Appx2181-2183 at ¶¶ 22-26 (Nguyen testimony).

Although Dr. Fernald did not know the precise logic gates that make up the logic design **in either structure**, Dr. Fernald's description of the concept of equivalence in logic design confirms that such knowledge is unnecessary. The '730 Patent does not show or describe the logic gates used in the "data selector 50," the "clock generator 62," the "CODEC," or either flip-flip ("FF 1" and "FF 2"). In fact, "[a]ny number of logic designs could be used to create the circuits … disclosed and depicted [in Figured 4A]." Appx2185 at ¶ 34. And Dr. Fernald did not have detailed schematics of the Bluetooth modules of the Accused Controllers that would show the logic gates used to synchronize the data streams. But, as Dr. Fernald clearly explained in his expert report, knowledge of the exact components of the logic in the Bluetooth modules of the accused products or in the logic design at block 34 in Figure 4A is unnecessary for a person of skill in the art to conclude that they are structurally equivalent. Appx1814 at ¶ 29; Appx1585-1589 at ¶¶ 55-64.

Based on his analysis of the relevant structures and the fundamental laws and theorems of logic design, Dr. Fernald determined that "the logic in the Bluetooth modules perform the same operation, specifically synchronizing the two streams to a common bit clock, as the logic design in block 34 of Figure 4A, and

hence is structurally equivalent to the logic design of block 34." Appx1610 at ¶ 135. This analysis and opinion testimony is sufficient to support a finding of structural equivalence, and hence to support an infringement verdict. Accordingly, this Court should reverse the district court's summary judgment determination.

### D. Dr. Fernald's Analysis of the "Encoding" Function

As noted above, the district court focused its discussion on the synchronizing function because it "best illustrates" the issues. Appx24 at 6. Therefore, Genuine Enabling focuses herein on the analysis of the "synchronizing" function. Nevertheless, even though the district court did not explicitly discuss the encoding function in its orders, Genuine Enabling briefly addresses that function here.

Dr. Fernald analyzed the operation of block 34 in Figure 4A in detail in order to determine the "way" in which that structure (and its components) performed the encoding function. Dr. Fernald concluded and opined that, in the identified structure, "the two streams are combined in a specific way to generate the combined data stream, i.e., by placing the stream values into predetermined locations in the combined data stream …." Appx1591 at ¶ 102. The logic in the "data selector 50" is the structure that encodes the two data streams into a combined data stream. Appx1605 at ¶¶ 125-126, *citing* Appx173 at 5:41-50 ("Both UI stream 24 and input stream SX are synchronized [sic] and encoded into a single

signal RXD* by data selector 50 under control of signal SEL"). The result is a combined data stream incorporating the stream values in the predetermined locations.

Dr. Fernald concluded that the logic in the Bluetooth modules of the Sony accused products performs the "encoding" function in substantially the same way, by "serializ[ing] this data block [with data from both streams] right-to-left, then top-to-bottom, thereby forming a serial combined data stream." Appx1598 at ¶ 113. Thus, the logic in the Bluetooth modules incorporates logic gates (structure) that are equivalent to the "data selector 50" of the logic design at block 34 in Figure 4A. Appx1593-1604 at ¶¶ 107-123. Dr. Fernald also concluded that the logic in the Bluetooth modules of the Sony accused products achieves substantially the same result as that achieved by block 34 in Figure 4A of the '730 Patent: "The result is a stream of digital bits, where user input stream values … and input stream values … are assigned to predetermined locations in the combined data stream by this serialization process." Appx1598 at ¶ 113.

## III. THE DISTRICT COURT ERRED IN CONCLUDING THAT GENUINE ENABLING COULD NOT PROVE STRUCTURAL EQUIVALENCE

### A. The District Court Incorrectly Concluded that Dr. Fernald's Testimony Regarding Equivalence in Digital Logic Design Is Insufficient to Establish Equivalence

#### 1. The District Court Erroneously Discounted Dr. Fernald's Testimony About Equivalence in the Field of Logic Design

The district court held that Dr. Fernald's analysis was insufficient to prove structural equivalence because Dr. Fernald purportedly did not explain "**how** the accused Bluetooth module **caused** the two data streams to become synchronized to a common bit-rate clock," and that "it was therefore impossible to tell whether any conceivable variation from block 34 was 'substantial.'" Appx6. The district court's holding was apparently based on its conclusion that Dr. Fernald only determined that both structures used a bit-rate clock, but did not analyze any other structures, similarities, or differences between the two structures:

> Notably, block 34 of Figure 4A included more details than simply the presence of a bit-rate clock (e.g., a data selector, a clock generator, and a signal sent to a CO-DEC), and Dr. Fernald had performed no analysis of whether those details or the corresponding unknown details in the accused Bluetooth module should be viewed as substantial from the perspective of one of ordinary skill in the art. (Reargument Opinion, ECF No. 316, at 10-12.)

Appx6-7.

The district court's analysis is erroneous because it ignores the central, undisputed basis for Dr. Fernald's structural equivalence analysis: his testimony

that, in the field of logic design, all logic designs that perform the same functions in the same way are equivalent. *See supra*, pp. 34-38. *See also* Appx2306-2308 (summary judgment hearing transcript addressing logic design equivalence). Based on this analysis—which, again, **was undisputed**—Dr. Fernald was able to conclude that the logic in the Bluetooth modules of the Accused Controllers is equivalent to the logic design at block 34 of Figure 4A.

The district court did not ever substantively address or consider Dr. Fernald's analysis, but instead simply dismissed it as testimony that "highlight[s] the use of **algebraic properties** to **transform simple digital circuits into equivalent ones**." Appx28. That characterization misses the conclusion based on these principles: that persons of ordinary skill in the art view two logic designs that perform the same operations as equivalent, regardless of the exact gates and connections used in the logic designs. The district court compounded its error by then asserting that "Dr. Fernald does not apply those [digital logic design] principles to the accused product or even reference them by analogy." Appx30. But the district court's statement is demonstrably wrong. After explaining why a person of ordinary skill would understand that the "**logic structural equivalence** relies on a comparison of the **operation performed** by the two logic designs, rather than a gate-by-gate and connection by connection comparison," Appx1589 at ¶ 64, Dr. Fernald expressly applied that principle in concluding that the logic in

the Bluetooth modules is equivalent to the "logic design at block 34": "Further, the logic in the Bluetooth modules **perform the same operation**, specifically synchronizing the two streams to a common bit clock, as the logic design in block 34 of Figure 4A, and **hence is structurally equivalent to the logic design of block 34**." Appx1610 at ¶ 135. The district court's failure to understand and consider Dr. Fernald's testimony renders the district court's conclusions erroneous and requires that summary judgment of noninfringement be reversed.

This Court's decision in *Overhead Door* is analogous to this case and demonstrates why Dr. Fernald's testimony about the nature of equivalence in logic design creates a material factual dispute for trial. 194 F.3d at 1261. The relevant infringement issue in *Overhead Door* turned on the claim limitation "memory selection switch." *Id.* at 1269. Although the limitation was construed to include only <u>hardware switches</u>, the plaintiff's expert opined that the accused devices, which incorporated a <u>software switch</u>, infringed the claims under the doctrine of equivalents. *Id.* at 1269. Although the "components" of the software switches in the accused products were necessarily different from the components of a hardware switch, the plaintiff's expert opined that in "the computing art," software processes can be equivalent to hardware processes when they perform the same function: "Dr. Rhyne averred … [that it is a] fundamental and well understood tenet of the computing art [that] … '[a]ny software process can be transformed into an

equivalent hardware process, and any hardware process can be transformed into an equivalent software process.'" *Id.* at 1269. Based on that expert testimony, this Court reversed the district court's summary judgment determination of non-infringement, holding that the evidence was sufficient to support a finding of infringement under the doctrine of equivalents:

> This record evidence shows that one of skill in the art would recognize these alternative systems as interchangeable substitutes. Drawing all reasonable inferences in favor of Chamberlain, as this court must in reviewing the summary judgment of non-infringement, this court concludes that Dr. Rhyne's statements and supporting citations to computer science literature show a genuine issue of material fact precluding summary judgment.

*Id.* at 1270.

Dr. Fernald's testimony in this case is analogous to that of the plaintiff's expert in *Overhead Door*. Like the expert in *Overhead Door*, Dr. Fernald based his equivalence analysis not on a component-by-component comparison, but on well-understood principles holding that two different structures that perform the same operation or function are equivalent. This evidence, like the expert testimony in *Overhead Door*, is sufficient to support a jury finding that the two structures are equivalent, mandating reversal of the district court's summary judgment determination.

### 2. Dr. Fernald Did Find That the Logic in the Bluetooth Modules Is Equivalent to the Relevant Components of the "Logic Design at Block 34 in Figure 4A"

Even though Dr. Fernald was not required to conduct a component-by-component analysis of the equivalence of the two structures, he did in fact determine that the logic in the Bluetooth modules of the Accused Controllers incorporate logic (structures) that are equivalent to the component of "the logic design at block 34 in Figure 4A" of the '730 Patent.

As the district court noted, the "structure corresponding to the 'framer' limitation … does include at least a **data selector** that alternately selects between the two streams to synchronize them." Appx72-73 (emphasis added). In fact, the "data selector 50" is the **only** component (other than the clock) shown in block 34 of Figure 4A that plays a role in synchronizing the two data streams. The '730 Patent teaches (in the only passage of the specification that refers to the "data selector") that the "data selector 50" "select[s]" or "samples" the data streams and, when it does so, synchronizes the data streams to a bit clock. Appx1605 at ¶¶ 125-126, *citing* Appx173 at 5:41-50. *See also id.* ("[b]oth UI stream 24 and input stream SX are synchronized [sic] and encoded into a single signal RXD* by data selector 50 under the control of signal SEL").

Contrary to the district court's assertions, Dr. Fernald did, in fact, determine that the logic in the Bluetooth modules of the Accused Controllers "selects" or

"samples" the two data streams and, when it does so, synchronizes the data streams to a bit clock.[6] As Dr. Fernald explained to the district court, he used "synchronizing" and "sampling"/"selecting" interchangeably in his report when discussing the logic design at block 34 in Figure 4A and the logic in the Bluetooth modules of the Sony Accused Controllers. Appx1815-1816 at ¶ 31-32. That is because a person of ordinary skill in the art would understand that "'synchronizing' to a common clock **is synonymous with** 'sampling' using a common clock." Appx1815-1816 at ¶ 32. In fact, "the only way to synchronize a signal to a clock using digital logic is to sample the signal using the clock." Appx1815-1816 at ¶ 32. *See also* Appx1894-1895 (same); Appx2180 at ¶ 20 (Nguyen testimony on same point). Thus, when Dr. Fernald opined that the logic in the Bluetooth modules of the Accused Controllers "synchronize the user input stream with the input stream by synchronizing both streams to a common bit clock," Appx1604-1610 at ¶ 127-135, he was opining that the logic in the Bluetooth controllers "samples" or "selects" the user input stream and the input stream, thereby synchronizing them to the bit clock, **precisely as the "data selector 50" of block 34 does**. As Dr. Fernald explained—and again his testimony **is undisputed**—the logic in the Bluetooth modules synchronizes the two data

---

[6] As noted, Dr. Fernald bases his conclusions in part on his analysis of the "bit processes" in Bluetooth. Appx1605-1606 at ¶¶ 126-128.

streams to a bit rate clock "'**sampling**' [the data streams] using a common clock," just as the data selector of block 34 does. Appx1815-1816 at ¶¶ 31-32 (emphasis added). In other words, Dr. Fernald did find that the logic of the Bluetooth modules includes logic—structures—that are equivalent to the "data selector 50" because they do exactly the same thing, even if they are not labeled a "data selector." In fact, Dr. Fernald testified that the logic in the Bluetooth modules necessarily have structures—logic designs or "pieces of logic"—that are equivalent to a data selector, a clock generator, a CODEC, and the rest, even though they may not be "specifically called a CODEC or … a data selector." Appx1187, Appx1893.

Thus, the only rationale underlying the district court's summary judgment determination—that Dr. Fernald did not address any of the components within block 34 in his analysis of the logic in the Bluetooth modules of the Accused Controllers—is simply incorrect. As Dr. Fernald opined, both the logic design at block 34 and the logic in the Bluetooth modules have structures—called a "data selector" in block 34 and an unnamed logic block in the logic in the Bluetooth module—that select the data streams, thereby synchronizing them to a common bit clock. That fact alone renders the district court's summary judgment determination erroneous and mandates reversal.

### 3. The District Court's "Paperclip and Paperweight" Analogy is Fatally Flawed

Dr. Fernald's analysis explains why the district court's "paperclip and paperweight" analogy is inapposite. Appx12. According to the district court:

> [a] paperclip and a paperweight … are similar in that they both apply pressure to paper but different in that one uses bent metal while the other uses gravity. … To say that the "way" both devices work is by applying pressure to paper just begs the question of whether the omitted details (bent metal and gravity) are insubstantial.
>
> Here, analogously, Genuine Enabling argues that block 34 and the Bluetooth module are equivalent because both synchronize data streams using a bit-rate clock. But Genuine Enabling does not explain why a person of ordinary skill in the art would view other details about the two structures as less significant. In particular, Genuine Enabling has pointed to essentially no information regarding how the accused Bluetooth module operates other than that a bit-rate clock is involved somehow. Missing is any explanation of how the Bluetooth module differs from block 34 or why a person of ordinary skill in the art would view these unknown differences as "insubstantial." … A factfinder would be left with no basis to draw the inference that block 34 and the accused Bluetooth module synchronize data streams in substantially the same way.

*Id.* As explained above, though, Dr. Fernald **did explain** "why a person of ordinary skill in the art would view these unknown differences as 'insubstantial.'" Dr. Fernald explained that a person of ordinary skill in the art would understand that, even though the precise **logic gates** in both structures are "unknown," the **logic designs** are equivalent because they perform the same function in the same way.

To use the district court's "paperclip and paperweight" analogy, Dr. Fernald's analysis and testimony regarding logic design in the framer of the '730 Patent and in the Bluetooth modules of the Accused Controllers is analogous to testimony that two structures use "bent metal"—paperclips—to apply pressure to the paper. Even if one does not know the size or shape of the paperclip—just as Dr. Fernald does not know the exact logic gates used in the logic of the Bluetooth modules—one can nevertheless conclude that the paperclips operate in the same way—by applying pressure to the paper using bent metal. The size and shape of the paperclips has no bearing on the way in which they work.

4. <u>The District Court's Reliance on *VLSI Tech. is Erroneous*</u>

The *VLSI Tech.* case relied upon by the district court is fundamentally different from this case. *See* Appx12-13, *citing VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332 (Fed. Cir. 2023). In *VLSI Tech.*, the plaintiff's expert admitted that there was a key structural difference <u>relevant to the way the function was performed</u> between the accused device and the structure identified in the patent. Specifically, the claim required that one component make the request and a second component receive and act on the request, whereas in the accused device, "[a]ccording to VLSI itself," the "request function is split between two physical components … with the request complete only in the second component, and receipt and output occur within the second component as well." *Id.* at 1344. As this

Court recognized, the plaintiff and its expert completely failed to address this admitted difference between the accused device and the claims. *Id.* The expert did not provide any testimony comparing the operation of the accused devices to the operation of the claimed invention with respect to the "request" function. Understandably, in the absence of any "meaningful testimony" whatsoever on this admitted difference, the Federal Circuit found that the function-way-result test was not met.

Here, in contrast, Dr. Fernald did not conclude, let alone admit that there are any relevant structural differences between the logic in the Bluetooth modules of the Accused Controllers and the logic design at block 34 in Figure 4A of the '730 Patent. And, contrary to the district court's assertion, Dr. Fernald **did provide detailed testimony about** "why any differences [between the logic in the Bluetooth modules of the Accused Controllers and the logic design at block 34] should be viewed as insubstantial." Appx13. In fact, as explained above, Dr. Fernald provided detailed and uncontradicted opinion testimony, based on scientific laws, principles of logic design, and specific real-world examples, that two logic designs that perform the same functions in the same way **are substantially the same** regardless of and differences in the specific logic gates used in the two logic designs. *See supra*, pp. 34-38. This aspect of Dr. Fernald's

testimony—which Sony and its expert **did not dispute** and which the district court did not substantively address—renders *VSLI Techs.* inapposite.

### B. The District Court Incorrectly Required Dr. Fernald to Perform a Component-by-Component Analysis

The district court's summary judgment determination is also based on a fundamental legal error: the district court granted Sony's motion because Dr. Fernald did not conduct a component-by-component comparison of the logic of the Bluetooth modules of the Accused Controllers to the framer of the '730 Patent. The origin of the district court's error lie in Sony's *Daubert* motion to exclude Dr. Fernald's testimony. In that motion, Sony attacked Dr. Fernald's analysis of the "way" prong on the grounds that he did not cite any schematics of the Bluetooth modules and "fail[ed] to analyze critical components of Figure 4A," namely, the "flip-flop FF2," the "OSC (oscillator), or the clock generator 62." Appx1716-1719. The Court concluded, in its *Daubert* Memorandum, that Dr. Fernald had not provided any analysis of "where or how in the Bluetooth module the streams become synchronized" and did not "address whether the Bluetooth module contains components that are similar to a CODEC[7] and a data selector, or operate

---

[7] The CODEC is outside of "block 34 of Figure 4A," the structure identified by the district court in its construction of the "framer" limitations. Appx168 at Fig. 4A. Therefore, even if Dr. Fernald were required to conduct a component-by-component analysis, he would not be required to find a CODEC in the Bluetooth modules.

similarly to a CODEC and a data selector." Appx31-32. The district court therefore barred Dr. Fernald from testifying to his ultimate conclusion on structural equivalency at least in part because Dr. Fernald did not conduct a component-by-component analysis.

The district court's error carried through to its summary judgment memorandum. There, the district court held that Dr. Fernald's testimony was insufficient to support a finding of equivalence because he did not analyze enough "details" (meaning the components) of block 34 of Figure 4A:

> Notably, block 34 of Figure 4A included more details than simply the presence of a bit-rate clock (e.g., a data selector, a clock generator, and a signal sent to a CODEC), and Dr. Fernald had performed no analysis of whether those details or the corresponding unknown details in the accused Bluetooth module should be viewed as substantial from the perspective of one of ordinary skill in the art. (Reargument Opinion, ECF No. 316, at 10-12.)

Appx6-7. *See also* Appx11 (citing Sony's contention that Dr. Fernald's analysis is "insufficient as a matter of law" because it did not address components other than "just a bit-rate clock").

This Court has long held that Section 112, ¶ 6 does not require a "component-by-component analysis of structural equivalence"; only the overall structures must be compared. *Odetics*, 185 F.3d at 1267-68. Indeed, "[t]he individual components, if any, of an overall structure that corresponds to the claimed function are not claim limitations. Rather, the claim limitation is the

overall structure corresponding to the claimed function." *Id.* at 1268. "The appropriate degree of specificity is provided by the statute itself; the relevant structure is that which 'corresponds' to the claimed function. … Further deconstruction or parsing is incorrect." *Id.* at 1268 (internal citations omitted).

Even though a component-by-component analysis is not required or proper, this Court's precedent allows for "greater weight" to be given to individual components that play a central role. "[O]ur case law allows for greater weight to be given to individual components that play a central role in the identified structure." *Solomon Techs., Inc. v. International Trade Comm'n*, 524 F.3d 1310, 1317 (Fed. Cir. 2008), *citing Toro Co. v. Deere & Co.*, 355 F3d 1313, 1324 (Fed. Cir. 2004). Here, the district court did not make any finding that any individual component of the logic at block 34 in Figure 4A is indispensable or plays a central role in the synchronizing function, and there is no support for such a finding with respect to any component other than the bit-rate clock (which Dr. Fernald found in the Accused Controllers).

Regardless, this case is unlike the cases that authorize "greater weight" to particular components. In *Solomon*, the patentee himself emphasized the central role of the relevant component in overcoming a rejection in the patent office. *Id.* Similarly, in *Toro*, the patentee did not dispute that the cam at issue was in indispensable part of the overall structure. *Toro*, 355 F.3d at 1324.

This is irrelevant in any event. A patentee proves structural equivalency in the presence of structures that are indispensable or central to the function if it shows that the component **or its equivalent** is present in the accused product. Dr. Fernald's analysis shows that the logic in the Bluetooth modules of the Sony accused products are equivalent to the logic at block 34 in Figure 4A of the '730 Patent, **which includes** the and data selector and other logic components. Appx1810-1815 at ¶¶ 19-30. There was no need for Dr. Fernald to look at a schematic of the Bluetooth module to reach this conclusion. *In re Hayes Microcomputer Prods. Inc. Patent Litigation*, 982 F.2d 1527, 1540 (Fed. Cir. 1992). In *Hayes*, the defendant appealed a jury verdict of infringement, asserting that the only evidence of infringement was the testimony of patentee's expert, who "had no knowledge of the structure of the [accused] product." *Id.* at 1540. Specifically, the defendant argued that the expert's testimony did not establish that the accused products met a means-plus-function limitation because they had equivalent structure. This Court rejected that argument, because although patentee's expert "had no knowledge of the internal structure of the accused products," he analyzed the operations of the accused modems and manually tested them. *Id.* at 1541. The expert was thus able to provide sufficient evidence to prove section 112, ¶ 6 equivalence. *Id.* at 1541-1543. Here, Dr. Fernald did not analyze the specific logic gates within the Bluetooth modules, but analyzed the operations

of the Accused Controllers and manually tested them. He properly concluded based on that analysis that the logic in the Bluetooth modules of the Accused Controllers is structurally equivalent to the logic design at block 34 in Figure 4A of the '730 Patent. With digital logic designs in particular, a component-by-component analysis is not required. Appx1814 at ¶ 29.

Although Dr. Fernald did not specifically analyze the logic of the Bluetooth modules in the Sony Accused Controllers to see if they incorporated structures that were **specifically named** "data selector" or "CODEC," Dr. Fernald **did** analyze the Accused Controllers to see if they incorporate any structure—by whatever name—that performs the relevant functions performed by the data selector and CODEC in Figure 4A. Appx1809 at ¶ 18. In that analysis, he properly focused only on the functions of the data selector and CODEC that are relevant to the synchronizing and encoding functions. Appx1806-1807 at ¶ 9. And, as explained above, he concluded that the logic in the Bluetooth modules of the Accused Products did operate in the same way as the logic design in the data selector and CODEC operate in block 34 of Figure 4A of the '730 Patent. *See supra*, pp. 29-33.

### C. The District Court Incorrectly Rejected Dr. Fernald's Definition of the "Way" the Structures Synchronize the Data Streams as a Matter of Law

The district court's summary judgment determination is also based on another fundamental legal error: the district court rejected Dr. Fernald's definition

of the “way” the logic at block 34 in Figure 4A of the ‘730 Patent synchronizes the two data streams, instead imposing a requirement that Dr. Fernald and Genuine Enabling apply another, unspecified definition of the “way” the structure synchronizes the data streams. The district court’s rejection of Dr. Fernald’s definition of the “way” was explicit: “Genuine Enabling proposes to prove equivalence by framing the “way” the claimed and accused structures operate at such a high level of generality that it is impossible to tell how they are similar or different.” Appx12. The district court did not, however, articulate an alternative definition of the “way” the structure synchronizes the data streams. Notably, **Sony did not dispute** Dr. Fernald’s definition of the “way” the framer of the ‘730 Patent synchronizes the two data streams.

The district court’s rejection as a matter of law of Dr. Fernald’s definition of the “way” the framer synchronizes the data streams is erroneous. Structural equivalency is a question of fact for the jury. “Whether an accused device infringes a § 112, ¶ 6 claim as an equivalent is a question of fact.” *Odetics*, 185 F.3d at 1268-69. *See also Hayes Microcomputer*, 982 F.2d at 1541. This is true also of the definition of the “way” in which a device performs the required function. “The way devices work is a question of fact, as is the question of whether the ways are equivalent.” *Spancrete Mach. Corp. v. RH & M Mach. Co.*, 34 F.3d 1080, 1994 WL 424620, at *2 (Fed. Cir. 1994) (unpublished). *See also Intendis GMBH v.*

*Glenmark Pharms. Inc., USA.*, 822 F.3d 1355, 1360 (Fed. Cir. 2016) (under doctrine of equivalents, "[e]ach prong of the function-way-result test is a factual determination").

As such, it is not proper for the Court to define the "way" devices perform the required function, and thereby remove this issue of fact from the province of the jury. The question of equivalence is one for the trier of fact, *National Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1191 (Fed. Cir. 1996) (addressing doctrine of equivalents), and the trier of fact should be provided with the evidence regarding equivalency presented by both parties. *See id.* ("Before the jury there was extensive evidence and argument on how the patented and the accused devices were constructed and operated, overall as well as with respect to each claim element. This evidence required evaluation and weighing by the trier of fact, in determining the question of equivalency.")

Dr. Fernald analyzed the logic design at block 34 and opined based on that analysis on the "way" in which that structure synchronizes the user input stream with the input stream. He then analyzed the logic in the Bluetooth modules of the Sony accused products and opined, based on that analysis, that the two structures synchronize the data streams in the same way: by sampling both streams with a common bit clock. This expert testimony on equivalence establishes genuine factual disputes that must be resolved by the trier of fact. *Charles Mach. Works,*

*Inc. v. Vermeer Mfg. Co.*, 723 F.3d 1376, 1380 (Fed. Cir. 2013). *Charles Mach.* is instructive. In that case, the patentee's expert witness opined on the way in which the structure described in the patent performed the function. *Id.* He then opined based on his analysis that the relevant structure in the accused product performed the same function in substantially the same way. The district court disregarded the expert's testimony and granted summary judgment of noninfringement. This Court reversed, holding that the expert's testimony "raised genuine factual disputes material to the function-way-result inquiries," *id.*, and that the expert's factual assertions must be accepted as true for summary judgment purposes. *Id. See also Brilliant Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1342, 1348 (Fed. Cir. 2013) (expert's "detailed application of the function-way-result test to the claim element and the allegedly equivalent feature of the accused product is sufficient to create a genuine issue of material fact for the jury to resolve").

This Court's decision in *Applied Med. Resources Corp.* also mandates reversal of the district court's summary judgment determination. *Applied Med. Resources Corp. v. U.S. Surg. Corp.*, 448 F.3d 1324 (Fed. Cir. 2006). The district court in *Applied Medical* granted summary judgment of noninfringement based on the accused products' failure to meet a means-plus-function limitation. *Id.* at 1331. Although the patentee had submitted expert testimony opining that the accused products incorporated equivalent structure, the district court "found that the

declaration contained only conclusory and unsupported opinions because it is devoid of meaningful analysis regarding how one of skill in the art would conclude that the differences in the way" the structure of the accused product performed the required functions are insubstantial. *Id.* "The district court granted summary judgment on the basis that the two structures perform the claimed functions in substantially different ways." *Id.* at 1334. This Court reversed, holding that the patentee had "presented evidence demonstrating a genuine issue of material fact that the two perform the claimed functions in substantially the same way." *Id.* Although district court found the expert's testimony to be conclusory, the expert "provides an explanation as to why one of skill in the art would view both structures as [performing the required function] in substantially the same way to achieve substantially the same result." *Id.* at 1336. Thus, expert testimony that "present[ed] evidence concerning each of the elements of structural equivalency" was sufficient to raise a genuine issue of material fact. *Id.* at 1335 at n.5.

Dr. Fernald's testimony would support a jury determination that the logic in the Bluetooth modules of the Accused Controllers synchronizes the two data streams in the same way that the logic design at block 34 in Figure 4A synchronizes the two data streams. Accordingly, this Court should reverse the district court's summary judgment determination and remand this case to district court for trial.

## IV. THE DISTRICT COURT ERRED IN EXCLUDING DR. FERNALD'S ULTIMATE CONCLUSION ON STRUCTURAL EQUIVALENCE

The district court excluded Dr. Fernald's testimony regarding his ultimate conclusion on structural equivalence, but did not exclude any of his other testimony. Appx33; Appx77. The district court held explicitly that Dr. Fernald would be allowed to testify concerning his "description of Block 34 of Figure 4A, his description of the Bluetooth technology, and his inferences about what features must be contained in the accused Bluetooth modules to implement the specification." Appx33. The district court also expressly allowed Dr. Fernald to testify regarding "how the claimed and accused structures operate or his opinions about how equivalence is viewed in the art." Appx77 at n.9.

The district court excluded Dr. Fernald's testimony regarding his ultimate conclusion on structural equivalence on the grounds that Dr. Fernald's testimony was insufficient to establish structural equivalence as a matter of law, the same grounds on which the district court granted summary judgment of noninfringement. *See supra*, pp. 18-22. *See also* Appx11-12 ("I agree with Sony that the same principles that warranted the partial exclusion of Dr. Fernald's equivalency analysis compel the conclusion that Genuine Enabling lacks sufficient evidence to prove that block 34 and the accused Bluetooth module synchronize signals in substantially the same 'way'").

As explained in detail above, the district court's holding that Genuine Enabling lacks sufficient evidence to prove that the **logic design at** block 34 and the **logic in** the Bluetooth modules of the accused synchronize signals in substantially the same "way" is erroneous, requiring reversal of the district court's summary judgment determination of noninfringement. For the same reason, the district court's exclusion of Dr. Fernald's testimony regarding his ultimate conclusion of structural equivalence was erroneous and an abuse of discretion. Accordingly, this Court should reverse the district court's *Daubert* order, permitting Dr. Fernald to testify to his ultimate conclusion at trial upon remand.

## CONCLUSION AND RELIEF SOUGHT

For the reasons stated above, the Court should reverse the district court's grant of summary judgment and remand for trial. The Court should also reverse the district court's exclusion of the expert testimony of Genuine Enabling's technical expert, Dr. Kenneth Fernald, regarding his ultimate conclusion that the logic in the Bluetooth modules of the Accused Controllers is structurally equivalent to the logic at block 34 in Figure 4A of the '730 Patent.

Respectfully submitted,

Dated: June 11, 2024

PADMANABHAN & DAWSON, P.L.L.C.

/s/ *Devan V. Padmanabhan*

Devan V. Padmanabhan
Paul J. Robbennolt
9800 Shelard Parkway

Suite 120
Minneapolis, MN 55441
Telephone: (612) 444-3601
Facsimile: (612) 444-3195
devan@paddalawgroup.com
paul@paddalawgroup.com

*Attorneys for Plaintiff-Appellant Genuine Enabling Technology LLC*

# ADDENDUM

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **GENUINE ENABLING TECHNOLOGY LLC,**<br>***Plaintiff,***<br>***v.***<br>**SONY CORPORATION *et al.*,**<br>***Defendants.*** | **Civil Action**<br>**No. 17-cv-135** |

**ORDER**

**AND NOW**, this 25th day of March, 2024, upon consideration of Defendants' motion for summary judgment, and the responses and replies thereto, and following oral argument held on March 18, 2024, and for the reasons set forth in the accompanying memorandum opinion, it is hereby **ORDERED** that:

1. Defendants' motion for summary judgment (ECF No. 332) is **GRANTED**.
2. **JUDGMENT** is entered in favor of Defendants and against Plaintiff.
3. The Clerk of Court shall mark this case closed.

**BY THE COURT:**

***/s/ Mitchell S. Goldberg***
**MITCHELL S. GOLDBERG, J.**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **GENUINE ENABLING TECHNOLOGY LLC,**<br>***Plaintiff,***<br>***v.***<br>**SONY CORPORATION et al.,**<br>***Defendants.*** | **Civil Action**<br>**No. 17-cv-135** |

**MEMORANDUM OPINION**

**GOLDBERG, J.**[1] **March 25, 2024**

In this patent infringement dispute, Plaintiff Genuine Enabling Technology LLC ("Genuine Enabling") asserts that video game hardware sold by Defendants Sony Corporation and Sony Interactive Entertainment LLC (collectively "Sony") infringes U.S. Patent No. 6,219,730 (the '730 patent). A more fulsome recitation of the facts is set forth in my November 28, 2022 Opinion, wherein I addressed the parties' motions under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

Sony has now moved for summary judgment of noninfringement. Sony argues that Genuine Enabling lacks sufficient evidence to establish that a certain component of the accused controllers (a Bluetooth module) is structurally equivalent to a logic diagram disclosed in Genuine Enabling's '730 patent. For the reasons set out below, Sony's motion will be granted.

[1] Pursuant to 28 U.S.C. § 292(b), I have been designated to serve as a visiting judge for the District of Delaware to handle this matter and other District of Delaware cases.

Case: 24-1686 Document: 11 Page: 79 Filed: 06/14/2024

## I. FACTUAL AND PROCEDURAL BACKGROUND

The material facts, which are essentially undisputed, are presented below in the light most favorable to Genuine Enabling as the non-moving party.

### A. The '730 Patent

The '730 patent claims an apparatus for sending multiple streams of information to a computer over a single communication link. The patent gives the example of a user-input device—such as a computer mouse—that can also receive speech input. ('730 patent, cols. 1-2.) By sending both voice and button presses over a single communication link instead of two, the invention "utilize[es] the computer resources efficiently." (Id.)

Genuine Enabling accuses Sony's products of infringing claims 10, 14, 16-18, and 21-23 of the '730 patent. Claim 10 is illustrative of these claims and reads, with independent claim 1 inserted:

> A user input apparatus operatively coupled to a computer via a communication means additionally receiving at least one input signal, comprising:
>
> user input means for producing a user input stream;
>
> input means for producing the [sic] at least one input signal;
>
> converting means for receiving the [sic] at least one input signal and producing therefrom an input stream; and
>
> encoding means for synchronizing the user input stream with the input stream and encoding the same into a combined data stream transferable by the communication means[;]
>
> wherein the input means is an input transducer.

('730 patent, claim 10 (emphasis added).)

As noted above, the two streams of information are referred to as the "user input stream" and the "input stream." Using the example from the patent of a mouse with voice input, the "user input stream" could be button presses on the mouse and the "input stream" could be sound data from a microphone. (See '730 patent, Fig. 1B.) The "encoding means" synchronizes the two data

streams, combines them, and sends the combined data stream to the computer via the "communication means."

Each of the asserted claims requires the claimed invention to include an "encoding means," "means for synchronizing and encoding," or a "framer." Following a Markman hearing, I construed these terms synonymously as "means-plus-function terms" under 35 U.S.C. § 112(f) (codified as § 112, ¶ 6 at the time the '730 patent issued). A means-plus-function term consists of a "function" and a set of possible "structures" for performing that function, the latter of which are taken from the patent's specification. See § 112(f); Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259, 1266-67 (Fed. Cir. 1999). I construed the term "framer" and its synonyms to have a function of "[s]ynchronizing the user input stream with the input stream and encoding the user input stream and the input stream into a combined data stream" and a structure of "[t]he logic design at block 34 in Figure 4A and equivalents thereof." (Claim Construction Opinion, ECF No. 112, at 27.)

Figure 4A depicts the following:




('730 patent, Fig. 4A.) "Block 34" of this figure, which corresponds to the "framer," is denoted by the dashed line. Other components of this figure that have been the subject of expert testimony are block 50, which is a "data selector"; block 62, a "clock generator"; and block 30 (not part of the framer), which is a "CODEC." An accompanying text in the patent's specification describes how

block 34 uses these components to synchronize the user input stream with the input stream to create a combined data stream. ('730 patent, col. 5.)

### B. The Accused Product

The accused products are video game consoles and controllers. Genuine Enabling asserts that Sony uses the patented technology to send multiple streams of information—such as button presses, motion sensor data, and voice—to the game console over a single wireless communication link.

According to Genuine Enabling, Sony's accused products contain a "user input stream" that consists of button presses and various "input streams" that include data from motion sensors (accelerometers) and a microphone. Genuine Enabling asserts that a Bluetooth module in the accused video game controllers acts as a "framer": it synchronizes the button data stream (i.e., the "user input stream") with data from the motion sensors or microphone (i.e., the "input stream") and combines these into a single data stream that may be transmitted to the video game console over a wireless communication link. (See Genuine Enabling's Response Brief at 8-10.)

### C. Dr. Fernald's Opinion and the Court's Subsequent Daubert Ruling

To support its theory that the accused Bluetooth module acts as a "framer," Genuine Enabling produced a report from its engineering expert Dr. Kenneth Fernald. Dr. Fernald asserts that certain steps in the Bluetooth protocol (called "whitening" and "CRC generation") require data that has been synchronized to a "bit-rate clock." Dr. Fernald further reasons that the data from button presses and the accelerometer must "be synchronized" to a common bit-rate clock for these steps to work correctly. Thus, Dr. Fernald concludes that the accused Bluetooth module, like block 34 of Figure 4A, synchronizes data streams to a common bit-rate clock. However, Dr. Fernald's report does not describe how the Bluetooth module causes the button presses and accelerometer

data to become synchronized to a common bit-rate clock. The report only explains that such synchronization must occur for the product to use Bluetooth as it does. (Fernald Report ¶¶ 128-31.)

On October 11, 2021, Sony moved to exclude Dr. Fernald's opinion pursuant to Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), based on Dr. Fernald's alleged failure to analyze whether the accused Bluetooth module performed synchronization in substantially the same "way" as block 34 of Figure 4A, which is required under the "function-way-result test" for structural equivalency. See Traxcell Tech. LLC v. Sprint Comms. Co., 15 F.4th 1121, 1128 (Fed. Cir. 2021). I granted Sony's motion in part, agreeing with Sony that Dr. Fernald's analysis was incomplete and excluding Dr. Fernald's ultimate conclusion that the accused Bluetooth module was equivalent to block 34 of Figure 4A. However, I did not preclude Dr. Fernald from testifying that the accused Bluetooth module does in fact synchronize certain data streams to a common bit-rate clock. (Daubert Opinion, ECF No. 303, at 15.)

On December 12, 2022, Genuine Enabling moved to reargue Sony's Daubert motion. Genuine Enabling attached a declaration from Dr. Fernald stating that the "way" block 34 of Figure 4A synchronizes the two data streams is by synchronizing both to a common bit-rate clock, and the "way" the accused Bluetooth module synchronizes data streams is also by synchronizing them to a common bit-rate clock. In other words, the two structures operate in the same "way." Based on that clarification, Genuine Enabling asked that Dr. Fernald be permitted to testify to his ultimate conclusion that block 34 of Figure 4A and the accused Bluetooth module are equivalent. I denied Genuine Enabling's reargument motion, determining that Dr. Fernald had provided no information about how the accused Bluetooth module caused the two data streams to become synchronized to a common bit-rate clock, and it was therefore impossible to tell whether any conceivable variation from block 34 was "substantial." Notably, block 34 of Figure 4A included more details than simply

the presence of a bit-rate clock (e.g., a data selector, a clock generator, and a signal sent to a CODEC), and Dr. Fernald had performed no analysis of whether those details or the corresponding unknown details in the accused Bluetooth module should be viewed as substantial from the perspective of one of ordinary skill in the art. (Reargument Opinion, ECF No. 316, at 10-12.)

**D. Sony's Summary Judgment Motion and Mr. Nguyen's Declaration**

On September 11, 2023, Sony filed the instant motion for summary judgment. Sony asserts that Genuine Enabling cannot prove that the accused Bluetooth modules are equivalent to block 34 of Figure 4A and, for that reason, Genuine Enabling lacks evidence that any accused product contains the "framer" limitation or its synonyms.

In response, Genuine Enabling attached a declaration from the inventor of the '730 patent, Nghi Nho Nguyen. There, Mr. Nguyen provides additional grounds for inferring that the accused Bluetooth modules must synchronize data streams to a common bit-rate clock. For example, Mr. Nguyen observes that data is fed into the Bluetooth modules using an interface called "UART," which will not work unless the data is synchronized to a bit-rate clock. (Nguyen Dec. ¶ 23.)

Mr. Nguyen also opines that the accused Bluetooth module is equivalent to block 34 of Figure 4A. In Mr. Nguyen's view, this is true because both devices synchronize data streams to a common bit-rate clock, and therefore function in the same way. (Nguyen Dec. ¶ 22.) Mr. Nguyen further clarifies that there are other ways of synchronizing two data streams that are different from synchronizing to a common bit-rate clock, such as "by detecting edges in the other data stream and synchronizing the one data stream to those edges." (Nguyen Dec. ¶ 41.)

Sony objects to consideration of Mr. Nguyen's declaration on the ground that it contains undisclosed expert opinion testimony, as confirmed by Mr. Nguyen's statement in deposition that he had not tested the accused product and relied on his lawyers' investigation. (Reply at 2-3.)

## II. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if there is evidence from which a reasonable factfinder could return a verdict for the non-moving party, and a dispute is "material" if it might affect the outcome of the case under governing law. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the non-moving party. Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011). However, "unsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. Schaar v. Lehigh Valley Health Servs., Inc., 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 461 (3d Cir. 1989)).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." Id. at 322.

After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" that show a

genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A).

## III. DISCUSSION

Sony's primary argument is that Genuine Enabling cannot prove that any accused product satisfies the "framer" limitation (and the synonymous limitations "encoding means" and "means for synchronizing and encoding"), found in every asserted claim.

As described above, these are means-plus-function terms with a function of "[s]ynchronizing the user input stream with the input stream and encoding the user input stream and the input stream into a combined data stream" and a structure of "[t]he logic design at block 34 in Figure 4A and equivalents thereof." (Claim Construction Opinion, ECF No. 112, at 27.) In analyzing infringement, a means-plus-function term encompasses any structure that performs the same function recited in the claim and that is the same as or equivalent to a structure disclosed in the specification. Odetics, 185 F.3d at 1267. "The word 'equivalent' in section 112 invokes the familiar concept of an insubstantial change which adds nothing of significance." Valmont Indus., Inc. v. Reinke Mfg. Co., 983 F.2d 1039, 1043 (Fed. Cir. 1993). "Structural equivalence under [§ 112(f)] is met only if the differences are insubstantial …; that is, if the assertedly equivalent structure performs the claimed function in substantially the same way to achieve substantially the same result as the corresponding structure described in the specification." Odetics, 185 F.3d at 1267. This is called the "function-way-result test" for structural equivalence. Traxcell, 15 F.4th at 1128.

In applying the function-way-result test, "[t]he appropriate degree of specificity is provided by the statute itself; the relevant structure is that which 'corresponds' to the claimed function. … Further deconstruction or parsing is incorrect." Odetics, 185 F.3d at 1268. Each "individual component[]" of a disclosed structure is not in itself a "claim limitation[]" required to be present

(literally or as an equivalent) in the accused device. Id. "Rather, the claim limitation is the overall structure corresponding to the claimed function." Id.

By limiting the scope of a means-plus-function term to disclosed structures and their equivalents, § 112(f) "prevents an overly broad claim construction by requiring reference to the specification, and at the same time precludes an overly narrow construction that would restrict coverage solely to those means expressly disclosed in the specification." Symbol Techs., Inc. v. Opticon, Inc., 935 F.2d 1569, 1575 (Fed. Cir. 1991). A patentee does not obtain ownership of "every conceivable way or means to perform the [claimed] function"—just those ways that are substantially the same as the way the patentee invented and disclosed. Mas-Hamilton Grp. v. LaGard, Inc., 156 F.3d 1206, 1214 (Fed. Cir. 1998). But by the same token, the patentee is not limited to structures that replicate every detail disclosed in the specification—so long as the details that vary are insubstantial. Odetics, 185 F.3d at 1267.

Sony argues that summary judgment is appropriate because Genuine Enabling cannot prove that the Bluetooth module is equivalent to block 34 of Figure 4A under the function-way-result test. There is no dispute that Genuine Enabling could prove that the accused Bluetooth module performs the same "function" as block 34 of Figure 4A: that is, synchronizing and combining the two data streams. It is also not disputed that Genuine Enabling could prove that the Bluetooth module achieves substantially the same "result" as block 34 of Figure 4A: a combined data stream. Rather, Sony's position focuses on Genuine Enabling's inability to prove that the accused Bluetooth module synchronizes the two data streams in substantially the same "way" as block 34 of Figure 4A. See Odetics, 185 F.3d at 1267. Sony presses that absent Dr. Fernald's now-excluded opinion that the two devices do operate in substantially the same way, Genuine Enabling cannot

meet its burden at trial to prove structural equivalence. See AquaTex Indus., Inc. v. Techniche Sols., 479 F.3d 1320, 1329 (Fed. Cir. 2007) (proof of equivalence requires expert testimony).

Genuine Enabling responds that it will prove that the accused Bluetooth module and block 34 of Figure 4A synchronize data streams in the same "way" because both synchronize data streams to a common bit-rate clock as opposed to by some other method, such as synchronizing the data streams directly to each other without a clock. Sony does not dispute the factual accuracy of this assertion, and, indeed, my prior Daubert ruling did not preclude Dr. Fernald from offering this testimony. Sony also does not take issue with the assertion in Dr. Fernald's declaration (repeated in Mr. Nguyen's declaration) that synchronizing to a bit-rate clock is not the only way to synchronize signals. Noting all of the above, Sony's contention is that proving the shared feature of a bit-rate clock is insufficient as a matter of law to show that the "way" in which these devices synchronize data streams is substantially the same. Specifically, Sony presses that each device consists of more than just a bit-rate clock, and proving only that the bit-rate clock is similar sheds no light on whether any other differences that might exist are "substantial."

While the legal principles underlying the present summary judgment motion substantially overlap with issues addressed in my prior Daubert ruling, the standard for evaluating summary judgment is different than the standard for evaluating evidentiary motions. Thus, my prior Daubert ruling is not necessarily dispositive of the outcome here. See Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1069-70 (3d Cir. 1990) (describing the difference between an evidentiary motion and a motion for summary judgment, the latter of which allows "the nonmovant [to] marshal his or her evidence to show that there is a genuine issue of material fact"). Nevertheless, I agree with Sony that the same principles that warranted the partial exclusion of Dr. Fernald's equivalency

analysis compel the conclusion that Genuine Enabling lacks sufficient evidence to prove that block 34 and the accused Bluetooth module synchronize signals in substantially the same "way."

Genuine Enabling proposes to prove equivalence by framing the "way" the claimed and accused structures operate at such a high level of generality that it is impossible to tell how they are similar or different. In denying Genuine Enabling's motion to reconsider my Daubert ruling, I used the analogy of a paperclip and a paperweight, which are similar in that they both apply pressure to paper but different in that one uses bent metal while the other uses gravity. (ECF No. 316 at 10.) To say that the "way" both devices work is by applying pressure to paper just begs the question of whether the omitted details (bent metal and gravity) are insubstantial. Here, analogously, Genuine Enabling argues that block 34 and the Bluetooth module are equivalent because both synchronize data streams using a bit-rate clock. But Genuine Enabling does not explain why a person of ordinary skill in the art would view other details about the two structures as less significant. In particular, Genuine Enabling has pointed to essentially no information regarding how the accused Bluetooth module operates other than that a bit-rate clock is involved somehow. Missing is any explanation of how the Bluetooth module differs from block 34 or why a person of ordinary skill in the art would view these unknown differences as "insubstantial." Valmont, 983 F.2d at 1043. A factfinder would be left with no basis to draw the inference that block 34 and the accused Bluetooth module synchronize data streams in substantially the same way.

The Federal Circuit's recent decision in VLSI Tech. LLC v. Intel Corp., 87 F.4th 1332 (Fed. Cir. 2023), supports this conclusion. While VLSI Tech. rested in part on policy concerns with the "doctrine of equivalents" (e.g., public notice) that do not apply to a literal infringement case such as this one, its discussion of the "way" prong of the function-way-result test is nevertheless instructive. See Kemco Sales, Inc. v. Control Papers Co., 208 F.3d 1352, 1364 (Fed. Cir. 2000)

("[T]he 'way' and 'result' prongs are the same under both the [§ 112(f)] and doctrine of equivalents tests … ."). In VLSI Tech., the accused product differed from the claim elements in how it performed a request to change clock frequency: in the claim, "the request function [was] performed by one component ... and the receipt and output functions [were] performed by a distinct component." In the accused product, the request and receipt "[were] performed not by distinct physical components but by different software 'modules'" within the same physical component. 87 F.4th at 1344. The plaintiff's expert characterized this difference as a "design choice" but did not otherwise explain why it should be viewed as "insubstantial." Id. In granting judgment as a matter of law to the defendant, the Federal Circuit concluded that such testimony was insufficient, as the label "design choice" "does not indicate whether, or begin to explain why, the options in the choice are substantially different or substantially the same: In both circumstances, the choice between the options is a design choice." Id.

Here, the evidence that the differences between the claimed and accused structures is insubstantial is even less specific. In VLSI Tech., the plaintiff's expert had at least narrowed the difference between the claim and the accused product to whether a request was transmitted between distinct physical components or software modules within the same physical component. Here, Genuine Enabling has provided essentially no information about how the accused Bluetooth module differs from block 34 of Figure 4A, much less why any differences should be viewed as insubstantial. For example, block 34 of Figure 4A feeds both data streams into a data selector that alternates between them to produce a combined data stream. (Fernald Report ¶ 125.) It is unknown whether the Bluetooth module does the same thing, or, if it does not, whether the choice to forego a data selector is substantial. A factfinder would be left entirely in the dark as to these issues.

Dr. Fernald's observation that there are other ways to synchronize data streams, without using a bit-rate clock, does not cure this problem. That block 34 and the accused Bluetooth module do not differ in every conceivable way sheds no light on whether the ways in which they do differ are insubstantial. Using again the analogy of a paperclip and a paperweight, a plaintiff might be able to prove that the two function in substantially the same "way" if it can convince a factfinder that the difference between bent metal and gravity is insubstantial in the context of the invention at hand. But absent such an explanation, the fact that there are other ways to hold paper together without pressure (e.g., a folder) does not bridge the necessary evidentiary gap. Just as it was insufficient in VLSI Tech. to show that both the claimed and accused devices transmitted a request to change clock frequency, the identification of one common feature, be it pressure or a bit-rate clock, is insufficient to explain why the "overall structure[s]" function in substantially the same way. Odetics, 185 F.3d at 1268.

Finally, Genuine Enabling notes that "[t]he 'way' … prong[] of a function-way-result test … [is a] factual inquir[y] that [is] not subject to construction by the Court." Marvell Semiconductor v. Commonwealth Sci. & Indus. Rsch. Organisation, No. 07-cv-204, 2010 WL 11531186, at *6 (E.D. Tex. Apr. 27, 2010). Although the "ways" the claimed and accused structures operate are indeed factual questions, it is still the plaintiff's burden at summary judgment to come forward with "concrete evidence" to "support[]" its factual contentions. Nitkin v. Main Line Health, 67 F.4th 565, 571 (3d Cir. 2023). Genuine Enabling has not pointed to "evidence on which the jury could reasonably find" that the differences between the way block 34 and the accused Bluetooth module synchronize signals are insubstantial. Anderson, 477 U.S. at 252.

For these reasons, I conclude that Genuine Enabling has failed to raise a dispute of fact as to whether the accused Bluetooth module satisfies the "framer" limitation and the synonymous

limitations "encoding means" and "means for synchronizing and encoding." As at least one of those limitations is present in every asserted claim, and Genuine Enabling has not advanced an argument under the doctrine of equivalents, Sony is entitled to summary judgment of noninfringement.[2]

## IV. CONCLUSION

For the reasons set out above, Sony's motion for summary judgment will be granted.

An appropriate order follows.

---

[2] Sony offers four other grounds for summary judgment. Because I agree with Sony on its first ground, I do not reach Sony's alternative grounds.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **GENUINE ENABLING TECHNOLOGY LLC,**<br><br>***Plaintiff,***<br><br>***v.***<br><br>**SONY CORPORATION *et al.*,**<br><br>***Defendants.*** | **Civil Action**<br><br>**No. 17-cv-135** |

**ORDER**

**AND NOW**, this 28th day of November, 2022, upon consideration of Defendants' Motion to Strike the Expert Report of Dr. Kenneth Fernald (ECF No. 234), Plaintiff's Motion to Preclude Certain Opinions and Testimony of Dr. Gregory Welch (ECF No. 242), Defendants' Motion to Strike the Expert Report of Gregory Urbanchuk (ECF No. 237), Plaintiff's Motion to Preclude the Valuation of the '730 Patent by Dr. Pallavi Seth (ECF No. 231), and the responses and replies thereto (ECF Nos. 259, 260, 264, 266, 286, 287, 289, and 290), and for the reasons set forth in the accompanying memorandum opinion, it is hereby **ORDERED** that:

1. Defendants' Motion to Strike the Expert Report of Dr. Kenneth Fernald (ECF No. 234) is **GRANTED in part, DENIED in part, and HELD UNDER ADVISEMENT in part** as follows:

    a. Defendants' Motion is **GRANTED** to the extent that Dr. Fernald's opinion that the claimed and accused "framer" and "encoding means" meet the function-way-result test for structural equivalence is precluded under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

b. Defendants' Motion is **HELD UNDER ADVISEMENT** as to Defendants' contention that Dr. Fernald used an incorrect construction of "user input means" in analyzing claim 14 pending possible additional construction of this term.

c. Defendants' Motion is **DENIED** in all other response.

2. Plaintiff's Motion to Preclude Certain Opinions and Testimony of Dr. Gregory Welch (ECF No. 242) is **GRANTED in part, DENIED in part, and HELD UNDER ADVISEMENT in part** as follows:

a. Plaintiff's Motion is **GRANTED** to the extent that Dr. Welch may not testify to a claim construction that differs from the Court's claim construction.

b. Plaintiff's Motion is **GRANTED** to the extent that Dr. Welch must base his enablement opinion on the state of the art as it existed on the filing date but **DENIED** as to Genuine Enabling's request for a ruling as to whether Bluetooth technology was part of that state of the art.

c. Plaintiff's Motion is **HELD UNDER ADVISEMENT** as to Plaintiff's contention that Dr. Welch used an incorrect construction of "input signal" in his infringement analysis pending possible additional construction of this term.

d. Plaintiff's Motion is **DENIED** in all other respects.

3. Defendants' Motion to Strike the Expert Report of Gregory Urbanchuk (ECF No. 237) is **GRANTED in part and DENIED in part** as follows:

a. Defendants' Motion is **GRANTED** to the extent that Mr. Urbanchuk's testimony must reflect that Nghi Nho Nguyen, not Genuine Enabling, is a party to the hypothetical negotiation.

b. Defendants' Motion is **DENIED** in all other respects.

4. Plaintiff's Motion to Preclude the Valuation of the '730 Patent by Dr. Pallavi Seth (ECF No. 231) is **GRANTED in part and DENIED in part** as follows:

a. Plaintiff's Motion is **GRANTED** to the extent that Dr. Seth may not testify that the royalty Sony paid for Bluetooth technology is an "upper bound" to the royalty Sony would have paid for the '730 patent merely because both technologies are necessary for the accused products to function.

b. Plaintiff's Motion is **DENIED** in all other respects.

**BY THE COURT:**

***/s/ Mitchell S. Goldberg***
**MITCHELL S. GOLDBERG, J.**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **GENUINE ENABLING TECHNOLOGY LLC,**<br>***Plaintiff,***<br>***v.***<br>**SONY CORPORATION *et al.*,**<br>***Defendants.*** | **Civil Action**<br>**No. 17-cv-135** |

**MEMORANDUM OPINION**

**GOLDBERG, J.** **November 28, 2022**

In this patent infringement lawsuit, Plaintiff Genuine Enabling Technology, LLC ("Genuine Enabling") asserts that video game controllers and consoles sold by Defendants Sony Corporation and related entities (collectively "Sony") infringe U.S. Patent No. 6,219,730 (the '730 patent). Each party has identified an engineering and a damages expert. Before me are four motions to exclude these experts' testimony pursuant to Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). For the reasons that follow, these motions will be granted in part and denied in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Genuine Enabling's Claimed Invention

The '730 patent describes an invention for transmitting multiple data streams from a user input device such as a mouse or keyboard to a computer over a single communication link. According to the patent's specification, sending multiple data streams over a single communication link is advantageous because it makes efficient use of computer hardware. ('730 patent, col. 1.)

Case: 24-1686 Document: 30 Page: 26 Filed: 06/11/2024

The patent refers to two of these data streams as the "input stream" and "user input stream," respectively. Despite the different names, both are streams of inputted data and both may originate with the user. The "input stream" derives from what the patent terms an "input signal," and the "user input stream" is produced by what the patent calls a "user input means."

To transmit the two data streams over a single communication link, the "input stream" and "user input stream" are synchronized and combined into a "combined data stream." ('730 patent, cols. 3-6.) The component of the invention that handles synchronizing and combining is referred to, in some claims, as an "encoding means," and in others as a "framer." (See, e.g., claims 1, 16.)

Genuine Enabling alleges that Sony's accused products infringe claims 10, 14, 16, 18, 21, and 23. Claim 16 is illustrative of these claims and reads:

> An apparatus linked to a computer by a communication link, functioning as a user input device and additionally receiving at least one input signal, comprising:
>
> a user input device producing a user input stream;
>
> an input port receiving at least one input signal;
>
> a converter receiving the at least one input signal for producing an input stream; and
>
> a framer synchronizing the user input stream with the input stream and encoding the same into a combined data stream transferable by the communication link.

('730 patent, claim 16.)

### B. Sony's Accused Products

Sony's allegedly infringing products consist of hardware used to play video games. These include game controllers (the input device held by the user) and consoles (the computer and associated hardware designed to play the game). (Complaint ¶ 24.)

The accused controllers transmit information from buttons, accelerometers, and other sensors to the accused consoles. According to Genuine Enabling, the stream of data produced by

button presses constitutes a "user input stream," the signal produced by an accelerometer is an "input signal," and the digitized accelerometer data is an "input stream." These two data streams are transmitted over a single wireless (Bluetooth) communication link. Genuine Enabling asserts that components of the accused controllers that synchronize and combine the two data streams for transmission correspond to the "encoding means" and "framer" limitations.

### C. Claim Construction

On December 3, 2019, I held a Markman hearing to construe terms in the asserted claims, three of which are relevant to the present Daubert disputes.

#### 1. "Encoding Means" and "Framer"

I construed the terms "encoding means" and "framer" as "means-plus-function" terms under 35 U.S.C. § 112(f).[1] A means-plus-function term "cover[s] the corresponding structure, material, or acts described in the specification and equivalents thereof." Id. I determined that the "function" performed by both the "framer" and "encoding means" is "[s]ynchronizing the user input stream with the input stream and encoding the user input stream and the input stream into a combined data stream." (Claim Construction Op. 3/9/2020, ECF No. 112, at 27.) I also found that the corresponding structure is "[t]he logic design at block 34 in Figure 4A," and, accordingly, the terms "framer" and "encoding means" cover "[t]he logic design at block 34 in Figure 4A and equivalents thereof."

[1] When the '730 patent issued, this provision was codified at 35 U.S.C. § 112 ¶ 6. Because the language did not change between the two codifications, this opinion will use the current one at 35 U.S.C. § 112(f).

2. "User Input Means"

Some claims in the '730 patent refer to a "user input means" that produces the "user input stream" described above. I construed "user input means" as a means-plus-function term with a function of "[p]roducing a digital stream, called the user input stream" and a structure of "[a] sensor translating user-initiated actuations and an encoder and equivalents thereof."

3. "Input Signal"

As described above, the invention converts an "input signal" into an "input stream," which is one of the data streams combined for transmission to the computer. I construed "input signal" to mean "[a] signal having an audio or higher frequency."

**D. The Federal Circuit's Nintendo Decision**

After I construed the term "input signal," the Federal Circuit construed that term in an appeal from another lawsuit brought in the Western District of Washington by Genuine Enabling. Genuine Enabling Tech. LLC v. Nintendo Co., 29 F.4th 1365 (Fed. Cir. 2022). Because the meaning of a claim term is a question of law, the Federal Circuit's construction is binding on me to the extent it does not depend on factual findings that differ between the Nintendo and Sony lawsuits. See Intel Corp. v. Qualcomm Inc., 21 F.4th 801, 808 (Fed. Cir. 2021). The Federal Circuit construed "input signal," as I did, to mean "a signal having an audio or higher frequency."

## II. EXPERT OPINIONS

Each side plans to offer the testimony of an engineering expert and a damages expert. Genuine Enabling's experts are Dr. Kenneth Fernald (engineering) and Gregory Urbanchuk (damages). Sony's experts are Dr. Gregory Welch (engineering) and Dr. Pallavi Seth (damages). These experts' challenged opinions are described infra in connection with each Daubert dispute.

## III. LEGAL STANDARD

Expert opinion testimony must comply with Federal Rule of Evidence 702. That Rule requires, among other things, that the proposed testimony "help the trier of fact to understand the evidence or to determine a fact in issue" and that it be "the product of reliable principles and methods." Fed. R. Evid. 702(a), (c). The proponent of expert testimony bears the burden of establishing that these requirements are met. See Bardo v. Norfolk Southern Ry. Co., 459 F. Supp. 3d 618, 624 (M.D. Pa. 2020). Rule 702 "has a liberal policy of admissibility." Pineda v. Ford Motor Co. 520 F.3d 237, 243 (3d Cir. 2008).

A motion to exclude evidence "is not a proper vehicle for a party to ask the Court to weigh the sufficiency of the evidence to support a particular claim or defense, because that is the function of a motion for summary judgment, with its accompanying and crucial procedural safeguards." Bowers v. NCAA 563 F. Supp. 2d 508, 532 (D.N.J. 2008) (alterations and quotation marks omitted). To be admissible, evidence need not be sufficient to prove a party's case. United States v. Kemp, 500 F.3d 257, 295 (3d Cir. 2007). "Where there is a logical basis for an expert's opinion testimony, the credibility and weight of that testimony is to be determined by the jury, not the trial judge." Breidor v. Sears, 722 F.2d 1134, 1138-39 (3d Cir. 1983). If the underlying facts are disputed, "[a]n expert is … permitted to base his opinion on a particular version of disputed facts and the weight to be accorded to that opinion is for the jury." Walker v. Gordon, 46 F. App'x 691, 695-96 (3d Cir. Sept. 17, 2002); see also Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.").

Case: 24-1686 Document: 30 Page: 100 Filed: 06/14/2024

## IV. DISCUSSION

### A. Dr. Fernald's Analysis of the "Encoding Means" and "Framer" Limitations

Dr. Fernald opines that Sony's accused products meet the "encoding means" limitation (for some claims) and "framer" limitation (for others). Sony asks that these opinions be excluded.

#### 1. Challenged Opinion

As stated above, I construed "encoding means" and "framer" as means-plus-function terms having the function "[s]ynchronizing the user input stream with the input stream and encoding the user input stream and the input stream into a combined data stream" and structure "[t]he logic design at block 34 in Figure 4A and equivalents thereof." Because I construed these terms to have the same meaning, I will refer to both as a "framer."

According to Dr. Fernald, the Bluetooth module in each accused controller meets the definition of a framer because: (1) it synchronizes and combines a user input stream with an input stream; and (2) it is structurally equivalent to Block 34 in Figure 4A. Dr. Fernald determined that the Bluetooth controller is structurally equivalent to Block 34 in Figure 4A using the "function, way, result" test, under which a structure in an accused product is equivalent to a claimed structure if "the two [structures] perform the identical function in substantially the same way, with substantially the same result." Traxcell Tech. LLC v. Sprint Comms. Co. 15 F.4th 1121, 1129 (Fed. Cir. 2021).

Sony challenges only the "way" prong of Dr. Fernald's analysis. Because the "synchronizing" aspect of the claimed function best illustrates Sony's objection, I will focus on that aspect. I begin by summarizing Dr. Fernald's "way" opinion regarding both the claimed and accused structures. I then summarize the basis for Dr. Fernald's opinion that the two ways are substantially similar.

**’730 Patent’s Claimed “Way”**: Dr. Fernald’s report first describes the “way” Block 34 of Figure 4A in the ’730 patent synchronizes the user input stream with the input stream. For reference, that figure is depicted below:




(Fig. 4A.) “Block 34” is indicated with a dashed line. The “user input stream” is wire 24 and the “input stream” is wire 33. The combined data stream exits Block 34 on wire 37. The component 50 is a “data selector.”

According to Dr. Fernald’s report, the “way” Block 34 synchronizes the user input stream with the input stream is by “sampling both streams using a common bit-rate clock.” (Fernald Infringement Report ¶ 124.) First, Block 34 synchronizes the <u>input stream</u> to the bit-rate clock by “feeding [the bit-rate clock] to the CODEC,” which “caus[es]” the output of the CODEC—that is, the input stream—“to clock on rising edges of” the bit-rate clock. (<u>Id.</u> ¶ 126 n.39.) Second, Block 34 synchronizes the <u>user input stream</u> to the same bit-rate clock using the data selector. The data selector “normally select[s] the input stream” but can alternately “sample[] [the user input] stream,” and stores data from both streams in the output stream. (<u>Id.</u> ¶ 125.) This sampling process “synchronizes the [user input] stream data to the [bit-rate] clock, and hence to the similarly synchronized input stream . . . .” (<u>Id.</u> ¶ 126.)

As I understand this description, Dr. Fernald opines that Block 34 uses one bit-rate clock to drive two processes: one that generates the input stream using a CODEC and one that samples the user input stream using a data selector. The output of each process is therefore synchronized to that same bit-rate clock, and, thus, the two outputs are synchronized.

But at oral argument, Genuine Enabling argued for a claimed "way" that was much broader than described above as it included fewer details. Specifically, referencing a discrete sentence from Dr. Fernald's voluminous report, Genuine Enabling focused on the following phrase:

> [T]he logic of block 34 … **synchronizes each of the bits of the input stream and user input stream … to the rising edge of the [bit-rate] clock …, thereby synchronizing the two streams together**.

(Fernald Infringement Report ¶ 125 (emphasis added); Tr. Oral Argument, 6/21/22, at 43:16-21 (referencing slides).) This sentence includes the common bit-rate clock but omits the CODEC, the data selector, and the process of sampling. The difference between these two "ways" is discussed in greater detail below.

**<u>Sony's Accused's Products' "Way"</u>**: Dr. Fernald's report does not expressly state the "way" in which the accused Bluetooth module synchronizes the input stream and user input stream. It is therefore unclear whether the report offers an opinion on what that "way" is. In its briefing and at oral argument, Genuine Enabling identifies the following sentence from the report as the accused "way": "The Bluetooth modules in the accused Sony controllers … synchronize the user input stream with the input stream by synchronizing both streams to a common bit clock." (Fernald Infringement Report ¶ 127.)

To arrive at the conclusion that the Bluetooth module "synchroniz[es] both streams to a common bit clock," Dr. Fernald refers to an industry-wide specification for the Bluetooth protocol. According to Dr. Fernald, to comply with the specification, the accused Bluetooth module must perform steps called "CRC generation" and "whitening." (<u>Id.</u> ¶¶ 127-128 & n.40.) Both steps "use

digital shift registers," and, therefore, "[f]or either process to operate properly, the incoming [data] must be synchronized to the same bit clock used for shifting these shift registers[.]" (Id. ¶ 131 (emphasis added).) From this, Dr. Fernald reasons that the data supplied to the CRC generation and whitening steps must be "synchronized to a bit-rate clock." (Id. ¶ 129.) Thus, according to Dr. Fernald, "the Bluetooth modules in the accused Sony controllers necessarily synchronize the user input stream with the input stream." (Id.)

In a footnote, Dr. Fernald clarifies that he is "not suggesting that the CRC generation or data whitening logic is part of the encoding means or framer, but only that the **existence** of such bitstream processing operations is evidence that the bitstream **is synchronized to a bit clock.**" (Fernald Infringement Report ¶ 131 n.46 (emphasis added).) Dr. Fernald does not identify the circuitry in the Bluetooth module that synchronizes the user input stream with the input stream. Rather, his report reasons that because certain required steps in the Bluetooth module only work if the data streams are synchronized, circuitry must exist to perform such synchronizing. Consistent with this reasoning, Dr. Fernald testified at his deposition that he "didn't have the schematics for the Bluetooth chips." (Fernald Tr. 9/1/21 at 107:14.)

**Substantial Similarity**: Dr. Fernald's report then states that the claimed and accused structures are equivalent:

> [T]he "encoding means" and "framer" in the Bluetooth modules of the accused Sony controllers synchronizes the user input stream with the input stream. Further, the logic in the Bluetooth modules perform[s] the same operation, specifically synchronizing the two streams to a common bit clock, as the logic design in block 34 of Figure 4A, and hence is structurally equivalent to the logic design of block 34.

(Fernald Infringement Report ¶ 135.) In introducing his analysis, Dr. Fernald's report also states that those two structures will be shown to operate "in substantially the same way." (Id. ¶ 104.) The report's conclusion does not repeat this reference to the "way" or state how the two "ways" have been shown to be substantially similar. (Id. ¶ 135.)

At oral argument on the Daubert motions, Genuine Enabling took the position that in the field of electrical engineering, an analysis of whether the "ways" are substantially similar is unnecessary because all ways of achieving a given result are equivalent. (See Tr. Oral Argument, 6/21/22, 45-46 (referencing slides).) For support, Genuine Enabling relied on paragraphs of Dr. Fernald's report that highlight the use of algebraic properties to transform simple digital circuits into equivalent ones. (Fernald Infringement Report ¶¶ 56-57.) The report states that "a [person of ordinary skill in the art] would understand that logic structural equivalence relies on a comparison of the operation performed by the two logic designs, rather than a gate-by-gate and connection-by-connection comparison." (Id. ¶ 64.) While the report does not state that all "ways" are equivalent if they achieve the same result, Dr. Fernald testified in deposition that:

> [T]he way equivalency is understood by one skilled in the art and logic is, if you can show that the Bluetooth module and Block 34 are basically producing the same result effectively, that is indicative of that—the structural equivalent, because it's just the fluid nature of logic. There's just so many different ways of doing the same thing in logic design, and they're all considered equivalent to one skilled in the art.

(Fernald Tr. 9/1/21 at 107.)

2. Sony's First Objection: Insufficient Analysis of the "Way" Prong of Structural Equivalence

Sony argues that Dr. Fernald's analysis of the "encoding means" and "framer" limitations should be excluded because Dr. Fernald does not analyze the "way" prong of structural equivalence. While Sony does not identify which requirement of Rule 702 this alleged deficiency violates, it cites to the Federal Circuit's nonprecedential opinion in Medtronic Inc. v. Boston Sci. Corp., 558 F. App'x 998 (Fed. Cir. March 11, 2014), which held that it was proper to exclude an expert's opinion under the "reliability" requirement of Rule 702(c) because the expert's infringement analysis was based on "conclusory statements." Id. at 1000. Genuine Enabling does not

contest that failing to correctly analyze structural equivalence could be a basis for exclusion, but responds that Dr. Fernald's testimony is "reliable" under Daubert.

**Genuine Enabling's "All Ways Are Equivalent" Argument**: At oral argument, Genuine Enabling contended that in the field of electrical engineering, an expert need not separately analyze the "way" prong of structural equivalence because all ways are equivalent if they achieve the same result.

Expert testimony may only be admitted if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Opinion testimony that is not "helpful" is not admissible, United States v. Gibbs, 190 F.3d 188, 213 (3d Cir. 1999), and, in particular, testimony consisting of "conclusory assertions" and "bald conclusion[s]"—as in "an expert's testimony that 'it is so' "—does not assist the factfinder in understanding the evidence or determining facts in issue. Barnes Foundation v. Township of Lower Merion, 982 F. Supp. 970, 1008-09 (E.D. Pa. 1997); see also Mooring Capital Fund, LLC v. Phoenix Central, Inc., No. 06-cv-6, 2009 WL 4263359, at *5 (W.D. Okla. Feb. 12, 2009) ("[A]n expert's opinions are not admissible merely because the expert says, in effect, 'trust me, I know.' "). An "expert must have 'good grounds' for his on her belief." Schneider ex rel. Est. of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003).

With this precedent in mind, I conclude that expert analysis of the "way" prong of functional equivalence based on a broad assertion that all "ways" are equivalent would not help the factfinder understand the claimed equivalence or determine whether the accused device operates in a substantially similar way as the claimed one. More specifically, such a broad assertion would not help the factfinder: (1) understand the way the claimed structure works; (2) understand the way the accused structure works; (3) understand the "differences" between the claimed and accused

structure; or (4) understand whether those "differences" are "insubstantial." See Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259, 1267 (Fed. Cir. 1999). The factfinder would therefore be left with no understanding of the "way" portion of Dr. Fernald's opinion.

Genuine Enabling presses that I should consider the statement in Dr. Fernald's report that "a [person of ordinary skill in the art] would understand that logic structural equivalence relies on a comparison of the operation preformed by the two logic designs … ." (Fernald Infringement Report ¶ 64.) It is true that the perspective of one skilled in the art "should be considered in a [§ 112(f)] equivalence determination." IMS Tech. Inc. v. Haas Automation Inc., 206 F.3d 1422, 1437 (Fed. Cir. 2000). For example, IMS Tech. involved testimony that "a floppy disk drive and a tape cassette" are considered interchangeable in the art. Id. at 1437. But Genuine Enabling proposes to offer expert testimony that is far broader and vaguer than that in IMS Tech.—that is, a blanket assertion that all structures are considered interchangeable if they achieve the same result. This is true even when considering those paragraphs of Dr. Fernald's report that describe how simple circuits can be algebraically equivalent. Dr. Fernald does not apply those principles to the accused product or even reference them by analogy. Rather, those paragraphs in his report only provide examples of Genuine Enabling's broad position that similar results imply similar ways

Ultimately, Dr. Fernald's assertion that the two structures are equivalent because they "perform the same operation, specifically synchronizing the two streams to a common bit clock" is "an expert's testimony that 'it is so,' " which is not admissible. Barnes Foundation, 982 F. Supp. at 1008-09. (Fernald Infringement Report ¶ 135.)

**Dr. Fernald's "Way" Analysis**: Having concluded that Genuine Enabling may not rely on Dr. Fernald's blanket assertion that all "ways" are equivalent, I next examine whether Dr. Fernald's report nonetheless contains a sufficient analysis of the "way" prong to support a conclusion

that the claimed and accused structures meet the function-way-result test for structural equivalence. This task is complicated by Genuine Enabling's inconsistent positions as to how much detail is included in the "way" Block 34 of Figure 4A operates.

Dr. Fernald's report identifies the "way" as "sampling both streams using a common bit-rate clock," using a CODEC to sample the input stream and a data selector to sample the user input stream. (Fernald Infringement Report ¶¶ 124-26.) But the report contains no discussion, or even a conclusion, that the accused Bluetooth module operates similarly to that "way." For example, Dr. Fernald's discussion of the Bluetooth module does not mention the components involved in the claimed "way" (the CODEC and the data selector). He also does not address whether the Bluetooth module contains components that are similar to a CODEC and a data selector, or operate similarly to a CODEC and a data selector. Dr. Fernald therefore offers no basis to render an opinion that the accused Bluetooth module operates in a substantially similar way to "sampling both streams using a common bit-rate clock."

At oral argument, Genuine Enabling argued that the "way" Block 34 of Figure 4A operates is by "synchroniz[ing]" (as opposed to sampling) "each of the bits of the input stream and user input stream … to the rising edge of the BCLK clock …, thereby synchronizing the two streams together." (Fernald Infringement Report ¶ 125 (emphasis added); Tr. Oral Argument, 6/21/22, at 43:16-21 (referencing slides).) This explanation is much broader than the one in Dr. Fernald's report because it omits several details: the data selector, the CODEC, the process of sampling, and the use of a common bit-rate clock to drive two operations. While it is permissible for a party to argue that the "way" a structure operates should be framed at a high level of generality, see 5B Chisum on Patents § 18.04b (2022), the assertion that a structure operates in a given way is a proposition that needs factual support. See Mylan Institutional LLC v. Aurobindo Pharma Ltd. 857

F.3d 858, 869 (Fed. Cir. 2017) (noting that facts "may at trial indicate a different 'way' "). Dr. Fernald's report contains no discussion as to whether the claimed "way" may be framed as broadly as Genuine Enabling posited at oral argument, nor does the report actually draw this conclusion. In particular, there is no assertion, or even discussion, that the data selector, CODEC, and sampling operation are sufficiently insubstantial that they may be omitted from the "way."

Dr. Fernald's report also does not support that the accused structure operates in a way that is substantially similar to "synchroniz[ing] each of the bits of the input stream and user input stream … to the rising edge of the BCLK clock …, thereby synchronizing the two streams together." In fact, as Sony points out, Dr. Fernald's report does not even draw the conclusion that these two ways are substantially similar, instead jumping to the ultimate conclusion that the two structures are equivalent because they "perform the same operation." (Fernald Report ¶ 135.)

Finally, to the extent Dr. Fernald's report could be read as impliedly concluding that the claimed and accused ways are substantially similar, that conclusion is still not supported. Dr. Fernald's report determines that the accused Bluetooth module must result in a combined data stream that is synchronized to a bit-rate clock for certain later steps (CRC generation and whitening) to operate correctly. That is, Dr. Fernald discusses only the result that must be achieved, not how it is achieved. Sony does not argue that it is necessarily improper for an expert working without schematics to reason backward from a specification to determine what steps must have been performed to meet the specification. But the problem with Dr. Fernald's analysis is that he only works backward as far as the result that is achieved, not how it was achieved. There is no discussion in Dr. Fernald's report of where or how in the Bluetooth module the streams become synchronized. Because there is no information about the "way" in which the streams become synchronized, a

factfinder would receive no factual support regarding why that "way" is substantially similar to the operation of Block 34 of Figure 4A.

For these reasons, I conclude that Dr. Fernald's ultimate conclusion that Block 34 of Figure 4A and the accused Bluetooth modules meet the function-way-result test for structural equivalency does not meet the helpfulness and reliability requirements of Rule 702. I will grant Sony's Motion to exclude that conclusion from Dr. Fernald's testimony. I make no determination regarding the other challenged portions of Dr. Fernald's proposed testimony, including Dr. Fernald's description of Block 34 of Figure 4A, his description of Bluetooth technology, and his inferences about what features must be contained in the accused Bluetooth modules to implement the specification.

3. Sony's Second Objection: Failure to Analyze Every Component

Sony next objects that Dr. Fernald does not incorporate every component of Block 34 of Figure 4A in his equivalency analysis.

"[A] component-by-component analysis of structural equivalence [is not required] under [§ 112(f)]." Odetics, 185 F.3d at 1267-68. While an expert's equivalency analysis might be impeached at trial for omitting "critical factors," cf. Mylan 857 F.3d at 868, admissibility does not require an expert to consider "every possible factor" an adversary might think relevant, Pfizer Inc. v. Teva Pharm. USA, Inc., 461 F. Supp. 2d 271, 274 (D.N.J. 2006).

Dr. Fernald justifies his selection of relevant components by tracing the signal paths of the user input stream and input stream through the data selector to the combined data stream and explaining how the circuit produces the SEL signal that controls the data selector. The accuracy of this description is for the factfinder.

Sony argues that whether an equivalent structure to Block 34 of Figure 4A must include all components is an issue of claim construction and, therefore, Genuine Enabling "waived" the

issue by not raising it at the Markman hearing. But "[w]hether an accused device infringes a [§ 112(f)] claim as an equivalent is a question of fact." Odetics, 185 F.3d at 1268. Genuine Enabling therefore did not waive this argument by not raising it at the Markman hearing.

Accordingly, I will deny Sony's Daubert motion as to this ground.

4. Sony's Third Objection: Use of Figure 4B

Sony next argues that Dr. Fernald's proposed testimony does not "fit" the case because he references Figure 4B in addition to Figure 4A. Figure 4B "shows the timing waveform of the critical signals involved in FIG. 4A" and "[t]he timing waveform for signals SEL, CLR, FS, QH, R*, TXD*, and RXD* are depicted in FIG. 4B, in relation to bit clock BCLK." ('730 patent, col. 3.)

Dr. Fernald opines that Figure 4B reflects "a more specific embodiment" of the structure in Figure 4A and references Figure 4B to discern properties of that embodiment. For example, Dr. Fernald uses the timing diagram in Figure 4B to infer that Block 34 of Figure 4A "plac[es] the stream values into predetermined locations in the combined data stream" and "sampl[es] both streams using a common bit-rate clock." (Fernald Infringement Report ¶¶ 102, 124.)

Because the specification states that Figure 4B is included to further describe the circuit depicted in Figure 4A, it is not improper for Dr. Fernald to reference Figure 4B in analyzing Block 34 of Figure 4A. While Sony argues that Dr. Fernald misuses Figure 4B, Sony does not say how, and, in any event, this alleged error may be addressed on cross examination. I will therefore deny Sony's Motion as to this ground.

## B. Dr. Fernald's Validity Analysis of Claim 14

1. Challenged Opinion

Dr. Fernald also authored a separate report on the validity of the asserted claims. Sony challenges Dr. Fernald's analysis of claim 14, which reads:

> A programming method, executed by a computer communicatively coupled via a communication link to a user input means having means for synchronizing and encoding a user input stream and at least one additional input signal into a combined data stream, comprising the steps of:
>
> initializing the communication link;
>
> servicing a single resource service interrupt for receiving the combined data stream; and
>
> recovering from the combined data stream respective information of the user input means and of the at least one additional input signal.

(emphasis added). As noted above, I construed "user input means" as a means-plus-function term with a function of "[p]roducing a digital stream, called the user input stream" and a structure of "[a] sensor translating user-initiated actuations and an encoder and equivalents thereof." In his validity report, Dr. Fernald writes that "the term 'user input means' in claim 14 should be read as 'user input apparatus,' " and this is the construction he uses in his analysis.

2. Sony's Objection: Use of a Different Construction for "User Input Means"

Sony objects that the construction Dr. Fernald uses for "user input means" in claim 14 differs from my construction of "user input means." Sony therefore asks that any of Dr. Fernald's analysis that relies on his different construction be excluded.

Genuine Enabling does not dispute that Dr. Fernald uses a construction for "user input means" that differs from my construction. Instead, Genuine Enabling argues that I should modify my construction because "user input means" in claim 14 has a different meaning than it does in claim 1.

The meaning of a claim term is a question of law for the court to decide. Markman v. Westview Instruments, Inc. 517 U.S. 370, 385 (1996). "[A]lthough a district court has great latitude in how it conducts the claim construction process, the parties must be involved," and a court may not issue a new construction without affording each party an opportunity to be heard on the

matter. TNS Media Research v. Tivo Research & Analytics, Inc., 629 F. App'x 916, 939 (Fed. Cir. 2015). Because the present dispute arises in the context of a motion to exclude expert testimony rather than to construe a claim term, I will not now rule on the meaning of "user input means" in claim 14 or decide whether Genuine Enabling forfeited its present contention by not raising it at the Markman hearing.

If Dr. Fernald's construction of "user input means" in claim 14 is ultimately determined to be incorrect, Dr. Fernald may not inform the jury of his incorrect construction, as the jury is "not free to consider its own meanings for the disputed terms but must apply the [court's] construction of the terms[.]" Sulzer Textil A.G. v. Picanol N.V. 358 F.3d 1356, 1367 (Fed. Cir. 2004). I therefore hold under advisement that portion of Sony's Motion, pending possible future resolution of the claim construction issue. See TNS Media Research, 629 F. App'x at 939 (parties must be "afforded the opportunity to present … claim construction arguments before the district court … decide[s] … claim construction").

Sony also asks that the totality of Dr. Fernald's analysis of claim 14 be excluded because it rests on an incorrect claim construction. Assuming Dr. Fernald's construction is incorrect, Sony does not explain how that error affects the remainder of Dr. Fernald's proposed testimony. While testimony based on an incorrect claim construction may sometimes be "unhelpful to the trier of fact" and thus excludable, TQ Delta, LLC v. ADTRAN, Inc., No. 14-cv-954, 2019 U.S. Dist. LEXIS 188930, at *3 (D. Del. Oct. 31, 2019), Sony has not shown how substituting a correct construction of "user input means" for Dr. Fernald's purportedly incorrect one would change any part of Dr. Fernald's reasoning. In fact, Sony offers no discussion of the substance of Dr. Fernald's testimony. I will therefore deny Sony's Motion to exclude the remainder of Dr. Fernald's analysis of the validity of claim 14 at this time.

### C. Dr. Welch's Use of "Plaintiff's Construction" of Certain Terms in His Validity Analysis

#### 1. Challenged Opinion

Sony's engineering expert Dr. Gregory Welch's report reviews Genuine Enabling's infringement contentions and opines that Genuine Enabling "has broadly interpreted the Asserted Claims in order to accuse Sony's products of infringement." (Welch Validity Report ¶ 167.) Dr. Welch explains that he has "considered, where appropriate, Plaintiff's infringement contentions to determine the scope of the asserted claims as interpreted by the Plaintiff." (Id. ¶ 134.) Specifically, in Dr. Welch's opinion, "if the Asserted Claims are really as broad as Plaintiff contends, then they are plainly invalid over the prior art." (Id. ¶ 167.) Dr. Welch uses, by way of example, what he believes to be Genuine Enabling's construction of "encoding means" to find an overlap between the invention and a prior art reference:

> I understand the Court has construed the term "encoding means" as "the logic design at block 34 in Figure 4A and equivalents thereof" performing the function "synchronizing the user input stream with the input stream and encoding the user input stream and the input stream into a combined data stream." …
>
> I also understand Plaintiff has alleged that simply including button press data and accelerometer data in the same Bluetooth packet infringes this limitation. Plaintiff's Final Infringement Contentions, at pp. 24-29. …
>
> … [I]f this claim limitation is as broad as Plaintiff's infringement theory, then [prior art reference] Rosenberg discloses this limitation. …

(Id. ¶ 194-96.)

#### 2. Genuine Enabling's Objection: Use of Incorrect Claim Construction

Genuine Enabling objects to Dr. Welch's reference to "Plaintiff's interpretation" of the claim terms. In Genuine Enabling's view, Dr. Welch's opinion reflects a claim construction other than this Court's construction. Sony responds that Dr. Welch's proposed testimony supports an

argument in the alternative: that if Genuine Enabling's contention that the claims encompass the accused product is accepted, it follows that those claims encompass the prior art.

Genuine Enabling is correct, as a general matter, that the jury is "not free to consider its own meanings for the disputed terms but must apply the [court's] construction of the terms[.]" Sulzer Textil, 358 F.3d at 1367. To the extent Dr. Welch intends to testify that the jury should accept one claim construction over another, such testimony is not admissible.

But Dr. Welch is not prohibited from opining on the significance of Genuine Enabling's evidence by explaining what that evidence shows about the relationship between the asserted claims and the prior art. See F.R.E. 703 (permitting an expert to base an opinion on "facts or data in the case"); Odyssey Wireless, Inc. v. Apple Inc., No. 15-cv-01735, 2016 WL 7644790, at *3 (S.D. Cal. Sept. 14, 2016) (denying motion to exclude expert testimony on similar grounds as raised here). The present record is insufficient for me to determine whether Dr. Welch's proposed opinions will be supported by the evidence adduced at trial. I will therefore deny Genuine Enabling's Motion as to this ground without prejudice to be renewed at trial if necessary.

**D. Dr. Welch's Infringement Analysis Based on the Frequency of the "Input Signal"**

1. Challenged Opinion

As noted above, I construed the term "input signal" to mean "[a] signal having an audio or higher frequency." Dr. Welch's rebuttal report concludes that the accused products do not infringe because none of the signals sent from the controller to the console have an audio or higher frequency, which Sony contends to be 20 Hz. (1 Hz is 1 cycle per second.) The next dispute involves Dr. Welch's handling of signals that contain multiple frequencies.

Dr. Welch acknowledges that most "real" signals contain "a range of frequencies" as opposed to just one. (Welch Rebuttal Report ¶¶ 32, 37.) When describing his approach to measuring

the signals in the accused products, however, Dr. Welch states that he is seeking to measure "the fundamental frequency," "the actual frequency," and the frequency that "is the dominant energy." (Id. ¶¶ 236, 285 (emphasis in original).) For example, Dr. Welch analyzes the signal depicted below to determine whether it has a 20 Hz or higher frequency:




(Id. ¶ 213.) Dr. Welch measures the signal's frequency by counting the peaks ("Peak 1," "Peak 2," and "Peak 3") and dividing by the duration of the recording (1 second) to yield a frequency of 3 Hz. Because 3 Hz is less than 20 Hz, Dr. Welch concludes that this signal does not meet the definition of an "input signal." This approach inherently yields a single number regardless of whether the signal is made up of one or multiple frequencies.

Dr. Welch also examines some measured signals using a mathematical operation called the "Fourier transform," which shows the extent to which multiple frequencies contribute to the overall makeup of a signal. The two images below show a signal measured by Dr. Welch (left) and the result of applying a Fourier transform (right):




(Id. ¶¶ 251, 253.) The Fourier transform graph shows frequencies greater than 20 Hz, indicated by circled peaks right of the 20 Hz gridline. Dr. Welch opines that those higher-frequency components should be disregarded for two reasons. The first, which Genuine Enabling does not challenge here, is that those higher-frequency components correspond to "distortions, aberrations, [and] ringing" rather than the signal itself. (Id. ¶ 256.) The second reason, which Genuine Enabling does take issue with, is that the graph on the left (the original signal) shows that "the frequency of the … signal [is] approximately 7 Hz," such that components other than 7 Hz should be disregarded. (Id.)

2. Genuine Enabling's Objection: Use of Incorrect Claim Construction

Genuine Enabling argues that Dr. Welch's approach of assigning a single frequency to each signal contradicts my claim construction. In Genuine Enabling's view, the construction "[a] signal having an audio or higher frequency" should be read to mean a signal having any frequency component that is an audio or higher frequency. Genuine Enabling argues that expert testimony using an incorrect claim construction is not "helpful" and should therefore be excluded under Rule 702(a). See TQ Delta, 2019 U.S. Dist. LEXIS 188930, at *3.

Sony responds that Dr. Welch's approach of assigning just one frequency to each signal is an issue of methodology, not claim construction. In Sony's view, because Dr. Welch's

methodology of measuring signals has not been challenged as unreliable, it is up to the factfinder to decide whether they accept a methodology that yields a single frequency or a methodology that yields multiple frequencies.

I agree with Genuine Enabling that whether the phrase "having an audio or higher frequency" may refer to any frequency component is a question of claim construction, not methodology. The issue of whether the word "having" in "having an audio or higher frequency" may refer to any frequency component is a question of the meaning of the claim term (compare "a car having a flat tire" or "a family having an income of $50,000 or less"). The disagreement is not how Dr. Welch performs his measurements but what Dr. Welch is seeking to measure. This is an issue of claim construction even though the disputed term comes not from the claim itself but from a definition supplied by a party. See TNS Media Research, 629 F. App'x at 938 (finding the district court should have construed the phrase "at a given time" appearing in a construction but not in the claim itself).

While I agree with Genuine Enabling that the meaning of "having an audio or higher frequency" is a question of claim construction, I disagree that my prior Markman opinion answers that question. The phrase "having an audio or higher frequency" is ambiguous as to whether it may refer to any frequency component or the signal's "actual" frequency.[2] Further, I have reviewed the briefs and hearing transcript from the Markman proceeding, and the issue of signals containing multiple frequencies was not raised. I will therefore deny Genuine Enabling's Motion without prejudice pending possible future resolution of the claim construction issue. See TNS Media Research, 629 F. App'x at 939 (requiring notice and an opportunity to be heard before construing claims).

---

[2] The Federal Circuit's construction, which is the same as mine, also does not answer this question.

## E. Dr. Welch's Enablement Analysis Based on Bluetooth Technology

### 1. Challenged Opinion

Sony's accused products use Bluetooth as the communication link between the controller and the console. Bluetooth is a standard for wireless communication.

Dr. Welch opines that the asserted claims are not enabled. To reach this conclusion, Dr. Welch applies the rule that a patent's specification must enable "the full scope of the claimed invention" and assumes that Bluetooth communication meets the claim term "communication means." Dr. Welch opines that the specification would not enable one skilled in the art to use "a wireless (e.g., Bluetooth) format" as the communication means because "[t]he logic design of the framer (34) shown in Fig. 4A is simply too inflexible to handle the latency and other issues that Bluetooth systems must be able to accommodate." (Welch Validity Report ¶ 169) He thus concludes that "if the Asserted Claims are broad enough to encompass Bluetooth, then they are invalid for failing to meet the enablement requirement." (Id. ¶ 171.)

### 2. Genuine Enabling's Objection: Reference to Technology Post-Dating the Invention

Genuine Enabling objects that Dr. Welch's proposed testimony is not "helpful" because it suggests two requirement for validity that do not exist. The first is a requirement to enable one skilled in the art to practice the claimed invention with a technology appearing after the patent application was filed—which Genuine Enabling argues includes Bluetooth. The second is a requirement to enable one skilled in the art to build the accused product.

As a matter of substantive patent law, the enablement requirement is based only on the state of the art at the time the application was filed, even if later-emerging technology turns out to fall within the scope of the claim. In re Hogan, 559 F.2d 595, 605-07 (C.C.P.A. 1977). Thus, the fact that the accused products use Bluetooth and are alleged to fall within the scope of the claim is

"irrelevant" to the question of whether the asserted patent must enable one skilled in the art to use the invention with Bluetooth. See id.

Sony responds that, in contrast to later-arising technology, technology that is "nascent" at the time of filing (which Sony contends includes Bluetooth) "must be enabled with a 'specific and useful teaching.' " Chiron Corp. v. Genentech, Inc., 363 F.3d 1247, 1254 (Fed. Cir. 2004) (quoting Genentech, Inc. v. Novo Nordisk A/S, 108 F.3d 1361, 1368 (Fed. Cir. 1997)). However, the cases cited by Sony apply to a different situation. Chiron dealt with the question of whether an earlier application sufficiently enabled a later patent to claim the benefit of the earlier priority date. 363 F.3d at 1254. Genentech, by contrast, observed that where the invention itself is a nascent technology, greater detail is required in the specification to enable it, on the ground that an artisan's background knowledge of science is less able to fill the gaps. See 108 F.3d at 1367-68. Neither Chiron nor Genentech suggests that an applicant must reach out to enable any nascent developments that might improve the claimed invention.

Nevertheless, I cannot rule on Genuine Enabling's motion on the present record. The state of the art as of the filing date (June 20, 1998) is disputed, and the parties have offered conflicting evidence. In particular, Sony has offered evidence that wireless technology that would later be incorporated into the Bluetooth specification was known in the art as of the filing date, even though the Bluetooth specification itself had not been published. I will therefore grant in part and deny in part Genuine Enabling's Motion as to this ground at this time. Dr. Welch must base his enablement analysis on the state of the art as it existed on the filing date. Whether that state of the art included Bluetooth technology is a factual question that I do not answer at this time.

### F. Dr. Welch's Rebuttal of Dr. Fernald's Infringement Analysis

1. Challenged Opinion

Two concepts in patent law use the word "equivalent." The first is structural equivalence, which allows certain claim terms to cover "structure … described in the specification and equivalents thereof." 35 U.S.C. § 112(f). The second is the doctrine of equivalents, a judicially created doctrine under which "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 21 (1997). Both forms of equivalence may be analyzed under tests called "function-way-result," although the two same-named tests differ slightly. Compare Applied Med. Res. Corp. v. United States Surgical Corp., 448 F.3d 1324, 1333 (Fed. Cir. 2006), with Dawn Equip. Co. v. Ky. Farms Inc., 140 F.3d 1009, 1016 (Fed. Cir. 1998).

Genuine Enabling's expert Dr. Fernald's report asserts that the accused Sony products literally infringe Genuine Enabling's patent, using, in certain places, a function-way-result test for structural equivalence. Dr. Welch authored a rebuttal report in which he argues that the accused products do not infringe, also using a function-way-result test in places.

2. Genuine Enabling's Objection: Confusion of "Structural Equivalence" with the "Doctrine of Equivalents"

Genuine Enabling argues that Dr. Welch's rebuttal testimony should be excluded because it uses the function-way-result test from the doctrine of equivalents rather than the one for structural equivalence.

Assuming Genuine Enabling's characterization of Dr. Welch's rebuttal report is correct, it is not a reason to exclude testimony. Dr. Welch is not required to mirror Dr. Fernald's analytical

framework, and, even if Dr. Welch did quote the wrong test, Genuine Enabling offers no explanation for why the error would affect the reliability or helpfulness of his analysis. I will therefore deny Genuine Enabling's Motion as to this ground.

### G. Mr. Urbanchuk's Opinion That Genuine Enabling and Sony Would Equally Divide Profits from the '730 Patent

1. Challenged Opinion

Mr. Urbanchuk calculates Genuine Enabling's damages using a "hypothetical negotiation" between Genuine Enabling and Sony in which Sony would obtain a license to the '730 patent. See Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1324 (Fed. Cir. 2009). He first calculates the value of the '730 patent to Sony by comparing Sony's gross profit between two versions of its controllers, then estimates how the hypothetical negotiators would divide that profit based on the bargaining positions of the parties and the importance to each of closing the deal, incorporating a set of factors known as the "Georgia-Pacific factors." See Georgia-Pacific Corp. v. United States Plywood Corp., 318 F. Supp. 1116 (S.D.N.Y. 1970). These factors include: "[t]he nature and scope of the license, as exclusive or non-exclusive …"; "[t]he licensor's established policy and marketing program to maintain his patent monopoly by not licensing others …"; and "[t]he commercial relationship between the licensor and licensee …"; among many others. Id. at 1120.

Mr. Urbanchuk's report touches on each Georgia-Pacific factor but concludes that relevant data is unavailable for some. For example, Mr. Urbanchuk decides that no contracts provided comparable royalties; he thus excludes that factor from his analysis. Mr. Urbanchuk ultimately concludes: "Based on the preceding, Sony would have agreed to share a significant portion of the … expected profits related to the '730 Patent[] from sales of the Accused Controllers. … Based on my analysis of the Georgia-Pacific Factors, it is my opinion that the parties would have agreed …

to a 50/50 split of the … expected profits related to the '730 Patents from sales of the Accused Controllers." (Urbanchuk Supp. 49-50.)

2. Sony's Objection: Lack of Support for a 50/50 Profit Split

Sony argues that Mr. Urbanchuk's valuation opinion should be excluded because Mr. Urbanchuk's conclusion that Genuine Enabling and Sony would divide profits 50/50 lacks support.

Expert testimony that "fails to tie the [expert's] theory [of damages] to the facts of the case … must be excluded." Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1315 (Fed. Cir. 2011). A plaintiff may not prove damages using a "rule of thumb" that the patentee and alleged infringer would divide profits 25/75. Similarly, an expert may not rely on the "Nash Bargaining Theorem" to derive a 50/50 profit split without analyzing whether, on the facts of the case, the assumptions underlying the theorem are satisfied. Virnetx, Inc. v. Cisco Sys., Inc., 767 F.3d 1308, 1332 (Fed. Cir. 2014).

Neither of those defects applies to Mr. Urbanchuk's proposed testimony: Mr. Urbanchuk does not rely on a rule of thumb, and he does not use the Nash Bargaining Theorem. Instead, he uses the Georgia-Pacific factors, which "properly tie the reasonable royalty calculation to the facts of the hypothetical negotiation at issue." Uniloc, 632 F.3d at 1317. Sony's objection is not that these factors are improper but that the connection Mr. Urbanchuk attempts to draw between the factors and his ultimate conclusion is too thin.

The reasons for excluding "rule of thumb" testimony do not apply to expert testimony based on the Georgia-Pacific factors. A rule of thumb is an "arbitrary, general rule, unrelated to the facts of [the] case" and "taints the jury's damages calculation." Uniloc, 632 F.3d at 1318. A party who asks the jury to award damages based on an improper consideration risks "mislead[ing]

the jury into awarding an unduly high royalty." See Ericsson, Inc. v. D-Link Systems, Inc. 773 F.3d 1201, 1227 (Fed. Cir. 2014). But testimony based on proper considerations, albeit ones that may prove incorrect at trial, does not invite the jury to disregard its responsibility to ground its damages award in the evidence. If the expert's reasoning is unsound, its unsoundness can be uncovered through cross examination.

Sony takes issue with the fact that Mr. Urbanchuk discerned no relevant evidence for the quantitative Georgia-Pacific factors, thus leading him to weigh only the qualitative ones. In particular, Sony contends that Mr. Urbanchuk should not have excluded comparator licenses post-dating the hypothetical negotiation. See M2M Sols. LLC v. Sierra Wireless Am., Inc., No. 14-cv-1102, 2020 WL 7767639, at *17 (D. Del. Dec. 4, 2020) (holding that comparator licenses post-dating the hypothetical negotiation may be considered). But an expert is not required to "consider every possible factor to render a 'reliable' opinion." MicroStrategy Inc. v. Bus. Objects, S.A., 429 F.3d 1344, 1355 (Fed. Cir. 2005). The fact that Mr. Urbanchuk could have considered other evidence therefore does not make his opinion inadmissible.

Because Mr. Urbanchuk's analysis rests on proper factors closely tethered to the facts of the case, and considering the "strong preference for admitting any evidence that may assist the trier of fact," Pineda, 520 F.3d at 243, I find that Mr. Urbanchuk's proposed testimony meets the threshold for admissibility under Daubert. See Glielmi v. Raymond Corp., No. 09-cv-5734, 2012 WL 924844, at *7 (D.N.J. March 19, 2012) ("[G]aps or inconsistencies in [an] expert's reasoning go [to the] weight of the evidence[,] not [its] admissibility[.]").

I will therefore deny Sony's Motion as to this ground.

### H. Mr. Urbanchuk's Opinion That Royalties for Non-Infringing Games May Be Included in Damages

1. Challenged Opinion

Although Sony earned revenue from sales of video games that could be played with the accused products, it is undisputed that the games themselves did not infringe. Mr. Urbanchuk nevertheless incorporates a small (1%) share of Sony's profits from the sale of some non-infringing games in his damages calculation.

To reach this result, Mr. Urbanchuk first describes how features of the accused videogame hardware allegedly derived from the '730 patent increased Sony's ability to sell non-infringing games. Specifically, "Sony's use of the invention claimed in the '730 Patent provided the functionality of allowing a gamer to use a wireless controller with motion control, vibration feedback, and voice." (Urbanchuk Supplemental Report 43.) Mr. Urbanchuk thus determines that "there is a functional relationship between the infringing consoles and controllers, and the non-infringing games." (Id.)

Second, Mr. Urbanchuk opines that the value to Sony of selling consoles includes the value of obtaining an increased ability to sell games that run on those consoles. In Mr. Urbanchuk's opinion, the increased ability to sell games represents most or all of the value of console sales because the hardware is otherwise sold at a loss. "The video game industry is a platform-based industry that follows a razor-blade model—i.e., manufacture and sell consoles at a loss to drive the sale of video games." (Id.)

Combining these two considerations, Mr. Urbanchuk concludes that "the Plaintiff would likely have wanted, and the Defendants would likely have paid, a royalty on the collateral sale of games utilizing the features enabled by the '730 Patent." (Id. at 44.) Mr. Urbanchuk estimates this

royalty at 1% of "the sales of games incorporating the motion and voice functionality enabled by the '730 Patent." (Id. at 51.)

2. Sony's Objection: Lack of Apportionment of Royalties to Infringing Products

Sony argues that it is impermissible for Mr. Urbanchuk to calculate damages based on sales of non-infringing games. In Sony's view, whether to include sales of non-infringing products in a damages calculation must be analyzed under the "entire market value rule," which permits consideration of "unpatented components normally sold with the patented components" only in limited circumstances. See Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1550, (Fed. Cir. 1995). Because the requirements of that rule are not met, Sony argues that Mr. Urbanchuk's valuation should be excluded.

Genuine Enabling disagrees that the entire market value rule is applicable. In Genuine Enabling's view, the analysis should proceed under the law applicable to "convoyed sales." See Interactive Pictures Corp. v. Infinite Pictures, Inc., 274 F.3d 1371, 1385 (Fed. Cir. 2001) ("The jury was entitled to rely on evidence of bundling and convoyed sales in determining the proper scope of the royalty base.").

"[I]n the context of a utility patent, it is only the patented technology that is taken from the owner, so the value to be determined is only the value that the infringing features contribute to the value of an accused product." Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc., 904 F.3d 965, 977 (Fed. Cir. 2018). "[W]here multi-component products are accused of infringement, the royalty base should not be larger than the smallest salable unit embodying the patented invention." Id. Even then, "the patentee must estimate what portion of that smallest salable unit is attributable to the patented technology when the smallest salable unit itself contains several non-infringing features." Id.

Consideration of "bundling and convoyed sales" is appropriate in some cases. See Fujifilm Corp. v. Benun, 605 F.3d 1366, 1373 (Fed. Cir. 2010). The closest analogy is Deere & Co. v. Int'l Harvester Co., 710 F.2d 1551 (Fed. Cir. 1983), in which it was permissible for the trial court to base its damages calculation in part on "anticipated collateral sales of an admittedly noninfringing product." Id. at 1559. Other non-precedential decisions have limited consideration of non-infringing sales where evidence did not establish that "the patents … drove demand" for the non-infringing products. SUNOCO Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC, No. 17-cv-1390, 2020 WL 7330715, at *7 (D. Del. Jan. 13, 2020); Finjan, Inc. v. Blue Coat Sys., Inc., No. 13-cv-03999, 2015 WL 4272870, at *9 (N.D. Cal. July 14, 2015); Zimmer Surgical, Inc. v. Stryker Corp., 365 F. Supp. 3d 466, 491 (D. Del. 2019).

Mr. Urbanchuk's opinion is that part of the value to Sony of selling a console is the increased opportunity to later sell games—and that the value of an increased opportunity to sell games is partly reflected in the dollar value of Sony's actual game sales. The present question is not whether Genuine Enabling will present sufficient evidence to meet its burden of production as to these damages; it is whether Mr. Urbanchuk offers a "reliable … method[]" supported by "sufficient facts or data" to conclude that the value to Sony of a console sale included the value of an increased opportunity to sell games. See Walker, 46 F. App'x at 692 (sufficiency not at issue in a motion to exclude testimony).

Mr. Urbanchuk primarily bases his opinion that sales of consoles drove sales of games on the usual practices of the video games industry, for which he provides substantial background. For example, Mr. Urbanchuk quotes an investor that, in the video game industry, "hardware is sold at a loss, and only by selling software units (its complementary goods) do platform holders recoup this investment and generate a profit over time." (Urbanchuk Supplemental Report 9-10.) He also

quotes Sony's Director of Business Insights and Strategy that "[i]f a console does well, then sales of accessories and software, [i.e.] games[,] also do well." (Id. at 10.) Mr. Urbanchuk corroborates this general proposition with financial information showing that Sony initially sold the PlayStation 2 at a loss. (Id.) Similar numbers are provided for the PlayStation 3, along with a quote from an industry commentator that "Sony's loss per unit" on the product was "remarkable." (Id. at 17.)

Mr. Urbanchuk also offers facts to tie Sony's increased ability to sell games to the features enabled by the '730 patent as opposed to the consoles' other features. Specifically, Mr. Urbanchuk only includes in his assessment of per-game royalties games that used features he considers to be enabled by the '730 patent. (Whether the '730 patent did in fact enable those features is an engineering issue beyond Mr. Urbanchuk's expertise.)

The above analysis, if credited, could provide a reliable means for inferring that Sony would be willing to pay some portion of its revenue on noninfringing games in order to obtain the right to sell the infringing consoles. Whether this is sufficient evidence to support a jury verdict for "bundling and convoyed sales" is not presently at issue. Daubert's reliability requirement does not provide a basis for excluding Mr. Urbanchuk's proposed testimony, and I will therefore deny Sony's Motion as to this ground.

## I. Mr. Urbanchuk's Setting of the Hypothetical Negotiation

### 1. Challenged Opinion

Mr. Urbanchuk bases his damages calculation on a hypothetical negotiation between Genuine Enabling and Sony taking place in November 2006. Mr. Urbanchuk chose November 2006 because that is when Sony began selling the PlayStation 3 in the United States, then with the "SixAxis" controller. Although the SixAxis controller is not an accused product, Genuine Enabling

contends that the SixAxis controller did, in fact, infringe, and is only not accused because the infringement occurred before the statute of limitations.

2. Sony's First Objection: Incorrect Date for the Hypothetical Negotiation

Sony objects to Mr. Urbanchuk's use of November 2006 as the date for the hypothetical negotiation because, in Sony's view, the correct date is April 2008, the date the first accused controller was sold. Sony further argues that a damages analysis based on the wrong date is not "help[ful]" and should be excluded. See Fed. R. Evid. 702(a).

"The correct determination of [the] date [of the hypothetical negotiation] is essential for properly assessing damages." Integra Lifesciences I, Ltd. v. Merck KGaA, 331 F.3d 860, 870 (Fed. Cir. 2003). "In general, the date of the hypothetical negotiation is the date that the infringement began." LaserDynamics, Inc. v. Quanta Comput., Inc., 694 F.3d 51, 75 (Fed. Cir. 2012).

Neither party cites authority that conclusively resolves whether, in a case in which actual infringement by non-accused products allegedly began before the statute of limitations, the date of the hypothetical negotiation is the date of first infringement by the non-accused product or the date of first infringement by an accused product. In LaserDynamics, the hypothetical negotiation date for induced infringement was the first date of actual infringement by the person induced, even though the alleged inducer had no knowledge of the infringement and thus no liability at the time. 694 F.3d at 76. In WangLabs, Inc. v. Toshiba Corp., the hypothetical negotiation date occurred when the patent was issued (as the accused products were already being sold at the time), even though the infringer did not receive notice of the patent until later. 993 F.2d 858, 870 (Fed. Cir. 1993). Neither of those cases involved two products, one accused and one not accused. The Federal Circuit did make the general observation that "the six-year limitation on recovery of past damages under 35 U.S.C. § 286 does not preclude the hypothetical negotiation date from

taking place on the date infringement began, even if damages cannot be collected until some time later." LaserDynamics, 694 F.3d at 75.

Closer to the present facts is Applied Medical Resources Corp. v. U.S. Surgical Corp., 435 F.3d 1356 (Fed. Cir. 2006). The issue in Applied Medical was collateral estoppel: whether a determination of a reasonable royalty in one lawsuit over one product was preclusive of the reasonable royalty in a second lawsuit involving the same patent but a different product. In holding that estoppel did not apply, the Federal Circuit stated that "the infringements requiring compensation began at separate and distinct times" and would thus have involved different hypothetical negotiations. Id. at 1361-62. However, the opinion later qualifies that statement by noting that the two products counted as separate infringements because they were "vastly different" and "involved different infringement issues." Id. at 1362. Under different facts, "two products, even if not identical, may present the same damages analysis." Id. at 1363. And the Court noted that the statute of limitations could, as in WangLabs, shift the date of the hypothetical negotiation to a date other than that of first infringement. Id. at 1364.

Although Applied Medical did not reach the issue presented here, it is clear from the Federal Circuit's reasoning that whether the sale of an earlier infringing but not accused product may be used as the date of the hypothetical negotiation turns on the facts of the case and, in particular, the similarity of the two products. This is consistent with the general principle that patent damages measure the "value of what was taken." Power Integrations, 904 F.3d at 977. If a patentee can prove that its patent was essential to the launch of an entire product line, the fact that the first product in that line was sold before the statute of limitations would not necessarily preclude accurate consideration of the infringer's need to use the patent pre-launch, "even if damages cannot be collected until some time later." LaserDynamics, 694 F.3d at 75.

Accordingly, I find that the date of the hypothetical negotiation turns on disputed facts, which potentially include whether the SixAxis controller was an infringing product and the degree of similarity between the SixAxis and the accused products. These factual disputes cannot be resolved on a motion to exclude testimony. I will therefore deny Sony's Motion as to this ground.

3. Sony's Second Objection: Incorrect Parties to the Hypothetical Negotiation

Sony finally objects that Mr. Urbanchuk's proposed testimony uses Genuine Enabling as one of the parties even though Genuine Enabling did not exist at the time. Sony contends that Mr. Urbanchuk should have used the patentee, Nghi Nho Nguyen.

"[T]he hypothetical negotiation takes place between the patentee and infringer at the time infringement began." Oracle Am., Inc. v. Google Inc., 798 F. Supp. 2d 1111, 1117 (N.D. Cal. 2011). If the current plaintiff was not the patentee at the time, it is improper to use the current plaintiff as the hypothetical negotiator. Id. Accordingly, I will grant Sony's Motion in part as to this ground: Mr. Urbanchuk's testimony must reflect that Nguyen is the hypothetical negotiator, not Genuine Enabling.

However, Sony fails to show how, if at all, changing the hypothetical negotiator from Genuine Enabling to Nguyen would affect Mr. Urbanchuk's calculations. While Sony presents some arguments that the difference could matter (such as that Nguyen is apparently "not greedy"), none so clearly undermines Mr. Urbanchuk's analysis to warrant exclusion of his testimony. I will therefore deny Sony's Motion to the extent it seeks exclusion of any of Mr. Urbanchuk's testimony.

### J. Dr. Seth's Damages Analysis Based on Sony's License to Use Bluetooth

1. Challenged Opinion

Dr. Seth is Sony's damages expert. A relevant factor in estimating damages for patent infringement is the royalties the infringer paid for licenses that are comparable to a hypothetical

license for the infringed patent. Bio-Rad Labs., Inc. v. 10X Genomics, Inc. 967 F.3d 1353, 1372 (Fed. Cir. 2020). Dr. Seth considers the royalties Sony paid for the use of Bluetooth technology and concludes that, because Sony paid $220,000 for Bluetooth, Sony would have paid no more than that for the right to use the ’730 patent. (Seth Report ¶ 63.)

Bluetooth is a technology for wireless communication. See Bluetooth Special Interest Group, “A Developer’s Guide to Bluetooth Technology,” https://www.bluetooth.com/blog/a-developers-guide-to-bluetooth/. According to Dr. Seth, Sony can only derive benefit from the ’730 patent if Sony also uses Bluetooth in its products because Sony cannot transmit “multiple user input data streams … over the Accused Controllers’ Bluetooth connection to the Accused Consoles” if the Bluetooth link is removed. Dr. Seth therefore concludes that both “a license to the ’730 Patent and a license to Bluetooth … are equally necessary” to achieve “that specific functionality.” (Seth Report ¶ 64.)

A manufacturer seeking to use Bluetooth technology in its product must become a member of the Bluetooth Special Interest Group and qualify its products with that organization. (Seth Report ¶¶ 68, 71.) The Bluetooth Special Interest Group has “over 36,000” members, and companies can join the organization for a fee. (Id. ¶ 68.) Sony and its related entities would have paid a total of between $110,000 and $220,000 for membership in the organization and qualification of the accused products. (Id. ¶ 78.) Using a principle termed the “symmetry axiom,” Dr. Seth concludes that Sony would have paid equal value for two blocking technologies, making $220,000 an “upper bound” for the value of a license for the ’730 patent. (Id. ¶¶ 64, 65 n.140)

2. Genuine Enabling’s First Objection: Misunderstanding of the Technological Relationship Between Bluetooth and the ’730 Patent

Genuine Enabling first argues that Dr. Seth’s proposed valuation testimony should be excluded because Dr. Seth fails to demonstrate that Bluetooth is “technologically … []comparable”

to the ’730 patent. See Bio Rad, 967 F.3d at 1373. Genuine Enabling contends that Dr. Seth inaccurately assumed that all elements of the ’730 patent are practiced on the Bluetooth modules of the accused controllers.

Genuine Enabling’s argument rests on a mischaracterization of Dr. Seth’s report, which does not assume that all steps necessary to infringe the ’730 patent are performed in the Bluetooth module. Rather, Dr. Seth opines that Bluetooth is technologically comparable to the ’730 patent because both are equally necessary to transmit a combined data stream from the controller to the console. Moreover, Dr. Seth is not Sony’s engineering expert, and a Daubert motion directed to an economics expert is not an appropriate vehicle to test the sufficiency of evidence on the technical relationship between Bluetooth and the ’730 patent. See Walker, 46 F. App’x at 692 (sufficiency not at issue on a motion to exclude evidence).

I will therefore deny Genuine Enabling’s Motion as to this ground.

3. Genuine Enabling’s Second Objection: Failure to Analyze Economic Comparability

Genuine Enabling next argues that Dr. Seth’s valuation analysis should be excluded because Dr. Seth fails to show that Sony’s license to use Bluetooth technology is economically comparable to a hypothetical license for the ’730 patent.

While damages testimony based on comparator licenses requires that those licenses be, in fact, “comparable” to a hypothetical license for the asserted patent, “the issue of comparability is often one of sufficiency of the evidence, not admissibility.” Bio-Rad, 967 F.3d at 1373. Daubert requires only that “there … be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case.” Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d at 1317. Once that threshold is met, “[t]he degree of comparability of … license

agreements … [is] [a] factual issue[] best addressed by cross examination and not by exclusion." ActiveVideo Networks, Inc. v. Verizon Comms., Inc., 694 F.3d 1312, 1333 (Fed. Cir. 2012).

I conclude that Dr. Seth has met that minimal threshold. She opines that removal of either Bluetooth or the '730 patent from the accused products would render them inoperable and offers an economic justification for why the licensors of those two technologies would split the profits accruing from the combination. I will therefore deny Genuine Enabling's argument to the extent it seeks to preclude Dr. Seth from placing any reliance on Sony's licensing of Bluetooth in rendering her opinion.

However, mindful that the threshold for admissibility is not high, I do find that Dr. Seth's ultimate conclusion that $220,000 is an "upper bound" for the royalty Sony would have paid for the '730 patent goes farther than Uniloc allows. According to Dr. Seth, Sony obtained the right to use Bluetooth technology by paying, along with 36,000 other companies, a flat fee for membership in an organization and qualification of its products. Dr. Seth then concludes that Sony would have paid no more than that same flat fee for the '730 patent because both are necessary to transmit a combined data stream from the accused controllers to the accused consoles—essentially, that both are necessary for the product to work.

Dr. Seth does not attempt to account for the stark differences between a technology available to all manufacturers equally on a flat fee and Sony's hypothetical negotiation with a single patentholder. "Testimony relying on licenses must account for … distinguishing facts when invoking them to value the patented invention." Ericsson, Inc. v. D-Link Systems, Inc., 773 F.3d 1201, 1227 (Fed. Cir. 2014). In fact, Dr. Seth's analysis could be copied verbatim to measure the value of any technology in any product that also requires Bluetooth, on the theory that licensors of blocking technologies would share profits equally. Dr. Seth's "upper bound" conclusion is

therefore "detached from the facts of [this] case" and must be excluded. ART+COM Innovationpool Gmbh v. Google, Inc., 155 F. Supp. 3d 489, 515 (D. Del. 2016).

In its briefing, Sony points out a fact not stated in Dr. Seth's report: that, under Genuine Enabling's infringement theory, the Bluetooth module of the accused products itself is used to satisfy some of the elements of the asserted claims. However, this observation differs from Dr. Seth's actual reasoning, which, as noted, is based on the fact that both Bluetooth and the '730 patent are blocking technologies, not on the physical portion of the product in which those technologies are utilized. Significantly, Dr. Seth herself does not rely on the physical proximity of the two technologies to argue that the two licenses would be economically comparable.

I will therefore grant Genuine Enabling's Motion but only to the extent that Dr. Seth is precluded from testifying that Sony's royalty for Bluetooth technology is an "upper bound" to the royalty Sony would have paid for the '730 patent merely because both are blocking technologies. Dr. Seth is not otherwise precluded from referencing Sony's license for Bluetooth technology, incorporating it in her valuation analysis, or arguing that it is indicative of the value of the '730 patent to Sony.

**K. Dr. Seth's Analysis of Other Licenses**

1. Challenged Opinion

Dr. Seth also surveys other licenses Sony purchased related to the accused products. Dr. Seth does not derive a valuation number from these licenses but opines that they are "consistent" with the valuation derived from Sony's Bluetooth license. (Seth Report ¶ 83.)

2. Genuine Enabling's Objection: Failure to Analyze Technological and Economic Comparability

As with Dr. Seth's analysis of Sony's Bluetooth license, Genuine Enabling argues that Dr. Seth's analysis of these licenses should be excluded because Dr. Seth did not adequately

consider whether these licenses are technologically and economically comparable to a hypothetical license for the ’730 patent.

Technological comparability is an engineering issue not properly directed to Dr. Seth. As to economic comparability, for each comparator license, Dr. Seth evaluates whether the time frame and territory are comparable. Where available, Dr. Seth evaluates the term of the license and the scope of products covered. Where these factors differ, Dr. Seth explains how the difference would affect the comparison. This analysis is sufficiently reliable to support the limited purpose for which Dr. Seth uses these licenses.

I will therefore deny Genuine Enabling’s Motion as to this ground.

## V. CONCLUSION

For the reasons given, the Motions to Exclude expert testimony are granted in part and denied in part as described above.

An appropriate order follows.

Case: 24-1686 Document: 11 Page: 136 Filed: 06/11/2024

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **GENUINE ENABLING TECHNOLOGY LLC,**<br>***Plaintiff*,**<br>***v.***<br>**SONY CORPORATION *et al.*,**<br>***Defendants*.** | **Civil Action**<br>**No. 17-cv-135** |

# ORDER

**AND NOW**, this 20th day of July, 2023, upon consideration of Plaintiff's Motion for Reargument (D.I. 308) and Defendants' response in opposition thereto (D.I. 313), and following a hearing held on June 20, 2023, and for the reasons set forth in the accompanying memorandum opinion, it is hereby **ORDERED** that:

1. Genuine Enabling's Motion for Reargument (D.I. 308) is **DENIED**.

2. Within fourteen (14) days of the date of this Order, the parties shall submit a joint letter, limited to five (5) pages, indicating whether the parties seek leave to file motions for summary judgment and, if so:

   a. The issues proposed to be addressed on summary judgment;

   b. For each issue, whether summary judgment on that issue would dispose of the entire case or would be limited to certain claims or theories; and

   c. A proposed briefing schedule.

**BY THE COURT:**

***/s/ Mitchell S. Goldberg***
**MITCHELL S. GOLDBERG, J.**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **GENUINE ENABLING TECHNOLOGY LLC,**<br><br>***Plaintiff,***<br><br>***v.***<br><br>**SONY CORPORATION et al.,**<br><br>***Defendants.*** | **Civil Action**<br><br>**No. 17-cv-135** |

**MEMORANDUM OPINION**

**GOLDBERG, J.**[1] **July 20, 2023**

In this patent infringement dispute, Plaintiff Genuine Enabling Technology LLC ("Genuine Enabling") asserts that video game hardware sold by Defendants Sony Corporation and Sony Interactive Entertainment LLC (collectively "Sony") infringes U.S. Patent No. 6,219,730 (the '730 patent).

On October 11, 2021, Sony moved to exclude certain opinions offered by Genuine Enabling's expert Dr. Kenneth Fernald under Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 (1993). I granted Sony's motion in part, precluding Dr. Fernald from offering the opinion that a component of Sony's products was structurally equivalent to an element of the claimed invention. Specifically, I found that Dr. Fernald had not sufficiently explained how that component operated in substantially the same "way" as the claimed structure under the function-way-result test. (See Daubert Opinion, ECF No. 303, at 6-15.)

[1] Pursuant to 28 U.S.C. § 292(b), I have been designated to serve as a visiting judge for the District of Delaware to handle this matter and other District of Delaware cases.

Presently before me is Genuine Enabling's "reargument" motion, which posits that my Daubert ruling misunderstood Dr. Fernald's opinions. In support, Genuine Enabling attached a declaration by Dr. Fernald clarifying which aspects of the claimed and accused structures he considers to be the "way" those structures operate under the function-way-result test. Finding that testimony from Dr. Fernald would be helpful to resolve this issue, I scheduled a hearing on June 20, 2023, wherein Dr. Fernald testified about his equivalency conclusions.

Having considered this testimony, along with Dr. Fernald's declaration, the parties' briefs on the original Daubert motion, and the motion for reargument, I conclude that Genuine Enabling's motion does not provide a basis to reconsider the reliability of Dr. Fernald's proposed testimony.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Dr. Fernald's Opinions and the Prior Daubert Motion

Genuine Enabling contends that certain video game controllers and consoles manufactured by Sony infringe claims of the '730 patent. A central infringement issue is whether the accused products contain a structure that meets the definition of a "framer" as used in the asserted claims. I construed the term "framer" as a means-plus-function term with a function of "[s]ynchronizing the user input stream with the input stream and encoding the user input stream and the input stream into a combined data stream" and a structure of "[t]he logic design at block 34 in Figure 4A and equivalents thereof." (Claim Construction Opinion, ECF No. 112, at 27.) Figure 4A of the '730 patent is a diagram showing various components and signals with an accompanying text describing how those components operate to synchronize the two data streams into a combined stream. ('730 patent at col. 5; Fernald Report ¶¶ 124-26.) The inventor described this approach to combining the two data streams as "unique and novel." (Claim Construction Opinion at 23.)

Through the report of its expert Dr. Kenneth Fernald, Genuine Enabling contends that the accused Sony products contain Bluetooth modules that are structurally equivalent to block 34 of Figure 4A under the "function-way-result" test, which requires that "the two [structures] perform the identical function in substantially the same way, with substantially the same result." Traxcell Tech. LLC v. Sprint Comms. Co., 15 F.4th 1121, 1128 (Fed. Cir. 2021).

Sony moved to exclude Dr. Fernald's opinion on structural equivalence for several reasons, and I granted Sony's motion as to just one, concluding that Dr. Fernald did not explain how the accused Bluetooth modules synchronized the two data streams in substantially the same "way" as block 34 of Figure 4A. (Daubert Opinion, ECF No. 303, at 6-15.)

### B. Genuine Enabling's Motion for Reargument

Genuine Enabling seeks to reargue Sony's Daubert motion as to Dr. Fernald's function-way-result opinion, and requests that Dr. Fernald be permitted to testify at trial as to his ultimate opinion that the accused Bluetooth modules are structurally equivalent to block 34 of Figure 4A. Genuine Enabling offers two bases for this request. First, it contends that I misunderstood Dr. Fernald's report when I concluded that Dr. Fernald did not analyze the "way" prong of the function-way-result test. In support, Genuine Enabling attached a new declaration from Dr. Fernald, which clarifies his opinion regarding the "way" block 34 of Figure 4A synchronizes the two data streams. Specifically, Dr. Fernald now expressly states that the "way" is by "synchronizing [the two data streams] to a common bit-rate clock." (Fernald Dec. ¶ 22.) Dr. Fernald extensively elaborated on this opinion at the June 20, 2023 hearing.

Dr. Fernald's declaration further states that details contained in his original report about how block 34 synchronizes streams to a common bit-rate clock (e.g., using a CODEC and a data selector) were not meant to be included in the "way" for purposes of the function-way-result test.

Instead, Dr. Fernald defines the "way" so that it stops at "synchronizing them to a common bit-rate clock" with no additional details. (Fernald Dec. ¶ 17.)[2]

Second, Genuine Enabling posits that Sony did not fully articulate the alleged problems with Dr. Fernald's report until its reply brief. In particular, Genuine Enabling submits, the section of Sony's brief addressed to Dr. Fernald's alleged failure to analyze the "way" prong did not quote from Dr. Fernald's report and instead relied on deposition testimony. Genuine Enabling therefore complains that it lacked an opportunity to fully respond to Sony's challenge.

Because Genuine Enabling had raised a concern that I misunderstood Dr. Fernald's report, and because Dr. Fernald's report concerns a highly technical subject, I determined that a hearing was appropriate to "allow for a meaningful evidentiary determination" of Sony's Daubert challenge. Oddi v. Ford Motor Co., 234 F.3d 136, 153 (3d Cir. 2000). That hearing was held on June 20, 2023.

**C. Dr. Fernald's Hearing Testimony**

At the hearing, Dr. Fernald explained his opinions consistently with how those opinions were expressed in his report. Generally, it remains Dr. Fernald's opinion that because all Bluetooth

[2] To the extent Dr. Fernald's declaration could be considered a request to supplement his expert report, it would have to meet the factors set out in Meyers v. Pennypack Woods Home Ownership Assn., 559 F.2d 894 (3d Cir. 1977). See LabMD Inc. v. Boback, 47 F.4th 164, 189 (3d Cir. 2022). These factors are: (a) whether there was "bad faith on the part of the party seeking to call [the] witness[][,]" an "intent to mislead," or "willfulness" in failing to comply with the court's schedule; (b) the "ability of the party to have discovered" the relevant testimony early and the "validity of [its] excuse" for not doing so; (c) "the importance of the … testimony"; (d) "the prejudice or surprise" to the opposing party and its "ability … to cure [that] prejudice"; and (e) any "disrupt[ion] [to] the orderly and efficient trial of the case or of other cases in the court." Pennypack, 559 F.2d at 904-05. Dr. Fernald's declaration does not present new opinions of a technical or factual nature. Instead, Genuine Enabling stands by its prior explanation of how the accused devices function and seeks only to show that, legally, that explanation satisfies the "way" prong of the function-way-result test. Sony's response to that argument is likewise primarily legal and not factual. Thus, I conclude that an analysis under Pennypack is unnecessary.

devices require data to be synchronized to a bit-rate clock, the accused Bluetooth module must be equivalent to block 34 of Figure 4A. (N.T. 6/20/23 at 40:14-25, 42:25-43:3, 43:20-23, 46:2-5.) He testified that Bluetooth is the "standard" that the accused products use to communicate, and some parts of that standard—called "whitening" and "CRC generation"—must be supplied with data that is synchronized to a bit-rate clock. (N.T. 6/20/23 at 50:6-13.) Thus, according to Dr. Fernald, the accused Bluetooth module must produce data that is synchronized to a bit-rate clock, or "the product would fail." (N.T. 6/20/23 at 43:13; see also id. at 51:11-13 ("[W]e know that again from looking at [sic] what the logic would have to be doing in order to satisfy the Bluetooth specification.").)

Consistent with his original report, Dr. Fernald's testimony clarified that "whitening" and "CRC generation" are not themselves the steps that synchronize the two data streams. Rather, whitening and CRC generation are the parts of the Bluetooth module that need synchronized data, and the data streams therefore "must be synchronized" for whitening and CRC generation to function in the manner required by the Bluetooth specification. (See id. at 43:19-23; Fernald Report at ¶ 131 n.46.)

Although Dr. Fernald testified that the Bluetooth module must synchronize the two data streams to a common bit-rate clock, he did not testify to any processes, components, or other details inside the accused Bluetooth module to explain how the two data streams become synchronized to a common bit-rate clock.[3] When pressed on this point, Genuine Enabling's counsel explained that,

[3] While Dr. Fernald did inspect the accused Bluetooth module with a "Bluetooth protocol analyzer," his report and testimony make clear that the purpose of this inspection was to determine which optional features of the Bluetooth protocol were being used, and, consequently, whether "CRC generation" was being performed ("whitening" is mandatory). (Fernald's Report ¶ 129; N.T. 6/20/23 at 37:25-38:16, 39:17-40:13.) Genuine Enabling does not argue that this "protocol analyzer" allowed Dr. Fernald to uncover the process by which the Bluetooth module produced the synchronized data streams necessary for the "whitening" and "CRC generation" steps.

in Dr. Fernald's view, synchronizing to a common bit-rate clock is in itself the "how"—i.e. the "way." (N.T. 6/20/23 at 46:10-47:18.) Dr. Fernald testified consistently and stated:

> If I understood your question correctly, because we know whitening occurs with a specific circuit diagram showing in the Bluetooth specification, we know that not only are the two streams synchronized together, but they were necessarily synchronized, each of them was necessarily synchronized to the bit clock, which **is the way** the block 34 does it.
>
> You know, there's multiple ways of synchronizing two streams together. The specific way for both block 34 and the Bluetooth modules, the logic of the Bluetooth modules is they synchronize each of the two streams to the bit clock.

(N.T. 6/20/23 at 49:15-24 (emphasis added).) In short, at the hearing and in its briefing, Genuine Enabling has not added any more details to the "way" other than to continue to posit that the data streams are synchronized to a bit-rate clock in the accused Bluetooth module.

Dr. Fernald did not agree that his analysis established only "that … synchronization is occurring." Rather, he claimed it also showed that a bit-rate clock was involved and that each stream was synchronized to that bit-rate clock. (N.T. 6/20/23 at 44:3-24.) In Dr. Fernald's view, there are two types of synchronizing: synchronizing two streams to each other and synchronizing each stream to a common bit-rate clock:

> [T]o give you an analogy, … think about if you have two wrist watches. If I wanted to synchronize the two, the time of two wrist watches, I could look at one and set the time on the other to match it or I could look at a wall clock and set both wrist watches to the wall clock time.
>
> It's the latter analogy that best fits what's happening [in block 34 of Figure 4A]. Rather than trying to directly synchronize one stream to the other, what block 34 [does] is it synchronizes both streams to a common clock, which thereby forces the two streams to also [be] synchronized to each other, just like the wrist watch example.

(N.T. 6/20/23 at 29:9-20.) Thus, Dr. Fernald opined that not "all ways" of synchronizing data streams are equivalent, because there are at least two "ways" that are not equivalent: synchronizing to a bit-rate clock and synchronizing streams directly to each other. (N.T. 6/20/23 at 58:2-19.)[4]

### D. Sony's Response

Sony maintains that Genuine Enabling's latest efforts are nothing new and still impermissible under Daubert and as a matter of patent law because it is incorrect to frame the "way" a device operates by isolating just one feature—the bit-rate clock—and ignoring the device's "overall structure[]." (Sony's Response at 4, citing Toro Co. v. Deere & Co., 355 F.3d 1313, 1324 (Fed. Cir. 2004).) Sony asks that I not alter my ruling barring Dr. Fernald from testifying to his ultimate opinion on structural equivalence.

## II. LEGAL STANDARD

"Reargument under the District of Delaware's local rules attempts to balance the interests in obtaining a final decision on matters presented to the Court and the recognition that the Court, like all others, is capable of mistake and oversight. Well-grounded motions for reargument thus present the court with an opportunity to correct erroneous rulings." Morningred v. Delta Fam.-Care & Survivorship Plan, 790 F. Supp. 2d 177, 191 (D. Del. 2011) (footnotes and quotation marks omitted). Motions for reargument are granted "sparingly," and typically only when: (1) "the court has patently misunderstood a party"; (2) "the court has made a decision outside the adversarial issues presented to the court by the parties"; (3) "the court has made an error not of reasoning but

[4] Dr. Fernald also rejected Sony's accusation that his analysis of the Bluetooth module rested on a theory that all ways of achieving a given result are considered equivalent in electrical engineering. Rather, Dr. Fernald clarified that he only meant to say that logic circuits that perform a "specific function" in a "specific way" may be considered equivalent in the art even if they do not have "gates" (i.e., the building block of logic circuits) in common. (N.T. 6/20/23 at 53:4-20.)

of apprehension"; (4) there has been "an intervening change in the controlling law"; (5) there is "new evidence that was not available when the court issued its order"; or (6) there is a "need to correct a manifest injustice." Id. at 192.

"[A] motion for reargument may not be used by the losing litigant as a vehicle to supplement or enlarge the record provided to the Court and upon which the merits decision was made unless new factual matters not previously obtainable have been discovered since the issue was submitted to the Court … ." Schering Corp. v. Amgen, Inc., 25 F. Supp. 2d 293, 295 (D. Del. 1998) (quotation marks omitted, emphasis in original).

## III. DISCUSSION

Genuine Enabling primarily argues that my prior Daubert opinion misunderstood the "way" Dr. Fernald had opined that the claimed structure (block 34 of Figure 4A) and accused structure (logic in the Bluetooth modules) synchronize data streams. Through his declaration and hearing testimony, Dr. Fernald has clarified that the "way" each device synchronizes data streams is by synchronizing those streams to a common bit-rate clock. Dr. Fernald has supplied no further details.[5] Genuine Enabling argues that even though Dr. Fernald has not described the specific processes or components that produce synchronized streams in the Bluetooth module, it is sufficient to demonstrate the "way" by explaining that data streams synchronized to a bit-rate clock must occur in order for the product to function correctly. Essentially, Genuine Enabling continues to press that Dr. Fernald be allowed to testify that the two structures in question are equivalent because they both function in that "way." It is worth noting, again, that Dr. Fernald has not opined

[5] As noted, Dr. Fernald's original report did supply additional details regarding how block 34 of Figure 4A synchronizes the two data streams, but he has since clarified that he does not consider those details to be part of the "way" (even if they are part of the "how").

on the steps or components within the Bluetooth module involved in producing such synchronized data streams, other than that a bit-rate clock is involved.

The relevant statutory section, 35 U.S.C. § 112(f), "operates to limit a claim from every possible means to those which are 'equivalent.'" Intel Corp. v. U.S. Int'l Trade Comm'n, 946 F.2d 821, 842 (Fed. Cir. 1991); see also Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc., 145 F.3d 1303, 1309 (Fed. Cir. 1998) ("[S]ection 112, paragraph 6, rules out the possibility that any and every means which performs the function specified in the claim literally satisfies that limitation." (emphasis in original)). "The word 'equivalent' in section 112 invokes the familiar concept of an insubstantial change which adds nothing of significance." Valmont Indus., Inc. v. Reinke Mfg. Co., 983 F.2d 1039, 1043 (Fed. Cir. 1993). "Structural equivalence under § 112, ¶ 6 is met only if the differences are insubstantial …; that is, if the assertedly equivalent structure performs the claimed function in substantially the same way to achieve substantially the same result as the corresponding structure described in the specification." Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259, 1267 (Fed. Cir. 1999).

By limiting the scope of a means-plus-function term to disclosed structures and their equivalents, § 112(f) "prevents an overly broad claim construction by requiring reference to the specification, and at the same time precludes an overly narrow construction that would restrict coverage solely to those means expressly disclosed in the specification." Symbol Techs., Inc. v. Opticon, Inc., 935 F.2d 1569, 1575 (Fed. Cir. 1991). A patentee does not obtain ownership of "every conceivable way or means to perform the [claimed] function"—just those ways that are substantially the same as the way the patentee invented and disclosed. Mas-Hamilton Grp. v. LaGard, Inc., 156 F.3d 1206, 1214 (Fed. Cir. 1998). But by the same token, the patentee is not limited to structures

that replicate every detail disclosed in the specification—so long as the insubstantiality test is met. Odetics, 185 F.3d at 1267.

A patentee and accused infringer will sometimes disagree as to how specifically or generally to phrase the "way" a disclosed structure operates. 5B Chisum on Patents § 18.04b (2022). As an analogy, consider how the "way" a paperclip holds paper together could be phrased with more detail ("by using bent metal to apply pressure to pages") or less ("by applying pressure to pages"). Depending on the level of specificity, a paperclip and a paperweight may or may not hold papers together in the same "way." In deciding how much detail is required, "[t]he appropriate degree of specificity is provided by the statute itself; the relevant structure is that which 'corresponds' to the claimed function. … Further deconstruction or parsing is incorrect." Odetics, 185 F.3d at 1268.

"Generally, a number of factors may be considered when determining the scope of a means-plus-function limitation, including the language of the claim, the patent specification, the prosecution history of the patent, other claims in the patent, and expert testimony." In re Hayes Microcomputer Prod., Inc. Pat. Litig., 982 F.2d 1527, 1543 (Fed. Cir. 1992) (quotation marks omitted). For example, an "'indispensable' part of" a structure may be given "greater weight" in determining whether two structures are equivalent. Toro Co. v. Deere & Co., 355 F.3d 1313, 1324 (Fed. Cir. 2004). But each "individual component[]" of a structure is not in itself a "claim limitation[]" required to be present (literally or as an equivalent) in the accused device. Odetics, 185 F.3d at 1268. "Rather, the claim limitation is the overall structure corresponding to the claimed function." Id.

Here, the dispute between the parties revolves around how specifically or generally Genuine Enabling's expert may describe the "way" the claimed and accused structures synchronize the two data streams. Genuine Enabling asserts that synchronizing two streams to a bit-rate clock is, in itself, the "way" block 34 of Figure 4A functions. That is, Genuine Enabling proposes to omit

details described in the specification (such as the data selector and CODEC) from the "way," even though Dr. Fernald agrees that those details are part of the process by which block 34 causes the two streams to become synchronized. (Fernald Dec. ¶ 9.)[6] Phrasing the "way" solely in terms of the bit-rate clock potentially allows Genuine Enabling to show that the accused Bluetooth module is equivalent to block 34 even though the specific processes used to synchronize data streams in the Bluetooth module are left undescribed by Dr. Fernald and he has not discussed how the Bluetooth module's structure resembles (or differs from) the claimed structure. But Dr. Fernald's report does not discuss why it is appropriate to omit details that are concededly part of how block 34 of Figure 4A causes the two data streams to become synchronized. And Dr. Fernald has not explained why these details are "insubstantial." See Odetics, 185 F.3d at 1267. This deficiency is even more pronounced on the Bluetooth module side, as it is unknown what other details are even involved in the process of synchronization and thus whether the omitted details are "insubstantial change[s] which add[] nothing of significance." Valmont Indus., 983 F.2d at 1043.

The second problem with phrasing the "way" so broadly is that the law requires the "degree of specificity" of a means-plus-function claim limitation to be "the … structure [that] 'corresponds' to the claimed function." Odetics, 185 F.3d at 1268. The '730 patent describes the structure corresponding to the "framer" limitation with a certain degree of specificity. While that description does not include every possible detail (e.g., some of the components are depicted as "box[es]" even though they are made from smaller parts, N.T. 6/20/23 at 27:18-24), it does include at least a

[6] As Genuine Enabling points out, the CODEC is outside the dotted-line border of block 34 and therefore not part of the "framer" limitation as construed. But Dr. Fernald's report makes clear that part of how block 34 causes the two streams to become synchronized is by using the same bit-rate clock for the CODEC as for the data selector. (Fernald Report ¶ 126 n.39; Fernald Dec. ¶ 9; N.T. 6/20/23 at 27:14-15 ("[S]ome of the logic of the codec does play a role in the synchronization process … .").)

data selector that alternately selects between two streams to synchronize them. (Fernald Report ¶¶ 125-26.) Genuine Enabling remains free to claim as equivalents structures that omit such details—and thus that operate in different "ways"—by showing that the differences are insubstantial. Valmont Indus., 983 F.2d at 1043. But Genuine Enabling needs a basis for doing so. Showing only that block 34 and the Bluetooth module have one detail in common—a bit-rate clock—fails to shed light on why that detail is the most significant or why other details are of lesser importance.[7]

Toro Co. v. Deere & Co., 355 F.3d 1313 (Fed. Cir. 2004), is instructive in resolving this issue. That case involved a means-plus-function term ("control means") with a structure that "include[d] a mechanical cam system." Id. at 1323. The accused product used a solenoid system, making the issue for infringement whether the cam and solenoid "function[ed] identically and in a substantially similar structural way to achieve the substantially same result." Id. The patentee's expert testimony demonstrated that the cam and solenoid systems were interchangeable, but this

[7] Compare, for example, Dr. Fernald's analysis of a different claimed function (producing the "output stream") to show that one of its components (an "inverting logic gate") was an insubstantial difference from the accused product:

> A POSITA [person of ordinary skill in the art] would not consider a simple inverting logic gate, as in the highlighted path above in Figure 4A, as a substantial structural difference. This inverter is used in that embodiment to correct for the signal inversion of the TXD line that occurs in block 35. However, as I discuss in ¶ 114 of this report, the '730 patent describes a number of different communication links and hence associated transceivers. A POSITA would clearly understand that if using different transmitter/receiver circuitry in place of block 35, such an inverter may or may not be needed.

(Fernald Report ¶ 140.) This analysis is less conclusory than that offered for the "synchronizing" function, which essentially asserts, without explanation, that the common feature of a bit-rate clock shows equivalence. While Genuine Enabling cites cases in which expert testimony on equivalence was found sufficient despite accusations that it was "conclusory," the cited opinions do not endorse those accusations or hold that conclusory expert testimony is admissible. See Applied Medical Res. Corp. v. U.S. Surgical Corp., 448 F.3d 1324, 1335 (Fed. Cir. 2006) ("[W]e conclude that the declaration was not overly conclusory … ." (emphasis added)); Charles Mach. Works, Inc. v. Vermeer Mfg. Co., 723 F.3d 1376, 1380 (Fed. Cir. 2013) (describing the expert's detailed reasoning on equivalence).

showed only their "function or result," not "the way in which cam systems and solenoid systems actually work." Id. at 1324. Absent evidence that the two systems functioned in substantially the same way, summary judgment was found to be properly granted on noninfringement. Id. at 1314.

This result is consistent with In re Hayes Microcomputer Prod., Inc. Pat. Litig., 982 F.2d 1527 (Fed. Cir. 1992). Hayes also involved a means-plus-function claim limitation, but the specification described the corresponding structure as a microprocessor programmed to perform certain "desired functions" without specifying how this programming was to be accomplished, relying instead on the fact that "[o]ne skilled in the art would know how to program a microprocessor to perform the necessary steps described in the specification." Id. at 1533-34 (emphasis deleted). The patentee's evidence demonstrated that the accused product contained a microprocessor and that it had been programmed in the specified manner, including testimony from the designer about the steps he designed the product to perform. Id. at 1541-42. The Federal Circuit concluded that the patentee's evidence was sufficient to prove infringement. Id. at 1543.

Thus, Hayes shows that where the patent's specification itself describes a structure in terms of the steps it has been programmed to perform, evidence that an accused product has been programmed to perform those same steps will suffice. See id. at 1543 (noting that "the patent specification," among other factors, may be considered in "determining the scope of a means-plus-function limitation"); Odetics, 185 F.3d at 1268. ("[T]he relevant structure is that which 'corresponds' to the claimed function."). Hayes does not stand for the broader proposition that evidence regarding how a device behaves is always sufficient to establish that structures operate in the same way, regardless of how the structure is described in the specification.

Here, in contrast to Hayes, the specification of the '730 patent does not describe the framer merely as any logic circuit designed to synchronize two data streams to a bit-rate clock. Rather, it

is described as a logic circuit that synchronizes data streams in a particular manner, using particular processes and components. Dr. Fernald notes these processes in paragraphs 125 and 126 of his report. While it might have been possible to describe block 34 as "just a box" having "certain features," (N.T. 6/20/23 at 27:18-24,) the patentee did not do so. Thus, any analysis of the accused product under the function-way-result test must describe and determine whether the "way" the accused product synchronizes data streams differs substantially from the disclosed "way."

Given all of the above, I conclude that Genuine Enabling has not provided a basis to reconsider my Daubert ruling. Dr. Fernald's analysis shows only that the Bluetooth module must achieve a certain result—data streams synchronized to a common bit-rate clock—to satisfy other requirements of the system, and does not show how, i.e. the "way," that result is achieved. Genuine Enabling's patent did not grant it ownership of "every conceivable way" of meeting the requirements of the Bluetooth specification. Mas-Hamilton, 156 F.3d at 1214. Absent a demonstration of how the Bluetooth module achieves data streams synchronized to a common bit-rate clock, a conclusion that the claimed and accused structures function in substantially the same way cannot reliably follow.

Genuine Enabling attempts to compensate for Dr. Fernald's lack of detail by pointing to sections in his report demonstrating that logic circuits built using different components (called "gates") can perform the same "operation." (Fernald Report ¶¶ 55-64.) In Dr. Fernald's view, such circuits should be considered "equivalent." (Id. ¶ 56.) Dr. Fernald repeats the phrase "same operation" in reference to block 34 of Figure 4A and the accused Bluetooth module, and concludes from this fact that the two structures are equivalent. (Id. ¶ 135.) To the extent Genuine Enabling is arguing that all logic circuits that can be used interchangeably are equivalent, this would be inconsistent with the function-way-result test, as interchangeability "goes to the function or result of

these systems, and begs the issue of the way in which … [those] systems actually work." Toro, 355 F.3d at 1324. "Almost by definition, two structures that perform the same function may be substituted for one another." Chiuminatta, 145 F.3d at 1309-10. "Such evidence does not obviate the statutory mandate to compare the accused structure to the corresponding structure." Id. (See also N.T. 6/20/23 at 59:17-22 ("Once you identify a specific way that something is being accomplished, … the various logic designs that could implement that specific way are considered equivalent … ." (emphasis added)).)

Finally, Genuine Enabling argues that my prior Daubert ruling inappropriately required Dr. Fernald to identify specific components (a CODEC and data selector) in the accused Bluetooth modules. But my prior ruling only suggested that identifying equivalents to a CODEC and a data selector was an "example" of one method by which Dr. Fernald might have established that the Bluetooth controllers synchronize data streams to a bit-rate clock in a similar "way" to block 34 of Figure 4A. (Daubert Opinion, ECF No. 303, at 13.) Other methods of analysis might have been possible, but other methods also do not appear in Dr. Fernald's report.

For these reasons, I conclude that Genuine Enabling has not demonstrated a sufficient ground for reconsidering my prior ruling that Dr. Fernald lacks a reliable basis to offer the ultimate opinion that the claimed and accused structures are equivalent.[8]

[8] Genuine Enabling also complains that Sony failed to adequately set out its Daubert position until its reply. Because Genuine Enabling has had several opportunities to clarify its position and respond to Sony's arguments (namely, at oral argument on the original Daubert motion, in its motion for reargument brief, in Dr. Fernald's new declaration, and at the hearing on its motion for reargument), Genuine Enabling's criticism is unhelpful. Moreover, Sony's opening brief was sufficient to put Genuine Enabling on notice of the nature of the challenge and did not lead to unfair surprise.

## IV. CONCLUSION

For the reasons set out above, Genuine Enabling's motion for reargument will be denied.[9]

An appropriate order follows.

[9] Some of the parties' arguments on the adequacy of Dr. Fernald's equivalency analysis are directed to the sufficiency of evidence rather than the reliability of expert testimony. (Compare Sony's Response at 5 ("Because the Court relied on Dr. Fernald's own factual contentions regarding both how the logic design at block 34 and how the Accused Bluetooth module allegedly synchronize the streams to a bit-rate clock, and then concluded as a matter of law his opinions were insufficient, there is no genuine dispute of material fact."), with Fed R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact … .").) In general, sufficiency-of-the-evidence questions should not be answered by viewing an expert's report in isolation but require a more fulsome record such as that available on a motion for summary judgment. See Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1069-70 (3d Cir. 1990). Nothing in this opinion precludes Genuine Enabling from offering additional evidence at summary judgment or trial that the accused and claimed structures are equivalent. In addition, I have not excluded any of Dr. Fernald's testimony of a technical or factual nature about how the claimed and accused structures operate or his opinions about how equivalence is viewed in the art.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **GENUINE ENABLING TECHNOLOGY, LLC,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | **No. 17-135** |
| **SONY CORPORATION, et al.,** | |
| **Defendants.** | |

## ORDER

**AND NOW**, this 9th day of March, 2020, upon consideration of the Claim Construction Opening Brief of Genuine Enabling Technology LLC ("GET") (ECF No. 70), Defendants Sony Corporation and Sony Interactive Entertainment LLC's (collectively, "Sony") Answering Brief (ECF No. 77), GET's Reply Brief (ECF No. 84), and Sony's Sur-reply Brief (Doc. No. 96), it is hereby **ORDERED** that the disputed claim terms in this case are construed as follows:

| Claim Term | Court's Construction |
|---|---|
| "input signal" | **"A signal having an audio or higher frequency."** |
| "combined data stream" | **No construction necessary.** |
| "input means for producing at least one input signal" | **"The input means is an input transducer."** |
| "framer" | **Function: "Synchronizing the user input stream with the input stream and encoding the user input stream and the input stream into a combined data stream."**<br><br>**Structure: "The logic design at block 34 in Figure 4A and equivalents thereof."** |
| "converter" | **"A circuit for converting (1) the at least one input signal into an input stream and (2) an output stream into the at least one output signal."** |

| | |
|---|---|
| "communication means" | **Function: "Communicating data between the user input apparatus and the computer."**<br><br>**Structure: "A wired or wireless transceiver and equivalents thereof."** |
| "means for receiving an output stream from the computer via the communication link" | **Function: "Receiving an output stream from the computer via the communication link."**<br><br>**Structure: "A wired or wireless transceiver and equivalents thereof."** |
| "user input means" | **Function: "Producing a digital stream, called the user input stream."**<br><br>**Structure: "A sensor translating user-initiated actuations and an encoder and equivalents thereof."** |
| "encoding means" | **Function: "Synchronizing the user input stream with the input stream and encoding the user input stream and the input stream into a combined data stream."**<br><br>**Structure: "The logic design at block 34 in Figure 4A and equivalents thereof."** |
| "means for converting the output stream into at least one output signal" | **Function: "Converting the output stream into at least one output signal."**<br><br>**Structure: "A circuit for converting a digital stream into an output signal and equivalents thereof."** |
| "converting means" | **Function: "Receiving the at least one input signal and producing therefrom an input stream."**<br><br>**Structure: "An analog-to-digital converter and equivalents thereof."** |

**BY THE COURT:**

***/s/ Mitchell S. Goldberg***
**MITCHELL S. GOLDBERG, J.**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **GENUINE ENABLING TECHNOLOGY, LLC,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | **No. 17-135** |
| **v.** | : | |
| **SONY CORPORATION, et al.,** | : | |
| **Defendants.** | : | |

**Goldberg, J.** **March 9, 2020**

**MEMORANDUM OPINION**

Plaintiff Genuine Enabling Technology LLC ("GET") alleges that Defendants Sony Corporation and Sony Interactive Entertainment LLC (collectively, "Sony") have infringed GET's U.S. Patent No. 6,219,730 through the development, manufacture, and sale of video game products, such as console systems and controllers. The parties seek construction of eleven of the patent's disputed terms pursuant to Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996).[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. The Invention

On April 17, 2001, the United States Patent and Trademark Office ("PTO") issued U.S. Patent No. 6,219,730 (the "'730 Patent"), entitled "Method and Apparatus for Producing a

[1] On May 18, 2017, Chief Judge D. Brooks Smith of the United States Court of Appeals for the Third Circuit designated me as a visiting judge for the United States District Court for the District of Delaware, pursuant to 28 U.S.C. § 292(b), to handle this and other District of Delaware cases.

[2] The following facts are derived from the Complaint, the '730 Patent, and the parties' claim construction briefs.

Combined Data Stream and Recovering Therefrom the Respective User Input Stream and at Least One Input Signal," to Nghi Nho Nguyen.[3]

GET's action alleging infringement of this patent centers on how Sony's hand-held video game controllers communicate information to the video game console. In the simplest terms, when a player moves the hand-held controller, it communicates a signal to the video game console so that the character on the screen will also move. The controller is also able to simultaneously communicate a separate signal to the console when the player pushes a button. These two signals, as GET alleges, are different types—the signal from the player's push of a button is "slow-varying" and the signal from the movement of the controller is higher frequency or a faster signal. GET asserts that, before the claimed invention, a slow-varying signal and a higher frequency signal could not be simultaneously received by a computer, or, in this case, a video game console, without colliding. "The inventor [of the '730 Patent] solved . . . this problem of being able to keep those [signals] in synchrony or coordinated in timing and communicate it to the gaming console. So that the gaming console receives both pieces of information, the push button information as well as the movement information, and can then process it for the game. So the player then visually sees whatever it is he or she did at the game controller." (Markman Hearing Tr., 12/3/19, at 8:8–21.) It is on the basis of this capability that GET alleges infringement of the '730 Patent.

Additional relevant background is detailed in the '730 Patent itself. As it states, computers utilize user input devices to receive their users' input. They also use "various kinds of input/output [("I/O")] cards or devices to handle I/O signals or information." ('730 Patent, col. 1, lines 16–17.) Typical user input devices are the mouse, the trackball, or the keyboard, and common I/O cards

[3] The inventor and patentee, Nghi Nho Nguyen, is also the owner and sole employee of GET.

include "the sound card handling I/O speech signals and the fax/modem device transferring information over the telephone line." (Id. at col. 1, lines 20–22.)

These devices and cards require and share "common computer resources such as the direct memory access (DMA) channels and the interrupt request services (IRQ)." (Id. at col. 1, lines 22–24.) However, computer resources for each card or each device have to be "configured, or assigned, to prearranged memory locations that are limited in number." (Id. at col. 1, lines 26–27.) At the time that the '730 Patent was granted, configuration setup for computer resources was "cumbersome" and "sometimes cause[d] conflict in running software." (Id. at col. 1, lines 28–20.) Although "plug-and-play technology" existed to "alleviate the configuration mechanism," it did not solve the problem of limited resources shared among cards and devices. (Id. at col. 1, lines 30–33.) The claimed invention seeks to do so:

> As computer technology advances, more cards and devices are offered for richer sets of functions; efficient use of computer resources becomes critical. Furthermore, a conventional computer requires that its user be close to its display screen in order to see and control what is shown on the screen. If somehow the user could issue commands to her computer and receive its responses remotely, she would gain a new freedom, such as walking around or staying in bed, while using the computer. The present invention offers a new kind of [user input device] utilizing the computer resources efficiently and enabling a mode of remote interaction between the computer and its user.

(Id. at col. 1, lines 33–44.) The '730 Patent's "new kind of user input device" "receiv[es]/transmit[s] additional I/O signals transferred to/from the computer, without using any computer resources except those available to the [user input device.]" (Id. at col. 1, lines 46–51.)

**B. Claim Construction**

GET initiated an action for infringement of the '730 Patent on February 8, 2017, alleging direct infringement, inducement of infringement, and contributory infringement. GET asserts that Sony has infringed, and continues to infringe, at least one of the claims of the '730 Patent by

"making using selling, offering for sale and/or importing into the United States user input devices and video game consoles, including [the Sony PlayStation® 3 console system, the Sony PlayStation® 4 console system, the Sony DualShock® 3 controller, and the Sony DualShock® 4 controller]." (Compl. ¶¶ 22–24.) For example, GET alleges that the Sony DualShock® 3 controller is a user input device that communicates via Bluetooth with the "PlayStation 3 Console" and meets every element of the '730 Patent's claim 16. (Id. at ¶ 23–24.) Sony denies infringement and asserts that the '730 Patent is invalid.

On July 13, 2019, GET submitted its opening claim construction brief regarding disputed terms in the following claims of the '730 Patent:

> **1.** A user input apparatus operatively coupled to a computer via a communication means additionally receiving at least one input signal, comprising: user input means for producing a user input stream; input means for producing the at least one input signal; converting means for receiving the at least one input signal and producing therefrom an input stream; and encoding means for synchronizing the user input stream with the input stream and encoding the same into a combined data stream transferable by the communication means. [4]
>
> **10.** The apparatus of claim 1 wherein the input means is an input transducer.
>
> **14.** A programming method, executed by a computer communicatively coupled via a communication link to a user input means having means for synchronizing and encoding a user input means and at least one additional input signal into a combined data stream, comprising the steps of: initializing the communication link; servicing a single resource service interrupt for receiving the combined data stream; and recovering from the combined data stream respective information of the user input means and of the at least one additional input signal.

[4] GET explicitly states that it is not asserting an infringement theory based on claim 1. (Markman Hearing Tr., 12/3/19, at 67:24–68:19.) However, Sony argues that claim 1 is in dispute, specifically regarding the term, "input means for producing at least one input signal," discussed infra.

> **16.** An apparatus linked to a computer by a communication link, functioning as a user input device and additionally receiving at least one input signal, comprising: a user input device producing a user input stream; an input port receiving at least one input signal; a converter receiving the at least one input signal for producing an input stream; and a framer synchronizing the user input stream with the input stream and encoding the same into a combined data stream transferable by the communication link.
>
> **17.** The apparatus of claim 16 further comprises means for receiving an output stream from the computer via the communication link and means for converting the output stream into at least one signal.
>
> **18.** The apparatus of claim 16 wherein the converter further comprises an output port wherein the framer further receives an output stream from the computer via the communication link, the output stream being further received and converted by the converter into at least one input signal going to the output port.
>
> **21.** A user input apparatus operatively coupled to a computer via a communication link receiving user input signals and additionally at least one digital input signal comprising: a user input device for producing a user input stream; an input port for producing the at least one digital input signal; and a framer for keeping the user input stream and the at least one digital input signal in synchrony and encoding the same into a combined data stream transferable to the computer by the communication link.
>
> **22.** The apparatus of claim 21 wherein the framer further receives output information from the computer to provide at least one input signal.
>
> **23.** The apparatus of claim 22 further comprises an output transducer converting the at least one output signal into output energy.

(Id. at col. 7, line 13–col. 8, line 4, 26–27; id. at col. 8, line 37–col. 10, line 15.)

I held a Markman hearing regarding these disputed terms on December 3, 2019. Having fully reviewed the parties' briefing on these terms, I now set forth their construction.

## II. LEGAL STANDARD

Claim construction is the first step in the infringement analysis. At claim construction, the court defines the meaning and scope of the disputed claim terms. See Markman, 52 F.3d at 976. Claim construction is an issue of law for the court to decide. Id.

Following claim construction, the court's interpretations are used by the factfinder to determine whether there has been infringement, by comparing the asserted claims with the accused device or prior art. Id.

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (internal quotation marks omitted). Thus, the focus of a court's analysis must therefore begin and remain on the language of the claims, "for it is that language that the patentee chose to use to 'particularly point[] out and distinctly claim[] the subject matter which the patentee regards as his invention.'" Interactive Gift Express, Inc. v. Compuserve, Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001). There is a "heavy presumption" that the terms of a claim have their ordinary and customary meaning. Texas Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193, 1202 (Fed. Cir. 2002). That ordinary meaning "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Phillips, 415 F.3d at 1313.

Generally, a person of ordinary skill in the art ("POSA") would not understand the ordinary and customary meaning of a claim term in isolation. As such, the ordinary meaning may be derived from a variety of sources including intrinsic evidence, such as the claim language, the written description, drawings, and the prosecution history; as well as extrinsic evidence, such as

dictionaries, treatises, or expert testimony. Dow Chem. Co. v. Sumitomo Chem. Co., Ltd., 257 F.3d 1364, 1373 (Fed. Cir. 2001).

The "most significant source" of authority is "the intrinsic evidence of record, i.e., the patent itself, including the claims, the patent specification[5] and, if in evidence, the prosecution history." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996); see also Phillips, 415 F.3d at 1313 (holding that a POSA is deemed to read the claim terms in the context of the entire patent, including the specification). The specification "is the single best guide to the meaning of a disputed term" and is usually dispositive as to their meaning. Vitronics, 90 F.3d at 1582. Although it is improper to import limitations from the specification into the claims, "one may look to the written description to define a term already in a claim limitation, for a claim must be read in view of the specification of which it is a part." Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1248 (Fed. Cir. 1998). On occasion, "the specification may reveal a special definition given to a claim term . . . that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." Phillips, 415 F.3d at 1316. The specification may also reveal an intentional disclaimer, or disavowal, of claim scope by the inventor . . . [, which] is regarded as dispositive." Id. "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." Renishaw, 158 F.3d at 1250.

The court "should also consider the patent's prosecution history, if it is in evidence." Markman, 52 F.3d at 980. This consists of "the complete record of proceedings before the Patent Office and includes the prior art cited during examination." Phillips, 415 F.3d at 1317. "Like the

[5] The specification is "that part of a patent application which precedes the claim and in which the inventor specifies, describes, and discloses the invention in detail." McCarthy's Desk Encyclopedia of Intellectual Property 408 (2d ed. 1995).

specification, the prosecution history provides evidence of how the [PTO] and the inventor understood the patent." Id. at 1317. Nonetheless, it is the least probative form of intrinsic evidence because it "represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation." Id.

If ambiguity still exists after considering all intrinsic evidence, the court may rely on extrinsic evidence, which is "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Markman, 52 F.3d at 980. "[D]ictionaries, and especially technical dictionaries, . . . have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology." Phillips, 415 F.3d at 1318. Additionally, expert testimony can provide background on the technology at issue, explain how it works, speak to what a POSA would understand, and establish that a particular term has a particular meaning in the pertinent field. Id. Notably, however, extrinsic evidence is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 862 (Fed. Cir. 2004) (quoting Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n, 366 F.3d 1311, 1318 (Fed. Cir. 2004)).

## III. DISCUSSION

Eleven claim terms in the '730 Patent are disputed. The parties disagree on the correct construction of the following terms: (1) "input signal"; (2) "combined data stream"; (3) "input means for producing at least one input signal"; (4) "framer"; (5) "converter"; (6) "communication means"; (7) "means for receiving an output stream from the computer via the communication link"; (8) "user input means"; (9) "encoding means"; (10) "means for converting the output stream into at least one output signal"; and (11) "converting means."

**A. "Input Signal"**

The first disputed claim term is "input signal."

| Claims | GET's Proposed Construction | Sony's Proposed Construction |
|---|---|---|
| 10, 14, 16–18, 21–23 | A signal having an audio or higher frequency. (Pl.'s Opening Claim Constr. Br., Ex. 2, at 2.) | A signal that comes from a source different from those of motion and selection units. (Markman Hearing Tr., 12/3/19, at 47:2–5; id. at 55:1–25.) |

The parties' dispute over this construction centers on whether GET disavowed the scope of the term during prosecution. Both parties rely primarily on the prosecution history in support of their proposed constructions.

Like the specification, the prosecution history may be useful in revealing either a special meaning assigned by the patentee to the term or a disclaimer clarifying what the claims do not cover. Phillips, 415 F.3d at 1317. Thus, examination of a patent's prosecution history and the application of prosecution disclaimer is a helpful tool during claim construction as it "ensures that claims are not construed one way in order to obtain their allowance and in a different way against accused infringers." Chimie v. PPG Indus., Inc., 402 F.3d 1371, 1384 (Fed. Cir. 2005).

However, a court's reliance on prosecution history must be tempered with the recognition that a "prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation." Phillips, 415 F.3d at 1317. A prosecution history "often lacks the clarity of the specification and thus is less useful for claim construction purposes." Id. Prosecution disclaimer is not appropriate in instances "where the alleged disavowal of claim scope is ambiguous," or where remarks made by an inventor to overcome a rejection may be viewed "as amenable to multiple reasonable interpretations." Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1324 (Fed. Cir. 2003) (citing N. Telecom Ltd. v. Samsung Elec. Co., 215 F.3d 1281, 1293–95 (Fed. Cir. 2000)). Rather, "for prosecution disclaimer to attach, [Federal Circuit] precedent requires that the alleged disavowing actions or statements made during prosecution be

Case: 24-1686 Document: 11 Page: 165 Filed: 06/11/2024

both clear and unmistakable." Id. at 1325–26; Cordis Corp. v. Medtronic Ave, Inc., 511 F.3d 1157, 1177 (Fed. Cir. 2008) (reiterating that "arguments made to distinguish prior art references" will be considered disavowals "only if they constitute clear and unmistakable surrenders of subject matter").

Here, the parties agree that, during prosecution, the patentee, Nghi Nho Nguyen, refined his invention and limited the scope of the claims. Their only dispute is what, in fact, was disavowed.

Consistent with its proposed construction, GET acknowledges that during prosecution the patentee limited "input signal" to those signals that have a higher frequency than the prior art—specifically, an audio frequency or higher. Sony argues that the patentee further limited "input signal," describing the "high frequency input signal" claimed by the invention as coming from "a source different from those of motion and selection units." (Defs.' Responsive Claim Constr. Br. at 5.)

The PTO originally rejected the '730 Patent over U.S. Patent No. 5,990,866 ("Yollin") in part because of the claim term "input signal": "Yollin teaches the invention substantially as claimed including . . . an input for delivering at-least-one input signal [i.e., input information received from motion translation unit 102, user selection unit 104 and physiological response sensor(s) . . . ." ('730 Patent File History, Office Action dated March 20, 2000, ECF No. 67-3, at 53.) In response, the patentee submitted the following in an attempt to differentiate his invention from Yollin:

> Yollin's invention, . . . utilizes various implementations and configurations for receiving input from motion translation unit 102, user selection unit 104 and physiological response sensor(s) 106, and for processing their information prior to communication to the host system . . . . However, Yollin only uses the configuration to receive the slow varying signal coming from the physiological

> response sensor(s). Yollin is not motivated and does not anticipate their use for receiving signals containing audio or higher frequencies in place of the physiological response sensor(s). **The high frequency input signal, which comes from a source different from those of motion and selection units, will run asynchronously relative to, and collide with, the other signals**. Yollin's invention does not teach or suggest any approach for receiving and recovering that kind of input signal. Yollin's invention utilizes . . . a controller to receive positional change information, user selection information and physiological change information to generate . . . a composite control signal but does not anticipate its use with signals containing audio or higher frequencies. Using a controller to generate the composite control signal out of the information changes, which are slow-varying, is standard and not worth mentioned [sic] in Yollin's description. Difficulties will arise when one signal runs asynchronously relative to another signal and fast. Yollin's patent does not teach or suggest any method for the controller to receive and recover such signals. In contrast, this invention describes, in its representative embodiments, how to combine the data from a UID (mouse) and from a high-frequency signal, via a framer, which is unique and novel.

('730 Patent File History, Response dated September 20, 2000, ECF No. 67-3, at 70–71 (emphasis added).)

Sony relies on the single statement set forth above in bold to support its scope disavowal argument. Sony posits that, based on this phrase, the construction of "input signal" should explicitly exclude signals coming from motion or selection units. Sony contends that, as a result of this disavowal, GET cannot now claim that the invention includes video game controllers with accelerometers or, in other words, motion sensors. (Markman Hearing Tr., 12/3/19, 10:10–13 ("When you move the controller, the accelerometer in the controller, that's the thing that actually figures out the position that you're moving to, the movement, that's a higher . . . frequency signal.").)

GET responds that the patentee did not distinguish the prior art based on whether the sensor was a motion or selection unit, but rather based on the speed or frequency of the signals. GET

maintains that during prosecution the patentee repeatedly characterized "input signal" as a signal "containing an audio or higher frequency." (Pl.'s Opening Claim Constr. Br. at 17.)

I agree with GET's proposed construction. The following portions of the prosecution history reflect that the patentee's explanation distinguishing Yollin is focused on the frequency of the input signals, not the type of sensors:

> Yollin only uses the configuration to receive the slow varying signal coming from the physiological response sensor(s). Yollin is not motivated and does not anticipate their use for receiving signals containing audio or higher frequencies . . . .
>
> Difficulties will arise when one signal runs asynchronously relative to another signal and fast. Yollin's patent does not teach or suggest any method for the controller to receive and recover such signals. In contrast, this invention describes, in its representative embodiments, how to combine the data from a UID (mouse) and from a high-frequency signal, via a framer, which is unique and novel.

('730 Patent File History, Response dated September 20, 2000, ECF No. 67-3, at 70–71.)

When read in the context of the patentee's full response, I conclude that the scope of "input signal" is not limited to signals from sources different from "motion and selection units." The patentee's statement to the PTO was that the "high frequency input signal" in *his* invention comes from a source different from the "motion and selection units" in *Yollin's* invention because the high frequency input signal claimed by the '730 Patent "will run asynchronously relative to, and collide with" the slow varying signals produced by the motion and selection units claimed in Yollin. (Id.) This is because Yollin's invention embodies a configuration for receiving only slow varying signals from motion and selection units and physiological response sensors and does not teach a method for receiving signals containing audio or higher frequencies. The '730 Patent teaches such a method. Therefore, the claimed invention's description of how to combine data from slow varying and higher frequency signals is the basis for its distinction from Yollin.

GET also argues that, in a prior Patent Trial and Appeal Board ("PTAB") *inter partes* review proceeding ("IPR") involving the '730 Patent, the PTAB construed "input signal" as a signal "having an audio or higher frequency." (Sony IPR Decision, dated March 14, 2018, ECF No. 67-6, at 11.) The PTAB's construction is not binding on this Court, but, "where the construction is similar to that of a district court's review," it is appropriate for me to take the PTAB's claim construction into consideration. SunPower Corp. v. PanelClaw, Inc., No. 12-1633, 2016 WL 1293479, at *6 (D. Del. April 1, 2016).

Here, I find the PTAB's reasoning to be persuasive. The issue of whether there was disavowal of the scope of "input signal" during prosecution was also before the PTAB. (Sony IPR Decision, dated March 14, 2018, ECF No. 67-6, at 9.) In concluding that the arguments in the prosecution history "clearly and unmistakably disavow any interpretation of 'input signal' that encompasses a signal that is slow-varying and not a high-frequency signal (i.e., audio or higher frequency)," the PTAB also relied on statements by the patentee distinguishing Yollin from the '730 Patent. (Id. at 10–11.) The PTAB likewise interpreted "input signal" as "a signal 'having an audio or higher frequency.'" (Id. at 11.)

Based on my review of the prosecution history, I will adopt GET's proposed construction of **"input signal"** as **"A signal having an audio or higher frequency."**

### B. "Combined Data Stream"

The second claim term in dispute is "combined data stream."

| Claims | GET's Proposed Construction | Sony's Proposed Construction |
|---|---|---|
| 10, 14, 16–18, 21–23 | No construction necessary.<br>Alternatively, a data stream resulting from synchronizing and merging the user input stream and the input stream. (Pl.'s Opening Claim Constr. Br., Ex. 2, at 6.) | A data stream including data from the user input stream and the input stream without a distinct identification of each source. (Defs.' Responsive Claim Constr. Br. at 7.) |

The focus of the parties' dispute on this term pertains to Sony's addition of "without distinct identification of each source" to its proposed construction.

GET relies on the claim language to support its argument that no construction of this term is necessary, arguing that each independent claim (1, 14, 16, 21) defines "combined data stream." (Id. at col. 8, lines 1–2 ("synchronizing the user input stream with the input stream and encoding the same into a combined data stream"); id. at col. 8, lines 39–41 ("synchronizing and encoding a user input stream and at least one input signal into a combined data stream"); id. at col. 9, lines 7–9 ("a combined data stream containing synchronized and encoded information of a user input means and of at least one additional input signal").)

GET also argues that the specification is consistent with the definition of "combined data stream" as taught by these claims. ('730 Patent, Abstract ("A communication program method, by which a computer receives a combined data stream resulted from two sources, one from a [user input device] another from an additional input signal, recovers from such stream the respective information of the two sources."); id. at col. 2, lines 63–67 ("Another object of the invention provides a method for receiving a combined data stream, resulted from a [user input device] and from an input signal, and for recovering therefrom the respective information of the [user input device] and of the input signal.").)

Sony responds that GET limited the scope of this claim term in the prosecution history when distinguishing U.S. Patent No. 5,870,080 ("Burnett et al."). In support of this alleged disavowal, Sony points to the following statements in response to the PTO's rejection of the '730 Patent over Burnett et al.:

> Burnet et al.'s invention uses two [multiplexers/demultiplexers] placed at its both ends in order to interleave, and later separate, the two signals of the mouse and of the transceiver . . . . In contrast, this invention implements a framer in place of the first

> [multiplexer/demultiplexer] to combine the two signals into a combined data stream which is communicated to the computer without needing the second [multiplexer/demultiplexer]. Thus, this invention does not use the [multiplexer/demultiplexer] 107 shown in Fig. 3, and consequently does not modify the computer between its port 125 and bus 101.
>
> Burnett et al.'s invention, by relying on the second [multiplexer/demultiplexer] 107 to separate the two sources of signals, **receives their data with distinct identification of each source**, therefore requires and maintains the number of resources needed for both devices, of the mouse and of the transceiver. In contrast, this invention's computer method of receiving the combined data stream received at port 103 **without first identifying the data**, whether mouse's or transceiver's. It therefore uses only a single resource to receive the combined data.

('730 Patent File History, Response dated September 20, 2000, ECF No. 67-3, at 68–69 (emphasis added).) Sony contends, based on the bolded phrases set forth above, that the data from the user input stream and the input stream combine "without a distinct identification of each source." GET responds that there is no language in the specification to support this limitation and that the patentee's distinction of Burnett et al. was based on the structure or type of device used to receive the two signals, not the content of the signals and whether the combined signal had information about its source. For the following reasons, I agree with GET.

My initial focus must be on the language of the claims. Interactive Gift Express, Inc. v. Compuserve, Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001). Here, the claims define "combined data stream." (See, e.g., '730 Patent, col. 8, lines 1–2 ("synchronizing the user input stream with the input stream and encoding the same into a combined data stream").) Moreover, the specification does not teach a requirement or limitation that the data stream is combined "without a distinct identification of each source." Rather, it clearly states that the data from the two streams (input stream and user input stream) can be recovered by the computer after transmission. (Id. at col. 7, lines 47–51 ("[A] communication method by which a computer, receiving a combined data stream

associated with two sources of information, one from a user input means and another from an input signal, recovers from such data the respective information of the two sources.”).)

Additionally, I conclude that the patentee did not clearly and unmistakably disavow the scope of the claim term in his distinction of the Burnett et al. patent. See Cordis Corp. v. Medtronic Ave, Inc., 511 F.3d 1157, 1177 (Fed. Cir. 2008) (reiterating that “arguments made to distinguish prior art references” will be considered disavowals “only if they constitute clear and unmistakable surrenders of subject matter”). Sony reads the patentee’s remarks out of context. The focus of the patentee’s response regarding Burnett et al. is the claimed invention’s structure, that is, the ‘730 Patent’s use of a framer instead of a multiplexer/demultiplexer at each end. (‘730 Patent File History, Response dated September 20, 2000, ECF No. 67-3, at 69 (“In contrast, this invention implements a framer in place of the first [multiplexer/demultiplexer] to combine the two signals into a combined data stream which is communicated to the computer without needing the second [multiplexer/demultiplexer].”).) As characterized by the patentee, the multiplexer/demultiplexers at the receiving end of Burnett et al.’s invention separate or split the combined signal so that each data component can be received by its own computer resource. The claimed invention is different because the combined data stream is received by a common computer resource and the respective input streams are recovered after they are received by the computer.

Finally, the patentee’s explanation that Burnett et al.’s invention “receives [its] data with distinct identification of each source [and] therefore requires and maintains the number of resources needed for both devices” is not a comment on the content of the combined data stream in the claimed invention. Rather, it is an explanation of how Burnett et al.’s invention receives data based on each source’s distinct identity. The patentee distinguishes his invention on this basis—the claimed invention allows a computer to receive the combined data stream without

needing to first identify which data is which so that a single resource on a computer can be shared between the two data sources. This reading is supported by the goals of the invention set forth in the specification—to utilize computer resources more efficiently by providing "an apparatus functioning as a [user input device] to a computer while receiving/transmitting additional [input/output] signals transferred to/from the computer without using any computer resources except those available to the [user input device]." ('730 Patent, col. 1, lines 43–44, 46–50.)

Based on the definition of "combined data stream" recited in the claims and my review of the prosecution history, I conclude that **no construction is necessary** for the term **"combined data stream."**

### C. "Input Means for Producing at Least One Input Signal"

The third claim term in dispute is "input means for producing at least one input signal."

| Claims | GET's Proposed Construction | Sony's Proposed Construction |
|---|---|---|
| 10 | The input means is an input transducer. (Pl.'s Opening Claim Constr. Br., Ex. 2, at 17.) | Function: Producing at least one input signal.<br>Structure: An input transducer that is part of a microphone or fax/modem device. (Markman Hearing Tr., 12/3/19, at 72:20–73:1.) |

The parties disagree on whether this claim term should be construed as a means-plus-function limitation and, therefore, governed by 35 U.S.C. § 112(f) (formerly, § 112, ¶ 6). Specifically, their dispute centers on whether "input means" should be construed as recited in independent claim 1, in light of GET's argument that it is only asserting dependent claim 10 for purposes of infringement.

In construing claim terms, a court must consider whether they qualify as "mean-plus-function" limitations. Means-plus-function claim elements are interpreted according to 35 U.S.C. § 112(f):

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

The statute establishes a two-step process for courts to follow in construing means-plus-function limitations: (1) construe the function recited; and (2) determine what structures the specification discloses to perform that function. Kemco Sales, Inc. v. Control Papers Co., 208 F.3d 1352, 1361 (Fed. Cir. 2000). When the specification discloses "distinct and alternative structures for performing the claimed function," the proper construction embraces each such structure. Creo Prods., Inc. v. Presstek, Inc., 305 F.3d 1337, 1346 (Fed. Cir. 2002); see also Ergo Licensing, LLC v. Carefusion 303, Inc., 673 F.3d 1361, 1363 (Fed. Cir. 2012).

The Federal Circuit has emphasized that the "essential inquiry" in determining whether a term is governed by the means-plus-function strictures of 35 U.S.C. § 112(f) is "whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." Williamson v. Citrix Online, LLC, 792 F.3d 1339, 1348 (Fed. Cir. 2015). However, absence of the word "means" in the claim term creates a rebuttable presumption that § 112(f) does not apply. TEK Global, S.R.L. v. Sealant Sys. Int'l, Inc., 920 F.3d 777, 785 (Fed. Cir. 2019); Williamson, 792 F.3d at 1348–49 (abandoning the heightened standard applied to the presumption flowing from the absence of the word "means"). The presumption can be overcome, and § 112(f) will apply to the term at issue, if the challenging party demonstrates that the term "fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." Id. at 1349 (internal quotation marks omitted). Conversely, presence of the word "means" creates a rebuttable presumption that § 112(f) applies

to the term, unless the challenging party demonstrates that the term recites sufficiently definite structure.

Here, GET recognizes that use of the word "means" in the claim term creates a rebuttable presumption that § 112(f) applies. However, GET claims that the presumption is overcome because claim 10 provides sufficiently definite meaning as the name for structure. See Williamson, 792 F.3d at 1348. Claim 10 teaches "[t]he apparatus of claim 1 wherein the input means is an input transducer." ('730 Patent, col. 8, lines 26–27.) Therefore, GET argues that the structure of "input means" is an input transducer.

Sony responds that, because there is no dispute that "input means," as recited in independent claim 1, is a means-plus-function term, "input means," as recited in dependent claim 10, should also be construed under § 112(f). Sony further argues that, in order to prove infringement as to dependent claim 10, GET must prove each element of independent claim 1, and, as such, I must consider the construction of "input means" in claim 1, when construing the term in claim 10. In claim 1, Sony explains that the function of "input means"—"producing at least one input signal"—is performed by the structure disclosed in the specification, a microphone and fax/modem device. Sony acknowledges that the structure of claim 10 is an "input transducer" but argues that it must be limited to the microphone or fax/modem device because claim 10 cannot be broader than claim 1.

For several reasons, I disagree that "input means," as recited in claim 10, is a means-plus-function limitation. First, GET represented at the Markman hearing that it is not asserting claim 1 for purposes of infringement. (Markman Hearing Tr., 12/3/19, 67:24–68:19.) I will, therefore, only consider the term "input means for producing at least one input signal" as taught by claim 10. Claim 10 explicitly recites the structure for performing the function of "input means"—an input

transducer. Sony admits this point and even includes "input transducer" in its proposed construction.

Moreover, construing "input means" as "the input means is an input transducer" does not make dependent claim 10 broader than independent claim 1. Sony construes the structure of "input means" in claim 1 as a microphone or fax/modem device and, therefore, limits "input means" in claim 10 to "an input transducer that is part of a microphone or fax/modem device." However, by doing so, Sony attempts to restrict the claimed invention to its specific examples or preferred embodiments, when the scope was not limited during prosecution. ('730 Patent, col. 2, lines 48–51 ("The inventive apparatus *may* integrate means to handle the I/O signals, *such as* the microphone . . . .) (emphasis added); id. at col. 1, lines 64–67 ("*For example*, *one inventive apparatus* handling the I/O telephone signals effectively functions as a fax/modem device and at the same time as a UID.") (emphasis added).)

Federal Circuit precedent prohibits Sony's suggested restriction. See B.E. Technology, L.L.C. v. Sony Mobile Communications (USA) Inc., 657 F. App'x 982, 988 (Fed. Cir. 2016) ("B.E. contends that the Board's construction is incorrect because it is broader than the examples depicted in the patent; however, we have rejected the notion that claim terms are limited to the embodiments disclosed in the specification, absent redefinition or disclaimer." (citing Phillips, 415 F.3d at 1316, 1323); Kinik v. Int'l Trade Commission, 362 F.3d 1359, 1364–65 (Fed. Cir. 2004) ("[W]hen the specification describes the invention in broad terms, accompanied by specific examples or embodiments, the claims are generally not restricted to the specific examples or preferred embodiments unless that scope was limited during prosecution."); Dow Chem. Co. v. United States, 226 F.3d 1334, 1342 (Fed. Cir. 2000) (as a general rule claims of a patent are not

limited to the preferred embodiment); Intel Corp. v. United States Int'l Trade Comm'n, 946 F.2d 821, 836 (Fed. Cir. 1991).

Because claim 10 recites sufficiently definite structure as to "input means"—an input transducer, I conclude that § 112(f) does not apply to the claim term. I also conclude that "input transducer" is not restricted to the specific examples of a microphone or fax/modem device as described in the specification.

Based on my analysis of the claim language and GET's representation that it only asserts claim 10 for purposes of infringement, I will adopt GET's proposed construction of **"inputs means for producing at least one input signal"** as **"The input means is an input transducer."**

**D. "Framer"**

The fourth claim term in dispute is "framer."

| Claims | GET's Proposed Construction | Sony's Proposed Construction |
|---|---|---|
| 16, 17, 18, 21, 22, 23 | Circuity that creates a frame, which is a digital data unit to be transmitted via a communication link. (Pl.'s Opening Claim Constr. Br., Ex. 2, at 10.) | Function: (1) synchronizing the user input stream with the input stream, and (2) encoding the user input stream and the input stream into a combined data stream.<br><br>Structure: The logic design at block 34 of Figure 4A. (Defs.' Responsive Claim Constr. Br. at 17.) |

The parties' dispute centers on whether "framer" connotes sufficiently definite structure to a POSA. As such, the parties rely primarily on extrinsic expert testimony.[6]

[6] "In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence." Vitronics, 90 F.3d at 1583. In other words, "[i]n those cases where the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper." Id. Rather, the public record of the patentee's claims is comprised of the claims, specification, and file history, and it is that record on which the public and competitors are entitled to rely to ascertain the scope of the patentee's claimed invention. Id. "Allowing the public record to be altered or changed by extrinsic evidence introduced at trial, such as expert testimony, would make this right meaningless." Id. Where the intrinsic record is unclear, however, reliance on extrinsic evidence is appropriate. Intel Corp. v. Broadcom Corp., 172 F. Supp. 2d 515, 527 (D. Del. 2001). A court may look to expert and inventor testimony, dictionaries, and learned treatises. Novartis Corp. v. Teva Pharms. USA, Inc., 565 F. Supp. 2d 595, 607 (D.N.J. 2008). "[B]ecause extrinsic evidence can help educate the court regarding the field of the invention and can help the court determine what a

Here, the parties agree that the absence of the phrase "means for" in the claim term creates a rebuttable presumption that § 112(f) does not apply. However, as discussed, "the essential inquiry is not merely the presence or absence of the word 'means' but whether the words of the claim are understood by persons of ordinary skill in the art to have sufficiently definite meaning as the name for structure." Williamson, 792 F.3d at 1348. The presumption may be overcome if the challenging party demonstrates that the claim term "fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." Id. at 1349 (internal quotation marks omitted).

GET argues that Sony cannot demonstrate that "framer" fails to recite sufficiently definite structure because "the '730 Patent clearly points to a structure—a circuit—when it uses the term 'framer.' Figure 4A, described as one embodiment of the invention, depicts a logic diagram that shows the components and connections of the circuit designated as 'framer 34.'" (Pl.'s Opening Claim Constr. Br. at 4.)

GET also relies on the declaration of its expert Dr. Kenneth W. Fernald to prove this point. Dr. Fernald asserts that a POSA at the time of the '730 Patent understood "framing" to generally refer to "the concept of transforming data into a format that can be recognized by the receiver of the data." (Fernald Decl., ECF No. 71, at ¶ 5.) He goes on to explain that a POSA would have understood "framing" to be achieved by a "frame":

> [A] block to be transmitted generally includes the data (generally called the payload) and additional information that allows the receiving computer to recognize the frame, such as a preamble bit of pattern at the beginning, potentially a postamble bit pattern at the end, and possible additional information relating to data link procedures. The exact format of the frame depends on which data

person of ordinary skill in the art would understand claim terms to mean, it is permissible for the district court in its sound discretion to admit and use such evidence." Phillips, 415 F.3d at 1319. In exercising that discretion, however, the court "should keep in mind the flaws inherent in [extrinsic evidence] and assess that evidence accordingly." Id.

> link control procedure is used. This recognizable block is referred to as a "frame."

(Id.) Dr. Fernald, therefore, concludes that a POSA would have understood a "framer" to be "a circuit that creates a frame, such creation being referred to as 'framing.'" (Id.)

Sony points to both intrinsic and extrinsic evidence in response. Sony presses that the claims do not recite any structure for "framer" and, instead, recite the term only in relation to its function. Sony also argues that statements made by the patentee during prosecution that describe the framer in the claimed invention as "unique and novel" demonstrate that a POSA would not have understood its structure. ('730 Patent File History, Response dated September 20, 2000, ECF No. 67-3, at 70–71 ("In contrast, this invention describes, in its representative embodiments, how to combine the data from a UID (mouse) and from a high-frequency signal, *via a framer, which is unique and novel*." (emphasis added).)

Additionally, Sony relies on extrinsic evidence to demonstrate that "framer" does not connote sufficiently definite structure. Sony does not dispute that a POSA would have understood the concept of "framing" or "frame" at the time of the '730 Patent. Instead, Sony argues that Dr. Fernald's testimony does not provide a reasonably well understood meaning for "framer," which is, in fact, the claim term. Sony asserts that Dr. Fernald's testimony (1) failed to "introduce any other evidence, such as dictionary definitions, suggesting that [framer] is a term commonly understood by [a POSA] to denote a device or class of devices"; (2) failed to "explain with any degree of definiteness what structure or class of structures a [POSA] would understand the term to encompass"; (3) failed to "offer any structural limitation that might serve to cabin the scope of the functional term"; and (4) "did little more than opine that a skilled artisan would understand the functional term [framer] to be any structure capable of performing the claimed function." (Defs.' Responsive Claim Constr. Br. at 17–18 (citations omitted) (internal quotation marks omitted).)

Sony relies on Diebold Nixdorf, Inc. v. Int'l Trade Commission, 899 F.3d 1291 (Fed. Cir. 2018) to support the argument that these flaws in GET's expert testimony demonstrate that "framer" fails to connote sufficiently definite structure.

Finally, Sony cites to the testimony of its own expert, Dr. Gregory F. Welch, who explains that "framer" was not commonly understood to connote any definite structure or class of structures to a POSA. (Welch Decl., ECF No. 78, at ¶¶ 22–23 ("I have never seen nor heard of the word 'framer' used in the context of user input devices, the word 'framer' was not commonly used in such contexts . . . . Claims 16 and 21 of the '730 Patent would connote no less structure to a [POSA] had those claims used the word 'means for' in place of 'framer' in Claim 16 or 'framer for' in Claim 21.").) As explained by Dr. Welch, "the use of the word 'framer' and 'framer for' connotes no additional information to a [POSA] about the structure or class of structures that is to perform the recited functions than if the claims instead recited 'means for.'" (Id. at ¶ 23.)

For the following reasons, I agree that "framer" fails to connote sufficiently definite structure to a POSA and that § 112(f) applies to that term. First, the disclosure of Figure 4A (showing the components and connections of "framer 34") is not alone sufficient to impart structure to the claim term. See MTD Prods. Inc. v. Iancu, 933 F.3d 1336, 1342–43 (Fed. Cir. 2019) ("Just as it is improper to import[ ] limitations from the specification into the claims, however, a preferred embodiment disclosed in the specification cannot impart structure to a term that otherwise has none. . . . As with all lexicography, [i]t is not enough for a patentee to simply disclose a single embodiment. Rather, the patentee must clearly express an intent to redefine the term." (internal quotation marks omitted)). And the claims recite "framer" only in relation to its function, not its structure. ('730 Patent, col. 8, lines 61–63 ("a framer synchronizing the user input stream with the input stream and encoding the same into a combined data stream transferable by

the communication link"); id. at col. 10, lines 5–8 ("a framer for keeping the user input stream and the at least one digital input signal in synchrony and encoding the same into a combined data stream transferable to the computer by the communication link.").

Second, based on the prosecution history, I conclude that the '730 Patent fails to convey to a POSA the structure or class of structures known as "framers" because the patentee explicitly stated during prosecution that the framer used "to combine the data from a UID (mouse) and from a high-frequency signal" in the claimed invention was "unique and novel," a characterization also recognized by the PTO Examiner. ('730 Patent File History, Response dated September 20, 2000, ECF No. 67-3, at 70–71; PTO Examiner Correspondence, ECF No. 67-3, at 145) ("Your invention, as far as I understand, is a user-interface (UI) with a *novel* framer that combines 2 different signals from 2 different sources.") (emphasis added).)

GET offers no response to these arguments, relying solely on the testimony of its expert and four documents introduced for the first time in its Reply Brief that it claims represent "framers" on the market at the time of the '730 Patent in the field of data communications. (Pl.'s Reply Claim Constr. Br., Ex. 8–11.) GET argues that the field of invention of the '730 Patent includes data communications and, therefore, a POSA would have known about these other framers. However, the specification recites the following as the field of the claimed invention: "[t]his invention relates to computer user-input devices including pointing devices, especially to those handling additional input/output signals." ('730 Patent, col. 1, lines 8–11.) This description does not expressly include the broad term "data communications," and GET's expert, Dr. Fernald, does not address whether it should. In fact, Dr. Fernald's description of a POSA makes no mention of "data communications." (See Fernald Decl., ECF No. 71, at ¶ 4.) And Sony's expert, Dr. Welch,

although asked directly whether data communications was the relevant field of invention, was unwilling to characterize it as such. (Welch Dep., ECF No. 84-1, at 17:2–18:10.)

Finally, I find that Dr. Fernald's testimony is insufficient to demonstrate that a POSA would have understood the structure or class of structures referred to by "framer" in the claimed invention. Diebold Nixdorf, Inc. v. Int'l Trade Commission, 899 F.3d 1291 (Fed. Cir. 2018), is instructive on this point. In Diebold, the Federal Circuit reversed a decision of the United States International Trade Commission declining to apply § 112(f) to the claim term "cheque standby unit." See 899 F.3d at 1298. The Court concluded that the claims of the patent at issue did not recite any structure for the term, describing it "solely in relation to its function and location in the apparatus." Id. The Court rejected expert testimony declaring that a POSA would readily understand that a "cheque standby unit" was a "structure in an ATM that temporarily holds checks pending the customer confirming the deposit." Id. at 1300. The Court's reason for doing so was the lack of any other evidence, such as dictionary definitions, suggesting that a "cheque standby unit" is a term commonly understood by a POSA to denote a device or class of devices. Id.

Here, Dr. Fernald's testimony suffers from the same deficiencies as the expert's testimony in Diebold. Dr. Fernald's testimony does not provide a reasonably well understood meaning for "framer." He defines "framing" and "frame" but offers no support, by way of dictionary definitions or other extrinsic evidence, for his assumption that a POSA who understands "framing" and "frame" would, therefore, understand that a "framer" was "a circuity that creates a frame." (Fernald Decl., ECF No. 71, at ¶ 5.) As the expert in Diebold, Dr. Fernald does little more than opine that a POSA would understand "framer" to be any structure that performs the function of "framing" and, therefore, fails to cabin the scope of the functional term. (Id. ("A framer is a circuit

that creates a frame, such creation being referred to as 'framing.'").) This is not sufficient to support a *definite* structural meaning of "framer." See Diebold, 899 F.3d at 1298.

Based on my analysis of the intrinsic and extrinsic evidence identified by the parties, I conclude that § 112(f) applies to "framer" because a POSA would not have understood the term to connote sufficiently definite structure at the time of the '730 Patent. I will, therefore, adopt Sony's proposed construction of **"framer"** as **"Function: Synchronizing the user input stream with the input stream and encoding the user input stream and the input stream into a combined data stream; Structure: The logic design at block 34 in Figure 4A**[7] **and equivalents thereof."**[8]

## E. "Converter"

The fifth claim term in dispute is "converter."

| Claims | GET's Proposed Construction | Sony's Proposed Construction |
|---|---|---|
| 16, 18 | A circuit for converting a digital stream into an output signal, such as, for example, the decoder part of a codec; 'converter' in Claim 18 does not necessarily refer to the same converter of Claim 16. (Pl.'s Opening Claim Constr. Br., Ex. 2, at 8.) | The converter in Claim 18 refers to the same converter component of Claim 16 and, in the alternative, a codec. (Defs.' Responsive Claim Constr. Br. at 20); (see also Markman Hearing Tr., 12/3/19, at 89:21–90:25.) |

[7] As discussed further infra, and in relation to the term "encoding means," the '730 Patent discloses only one type of structure to perform the function of "framer"—the logic design at block 34 in Figure 4A. Therefore, based on Bennett Marine, Inc. v. Lenco Marine, Inc., 549 F. App'x 947 (Fed. Cir. 2013), I will construe the structure of "framer" as "the logic design at block 34 in Figure 4A and equivalents thereof." See id. at 954-55 ("The '780 patent discloses only one specific type of circuit to perform the part of the function required by the fifth limitation. In such a situation, the corresponding structure should be limited to that structure and its equivalents. . . . [T]he '780 patent does not disclose alternatives to the circuit shown in figure 2, such as, for example, a general class of known switches. . . . Bennett has not identified any evidence showing that any circuit other than the circuit disclosed in figure 2 was known and capable of performing the function required by the fifth limitation."); see also J&M Corp. v. Harley-Davidson, Inc., 269 F.3d 1360, 1367 (Fed. Cir. 2001) ("The literal scope of a properly construed means-plus-function limitation does not extend to all means for performing a certain function. Rather, the scope of such claim language is sharply limited to the structure disclosed in the specification and its equivalents.").

[8] I will also construe the structure of "framer" to include equivalents thereof as discussed infra in Section F. See 35 U.S.C. § 112(f) ("[S]uch claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.").

The parties' dispute focuses on whether the converter disclosed in claim 18 is the same as the converter in claim 16.

Independent Claim 16 teaches an apparatus comprising, in pertinent part, "a converter receiving the at least one input signal for producing an input stream." ('730 Patent, col. 8, lines 59–60.) The parties agree that this claim term requires no construction because the meaning of "converter" is readily understood by a POSA without the need for clarification and it connotes sufficiently definite structure—a device that converts data or signals from one form to another. (See Pl.'s Opening Claim Constr. Br. at 18; Defs.' Responsive Claim Constr. Br., Ex. 6, at 120.) However, the parties dispute the construction of "converter" in claim 18. Claim 18, which is dependent on claim 16, teaches:

> the apparatus of claim 16 **wherein the converter further comprises an output port** wherein the framer further receives an output stream from the computer via the communication link, the output stream being further received and converted by the converter into at least one input signal going to the output port.

('730 Patent, col. 9, lines 1–5 (emphasis added).)

Because claim 16 is an independent claim, it must be at least as broad as claim 18, which depends from it. See Alcon Research, LTD v. Apotex Inc., 687 F.3d 1362, 1367 (Fed. Cir. 2012). Moreover, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." Phillips, 415 F.3d at 1314–15. This "presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." SunRace Roots Enter. Co., Ltd. v. SRAM Corp., 336 F.3d 1298, 1303 (Fed. Cir. 2003).

GET argues that the "converter" disclosed in claim 18 does not necessarily refer to the same converter in claim 16 because, as made clear by the specification, the converter in claim 16 performs as an analog-to-digital converter, converting at least one input signal into an input stream, and the converter in claim 18 performs as a digital-to-analog converter, converting an output stream into at least one output signal. (Pl.'s Opening Claim Constr. Br. at 13.) Sony responds that "the antecedent basis for 'the converter' in claim 18 is the converter of claim 16 and, therefore, they refer to the same thing." (Defs.' Responsive Claim Constr. Br. at 20.)

I disagree with Sony for several reasons. First, the parties do not dispute that "converter" is understood by POSAs to evoke a sufficiently definite structure or class of structures that convert data or signals from one form to another. Therefore, § 112(f) does not apply to the term in question.

The parties have also agreed that no construction of "converter" in claim 16 is necessary. Thus, the converter in claim 16 is construed based on the readily understood meaning taught by the claim language—a converter that must be able to convert an input signal into an input stream.

Claim 18, on the other hand, refers to the apparatus of claim 16, but with a limitation—the converter must also be able to convert an output stream into at least one output signal. ('730 Patent, col. 9, lines 1–5.) This claim language demonstrates that claim 18 does not necessarily refer to the same converter as claim 16. If it did, then claim 18 would become superfluous. That is, if the converter disclosed in claim 16 was required to perform as not only an analog-to-digital converter, but also a digital-to-analog converter, then there would be no need to disclose the additional digital-to-analog function of the converter in a separate claim, i.e. claim 18. See Seachange Int'l, Inc. v. C-COR, Inc., 413 F.3d 1361, 1368 (Fed. Cir. 2005) (quoting Karlin Tech. Inc. v. Surgical Dynamics, Inc., 177 F.3d 968, 971–72 (Fed. Cir. 1999)) ("The doctrine of claim differentiation stems from 'the common sense notation that different words or phrases used in

Case: 24-1686 Document: 11 Page: 185 Filed: 06/11/2024

separate claims are presumed to indicate that the claims have different meanings and scope.'"); Tandon Corp. v. U.S. Int'l Trade Comm'n, 831 F.2d 1017, 1023 (Fed. Cir. 1987) ("To the extent that the absence of such difference in meaning and scope would make a claim superfluous, the doctrine of claim differentiation states the presumption that the difference between the claims is significant.").

As it stands, based on the claim language, the converter in independent claim 16 must, at least, perform as an analog-to-digital converter, but it is not limited to only this function. The converter in dependent claim 18 is thus limited. It must be able to perform both analog-to-digital and digital-to-analog conversions.

This reading of the claim language, and the conclusion that the converter in claim 18 does not necessarily refer to the same converter as claim 16, is also supported by the specification. In the preferred embodiments, the specification states, in pertinent part, that "[o]ne embodiment of the present invention, having the functional block diagram depicted by FIG. 2A, comprises . . . a signal converting means called converter 30 . . . ." ('730 Patent, col. 4, lines 1–5.) In Figures 2A, 2B, and 2C, converter 30 "converts input signal 31, delivered by input 32, into input stream 33 representative of the input signal." (Id. at col. 4, lines 12–13.) Figure 2C "additionally shows converter 30 receiving output stream 54 from framer 34 to produce output signal 52 going out via output 53 to the external device." (Id. at col. 4, lines 16–19.) In other words, converter 30, in Figure 2C, performs an additional function to the converter 30 depicted in Figures 2A and 2B—it also converts an output stream from the framer into an output signal via an output port to an external device.[9]

[9] Sony also offers, as an alternative construction, that "converter" in claim 18 is a "codec." "[A] 'codec' is a combined analog-to-digital converter and digital-to-analog converter. The analog-to-digital conversion is referred to as 'encoding,' and the digital-to-analog conversion is referred to as 'decoding.'" (See Fernald Decl., ECF No. 71, at ¶ 7.) Yet, the converter taught by claim 18 is broader than the example

Case: 24-1686 Document: 11 Page: 186 Filed: 06/11/2024

Based on these multiple examples or alternative embodiments of "converter" disclosed in the specification, I conclude that the converter in broader, independent claim 16 and its claimed function are not limited to the converter disclosed in dependent claim 18. See Intel Corp., 946 F.2d at 836 ("Where a specification does not require a limitation, that limitation should not be read from the specification into the claims."); see also Katz v. AT&T Corp., 63 F. Supp. 2d 583, 591 (E.D. Pa. 1999) ("[I]f a term is used in a variety of ways by the patentee in the specification, this may be indicative of the breadth of the term, rather than a limited definition.").

Therefore, I will construe **"converter"** in claim 18 as **"A circuit for converting (1) the at least one input signal into an input stream and (2) an output stream into the at least one output signal."**[10]

### F. Terms Which the Parties Do Not Dispute are Means-Plus-Function

The parties do not dispute that § 112(f) applies to the remaining disputed claim terms but offer different proposed constructions. Two issues of construction are common to these remaining

or preferred embodiment of a "codec" disclosed in the specification. (See '730 Patent, col. 4, lines 41-52 ("FIG. 3A illustrates one implementation of the embodiment of the invention that receives and transmits analog I/O signals while transferring data to/from the computer via the RS-232 cable. It utilizes all the elements shown in FIG. 2A and further includes the feature of receiving an output information sent from the computer via line TXD of the RS-232. Framer 34 serializes such output information to become signal 54, which is converted by converter 30 into output signal 52 to output 53. Converter 30 [in this preferred embodiment] is a codec . . . ."); id. at col. 5, lines 7-11 ("FIG. 4A, the codec TP3054, in place of converter 30, converts output information 54, sent from the computer via line TXD, into output signal 52 entering output 53. Concurrently, the codec also converts input signal 31, delivered by input 32, into serial stream 33.").). I will not limit the construction of "converter" to an example without a disclaimer. See, e.g., B.E. Technology, L.L.C., 657 F. App'x at 988 ("B.E. contends that the Board's construction is incorrect because it is broader than the examples depicted in the patent; however, we have rejected the notion that claim terms are limited to the embodiments disclosed in the specification, absent redefinition or disclaimer.").

[10] For the reasons discussed supra, I disagree with the parties' constructions. The converter in claim 18 is not necessarily the same as the converter in claim 16. Therefore, I decline to adopt Sony's proposed construction. GET's construction, on the other hand, accounts for only part of the function of the converter disclosed in claim 18. Claim 18's converter not only converts an output stream into an output signal, but it also performs the function of the converter disclosed in claim 16—converting an input signal into an input stream. ('730 Patent, col. 9, lines 1-5 ("The apparatus of claim 16 *wherein the converter further comprises* an output port . . . .") (emphasis added).) Therefore, I also decline to adopt GET's proposed construction.

terms. The first issue is whether each means-plus-function limitation should be construed to include equivalents thereof. The second issue is whether the construction of these terms should specify that each corresponding structure may be implemented by integrated circuit technology or microprocessor-based design. I address each of these issues in turn here.

Regarding the first issue of construction, § 112(f) explicitly permits GET to pursue a literal infringement theory based on the equivalent of any term construed under this provision. 35 U.S.C. § 112(f) ("[S]uch claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."). Sony agrees but raises the concern that jurors may be confused or misled if equivalents are expressly included in the construction of all means-plus-function limitations without any explanation of how to find equivalents. Sony advocates, instead, for a jury instruction on the right to equivalents, along with a description of how to perform the analysis. GET responds that courts typically include "and equivalents thereof" or similar language in their constructions of means-plus-function limitations. (Pl.'s Reply Claim Constr. Br. at 8.) GET also insists that any potential juror confusion can be addressed through jury instructions and that an omission of equivalents risks prejudice if the jury neglects to apply the law.

I conclude that GET is entitled to pursue a literal infringement theory based on equivalent structures for means-plus-function limitations pursuant to § 112(f). The parties will have an opportunity to propose jury instructions on how to perform this infringement analysis. As such, I will construe each means-plus-function limitation to include "equivalents thereof."

GET also argues that, based on language in the specification, the construction of all means-plus-function limitations should specify that the corresponding structures may be implemented by

an integrated circuit or microprocessor. (Pl.'s Opening Claim Constr. Br. at 7 (citing '730 Patent, col. 7, lines 16–23 and id. at col. 2, lines 53–58).)

However, the specification characterizes these methods as alternatives or preferred embodiments of the inventive apparatus. ('730 Patent, col. 2, lines 53–60 ("The inventive apparatus *may* be implemented, *at least partially*, by integrated circuit (IC) technology . . . . The inventive apparatus *may* be implemented, *at least partially*, by a microprocessor-based design . . . ." (emphasis added); see also id. at col. 7, lines 16–23 ("Also, the IC technology, using the PLDs, the gate arrays, the ASICs, *or* the mixed-signal ICs, *can* integrate many elements of the apparatus into at least one IC device. *For instance*, a combination of the framer, the codec, the electronic part of the UI means, and the transceiver, *can* be packaged into at least one IC device. *Alternatively*, the logic of such combination *can* be implemented by a microprocessor, such as part DSP56xxx from Motorola." (emphasis added).) Claims are generally not restricted to or construed as the specific examples or preferred embodiments disclosed in the specification, unless there is evidence of scope disavowal. See, e.g., Kinik, 362 F.3d at 1364–5; Dow Chem. Co. v. United States, 226 F.3d at 1342; Intel Corp., 946 F.2d at 836.

Accordingly, I will not construe the structure of the remaining means-plus-function limitations to include examples or preferred embodiments of the inventive apparatus, such as an integrated circuit or microprocessor.

**1. "Communication Means"**

The sixth claim term in dispute is "communication means."

| Claims | GET's Proposed Construction | Sony's Proposed Construction |
|---|---|---|
| 10 | Function: Communicating data between the user input apparatus and the computer.<br><br>Structure: A wired or wireless transceiver (such as, for example, IR or RF) transceiver compatible with a communication protocol, including without limitation transceivers using RS-232 or USB communication protocols and equivalents thereto; may be implemented by integrated circuit or microprocessor-based design. (Pl.'s Opening Claim Constr. Br., Ex. 2, at 2.) | Function: Communicating data between the user input apparatus and the computer.<br><br>Structure: A transceiver compatible with RS-232 or USB communication protocols. (Defs.' Responsive Claim Constr. Br. at 11, 11 n.4.) |

The parties agree that § 112(f) applies to this term. The primary dispute between them is whether to limit the structure of "communication means" to a transceiver compatible with RS-232 or USB communication protocols.

GET argues that the communication means may be either a wired or wireless transceiver as stated in the specification. ('730 Patent, col. 2, lines 37–39 ("The transmission of the communication signals may be wired (via cable) or wireless (via electromagnetic wave).").) Sony does not dispute that the structure for performing the function of "communication means" is a transceiver, but it limits the construction to transceivers compatible with RS-232 or USB communication protocols. GET responds that transceivers compatible with RS-232 or USB communication protocols are alternative embodiments or examples and, by limiting the structure of "communication means" to these examples, Sony excludes specific embodiments of the invention disclosed in the specification.

On this construction, I agree with GET. The specification explicitly discloses in the preferred embodiments both wired and wireless transceivers for performing the function of "communication means." (Id. at col. 4, lines 33–40 ("[C]ommunication means 35 is a wireless transceiver which transmits/receives the electromagnetic signals forming link 36, while at port 38 there is a compatible wireless transceiver to receive/transmit the same signals. *Two typical*

*wireless transceivers* are the infrared-light (IR) . . . and the radio frequency (RF) . . . .") (emphasis added); id. at col. 4, lines 41–44 ("FIG. 3A illustrates one implementation of the embodiment of the invention that receives and transmits analog I/O signals while transferring data to/from the computer via the RS-232 cable."); id. at col. 2, lines 34–36 ("*Two examples of communication protocols* used by a UID are the popular RS-232 and the newly standardized Universal Serial Bus (USB).") (emphasis added).)[11] By limiting the structure of "communication means" to transceivers compatible with RS-232 or USB communication protocols, I would be improperly reading out preferred embodiments of the claimed invention. (Id. at col. 4, lines 33–40.)

Moreover, I will not restrict the claim term to the alternative transceivers disclosed in the specification when there is no disclaimer or disavowal in the file history. See, e.g., Kinik, 362 F.3d at 1364–65 ("[W]hen the specification describes the invention in broad terms, accompanied by specific examples or embodiments, the claims are generally not restricted to the specific examples or preferred embodiments unless that scope was limited during prosecution."); see also Bennett Marine, Inc. v. Lenco Marine, Inc., 549 F. App'x 947, 954–55 (Fed. Cir. 2013) (limiting the structure of a means-plus-function limitation to the circuit disclosed in figure 2 because the patent did not disclose alternatives).

Therefore, I will adopt, in part, GET's proposed construction of **"communication means"** as **"Function: Communicating data between the user input apparatus and the computer; Structure: A wired or wireless transceiver and equivalents thereof."**[12]

[11] Both the RS-232 and USB communication protocols are for wired transmission of data. (Markman Hearing Tr., 12/3/19, at 95:9-11.)

[12] I decline to adopt the remainder of GET's proposed construction of this term for the reasons discussed supra in Section F.

**2. "Means for Receiving an Output Stream from the Computer Via the Communication Link"**

The seventh disputed claim term is "means for receiving an output stream from the computer via the communication link."

| Claims | GET's Proposed Construction | Sony's Proposed Construction |
|---|---|---|
| 17 | Function: Receiving an output stream from the computer via the communication link.<br><br>Structure: A wired or wireless transceiver and equivalents thereto; may be implemented by integrated circuit technology or microprocessor-based design. (Pl.'s Opening Claim Constr. Br., Ex. 2, at 7.) | Function: Receiving an output stream from the computer via the communication link.<br><br>Structure: A transceiver compatible with RS-232 or USB communication protocols. (Defs.' Responsive Claim Constr. Br. at 19.) |

This term, as agreed to by the parties, is governed by § 112(f). The parties propose the same construction for the function of this term, and their proposed structures, although differently construed, are dependent upon my analysis of the structure of "communication means." Therefore, for the same reasons discussed supra regarding "communication means," I will adopt, in part, GET's proposed construction of **"means for receiving an output stream from the computer via the communication link"** as **"Function: Receiving an output stream from the computer via the communication link; Structure: A wired or wireless transceiver and equivalents thereof."**

**3. "User Input Means"**

The eighth disputed claim term is "user input means."

| Claims | GET's Proposed Construction | Sony's Proposed Construction |
|---|---|---|
| 10, 14 | Function: Producing a user input stream.<br><br>Structure: A sensor of user-initiated actuations and an encoder and equivalents thereto; may be implemented by circuit technology or microprocessor-based design. (Pl.'s Opening Claim Constr. Br., Ex. 2, at 3.) | Function: Producing a digital user input stream.<br><br>Structure: A mouse, trackball, keyboard, pressure tablet, or pen-based input device comprising a sensor of user-initiated actuations and an encoder. (Defs.' Responsive Claim Constr. Br. at 13.) |

The parties agree that this term is also governed by § 112(f). They also mostly agree regarding the construction of the term's function. However, Sony adds the word "digital"—"producing a *digital* user input stream."

For the following reasons, I agree with Sony's addition of the word "digital" to the terms construed function. Claim 1, from which claim 10 depends, teaches an apparatus comprising a "user input means for producing a user input stream." ('730 Patent, col. 7, lines 61–64.) This claim language explicitly defines the function of the "user input means" as "producing a user input stream." The claims do not otherwise limit the user input stream to a digital stream. However, patent claims must also "be read in view of the specification, of which they are a part." Markman, 52 F.3d at 979 (citing Autogiro Co. of Am. v. United States, 384 F.2d 391, 397 (1967)); see also SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1121 (Fed. Cir. 1985). The specification is "highly relevant to the claim construction analysis" because it contains a written description of the invention that must be clear and complete enough to enable those of ordinary skill in the art to make and use it. Vitronics, 90 F.3d at 1582. "[W]here the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone" the specification can provide clarity. Teleflex. Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1325 (Fed. Cir. 2002).

Here, the specification describes the user input stream as a digital stream: "[f]unctionally a UID or UI module comprises a sensor translating a user-initiated actuation into electrical signals, and an encoder converting such signals into a digital stream, called the [user input] stream . . . ." (Id. at col. 3, lines 56–59.) GET, in fact, relies on this portion of the specification to support its construction of the structure of "user input means." (Pl.'s Opening Claim Constr. Br. at 9–10.) GET cannot rely on these select disclosures in the specification when construing one aspect of the

claim term's definition but then ignore their impact in construing another. Therefore, based on the language of the specification, I conclude that the function of "user input stream" must be construed to include "digital."

Regarding the terms structure, the primary dispute between the parties is whether the structure should be limited to a mouse, trackball, keyboard, pressure tablet, or pen-based input device. GET argues that the specification explicitly discloses the structure of the "user input means" as "a sensor translating user-initiated actuations and an encoder." ('730 Patent, col. 3, lines 56–59 ("Functionally, a UID or a UI module comprises a sensor translating a user-initiated actuation into electrical signals, and an encoder for converting such signals into a digital stream, called the [user input] stream.").) Sony does not dispute that the structure of "user input means" is a sensor of user-initiated actuations and an encoder. It includes this language in its construction. However, Sony limits its construction to a mouse, trackball, keyboard, pressure tablet, or pen-based input device *comprising* a sensor and an encoder.

GET argues that Sony improperly limits the structure to examples of "user input devices in the specification that incorporate the sensor and encoder." (Pl.'s Opening Claim Constr. Br. at 10.) It explains that the "user input means" is the sensor and encoder of the user input device (the mouse, keyboard, or trackball) that produces the user input stream, "not the [user input device] itself." (Id.) Therefore, GET asserts that Sony is attempting to incorporate structure from the written description beyond what is necessary to perform the claimed function. (Id. (citing Asyst Tech., Inc. v. Empak, Inc., 268 F.3d 1364, 1369–70 (Fed. Cir. 2001) and Micro Chem., Inc. v. Great Plains Chem. Co., Inc., 194 F.3d 1250, 1258 (Fed. Cir. 1999)).)

I agree that Sony is attempting to improperly limit the structure of "user input means," the sensor and encoder, to examples disclosed in the specification. The specification explains that the

user input stream produced by the sensor and encoder "follows the format of the communication link used by the associated [user input device]." ('730 Patent, col. 3, lines 60–61; see also id at col. 3, lines 65–67 ("The inventive apparatus receives a [user input] stream coming either from a UI module or from an interface to an external [user input device].").) The specification describes examples of typical user input devices as the mouse, trackball, keyboard, pressure tablet, and pen-based input device. (See id. at col. 1, lines 16–18; id. at col. 3, lines 61–65 ("In his description, the [user input stream] conforms to the Microsoft serial mouse's asynchronous frame format . . . .").)

As discussed throughout this Memorandum Opinion, claims should not be restricted to the specific examples or preferred embodiments disclosed in the specification, unless the scope of the claim was limited during prosecution. See, e.g., Kinik, 362 F.3d at 1364–65. Here, there was no disavowal of this claim term's scope in the file history. Therefore, I will not limit the structure of "user input means" to the mouse, trackball, keyboard, pressure tablet, and pen-based input device comprising a sensor and encoder.

As such, I will construe **"user input means"** as **"Function: Producing a digital stream, called the user input stream; Structure: A sensor translating user-initiated actuations and an encoder and equivalents thereof."**[13]

**4. "Encoding Means"**

The ninth claim term in dispute is "encoding means."

[13] I decline to adopt the remainder of GET's proposed construction of this term for the reasons discussed supra in Section F.

| Claims | GET's Proposed Construction | Sony's Proposed Construction |
|---|---|---|
| 10, 14 | Function: Synchronizing the user input stream with the input stream and encoding the same into a combined data stream transferable by the communication means.<br><br>Structure: A framer that implements a frame format containing data bits of the UI stream and of the additional input signal and equivalents thereto; framer 34 of Figure 4A and equivalents thereto; may be implemented by integrated circuit technology or microprocessor-based design. (Pl.'s Opening Claim Constr. Br., Ex. 2, at 5.) | Function: (1) synchronizing the user input stream with the input stream, and (2) encoding the user input stream and the input stream into a combined data stream.<br><br>Structure: The logic design at block 34 of Figure 4A. (Defs.' Responsive Claim Constr. Br. at 16.) |

The parties agree that § 112(f) applies to this term. The central dispute between the parties is whether the structure, which performs the function of "encoding means," is limited to the framer disclosed in Figure 4A of the '730 Patent.

GET argues that the evidence offered in support of its construction of "framer" is dispositive as to "encoding means" because the structure that performs the function of this term is a "framer." GET contends that Sony's proposed construction seeks to limit the term to a single example in the specification, which it asserts is improper when construing means-plus-function limitations.

When the patent discloses only one type of structure to perform the function of a means-plus-function limitation, the Federal Circuit has held that the construed structure of the term should be limited to the structure disclosed in the specification and its equivalents. See Bennett Marine, 549 F. App'x at 954–55. Bennett Marine involved a patent for trim tab systems used on powerboats, which disclosed only one type of circuit for performing the function of the means-plus-function limitation at issue. Id. at 949, 954. The Federal Circuit concluded that, "[i]n such a situation, the corresponding structure should be limited to that [disclosed] structure and its equivalents." Id. at 954 (citing Mettler-Toledo, Inc. v. B-Tek Scales, LLC, 671 F.3d 1291, 1295–

6 (Fed. Cir. 2012)). In support of this conclusion, the Federal Circuit noted that the patent at issue "did not disclose alternatives to the circuit shown in figure 2, such as, for example, a general class of known switches." Id. at 954–55 ("Bennett has not identified any evidence showing that any circuit other than the circuit disclosed in figure 2 was known and capable of performing the function required by the fifth limitation."); see also J&M Corp. v. Harley-Davidson, Inc., 269 F.3d 1360, 1367 (Fed. Cir. 2001) ("The literal scope of a properly construed means-plus-function limitation does not extend to all means for performing a certain function. Rather, the scope of such claim language is sharply limited to the structure disclosed in the specification and its equivalents.").

Here, the '730 Patent discloses only one specific structure for performing the function of "encoding means," framer 34 identified in Figure 4A. ('730 Patent, col. 5, lines 4–64.) GET admits that the specification identifies framer 34 as the relevant structure. (Pl.'s Opening Claim Constr. Br. at 11 ("The specification clearly identifies the structure that synchronizes the user input stream with the input stream and encodes them into a combined data stream: a framer. 'Framer 34 keeps UI stream 24 and input stream 33 in synchrony and encodes them into combined data stream 37 . . . .' (quoting '730 Patent, col. 4, lines 13–16)).) For the same reasons discussed supra in regarding "framer," I disagree that the use of "framer" in the claimed invention refers to a general class of known framers capable of performing the function of "encoding means."

Therefore, based on my foregoing discussion of "framer" and the reasoning in Bennett Marine, I will adopt Sony's proposed construction of **"encoding means"** as **"Function: Synchronizing the user input stream with the input stream and encoding the user input**

**stream and the input stream into a combined data stream;[14] Structure: The logic design at block 34 in Figure 4A and equivalents thereof."**

### 5. "Means for Converting the Output Stream Into At Least One Output Signal"

The tenth claim term in dispute is "means for converting the output stream into at least one output signal."

| Claims | GET's Proposed Construction | Sony's Proposed Construction |
|---|---|---|
| 17 | Function: Converting the output stream into at least one output signals.<br><br>Structure: A circuit for converting a digital stream into an output signal, such as, for example the decoder part of a codec, and equivalents thereto; may be implemented by integrated circuit technology or microprocessor-based design. (Pl.'s Opening Claim Constr. Br., Ex. 2, at 8.) | Function: Converting the output stream into an output signal.<br><br>Structure: The decoder portion of a codec. (Defs.' Responsive Claim Constr. Br. at 20; see also Defs.' Sur-reply Claim Constr. Br. at 10.) |

The parties agree that § 112(f) also applies to this term and do not substantively dispute the construction of the term's function. Rather, GET disputes Sony's limitation of the structure of the term to a preferred embodiment of the claimed invention—the decoder portion of a codec.

As discussed supra regarding "converter," claim 18 teaches a converter that can perform the function of converting an output stream into an output signal. The specification also refers to an embodiment of the converter that performs this same function. (Id. at col. 4, lines 16–19 ("FIG. 2C additionally shows converter 30 receiving output stream 54 from framer 34 to produce output signal 52 going out via output 53 to the external device.").)

[14] The parties substantively agree regarding the construed function of "encoding means." Based on this agreement and the language of claim 16, I have adopted a hybrid of the parties' proposed constructions. ('730 Patent, col. 8, lines 61-63 ("a framer synchronizing the user input stream with the input stream and encoding the same into a combined data stream transferable by the communication link").

The specification discloses a "codec" as only one embodiment of converter 30. ('730 Patent, col. 4, lines 41–52 ("FIG. 3A illustrates one implementation of the embodiment of the invention that receives and transmits analog I/O signals while transferring data to/from the computer via the RS-232 cable. It utilizes all the elements shown in FIG. 2A and further includes the feature of receiving an output information sent from the computer via line TXD of the RS-232. Framer 34 serializes such output information to become signal 54, which is converted by converter 30 into output signal 52 to output 53. Converter 30 [in this preferred embodiment] is a codec . . . ."); id. at col. 5, lines 7–11 ("FIG. 4A, the codec TP3054, in place of converter 30, converts output information 54, sent from the computer via line TXD, into output signal 52 entering output 53. Concurrently, the codec also converts input signal 31, delivered by input 32, into serial stream 33.").)

Because the "codec" disclosed in the specification is a preferred embodiment of the claimed invention, I will not limit the construction of "converter" to this example without a disclaimer. See, e.g., B.E. Technology, L.L.C., 657 F. App'x at 988.

Therefore, I will adopt GET's proposed construction of **"means for converting the output stream into at least one output signal"** as **"Function: Converting the output stream into at least one output signal; Structure: A circuit for converting a digital stream into an output signal and equivalents thereof."**[15]

### 6. "Converting Means"

The eleventh and final claim term in dispute is "converting means."

[15] I decline to adopt the remainder of GET's proposed construction of this term for the reasons discussed supra in Section F.

| Claims | GET's Proposed Construction | Sony's Proposed Construction |
|---|---|---|
| 10 | Function: Receiving the at least one input signal and producing therefrom an input stream.<br><br>Structure: An analog-to-digital converter and equivalents thereto; may be implemented by integrated circuit technology or microprocessor-based design. (Pl.'s Opening Claim Constr. Br., Ex. 2, at 4.) | Function: Receiving the at least one input signal and producing therefrom an input stream.<br><br>Structure: An analog-to-digital converter. (Defs.' Responsive Claim Constr. Br. at 15.) |

The parties again agree that § 112(f) applies to this term. Their central dispute is whether the construction of this term's structure should include "equivalents thereof" and "may be implemented by integrated circuit technology or microprocessor-based design." For the same reasons discussed supra regarding these proposed additions by GET, I will construe **"converting means"** as **"Function: Receiving the at least one input signal and producing therefrom an input stream; Structure: An analog-to-digital converter and equivalents thereof."**

## IV. CONCLUSION

The claims shall be construed as set forth above and in the Claim Construction Order that follows.

US006219730B1

(12) **United States Patent**
**Nguyen**

(10) **Patent No.: US 6,219,730 B1**
(45) **Date of Patent: Apr. 17, 2001**

(54) **METHOD AND APPARATUS FOR PRODUCING A COMBINED DATA STREAM AND RECOVERING THEREFROM THE RESPECTIVE USER INPUT STREAM AND AT LEAST ONE ADDITIONAL INPUT SIGNAL**

(76) Inventor: **Nghi Nho Nguyen**, 301 Santillo Way, Downingtown, PA (US) 19335

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/100,410**

(22) Filed: **Jun. 20, 1998**

(51) **Int. Cl.**[7] .............................. **G09G 5/08**; G06F 15/20; G06F 13/00; H03M 7/00; G10L 3/00

(52) **U.S. Cl.** .................................. **710/62**; 710/10; 710/8; 710/63; 710/64; 710/65; 710/73; 345/163; 345/157; 345/328; 341/50; 370/535; 379/202; 379/399

(58) **Field of Search** .................................. 710/100, 8, 9, 710/10, 62, 63, 64, 65, 68, 69, 70, 71, 72, 73; 345/157, 168, 163, 160, 328; 348/6; 341/50; 379/399, 202; 370/535

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,689,761 8/1987 Yurchenco .
5,020,098 * 5/1991 Celli .................................... 379/202
5,168,556 * 12/1992 Lajtai et al. ........................... 710/71
5,359,712 * 10/1994 Cohen et al. ........................ 345/328
5,387,927 * 2/1995 Look et al. .............................. 348/6
5,402,518 3/1995 Lowery .
5,568,614 * 10/1996 Mendelson et al. ................. 709/231
5,631,669 5/1997 Stobbs et al. .
5,663,962 * 9/1997 Caire et al. .......................... 370/535
5,706,335 * 1/1998 Hinderks .............................. 379/399
5,802,318 * 9/1998 Murray et al. ....................... 710/100
5,808,569 * 9/1998 Wuppermann et al. ............... 341/50
5,870,080 * 2/1999 Burnett et al. ....................... 345/163
5,877,747 * 3/1999 Kitao et al. .......................... 345/160
5,878,120 * 3/1999 O'Mahony ........................ 379/93.09
5,990,866 * 11/1999 Yollin .................................. 345/157
5,990,872 * 11/1999 Jorgenson et al. .................. 345/168

OTHER PUBLICATIONS

Gorges et al. "Speech Browsing the World Word Web", Systems, Man, and Cybernetics, 1999, IEEE SMC '99 Conference Proceedings. 1999 IEEE Int. Conf. on, vol. 4, pp. 80–86.*

Severance, C. "Linking Computers and Consumer Electronics", Computer, vol. 20, Issue 2, Feb. 1997, pp. 119–121.*

Nishimoto et al. "Improving Human Interface Drawing Tool Using Speech, Mouse and Key–board", Robot and Human Communication, 1995. RO–MAN'95 Tokyo, Proceedings, pp. 107–112.*

(List continued on next page.)

*Primary Examiner*—Thomas Lee
*Assistant Examiner*—Katharina Schuster

(57) **ABSTRACT**

An apparatus, functioning as a user-input device (UID) to a computer by using a communication link, receives/transmits additional I/O signals via the same link. The I/O signals may be analog or digital. One implementation of the apparatus, made wireless and supported by speech processing software, allows its user to interact with the computer remotely. The inventive apparatus comprises means for converting the I/O signals into/from the digital I/O streams in such a manner as to be transferable to/from the computer along with the UI information via the same communication link. The apparatus, while functioning as a UID, may handle the I/O signals coming from/to an external I/O device, such as a fax/modem device or even another conventional UID. The apparatus, while performing as a UID, may include the complete functionality of an external I/O device handling the I/O signals. A communication program method, by which a computer receives a combined data stream resulted from two sources, one from a UID another from an additional input signal, recovers from such stream the respective information of the two sources.

**25 Claims, 8 Drawing Sheets**



OTHER PUBLICATIONS

Vo et al. "Multi–Modal HCL: Combination of Gesture and Speech Recognition", Interact '93 and CHI '93 Conference Companion on Human Factors in Computing Systems, 1993, pp. 69–70.*

Malkewitz et al. "Experiences with Adding New Input Modalities to PC Desktop Computing", Proceedings of the Conference on Designing Interactive Systems, 1997, pp. 235–238.*

Philips Electronics N.V., Product Brochure of Speech Mike, Model LFH6173, Advertised Sep. 1997; Web http://www.speechmike.philips.com.

* cited by examiner




FIG. 1A - PRIOR ART




FIG. 1B


COMM MEANS
COMPUTER
FRAMER
UI MEANS
CONVERTER
35
36
38
10
37
34
24
33
20
30
32
31

FIG. 2A


COMM MEANS
35
36
38
COMPUTER
10
37
FRAMER
34
24
I/F
20
19
EXTERNAL UID
33
CONVERTER
30
31
32

FIG. 2B


COMM MEANS
35
36
COMPUTER
38
10
37
55
FRAMER
34
54
CONVERTER
52
53
24
33
32
31
30
UI MEANS
20
EXTERNAL DEVICE

FIG. 2C


COMPUTER
10
38
CTS
RXD
TXD
35
37
CTS*
RXD*
TXD*
FRAMER
34
24
33
54
UI MEANS
20
CODEC
30
31
32
52
53

FIG. 3A


STARTBITS
STOPBITS
D7
D6
D5
D4
D3
D2
D1
D0
D7
D6

FIG. 3B

FIG. 4A



RXD
TXD
35
37
RXD*
TXD*
VCC
R*
SEL
CLR
34
50
FF 2
62
SX
STA*
FF 1
OSC
24
DX
33
54
DR
FS
BCLK
MCLK
QH
20
UI MEANS
CODEC
30
32
31
52
53

FIG. 4B


BCLK
TXD*
CLR
QH
R*
SEL
FS
RXD*
STARTBITS
T0
PE
T7
T6
T5
T4
T3
T2
T1
T0
PE
T7
T6
D0
UI
D7
D6
D5
D4
D3
D2
D1
D0
UI
D7
D6




FIG. 5

# METHOD AND APPARATUS FOR PRODUCING A COMBINED DATA STREAM AND RECOVERING THEREFROM THE RESPECTIVE USER INPUT STREAM AND AT LEAST ONE ADDITIONAL INPUT SIGNAL

## FIELD OF THE INVENTION

This invention relates to computer user-input devices including pointing devices, especially to those handling additional input/output signals.

## BACKGROUND OF THE INVENTION

A computer utilizes a user-input device (UID) to receive its user's input and various kinds of input/output (I/O) cards or devices to handle I/O signals or information. A typical UID is the mouse, the trackball, the keyboard, the pressure tablet, or the pen-based input device. Popular I/O cards include the sound card handling I/O speech signals and the fax/modem device transferring information over the telephone line. Devices and cards require and share common computer resources such as the direct memory access (DMA) channels and the interrupt request (IRQ) services. Computer resources for each device or each card equipped in a computer must be configured, or assigned, to prearranged memory locations that are limited in number. Configuration setup for computer resources is cumbersome and sometimes causes conflict in running software. The recent plug-and-play technology implemented in computers alleviates the configuration mechanism. However, it does not solve the problem of limited resources shared among cards and devices. As computer technology advances, more types of cards and devices are offered for richer sets of functions; efficient use of computer resources becomes critical. Furthermore, a conventional computer requires that its user be close to its display screen in order to see and control what shown on the screen. If somehow the user could issue commands to her computer and receive its responses remotely, she would gain a new freedom, such as walking around or staying in bed, while using the computer. The present invention offers a new kind of UID utilizing the computer resources efficiently and enabling a mode of remote interaction between the computer and its user.

## SUMMARY OF THE INVENTION

An object of the present invention provides an apparatus functioning as a UID to a computer while receiving/transmitting additional I/O signals transferred to/from the computer without using any computer resources except those available to the UID.

Since the inventive apparatus is a UID functioning additionally as an I/O card (or device) without using the card (or device) and its resources, it provides the following advantages. Elimination of the I/O card (or device) reduces the computer parts and resources, thus enhances the computer's reliability, serviceability and efficiency. Such inventive apparatus is useful in hand-held computers or embedded systems, which usually have a communication port needed for a UID but no provision for I/O cards (or devices). When handling two input (or output) signals of the same type, two identical I/O cards cannot be used in one computer due to configuration conflict, but the inventive apparatus cooperating with one such I/O card (or device) can. For example, one inventive apparatus handling the I/O telephone signals effectively functions as a fax/modem device and at the same time as a UID. A computer may use such apparatus in conjunction with another fax/modem card to handle two telephone lines. As another example, a computer may use one inventive apparatus that handles the I/O speech signals to work in conjunction with a sound card in order to deal with two speech inputs and two speech outputs. Such use is essential to computers that need to deal with two sources of speech inputs, say, one as the voiced command and another for multimedia recording. Furthermore, the inventive apparatus that handles the speech I/O signals will be further supported by software interpreting the speech input as voiced commands and generating the speech output as voiced responses. Such apparatus, made cordless and integrated with a microphone and a speaker, will allow the user to interact with the computer remotely. By carrying the apparatus with her, the user may issue oral commands to the computer via the microphone, and hear its responses from the speaker, while being away from the computer.

One object of this invention provides a user-input (UI) apparatus that sends its data to a computer, by using the communication link available to a conventional UID, while receiving/transmitting additional I/O signals, the information of which being transferred to/from the computer via the same communication link. The inventive apparatus comprises means for converting the I/O signals into/from the digital I/O streams in such a manner as to be transferable to/from the computer along with the UI information via the same communication link. The apparatus, while functioning as a UID, may handle I/O signals sent from/to an external I/O device, such as an external fax/modem device or even another conventional UID. Furthermore, there is a program method, executed by the computer and cooperating with the apparatus, for transferring information over the communication link, and for recovering therefrom the UI information and the information of the input signals.

Two examples of communication protocols used by a UID are the popular RS-232 and the newly standardized Universal Serial Bus (USB). The transmission of the communication signals may be wired (via cable) or wireless (via electromagnetic wave). The I/O signals may be analog, such as the speech, or digital, such as the data transferred to/from a computer.

In order to function as a UID, the inventive apparatus utilizes a user-input module as one of its components or alternatively provides interface to an external conventional UID.

Another object of the invention provides an apparatus comprising only the feature of receiving at least one input signal.

The inventive apparatus may integrate means to handle the I/O signals, such as the microphone converting a speech input into the input signal and/or the speaker converting the output signal into speech energy.

The inventive apparatus may be implemented, at least partially, by integrated circuit (IC) technology using such part as the programmable logic device (PLD) or the application-specific IC (ASIC).

The inventive apparatus may be implemented, at least partially, by a microprocessor-based design; furthermore, data compression/decompression algorithms may be used to reduce the data traffic over the communication link.

The inventive apparatus may be powered solely from the signals of the communication link.

Another object of the invention provides a method for receiving a combined data stream, resulted from a UID source and from an input signal, and for recovering therefrom the respective information of the UID and of the input signal.

## BRIEF DESCRIPTION OF THE DRAWINGS

In the figures referred below, the like numbers or names denote the like elements.

FIG. 1A shows a computer utilizing a conventional UID and a sound card.

FIG. 1B shows the same computer wherein one embodiment of the invention replaces both the UID and the sound card.

FIGS. 2A, 2B, and 2C show block diagrams of the various embodiments of the invention.

FIG. 3A shows one embodiment of the invention utilizing the RS-232 cable.

FIG. 3B shows one timing waveform of the RS-232 data format.

FIG. 4A shows one logic design of another embodiment of the invention.

FIG. 4B shows the timing waveform of the critical signals involved in FIG. 4A.

FIG. 5 shows the block diagram of one of the onboard embodiments of the invention.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIG. 1A illustrates a computer system in which computer **10** communicates with UID **11** via communication link **12** to move object **14** displayed on monitor **13**, while utilizing sound card **15** to receive speech input from microphone **16** and to transmit speech output to speaker **17**. According to one implementation of the present invention, by substituting UID **11** with inventive apparatus **18**, as depicted in FIG. 1B and described subsequently, computer **10** eliminates the sound card. Apparatus **18** directly receives speech input from microphone **16** and transmits speech output to speaker **17**. When using the computer shown in FIG. 1B, a user operates apparatus **18** normally as a conventional UID and further may speak into the microphone and hear speech output from the speaker. In other words, apparatus **18** singly provides both functions, of a UID and of a sound card, without utilizing the sound card and its computer resources. Apparatus **18** realizes one embodiment of the invention wherein the I/O signals are speech; there are other embodiments which receive/transmit other types of the I/O signals while performing as a UID.

In order to function as a UID, the apparatus offered by this invention either cooperates with an external conventional UID or utilizes a user-input (UI) module. A UI module is a UID without its housing and cable attachment; it can be made or purchased. Examples of commercial UI modules are: the VersaPoint module from Interlink Electronics, 546 Flynn Road, Camarillo, Calif. 93012; the HulaPoint module from USAR Systems, 568 Broadway #405, New York, N.Y. 10012; and the generic modules compatible with the standard serial mouse made by Microsoft, One Microsoft Way, Redmond, Wash. 98052-6399. Functionally, a UID or a UI module comprises a sensor translating a user-initiated actuation into electrical signals, and an encoder converting such signals into a digital stream, called the UI stream, representative of its actuation. The UI stream follows the format of the communication link used by the associated UID. In this description, the UI stream conforms to the Microsoft serial mouse's asynchronous frame format composed of one start-bit, seven data-bits, and one stop-bit, transmitted at 1200 bits/s. The inventive apparatus receives a UI stream coming either from a UI module or from an interface to an external UID.



One embodiment of the present invention, having the functional block diagram depicted by FIG. 2A, comprises a UI means **20**, a signal converting means called converter **30**, a framing logic means called framer **34**, and a communication means **35**. The same block diagram is shown in FIG. 2B in which an interface to external UID **19** acts as the UI means **20**. Another block diagram is shown FIG. 2C in which an external device such as the fax/modem device, transmits/receives I/O signals to/from converter **30** via input **32** and output **53**. In reference to FIGS. 2A, 2B, and 2C, UI means **20** produces UI stream **24**, while converter **30** converts input signal **31**, delivered by input **32**, into input stream **33** representative of the input signal. Framer **34** keeps UI stream **24** and input stream **33** in synchrony and encodes them into combined data stream **37** in accordance with the protocol of the communication means. FIG. 2C additionally shows converter **30** receiving output stream **54** from framer **34** to produce output signal **52** going out via output **53** to the external device. Generally, any stream described in this invention has digital values, which may be transported either by a single signal or by multiple signals. Communication means **35** translate combined data stream **37** into proper signaling format traveling on communication link **36** to computer **10** at port **38**. Although being shown in the drawings, the external device, link **36**, computer **10**, and port **38** do not belong to the embodiment of the invention. For the I/O signals being analog, converter **30** at least performs as an analog-to-digital converter such as the encoder-decoder (codec). For the I/O signals being digital, the converter at most may be eliminated, so that the framer may directly synchronize and merge digital input signal **31** with UI stream **24** to produce combined data stream **37**.

In order to implement wireless communication link, communication means **35** is a wireless transceiver which transmits/receives the electromagnetic signals forming link **36**, while at port **38** there is a compatible wireless transceiver to receive/transmit the same signals. Two typical wireless transceivers are the infrared-light (IR), such as those used in standard IR devices, and the radio frequency (RF), such as those used in cordless telephones or in conventional RF transmitters and receivers.

FIG. 3A illustrates one implementation of the embodiment of the invention that receives and transmits analog I/O signals while transferring data to/from the computer via the RS-232 cable. It utilizes all the elements shown in FIG. 2A and further includes the feature of receiving an output information sent from the computer via line TXD of the RS-232. Framer **34** serializes such output information to become signal **54**, which is converted by converter **30** into output signal **52** going to output **53**. Converter **30** is a codec, such as part TP3054 from National Semiconductor, 2900 Semiconductor Drive, P.O. Box 58090, Santa Clara, Calif. 95052-8090. Communication means **35** is an RS-232 transceiver, such as part MC145406 from Motorola, P.O. Box 20912, Phoenix, Aria. 85036-9938. In reference to FIG. 3A, UI stream **24** directly becomes signal CTS*, while digital stream **33** is transformed by framer **34** to become signal RXD*. Both signals CTS* and RXD* form the combined data stream **37**, which is translated by transceiver **35** to become respectively the RS-232's CTS and RXD lines. While line RXD is specifically utilized to transport stream **33** because of its high data transfer rate, any RS-232's other input line, instead of CTS, may be chosen to transport stream **24**. In order to be compatible with the serial format of the codec, the RS-232 protocol is preferably formatted with one start-bit, eight data-bits (D7 to D0), and one stop-bit, as depicted by FIG. 3B, and transmitted at 115.2 kbits/s.

In applications where the efficiency of the communication link is desired, such as in wireless communication, combined data stream **37** is encoded into a single signal transmitted by a single wire or electromagnetic wave. FIG. **4**A depicts one embodiment of the invention in which framer **34** encodes data stream **37** into a single signal. In reference to FIG. **4**A, the codec TP3054, in place of converter **30**, converts output information **54**, sent from the computer via line TXD, into output signal **52** entering output **53**. Concurrently, the codec also converts input signal **31**, delivered by input **32**, into serial stream **33**. In order to make stream **33** compatible with the RS-232's data format, a start-bit pulse provided by signal STA* is logically AND-ed with stream **33** to become digital input stream SX carrying information of the input signal. Since codec **30** converts output information **54** and input signal **31** simultaneously, their corresponding data streams traveling on the RS-232's data lines, TXD and RXD, are preferably synchronized for their timely transmission and reception by the computer. One logic implementation of the framer, as depicted in FIG. **4**A, relies on the signal of line TXD to maintain the synchronization between the UI and input streams. The data lines TXD and RXD are programmed by the computer to have a data rate of 115.2 kbits/s and a frame format composed of eleven bits: one start-bit, eight data-bits, one parity-error-bit (PE-bit) and one stop-bit. In reference to FIGS. **4**A and **4**B, flip-flop FF**2**, utilizes signal CLR to re-synchronize clock generator **62** with the start-bit of signal TXD*. Signal CLR is kept low by signal R* during the transmission of each data frame of signal TXD*; otherwise, due to the high voltage VCC at FF**2**'s input pin, it waits for being set high by the upcoming start-bit of signal TXD*. Once set, signal CLR restarts, and is immediately reset by the same, clock generator **62** providing bit-clock signal BCLK of the codec. Signal BCLK is divided by sixteen to become signal QH, which is latched into flip-flop FFI to provide the codec's frame-sync signal FS converting input signal **31** into serial stream **33** coming out of the codec's pin DX. Simultaneously, signal FS moves output information **54** serially into the codec, via pin DR, to be converted into output signal **52**. Both UI stream **24** and input stream SX are synchronezed and encoded into a single signal RXD* by data selector **50** under control of signal SEL. The latter, formed by signals coming from clock generator **62**, produces a string of positive pulses in sychrony with the PE-bit locations of signal RXD*, referred to as the UI-bit and denoted as "UI" in FIG. **4**B. Data selector **50**, normally selecting the input stream SX, otherwise samples UI stream **24** and stores its data into the UI-bit location of signal RXD*. Since UI stream **24** varies slowly compared to the pulsing of signal SEL, its information is conserved in, and subsequently can be recovered from, the UI-bits of signal RXD*. The UI-bit location on signal RXD* is not necessarily at the PE-bit. For instance, the least-significant data-bit (DO) location may be used instead. In such case, the pulses of signal SEL occur at the DO-bit time slots; consequently, the PE-bits, no longer needed, may be omitted entirely from signal RXD* to enhance the data transfer rate. In order to provide clocking signals, oscillator OSC of frequency around 1.8 MHz generates master clock MCLK running the codec. Clock generator **62** divides signal MCLK by sixteen to produce bit clock BCLK. The timing waveform for signals SEL, CLR, FS, QH, R*, TXD*, and RXD* are depicted in FIG. **4**B, in relation to bit clock BCLK.

Another embodiment of the invention provides an apparatus inside, or onboard, the computer. As illustrated in FIG. **5**, the RS-232 implementation of the onboard embodiment



does not need transceiver **35**; framer **34** links directly to the universal asynchronous receiver/transmitter (UART) controller **39** existed inside computer **10**.

Working in conjunction with each inventive apparatus, there exists a program method, executed by the computer, for sending output information to the apparatus, for receiving the combined data stream **37** in which a UI stream and an input stream are kept in synchrony and encoded, and for recovering therefrom the respective information of the UI stream and of the input signal. The program method comprises an initialization section, an interrupt service routine (ISR), and a data recovering routine. Specifically, for the inventive apparatus communicating with a personal computer (PC) via an RS-232 link, the three parts of the method are as follow.

The initialization section comprises the steps of:

setting up essential data buffers and their respective pointers;

initializing the communication control signals;

programming the communication mode;

installing the interrupt service routine;

loading initial data into the transmit-data register; and

enabling the communication interrupt to transmit/receive data.

The interrupt service routine comprises a tightly written code for:

reading the communication status;

checking for the error conditions;

transmitting data from a transmit-data buffer;

monitoring to receive and store data in a receive-data buffer;

deriving the UI-bit associated with each receive-data byte; and

storing the UI-bit into an UI-bit buffer.

Depending on the way the combined data stream **37** is formed, the step of deriving the UI-bit is done as follows. If stream **37** is sent via two separate signals, as shown in FIG. **3**A, that step reads the level of line CTS representing the value of the UI-bit during each receive-data byte. If stream **37** is sent via one single signal, as shown in FIG. **4**A, that step reads the parity error status, compares with the expected PE-bit of the receive-data byte, and derives the corresponding UI-bit. For example, corresponding to a receive-data byte=5D-hex (expected PE-bit is even), the UI-bit is 0 if an odd-parity error occurs otherwise 1.

The data recovering routine has the steps of:

recovering the input-signal byte from the data contained in the receive-data buffer;

storing it into the input-signal buffer;

reconstructing from the UI-bits each byte of the UI stream; and

depositing it into the UI-buffer.

The reconstruction of each UI-byte takes into account the programmed data rate of the UART and the bit-pattern of each data frame associated with that UI-byte. For example, in reference to FIG. **4**B, the UART is programmed with eleven bits at 115.2 kbits/s while the UI stream received at 1200 bits/s; hence, each UI-bit cell has an elapsed time corresponding to 115.2÷(1.2*11)=8.72 received data-bytes. Therefore, each UI-bit must have the same bit-value for N consecutive receive-data bytes, where N is an integer near 8.72 with its fraction being carried forward to the following UI-bit. The UI-byte can be reconstructed based on the UI stream's format, described earlier, which consists of one

start-bit, seven data-bits representing the UI-byte, and one stop-bit. Due to the asynchronous nature of the UI stream, the stop-bit may have the bit length N>8.72 before the occurrence of the start-bit of the next UI-byte.

For the apparatus that receives only input signals to be sent to the computer, the UART does not transmit data. Accordingly, the first two steps of the program method are modified so that the ISR will be invoked when its receive-data being available, rather than when its transmit-buffer is empty.

For the inventive apparatus connected to a computer by an RS-232 cable, its power can be solely drawn from the RS-232's output signals, such as the RTS, DTR, and TXD; hence, the apparatus needs no battery or external power supply.

Also, the IC technology, using the PLDs, the gate arrays, the ASICs, or the mixed-signal ICs, can integrate many elements of the apparatus into at least one IC device. For instance, a combination of the framer, the codec, the electronic part of the UI means, and the transceiver, can be packaged into at least one IC device. Alternatively, the logic of such combination can be implemented by a microprocessor, such as part DSP56xxx from Motorola.

The above-mentioned TP3054 codec, compresses/decompresses the I/O signals into data according to the simple mu-law; there are other known methods that do so more efficiently, such as the ADPCM in the communication field and the vector-quantization (VQ) in the speech processing field. Such methods can be implemented by a microprocessor to reduce significantly data traffic on the communication link.

The above implementation converts straightforwardly the analog I/O signals into/from the data streams sent to/from the computer. Other embodiments of the invention have the converter process the I/O signals completely before transferring their information to/from the computer along with the UI information, such as the case of dealing with the telephone I/O signals.

For the apparatus using the USB as the communication link, a USB controller, such as part CY7C6xxxx from Cypress Semiconductor, 3901 North First St., San Jose, Calif. 95134-1599, implements either only transceiver **35** or both framer **34** and communication means **35**. More generally, a micro-controller or a microprocessor specialized in the USB protocol can be used to implement at least some electronic parts of the inventive apparatus.

Another aspect of the invention offers a communication method by which a computer, receiving a combined data stream associated with two sources of information, one from a UI means and another from an input signal, recovers from such data the respective information of the two sources. Such method comprises the three steps described earlier. Such method further transmits data onto the communication.

Although the present invention has been described in connection with the above-mentioned embodiments, it is not limited to their illustrated implementations. People skilled in the art can modify, enhance, and/or refine those implementations to achieve the spirit and cover the scope of the invention as defined in the appended claims.

I claim:

**1**. A user input apparatus operatively coupled to a computer via a communication means additionally receiving at least one input signal, comprising:

user input means for producing a user input stream;

input means for producing the at least one input signal;

converting means for receiving the at least one input signal and producing therefrom an input stream; and

encoding means for synchronizing the user input stream with the input stream and encoding the same into a combined data stream transferable by the communication means.

**2**. The apparatus of claim **1** wherein the combined data stream is encoded into a single signal.

**3**. The apparatus of claim **1** wherein at least part of the apparatus is implemented by an integrated circuit device.

**4**. The apparatus of claim **1** wherein at least part of the apparatus is implemented by a microprocessor.

**5**. The apparatus of claim **4** further comprising means for compressing/decompressing the combined data stream, reducing the data traffic traveling on the communication means.

**6**. The apparatus of claim **1** wherein the apparatus resides in the computer.

**7**. The apparatus of claim **1** wherein the apparatus draws its power solely from communication signals traveling on the communication means.

**8**. The apparatus of claim **1** wherein the communication means is an RS-232 having at least two separate signal lines wherefrom the encoding means sends the user input stream and the input stream.

**9**. The apparatus of claim **1** wherein the communication means is a Universal Serial Bus.

**10**. The apparatus of claim **1** wherein the input means is an input transducer.

**11**. The apparatus of claim **1** wherein the user input means is an interface to an external user input device.

**12**. The apparatus of claim **1** further comprises means for receiving an output stream from the computer via the communication means and means for converting the output stream into at least one output signal.

**13**. The apparatus of claim **12** further comprises an output transducer converting the at least one output signal into output energy.

**14**. A programming method, executed by a computer communicatively coupled via a communication link to a user input means having means for synchronizing and encoding a user input stream and at least one additional input signal into a combined data stream, comprising the steps of:

initializing the communication link;

servicing a single resource service interrupt for receiving the combined data stream; and

recovering from the combined data stream respective information of the user input means and of the at least one additional input signal.

**15**. The programming method of claim **14** further comprises transmitting, via the communication link, output information, the output information being received and converted by a converter residing in the user input means into at least one output signal.

**16**. An apparatus linked to a computer by a communication link, functioning as a user input device and additionally receiving at least one input signal, comprising:

a user input device producing a user input stream;

an input port receiving at least one input signal;

a converter receiving the at least one input signal for producing an input stream; and

a framer synchronizing the user input stream with the input stream and encoding the same into a combined data stream transferable by the communication link.

**17**. The apparatus of claim **16** further comprises means for receiving an output stream from the computer via the communication link and means for converting the output stream into at least one output signal.

**18**. The apparatus of claim **16** wherein the converter further comprises an output port wherein the framer further receives an output stream from the computer via the communication link, the output stream being further received and converted by the converter into at least one output signal going to the output port.

**19**. A method by which a computer receives via a communication link a combined data stream containing synchronized and encoded information of a user input means and of at least one additional input signal, said method comprising the steps of:

initializing the communication link;

servicing a single resource service interrupt for receiving the combined data stream; and

recovering from the combined data stream respective information of the user input means and of the at least one additional input signal.

**20**. The method of claim **19** further comprises transmitting output information to the communication link, the output information being received and converted by a converter residing in the user input means into at least one output signal.

**21**. A user input apparatus operatively coupled to a computer via a communication link receiving user input signals and additionally at least one digital input signal, comprising:



a user input device for producing a user input stream;

an input port for producing the at least one digital input signal; and

a framer for keeping the user input stream and the at least one digital input signal in synchrony and encoding the same into a combined data stream transferable to the computer by the communication link.

**22**. The apparatus of claim **21** wherein the framer further receives output information from the computer to provide at least one output signal.

**23**. The apparatus of claim **22** further comprises an output transducer converting the at least one output signal into output energy.

**24**. The apparatus of claim **22** wherein the apparatus is further coupled to an external device, the external device providing the at least one digital input signal and receiving the at least one output signal.

**25**. The apparatus of claim **21** wherein the input port receives the at least one digital input signal from an external device.

* * * * *

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e)

_X_ The brief contains 13,333 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6)

_X_ The brief has been prepared in a proportionally spaced typeface using MS Word 2018 in a 14 point Times New Roman font or

____ The brief has been prepared in a monospaced typeface using ________ ______in a ___ characters per inch_________ font.

June 11, 2024

/s/ *Devan V. Padmanabhan*
Devan V. Padmanabhan
PADMANABHAN & DAWSON, PLLC
*Counsel for Plaintiff-Appellant*