# 2024-1686

In The

# United States Court of Appeals
## For The Federal Circuit

**GENUINE ENABLING TECHNOLOGY LLC,**

*Plaintiff - Appellant,*

**v.**

**SONY CORPORATION,**
**SONY INTERACTIVE ENTERTAINMENT LLC,**

*Defendants - Appellees.*

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**
**ORIGINATING CASE NO.: 1:17-CV-00135-MSG**

## BRIEF OF APPELLEES

**Adam P. Seitz**
**Clifford T. Brazen**
**ERISE IP, P.A.**
**7015 College Blvd., Suite 700**
**Overland Park, KS 66211**
**(913) 777-5600**

***Counsel for Appellees***

GibsonMOORE APPELLATE SERVICES, LLC
206 East Cary Street ♦ P.O. Box 1460 (23218) ♦ Richmond, VA 23219
804-249-7770 ♦ www.gibsonmoore.net

1. A user input apparatus operatively coupled to a computer via a communication means additionally receiving at least one input signal, comprising:

user input means for producing a user input stream;

input means for producing the at least one input signal;

converting means for receiving the at least one input signal and producing therefrom an input stream; and

encoding means for synchronizing the user input stream with the input stream and encoding the same into a combined data stream transferable by the communication means.

10. The apparatus of claim 1 wherein the input means is an input transducer.

**FORM 9. Certificate of Interest** **Form 9 (p. 1)**
**March 2023**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 24-1686

**Short Case Caption** Genuine Enabling Technology LLC v. Sony Interactive Ent

**Filing Party/Entity** Sony Interactive Entertainment LLC and Sony Group Corporation (previously Sony Corporation)

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 04/26/2024

Signature: /s/ Adam P. Seitz

Name: Adam P. Seitz

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br>☒ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br>☐ None/Not Applicable |
| Sony Group Corporation (previously Sony Corporation) | | |
| Sony Interactive Entertainment LLC (a successor in interest to Sony Interactive Entertainment America LLC) | | Sony Group Corporation; Sony Corporation of America |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☑ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ■ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

Case: 24-1686 Document: 14 Page: 4 Filed: 04/26/2024

**4. Legal Representatives**

<u>Erise IP, P.A.</u>

Abran J. Kean
Eric A. Buresh
Hunter Horton
Michelle L. Marriott
Jason Mudd (no longer with Erise IP)
Kelly R. Hughes (no longer with Erise IP)
Michelle A. Callaghan (no longer with Erise IP)

<u>Morris James LLP</u>

Kenneth Laurence Dorsney
Cortlan S. Hitch

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES .... iv

STATEMENT OF RELATED CASES .... vii

INTRODUCTION .... 1

STATEMENT OF THE ISSUES .... 4

STATEMENT OF THE CASE .... 5

Mr. Nguyen's Attempt To Improve The Computing Technology Of The Late 1990s Through The Use Of Voice Commands .... 5

SIE Takes The Video Game Industry By Storm With The Release Of Its High-Performance PlayStation 3 In 2006 And Again With Its PlayStation 4 In 2013 .... 10

Four Years After SIE Released Its PlayStation 4 and DualShock 4, GET Sues SIE For Infringement Of Mr. Nguyen's Patent .... 13

Identifying Fatal Defects In Dr. Fernald's Equivalency Analysis And GET's Infringement Case, SIE Moves The Court For Relief .... 19

SUMMARY OF THE ARGUMENT .... 26

STANDARD OF REVIEW .... 29

ARGUMENT .... 30

I. Dr. Fernald's Equivalency Analysis Was Insufficient As A Matter Of Law And The District Court Was Right To Exclude It ........ 34

A. Dr. Fernald's equivalency analysis rested on an overly generalized recitation of how the '730 Patent teaches Block 34 synchronizes the two data streams ........ 36

B. Dr. Fernald's "all logic designs are equivalent" opinions are insufficient as a matter of law to establish equivalency ........ 43

C. The district court did not demand a component-by-component analysis from Dr. Fernald ........ 48

II. The District Court Correctly Determined That GET Could Not Prove The Accused Bluetooth Module Was Structurally Equivalent To Block 34 And Granted Summary Judgment For SIE ........ 52

A. GET failed to present the particularized testimony and linking argument the law requires to support a finding of equivalence ........ 53

B. GET's reliance on the presence of a bit rate clock in the accused Bluetooth module to show equivalency fails on the facts and the law ........ 58

III. This Court Can Alternatively Affirm The District Court's Grant Of Summary Judgment Of Noninfringement Because SIE's Sale Of The Accused Products Does Not Constitute Direct Infringement ........ 63

A. SIE does not directly infringe the asserted apparatus claims because the Accused Products, as sold by SIE, lack the input signal required by the claims ........ 64

B. SIE's sale of the Accused Products cannot, as a matter of law, form the basis for a claim of direct infringement of the asserted method claim ................. 68

CONCLUSION ........................................................................... 70

CERTIFICATE OF COMPLIANCE ........................................................ 71

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Abbott Labs. v. Sandoz, Inc.*,
566 F.3d 1282 (Fed. Cir. 2009) .......... 29

*Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*,
811 F.3d 1334 (Fed. Cir. 2016) .......... 55, 56

*Bailey v. Dart Container Corp. of Michigan*,
292 F.3d 1360 (Fed. Cir. 2002). .......... 64

*Biafora v. U.S.*,
773 F.3d 1326 (Fed. Cir. 2014) .......... 64

*Bid for Position, LLC v. AOL, LLC*,
601 F.3d 1311 (Fed. Cir. 2010) .......... 39

*Blackboard, Inc. v. Desire2Learn, Inc.*,
574 F.3d 1371 (Fed. Cir. 2009) .......... 47

*Brumfield, Tr. for Ascent Tr. v. IBG LLC*,
97 F.4th 854 (Fed. Cir. 2024) .......... 30

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
296 F.3d 1106 (Fed. Cir. 2002) .......... 39

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*,
424 F.3d 1293 (Fed. Cir. 2005) .......... 65, 66, 67

*Dominion Energy, Inc. v. Alstom Grid LLC*,
725 F. Appx’ 980 (Fed. Cir. 2018) .......... 59, 61

*Ericsson, Inc. v. D-Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2014) .......... 68, 69

*Finjan, Inc. v. Secure Computing Corp.*,
626 F.3d 1197 (Fed. Cir. 2010) .......................................................69

*Gemalto S.A. v. HTC Corp.*,
754 F.3d 1364 (Fed. Cir. 2014) ................................................54, 55

*IMS Tech., Inc. v. Haas Automation, Inc.*,
206 F.3d 1422 (Fed. Cir. 2000) ..............................42, 43, 50, 51-52

*INVT SPE LLC v. ITC*,
46 F.4th 1361 (Fed. Cir. 2022)........................................................67

*Joy Techs., Inc. v. Flakt, Inc.*,
6 F.3d 770 (Fed. Cir. 1993) ............................................................68

*LifeNet Health v. LifeCell Corp.*,
837 F.3d 1316 (Fed. Cir. 2016) .......................................................65

*Mangosoft, Inc. v. Oracle Corp.*,
525 F.3d 1327 (Fed. Cir. 2008) .......................................................62

*Odetics, Inc. v. Storage Technology Corp.*,
185 F.3d 1259 (Fed. Cir. 1999)........................................ 39, 42, 53-54

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003) .......................................................29

*Ottah v. Fiat Chrysler*,
884 F.3d 1135 (Fed. Cir. 2018) .......................................................29

*Overhead Door Corp. v. Chamberlain Grp., Inc.*,
194 F.3d 1261 (Fed. Cir. 1999) ....................................45, 46, 47, 48

*Packet Intelligence LLC v. NetScout Sys., Inc.*,
965 F.3d 1299 (Fed. Cir. 2020) .......................................................68

*Sage Prods., Inc. v. Devon Indus., Inc.*,
126 F.3d 1420 (Fed. Cir. 1997) .......................................................29

*Solomon Techs., Inc. v. Int'l Trade Comm'n*,
524 F.3d 1310 (Fed. Cir. 2008) ................................................ 50, 51

*Texas Instruments Inc. v. Cypress Semiconductor Corp.*,
90 F.3d 1558 (Fed. Cir. 1996) ................................................ 54, 55

*Toro Co. v. Deere Co.*,
355 F.3d 1313 (Fed. Cir. 2004) ................................................ 45

*Traxcell Techs., LLC v. Sprint Commc'ns Co. LP*,
15 F.4th 1121 (Fed. Cir. 2021) ................................................ *passim*

*Valmont Indus., Inc., v. Reinke Mfg. Co.*,
983 F.2d 1039 (Fed. Cir. 1993) ................................................ 54

*VLSI Tech. LLC v. Intel Corp.*,
87 F.4th 1332 (Fed. Cir. 2023) ................................................ 45, 55, 56, 57

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
520 U.S. 17 (1997) ................................................ 29

*Wavetronix LLC v. EIS Electronic Integrated Sys.*,
573 F.3d 1343 (Fed. Cir. 2009) ................................................ 39

**Statutes:**

35 U.S.C. § 271(a) ................................................ 69

**Rules:**

Fed. R. Evid. 702 ................................................ 30

## STATEMENT OF RELATED CASES

No appeal has been previously taken from the civil action. Counsel is aware of one other pending case that may directly affect or be directly affected by this court's decision: *Genuine Enabling Tech., LLC v. Nintendo Co., Ltd., et al.*, No. 2:19-cv-00351-JNW (W.D. Wa.).

# INTRODUCTION

The district court's grant of summary judgment of noninfringement for Appellees Sony Interactive Entertainment LLC and Sony Group Corporation (collectively, "SIE") was sound. To survive summary judgment, GET had to show a genuine dispute that the Bluetooth module within SIE's Accused Products was equivalent to the logic design shown in Block 34 in Figure 4A of the '730 Patent—the structure corresponding to the claimed framer. Applying this Court's precedent, the district court correctly determined that GET lacked the evidence required to show the Bluetooth module was equivalent to Block 34 and granted summary judgment for SIE. This Court should affirm.

Establishing equivalence requires particularized testimony and linking argument regarding each prong of this Court's function-way-result test. These requirements ensure that meaningful structural and functional limitations—limitations on which the public is entitled to rely to avoid infringement—are not erased. Dr. Fernald's analysis of the "way" prong of the function-way-result test here exemplifies the reason these requirements exist. The '730 Patent provides a detailed and specific teaching of how Block 34 synchronizes the two streams. Dr. Fernald

ignored those teachings, arguing instead that equivalency could be found simply because the Bluetooth module and Block 34 allegedly have one commonality—they both synchronize the streams to a common bit clock. GET's own failure to seek discovery into the internal structure of the Bluetooth module prevented Dr. Fernald from saying how the Bluetooth module actually did this (or even if the Bluetooth module did, in fact, have a common bit clock). Instead, he erroneously argued he did not need to know, because, like Block 34, the Bluetooth module was comprised of digital logic, so a POSITA would have understood that however the Bluetooth module synchronized the two streams, it would have been understood to be equivalent.

As the district court correctly determined, Dr. Fernald's analysis erased nearly all the meaningful structure limitations from the asserted claims and did not comply with the function-way-result test. First, Dr. Fernald provided no basis for ignoring the '730 Patent's teaching regarding the way Block 34 synchronized the two streams. As a result, Dr. Fernald's analysis failed to resolve the key issue—whether the Bluetooth module operated substantially similarly to Block 34. Second, Dr. Fernald's reliance on a POSITA's understanding that all logic designs

are equivalent at best suggested the Bluetooth module and Block 34 are interchangeable, which goes only to the function or result of the structures, not the way they are achieved. Without more, the district court correctly determined that GET could not prove equivalence and granted summary judgment for SIE.

GET's failure to establish equivalency was not the only shortcoming in its infringement case. GET's case was based only on SIE's sale of the Accused Products. Under GET's theories of infringement, however, there is no infringement as a matter of law at the point of sale. As to the apparatus claims, SIE's Accused Products do not become a complete, infringing apparatus, if ever, until end users of the Accused Products take specific, independent action to supply a missing claim limitation. Such circumstances implicate indirect infringement, not direct. As to the method claims, it is black letter law that the mere sale of a product allegedly programmed to perform the method cannot constitute direct infringement. While these bases for summary judgment were not reached by the district court, they give this Court a separate basis to affirm the district court's judgment.

## STATEMENT OF THE ISSUES

(1) Whether the district court rightly determined that Dr. Fernald's opinion that the accused Bluetooth module was equivalent to Block 34 was insufficient to establish equivalency where Dr. Fernald had no evidence of the Bluetooth module's structure and based his "way" analysis on an overly generalized understanding of the way Block 34 performed the claimed synchronization function;

(2) Whether the district court correctly found that SIE's accused Bluetooth module was not an equivalent to Block 34, where GET presented no evidence of the Bluetooth module's structure and only limited expert testimony regarding the overall similarity between the Bluetooth module and Block 34;

(3) Whether this Court can separately affirm the district court's grant of summary judgment of noninfringement because:

a. The Accused Products, as sold by SIE, lack the specific input signal of audio of higher frequency required by the asserted apparatus claims; and

b. SIE's sale of the Accused Products is not direct infringement of method claim 14 as a matter of law.

## STATEMENT OF THE CASE

### *Mr. Nguyen's Attempt To Improve The Computing Technology Of The Late 1990s Through The Use Of Voice Commands*

The technology at the center of this case was designed to solve the problems associated with allocating resources to multiple user input devices ("UID") and the input/output ("I/O") cards that are required to handle the signals or information exchanged between the UIDs, I/O cards, and a computer. Appx171 1:15–17. When the inventor of the invention described in the '730 Patent, Mr. Nguyen, filed his patent application in 1998, UIDs and I/O cards "require[d] and share[d] common computer resources[.]" Appx171 1:21–23. The '730 Patent highlighted this drawback in a simple computing system utilizing a mouse **11**, a microphone **16**, and a speaker **17**:



FIG. 1A - PRIOR ART

Appx163.

Mr. Nguyen's solution involved a new UID **18** that eliminated the need for the sound card. Appx172 3:30–34. To accomplish this, the UID **18** "directly receive[d] speech input from microphone **16** and transmit[ted] speech output to speaker **17**":




FIG. 1B

Appx172 3:34–36; Appx163. Thus, this new UID itself took on the role of both a UID and sound card, providing both the speech input and output functions without needing to utilize the sound card or its dedicated computer resources. Appx172 3:36–41.

However, by routing the microphone and speaker through the UID, two distinct types of signals had to be sent to and from the computer through the UID—input signals from the UID (i.e., button and motion information from the mouse) and audio signals from the microphone and back to the speaker. This presented a new problem: because these signals

come from different sources and have distinct frequencies, they "will run asynchronously relative to, and collide with" each other. Appx281.

To overcome this problem, the UID employed a two-step process. First, "[a] converter is used to produce an input stream from the" audio signals, and then a framer included in the UID synchronizes the user input stream (i.e., button and motion data from the mouse) with the input stream of audio signals and encodes the two streams into a combined data stream, which is then sent to the computer. Appx2338. This arrangement is shown in Figure 2C:



FIG. 2C

Appx166. But *how* the framer synchronizes and encodes the two streams is not as simple as "two streams go in, one comes out." Appx172 4:13–16. To successfully synchronize and encode the UI stream and input stream

into a combined data stream, the framer utilizes a specific logic design, shown in Block 34 of Figure 4A:

FIG. 4A




Appx168 (annotated). Over nearly a column of disclosure, the '730 Patent lays out a specific, detailed sequence of steps the framer's subcomponents carry out to synchronize the two streams. Appx173 5:20–64.

After filing his patent application. Mr. Nguyen set out to build a working prototype of his invention. However, that prototype, what he called a "voice mouse," was crude:



Appx1938. Indeed, as Mr. Nguyen admitted, he was never able to get his voice mouse to "work perfectly." Appx2671–2673. Instead, it would regularly "destroy the user-input stream." Appx2672. Ultimately, this was the only prototype Mr. Nguyen ever built, and it never made it to market. Appx2658, Appx2674, Appx2706–2707.

Besides reducing the computer's resources needed to handle multiple UIDs and I/O cards, Mr. Nguyen also believed his UID may have another application. If the UID were designed for wireless, rather than wired, communication, a user could interact with a computer remotely. Appx171 2:12–14. "By carrying the apparatus with her, the user may issue oral commands to the computer via a microphone, and hear its

responses from the speaker, while being away from the computer." Appx171 2:14–17.

However, Mr. Nguyen's attempt to build a prototype of his envisioned wireless embodiment was even less successful than his attempt at building the wired prototype. While Mr. Nguyen spent two years trying to build a Bluetooth-enabled voice mouse, he was never successful. Appx2674; Appx2706–2707. As Mr. Nguyen tells it, the challenges were so insurmountable that nobody in the United States at that time would have been able to successfully build the wireless version of his invention using Bluetooth. Appx2706–2707.

***SIE Takes The Video Game Industry By Storm With The Release Of Its High-Performance PlayStation 3 In 2006 And Again With Its PlayStation 4 In 2013***

By the time Mr. Nguyen filed his patent application, SIE had already established its presence in the video game market. SIE's first console, the PlayStation, was released to widespread critical acclaim in the United States in 1995. SIE followed up the PlayStation with its successor, the PlayStation 2, in 2000. With the PlayStation 2, SIE dominated the marketplace, selling more than 160 million units worldwide—more than three times the *combined* unit sales of the

PlayStation 2's competitor consoles. To date, the PlayStation 2 remains the best-selling video game console of all time. It is against this backdrop that SIE's accused PlayStation 3 and PlayStation 4 consoles (the "Accused Consoles") and DualShock 3, DualShock 4, and Move controllers (the "Accused Controllers") (collectively, the "Accused Products") came to be.

SIE's PlayStation 3 and DualShock 3 controller were released in 2006 and 2008, respectively. Appx1937. As was the case with the jump from the PlayStation to PlayStation 2, the PlayStation 3 represented yet another evolution in the PlayStation line, having far superior performance to and more capabilities than the PlayStation 2. Among its unique features, the PlayStation 3 and DualShock 3, for the first time, allowed users to play games using not just the buttons on the controller but the controller itself. Appx1937. When players tilted, rotated, or translated the controller in 3-D space, the DualShock 3's accelerometer would translate those movements into signals, which would then be sent to the PlayStation 3 to control gameplay. Appx2820. SIE took this motion control functionality to the next level when it released its Move controller in 2010. Appx1937. Rather than using an accelerometer alone to measure

the motion of the controller, the Move used an accelerometer and an external camera, which measured the physical movement of the controller in 3-D space. Appx1937 n.1.

SIE released the PlayStation 4 and DualShock 4 in 2013, and with it came even more innovative features. Appx1937. Among them—the ability to chat with other game players online. To do this, players would connect one of an assortment of headsets to the PlayStation 4, all of which came equipped with a microphone to enable players to speak to one another during gameplay. Appx1937–1938.

The Accused Controllers were noteworthy over their predecessors for another reason: they were *wireless*. Relying on the Bluetooth wireless protocol, the Accused Controllers no longer had to be physically plugged into their respective consoles via a wire. Appx1939. Instead, after a player unboxed their console and controller, they could then "pair" their controller to their console, enabling the wireless transmission of data between the two and making wireless game play possible. Appx1939.

Like the PlayStation and PlayStation 2 before them, the Accused Products garnered high praise and were huge commercial successes.

***Four Years After SIE Released Its PlayStation 4 and DualShock 4, GET Sues SIE For Infringement Of Mr. Nguyen's Patent***

Following the release of its PlayStation 4 and DualShock 4, SIE continued to sell its Accused Products without incident for some time. However, in 2017, roughly 19 years after Mr. Nguyen filed his patent application, Mr. Nguyen, through his company GET, sued SIE without warning, claiming that SIE was infringing his patented technology. Appx124. SIE denied that it infringed on Mr. Nguyen's invention. After all, SIE's Accused Products were video game systems, and "Mr. Nguyen did not invent a game system." Appx1969. But according to GET, Mr. Nguyen's invention and, more specifically, his framer, had opened the door to wireless gaming and was how SIE managed to achieve wireless communication between the Accused Controllers and Accused Consoles. Appx1969. Without Mr. Nguyen's invention, GET argued, it would not be possible for SIE's Accused Controllers to send button press data with either motion data or audio data to the Accused Consoles without issue. Appx1969–1972. In fact, Mr. Nguyen's technology was so critical to the success of SIE's Accused Products, that GET argued that it was entitled not just to a royalty on the sales of the Accused Controllers Mr. Nguyen's invention allegedly enabled but to a royalty on the sales of the Accused

Controllers and SIE's games playable on the Accused Consoles, which GET had not accused of infringement. Appx3193. Altogether, GET argued it was entitled to nearly ***$500,000,000*** in royalties for SIE's alleged use of Mr. Nguyen's framer technology. Appx1936.

As GET's case was built on the wireless communication capabilities in the Accused Products, the scope of the invention's framer and the types of signals that the framer synchronized and encoded before transmission to the computer were front and center during claim construction. Beginning with the framer,[1] the district court determined that it was expressed as a means-plus-function term. Appx100–106. Consistent with the intrinsic and extrinsic evidence, the district court identified the function of the claimed framer as "[s]ynchronizing the user input stream with the input stream and encoding the user input stream and the input stream into a combined data stream" and the relevant structure as "[t]he logic design at block 34 in Figure 4A and equivalents thereof." Appx106.

---

[1] While the "framer" limitation is only recited in Claims 16–18 and 21–23, as GET acknowledged, there is no dispute that "[e]ach of the Asserted Claims requires a structure that synchronizes the user input stream with the input stream and encodes the two data streams into a combined data stream." Op. Br., 6–7. Indeed, the court gave all of these structures the same construction. Appx100–106, Appx118–121.

Turning to the claimed input signal, the district court determined that it should be construed as "[a] signal having an audio or higher frequency." Appx88–92.

Following claim construction, GET admitted that it was not contending that the Accused Products included the exact logic design shown in Block 34. Appx1996–1997. Nevertheless, GET maintained its infringement claim, arguing that the Bluetooth module within the Accused Controllers was equivalent to Block 34. Appx1996–1997. While GET's infringement claim hinged on this equivalency argument, GET made few attempts to support it. GET did not even subpoena the manufacturers of the Bluetooth modules in SIE's Accused Products until the evening of the final day of fact discovery—more than two years after learning of these companies' involvement with SIE's Accused Products. Appx1459. The district court denied GET's untimely request to extend the close of fact discovery and serve its subpoenas, and consequently, GET never obtained any evidence regarding the Bluetooth module's internal structure—it remained a black box. Appx3212.

Lacking any direct evidence of the Bluetooth module's internal structure, GET turned to its infringement expert, Dr. Fernald, to fill in

the gaps. He did so by falling back on foundational principles of circuit design. Appx1585–1589. The Bluetooth module, like Block 34, is a digital logic design. Appx1807. And in the field of digital logic design, Dr. Fernald contended, "[a] POSITA would understand that two logic designs could be structurally equivalent without the two logic designs using the exact same types of logic gates connected in the same manner." Appx1586. According to Dr. Fernald, a POSITA would recognize that two digital logic designs that do not have even one logic gate in common were nonetheless equivalent, so long as they performed the same function. Appx1587–1588.

Next, Dr. Fernald identified how Block 34 synchronized the two data streams: by synchronizing each of the bits of the respective streams to a common bit clock. Appx1605. More specifically, the input stream is synchronized to the bit clock "by feeding [the bit clock] to the CODEC, causing its output stream to clock on rising edges of [the bit clock][,]" while the "data selector 'samples UI stream **24** and stores its data into the UI-bit location" thereby "synchroniz[ing] the UI stream data to the bit clock, and hence to the similarly synchronized input stream[.]" Appx1605.

Turning to the accused Bluetooth modules, Dr. Fernald argued that "[t]he Bluetooth modules . . . also synchronize the user input stream with the input stream by synchronizing both streams to a common bit clock." Appx1605. However, lacking direct evidence that a common bit clock was present in the Bluetooth module, Dr. Fernald had to rely on conjecture to support his argument. Specifically, Dr. Fernald observed that the Bluetooth module performed two processes on the input streams: CRC generation and data whitening. Appx1606. Without citing any supporting documents or evidence, Dr. Fernald argued that both of "these processes operate on a serial bitstream of the payload, indicating the payload is synchronized to a bit-rate clock. As such, the Bluetooth modules in the accused SIE controllers necessarily synchronize" the two streams. Appx1606; Appx1608 (opining without citing evidence, that for either CRC generation or data whitening "to operate properly, the incoming 'data in' must be synchronized to the same bit clock used for shifting these shift registers").

Having determined that the Bluetooth module in the Accused Controllers was equivalent to Block 34, Dr. Fernald next had to determine if the Accused Products infringed the input signal limitations.

GET had advanced two theories for how the Accused Products infringed. First, GET argued that the Accused Products motion control functionality resulted in infringement because the Accused Controllers allegedly synchronized and encoded the motion data from the internal accelerometer and the data from the buttons pressed by a user into a single, combined data stream before transmitting that stream to an Accused Console. Op. Br., 15. However, because the district court had construed the input signal that the claimed user input device had to receive as being limited to signals having audio or higher frequency, GET could not rely on just any motion to satisfy the claims; it had to show that the motion of the Accused Controllers could generate input signals having at least an audio frequency. But the typical movements players employed during normal gameplay, such as rotating, tilting, or translating an Accused Controller, did not result in signals having audio or higher frequency. Appx3013–3014. As a result, contrary to how the Accused Controllers are used in the real world, Dr. Fernald had to rapidly slam each Accused Controller between his hands to create the signals alleged to satisfy the claims. Appx1947.

Second, GET contended that the Accused Products infringed when a user plugged a wired microphone headset that was sold with the PlayStation 4 and DualShock 4 into the DualShock 4, which would then allegedly synchronize and encode the voice data from the microphone and the data from the buttons pressed by a user into a single, combined data stream for transmission to an Accused Console. Op. Br., 15.

***Identifying Fatal Defects In Dr. Fernald's Equivalency Analysis And GET's Infringement Case, SIE Moves The Court For Relief***

Dr. Fernald's equivalency opinions and subsequent infringement analysis were not without controversy. Indeed, SIE vigorously disputed them both. Beginning with Dr. Fernald's equivalency analysis, Dr. Welch identified a critical defect undermining his ultimate conclusion relevant to this appeal. Namely, that Dr. Fernald's assumption that the Bluetooth module's inclusion of CRC generation and data whitening processes necessarily means the Bluetooth module synchronizes the two data streams was not supported by the evidence. Appx3050. Indeed, the evidence Dr. Fernald relied upon showed that the two data streams were combined by the Accused Products' microcontroller/IOC "prior to being serialized and sent to the Bluetooth module." Appx3049. Thus, "the Bluetooth module in the Accused Controllers simply receives serialized

payload data[.]" Appx3050. As Dr. Welch explained, by "presum[ing] the existence of a bit rate clock based on the fact that the payload data is serialized," Dr. Fernald "fails to account for the fact that the Bluetooth payloads are serialized prior to being sent to the Bluetooth module." Appx3055.

Turning to Dr. Fernald's analysis of GET's infringement theories, Dr. Welch again identified several deficiencies in Dr. Fernald's analysis of GET's motion control theory relevant here. Most critically, Dr. Welch explained that the frequency measurements that Dr. Fernald obtained by slamming the accused Move and DualShock 3 back and forth between his hands could not have been of audio or higher frequency. The accelerometers within each of these controllers are "designed to include a low pass filter having an adjustable cut-off frequency." Appx2821; Appx2861–2862. That low pass filter accepts "signals with a frequency lower than the cut-off frequency" but rejects "signals with frequencies higher than the cut-off frequency." Appx2822. Both of the low pass filters included in the Accused Controllers have cut-off frequencies below the audio frequency required by the court's claim construction. Appx2825; Appx2861. Moreover, Dr. Fernald's slamming methodology for

generating signals allegedly of audio or higher frequency was fundamentally flawed because his methodology was based on an aberrant use of the Accused Controllers. Appx3012–3017. Dr. Fernald was only able to generate the signals he relies on to support GET's infringement case by holding them "in such a way that they cannot be used for their stated purpose" and by misusing them in a way SIE expressly instructs against and in a way that introduced distortions to Dr. Fernald's frequency readings—the same distortions he cites as the signals having audio or higher frequency. Appx3012; Appx3015. Indeed, Dr. Fernald was unable to cite a single incidence of an Accused Controller ever being used by an end user in the manner he employed to generate the alleged audio frequencies. Appx3017.

Based on the flaws underlying Dr. Fernald's opinions, SIE filed a *Daubert* motion asking the Court to exclude Dr. Fernald's opinions. Appx1473. Among the bases supporting its motion, SIE argued that Dr. Fernald's equivalency analysis was insufficient to establish equivalency as a matter of law. Appx1495–1497. More specifically, to establish equivalency, GET had to show that the accused Bluetooth module satisfied this Court's function-way-result test. Appx1496. By limiting his

comparison to the respective outputs of the Bluetooth module and Block 34, Dr. Fernald had all but ignored the "way" the Bluetooth module synchronized the two data streams and whether that way was substantially similar to the "way" he understood Block 34 synchronized the streams. Appx1497. In response during oral argument, GET argued that Dr. Fernald had not meant to suggest that Block 34 synchronized the two streams to a bit rate clock using a CODEC and the data collector as taught in the '730 Patent; instead, all that was required was that Block 34 synchronized the streams to a bit rate clock *somehow*. Appx26. Thus, because Dr. Fernald had determined that the accused Bluetooth module also synchronized the two streams to a bit rate clock *somehow*, GET took the position that he had correctly applied the "way" prong in his analysis. Appx1568–1569.

Regardless of how Dr. Fernald had described Block 34's operation, the district court was unpersuaded by GET's arguments, and determined his opinions would be unhelpful to the jury and excluded them. First, the district court rejected GET's "all ways are equivalent" argument because it amounted to "a blanket assertion that all structures are considered interchangeable if they achieve the same result." Appx29–30. Second, the

court found Dr. Fernald's remaining "way" analysis lacking. Starting with how Dr. Fernald had initially characterized the "way" Block 34 synchronized the streams, the court observed that Dr. Fernald had failed to provide any "discussion, or even a conclusion, that the accused Bluetooth module operates similarly to that 'way.'" Appx31. Turning to GET's revised recitation of that "way," the court determined that Dr. Fernald had failed to provide any basis for framing it at such a high level of generality. Appx31. And even if he had, Dr. Fernald had nonetheless failed to "support that the accused structure operates in a way that is substantially similar" to that more generalized way. Appx32.

Following that order, GET moved for reargument, arguing the district court had erred by rejecting Dr. Fernald's recitation of the "way" Block 34 synchronized the two streams, by requiring Dr. Fernald to analyze equivalency at a component-by-component level, and by misunderstanding Dr. Fernald's "all ways are equivalent" analysis of digital logic design. Appx1796–1801. While SIE argued that none of GET's arguments satisfied any of the district court's grounds supporting reargument, the district court agreed to let GET and Dr. Fernald make its case directly at a hearing. Appx1817–1831; Appx3214–3216. While

GET again made its case to the court during the hearing, Dr. Fernald also made a key admission: Just as Dr. Welch had opined, Dr. Fernald could not be certain the two data streams in the Accused Controllers were not synchronized prior to arriving at the Bluetooth module. Appx1901.

After hearing GET and Dr. Fernald's arguments, the court denied GET's motion for reargument. Appx60. As it had explained in its *Daubert* decision, Dr. Fernald had framed the "way" Block 34 synchronized the two streams too broadly, had, at best, shown only that the Bluetooth module "achieve[d] a certain result," and he could not remedy these deficiencies by relying on the purported interchangeability of digital logic designs. Appx72; Appx75–76.

SIE promptly followed with its motion for summary judgment of noninfringement. Appx3217. While SIE argued summary judgment was warranted for several reasons, two are relevant on appeal. First, with Dr. Fernald's opinions struck, GET lacked the particularized testimony and linking argument the law demands to make a showing of equivalency. Appx1942–1946. Second, GET could not establish that SIE was liable for direct infringement solely through SIE's sale of the Accused Products. As to the asserted apparatus claims, the Accused Products, as sold by SIE,

did not satisfy each and every limitation of the claims. Each asserted apparatus claim required (1) that the claimed user input device be "operatively coupled" to the claimed computer, and (2) that the claimed user input device be "additionally receiving" the claimed user input signal. Appx1946–1949; Appx2198–2201. Under either of GET's infringement theories, direct infringement could not lie unless and until SIE's customers (1) purchased the Accused Products; (2) "paired" an Accused Controller with an Accused Console; and (3) took specific, independent action to create and supply either the allegedly infringing motion signal or audio signal. Appx1946–1949; Appx2198–2201. As to the asserted method claims, SIE argued that it was well-established that its sale of the Accused Products alone could not form the basis for GET's direct infringement claim. Appx1949; Appx2201. After a hearing, the district court agreed with SIE's first basis for noninfringement: GET could not create a genuine dispute that the Bluetooth module in the Accused Controllers was equivalent to Block 34. Appx2.

Thereafter, the court entered judgment in favor of SIE, and this appeal followed. Appx1.

## SUMMARY OF THE ARGUMENT

I. The district court was correct in its determination that Dr. Fernald's analysis of the way prong of this Court's function-way-result test. Lacking the schematics for the Bluetooth module GET alleged was equivalent to the logic design at Block 34 in Figure 4A, Dr. Fernald was unable to determine the Bluetooth module's actual structure and compare it to Block 34's structure. Nevertheless, believing that the Bluetooth module and Block 34 both achieved the claimed synchronization by synchronizing the two data streams to a bit rate clock, Dr. Fernald argued that this minimal commonality was sufficient to establish that the Bluetooth module operated in substantially the same way as Block 34—no matter what structure(s) the Bluetooth module relied on to synchronize the streams to the bit rate clock.

Following a thorough analysis of Dr. Fernald's opinions regarding the way prong, the district court correctly determined Dr. Fernald committed multiple legal errors. First, by ignoring all but the bit rate clock within Block 34, Dr. Fernald ran afoul of this Court's dictate that a proper way analysis must be based on the way Block 34, as a complete structure, performs the claimed synchronization. Second, in concluding

that the specific logic design of the Bluetooth module was immaterial to his analysis because a POSITA would have understood any two logic designs that perform the same function to be equivalent, Dr. Fernald impermissibly reduced the test for equivalency to a function-result test and did not address, let alone establish, the requirement that the Bluetooth module and Block 34 were substantially similar.

II. Having properly determined that Dr. Fernald failed to adhere to the law in analyzing the way prong of the function-way-result test, the district court reached the only justifiable conclusion at summary judgment: GET could not show a genuine dispute that the accused Bluetooth module was equivalent to Block 34 and, therefore, could not prove its direct infringement case. In reaching this conclusion, the court correctly applied this Court's precedent. First, to survive summary judgment, the law requires that GET point to particularized testimony and linking argument to establish equivalence. Dr. Fernald's analysis, having been properly found inconsistent with this Court's precedent, cannot be the particularized testimony and linking argument required. And Dr. Fernald's remaining testimony, which at best show a high-level similarity between the Bluetooth module and Block 34 overall, are

insufficient to show a genuine dispute. This is true both because his testimony lacks evidentiary support and because it is the kind of generalized testimony that is insufficient to prove equivalency.

III. This Court can also affirm the district court's grant of summary judgment on a separate basis: SIE's sale of the Accused Products was not direct infringement as a matter of law. First, to infringe the asserted apparatus claims under GET's infringement theories, GET had to show that the Accused Products, as sold, included an input signal having an audio or higher frequency. GET cannot make this showing. The signals GET has accused of satisfying the claimed input signal do not come into existence until a third party (e.g., an end user) takes specific, independent action to create them. Thus, because the apparatus claims require the presence of the input signal and not just the capability to create that signal, GET's direct infringement claim fails as a matter of law. Second, to prove indirect infringement, GET must point to evidence that SIE performed every step of the claim in the United States. However, GET only alleges that SIE infringes the method claim because it programs the Accused Products to perform the steps of the claim when executed by SIE's customers. But this Court has never held that the mere

programming of an accused product to perform a claimed method constitutes direct infringement, so GET's failure to present evidence that SIE itself ever performed every step of the asserted method entitles SIE to summary judgment as a matter of law.

## STANDARD OF REVIEW

This Court reviews a district court's summary judgment of noninfringement *de novo*. *Ottah v. Fiat Chrysler*, 884 F.3d 1135, 1139 (Fed. Cir. 2018). To establish that summary judgment is inappropriate, the opposing party must identify "'specific facts showing that there is a genuine issue" of fact that "'might affect the outcome of the suit under the governing law.'" *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1320 (Fed. Cir. 2003) (internal citations omitted).

Infringement by equivalency is a question of fact. *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009). Nonetheless, a district court should—and indeed, is obliged to—grant summary judgment when the evidence is such that no reasonable fact finder could find equivalence. *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1423 (Fed. Cir. 1997) (citing *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 n.8 (1997)); *Abbott Labs.*, 566 F.3d at 1288.

The "[e]xclusion of evidence under Federal Rule of Evidence 702 is generally reviewed under the standards prescribed by the pertinent regional circuit." *Brumfield, Tr. for Ascent Tr. v. IBG LLC*, 97 F.4th 854, 870 (Fed. Cir. 2024). But when that exclusion "rests on an interpretation of patent law," this Court applies its own law and reviews the district court's interpretation without deference. *Id.*

## ARGUMENT

The district court's decisions to exclude Dr. Fernald's equivalency opinions and to grant summary judgment of noninfringement for SIE were correct and were not made in haste or without proper consideration. The court analyzed the core dispute on appeal—whether GET could establish that the Bluetooth modules in SIE's Accused Products were structurally equivalent to Block 34, the identified structure corresponding to the claimed framer—over the span of almost 30 months: first when it granted SIE's *Daubert* motion, again when it denied GET's motion for reargument of the *Daubert* grant, and finally when it granted SIE's motion for summary judgment of noninfringement.

Over the course of those 30 months, the court gave GET every benefit of the doubt. At *Daubert*, the Court accepted all the facts Dr.

Fernald relied on to support his equivalency opinions but concluded his opinions were inadmissible. Then, at reargument, GET submitted an untimely second report that Dr. Fernald prepared as a direct rebuttal to the Court's *Daubert* ruling, where he attempted to reframe his original opinions and cure the defects the court had identified at *Daubert*. Appx1803–1816. The Court would have been well within its rights to reject that untimely report, but it did not. Instead, it considered it. Appx63. Dr. Fernald was then given the opportunity to make his case directly to the district court when he testified for several hours during the reargument hearing and responded to direct questions from the Court. Appx1832–1904. After considering all the evidence, both timely and untimely, the court reaffirmed its *Daubert* ruling. Appx60. Because this was the only evidence GET had on the equivalency prong for the framer, SIE moved for summary judgment. Appx3217. GET *again* responded with an untimely declaration, this time from Mr. Nguyen. Appx2174–2187. In that declaration, Mr. Nguyen largely repeated Dr. Fernald's excluded equivalency opinions as his own, including Dr. Fernald's opinions on the operation of SIE's Accused Products. Appx2174–2187. This testimony came ***despite*** GET's failure to identify

Mr. Nguyen as an expert during the expert disclosure period and ***despite*** Mr. Nguyen previously testifying in his deposition that he had no knowledge regarding the workings of the Accused Products. Appx2195–2198.

While it did not have to, the Court accepted GET's late declarations and unsubstantiated testimony and drew all justifiable inferences in GET's favor in reaching its decision on the "way" prong of the equivalency test: no reasonable jury could conclude that SIE's Accused Products infringed the asserted claims. The district court was right to grant summary judgment for SIE.

First, Dr. Fernald's equivalency opinions were properly excluded. As a result of GET's failure to seek discovery on the accused Bluetooth module, Dr. Fernald had no knowledge of its structure. Lacking that, Dr. Fernald was forced to work backward from the Bluetooth module's output to try to reverse engineer how that output was created. With so little to work with, Dr. Fernald was able to offer little more than a generalized understanding of how the Bluetooth module worked. His resulting opinions, expectedly, lacked the specificity the '730 Patent prescribed to

the way Block 34 performed the claimed function, and the district court correctly excluded them.

Second, to survive summary judgment, GET was required to present particularized testimony and linking argument regarding the equivalence between Block 34 and the accused Bluetooth module. With Dr. Fernald's equivalency opinions properly rejected as a matter of law, GET's only evidence was Dr. Fernald's remaining testimony on the generalized similarity between the accused Bluetooth module and Block 34. This testimony falls short of the particularized testimony and linking argument required by law, and the district court rightly granted summary judgment for SIE.

While this Court can affirm the district court's grant of summary judgment based on these reasons alone, it can also affirm for another reason: under GET's infringement theories, SIE's sale of the Accused Products, standing alone, is insufficient to hold SIE liable for direct infringement. Regarding the asserted apparatus claims, GET's infringement theories necessarily depend on another party (e.g., SIE's customers) taking specific, independent steps to complete the allegedly infringing system. That is a claim for indirect—not direct—

infringement, and GET has not advanced indirect infringement allegations in this case. As for the method claims, it is settled law that SIE's sale of a product GET alleges has been programmed to perform the claimed method is not a cognizable act of direct infringement. For these additional reasons, this Court can separately affirm the district court's grant of summary judgment.

## I. Dr. Fernald's Equivalency Analysis Was Insufficient As A Matter Of Law And The District Court Was Right To Exclude It.

The district court's exclusion of Dr. Fernald's equivalency opinions followed its straightforward, proper application of the way prong of this Court's function-way-result test. First, the district court considered "whether Dr. Fernald's report contain[ed] a sufficient analysis of the 'way' prong to support a conclusion" of equivalency. Appx30–31; Appx71–75. Answering in the negative, the court followed this Court's instruction for analyzing the way prong of the equivalency test: the court identified Dr. Fernald's characterization of the "way" that Block 34 synchronized the two data streams and determined that characterization lacked the specificity required by the '730 Patent. Appx30–33; Appx71–75. As a result, the district court correctly ruled that Dr. Fernald's opinions were

overly generalized and could not support a finding of equivalence. Appx33; Appx75.

Second, in rejecting Dr. Fernald's "all ways are equivalent" analysis, the district court determined that Dr. Fernald's analysis was too broad to help the jury understand how the claimed or accused structures work, understand the differences between them, or understand whether those differences are insubstantial. Appx29–30; Appx75–76. More fundamentally, the district court held that Dr. Fernald's generic evidence that the accused Bluetooth module and Block 34 performed the same operation could not "obviate the statutory mandate to compare the" two structures. Appx76. The district court was right. Dr. Fernald's results-based analysis vitiates the way prong of the function-way-result test and says nothing about whether the two structures are equivalent. Under this Court's precedent, his analysis cannot establish equivalency.

GET raises numerous objections to the district court's analysis. But those objections are not grounded in the facts or the law. Accordingly, GET's objections give this Court no reason to disturb the district court's exclusion of Dr. Fernald's equivalency opinions.

### A. Dr. Fernald's equivalency analysis rested on an overly generalized recitation of how the '730 Patent teaches Block 34 synchronizes the two data streams.

A proper equivalency analysis must begin with identifying the relevant structure corresponding to the claimed function and the way that structure performs that function. The '730 Patent dictates this inquiry. *See Traxcell Techs., LLC v. Sprint Commc'ns Co. LP*, 15 F.4th 1121, 1129 (Fed. Cir. 2021) ("[T]he identified structure from the specification is a 'very detailed' algorithm. That algorithm includes numerous steps necessary for its function."). Here, the relevant structure is Block 34 in Figure 4A:

FIG. 4A



Appx168 (annotated). As for how Block 34 synchronizes the two streams, the ’730 Patent provides nearly a column explaining the process:

> [T]he framer, as depicted in FIG. 4A, relies on the signal line TXD to maintain the synchronization between the UI and input streams. … In reference to FIGS. 4A and 4B, flip-flop FF**2**, utilizes signal CLR to re-synchronize clock generator **62** with the start-bit of signal TXD*. … Once set, signal CLR restarts, and is immediately reset by the same, clock generator **62** providing bit-clock signal BCLK of the codec. Signal BCLK is divided by sixteen to become signal QH, which is latched into flip-flop FF**1** to provide the codec’s frame-sync signal FS converting input signal **31** into serial stream **33** coming out of the codec’s pin DX. Simultaneously, signal FS moves output information **54** serially into the codec, via pin DR, to be converted into output signal **52**. Both UI stream **24** and input stream SX are synchron[i]zed and encoded into a single signal RXD* by data selector **50** under control of signal SEL. … Data selector **50**, normally selecting the input stream SX, otherwise samples UI stream **24** and stores its data into the UI-bit location of signal RXD*. … In order to provide clocking signals, oscillator OSC of frequency around 1.8 MHz generates master clock MCLK running the codec. Clock generator **62** divides signal MCLK by sixteen to produce bit clock BCLK.

Appx173 5:20–62. Consistent with precedent, the district court correctly determined that Dr. Fernald’s “way” analysis had to comport with this level of specificity. Appx31–32; Appx72–73.

Notably, Dr. Fernald initially relied on the ’730 Patent’s detailed teachings to inform the opinions in his opening report. Appx25–26. While his summary still lacked much of the detail in the ’730 Patent’s teachings,

it nonetheless reflected Dr. Fernald's apparent understanding that certain components in Block 34 played a larger role than others in its synchronization process: "Block 34 uses one bit-rate clock to drive two processes: one that generates the input stream using a CODEC and one that samples the user input stream using a data selector. The output of each process is therefore synchronized to that same bit-rate clock, and, thus, the two outputs are synchronized." Appx26. However, after SIE filed its *Daubert* motion, GET's position changed. Appx26. GET significantly broadened Dr. Fernald's opinion, claiming Dr. Fernald opined only that Block 34 synchronized the streams to a bit rate clock. Appx26; Appx64.

Dr. Fernald's revised recitation of the way the '730 Patent teaches that Block 34 synchronizes the two streams was overly generalized and untethered to the teachings of the '730 Patent. Appx30–32; Appx71–75. Moreover, GET failed to provide any basis for ignoring so much of the '730 Patent's teachings. Appx31–32; Appx71–72. For these reasons, the district court rejected Dr. Fernald's analysis. Appx33; Appx75. GET argues this finding was erroneous because the way Block 34 synchronizes

the streams is a question of fact for the jury to decide. Op. Br., 56–57. The law does not support GET's argument.

First, that the way Block 34 synchronizes the two data streams is a question of fact does not mean Dr. Fernald had carte blanche to define that way as he saw fit; nor was the district court bound to accept his definition. As explained above, the patent dictates the "way" a claimed structure performs a claimed function. *Traxcell*, 15 F.4th at 1129 (Fed. Cir. 2021). This "'degree of specificity is provided by the statute itself[.]'" Appx71 (quoting *Odetics, Inc. v. Storage Technology Corp.*, 185 F.3d 1259, 1268 (Fed. Cir. 1999)). Consistent with that statutory mandate, the district court found Dr. Fernald's opinions lacking. Appx30–32; Appx71–75. That finding comports with this Court's precedent. *See, e.g.*, *Bid for Position, LLC v. AOL, LLC*, 601 F.3d 1311, 1318 (Fed. Cir. 2010) (Finding no equivalency where the method "recited in the [] patent" was "substantially different" from the accused method); *Wavetronix LLC v. EIS Electronic Integrated Sys.*, 573 F.3d 1343, 1360–61 (Fed. Cir. 2009); *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1119 (Fed. Cir. 2002).

By ignoring most of the steps that the '730 Patent teaches the "relevant structure," e.g., Block 34, takes to synchronize the two streams

to the bit rate clock, Dr. Fernald's ensuing analysis of the accused Bluetooth module was impermissibly vague: he could not identify what steps the accused Bluetooth module takes to synchronize the two streams to a bit rate clock, nor could he explain why a POSITA would have believed those steps are equivalent to the steps Block 34 takes to synchronize the streams to a bit rate clock. Appx31–33; Appx71–75. Such abstract generalizations cannot support a finding of equivalence as a matter of law.

This Court's decision in *Traxcell* is instructive. 15 F.4th 1121. As here, the relevant structure described in the patent in *Traxcell* was specific: "a 'very detailed' algorithm." *Id.* at 1129. And the way that structure performed the claimed function was described in detail in the patent itself. *Id.* But Traxcell and its expert ignored a "significant fraction" of this structure in its equivalency analysis:

> [The disclosed algorithm] includes numerous steps necessary for its function. But Traxcell neglected to address a significant fraction of that structure. Indeed, Traxcell's infringement expert instead discussed the accused technology at only a generalized level and didn't at all discuss at least nine entire steps of the algorithm—focusing on function and results but eliding the way those results are achieved.

*Id.* (internal citations omitted). Affirming the district court's "thorough analysis[,]" this Court explained that "[s]howing identical function is not enough for literal infringement of a means-plus-function claim . . . evidence of identical or equivalent *structure*" is also required. *Id.* Traxcell failed to consider the specific way the patent taught the relevant structure operated and thus failed to establish the existence of an equivalent structure. *Id.*

Dr. Fernald made these same mistakes. Like Traxcell, when Dr. Fernald compared how Block 34 and the accused Bluetooth module synchronize the streams to a bit rate clock, he "discussed the accused technology at only a generalized level and didn't at all discuss" the specific way that the '730 Patent teaches that Block 34 uses a bit-rate clock to synchronize the two streams. *Traxcell*, 15 F.4th at 1129. In other words, Dr. Fernald "focus[ed] on function and results but elid[ed] the way those results are achieved." *Id.*

The district court's apt paperclip/paperweight analogy illustrates Dr. Fernald's error. Appx71; Appx12. A paperclip and a paperweight share an identical function: holding paper in place. Generally, the paperclip and the paperweight accomplish that function in the same way:

by applying pressure to the paper. But in practice, how the paperclip and the paperweight hold the paper in place is quite different. While the paperclip relies on energy in bent metal to put pressure on both the front and back of the pages, holding them together, the paperweight holds the paper together by relying on gravity to put pressure on one side of the paper, keeping the paper in place against a surface.

As the district court recognized, whether the ways the paperweight and paperclip hold the paper in place are equivalent cannot be ascertained in a vacuum. Appx71; Appx12. Instead, this inquiry necessarily depends on the level of specificity ascribed to the claimed structure by its patent. Appx71 (quoting *Odetics*, 185 F.3d at 1268); *see IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1436 (Fed. Cir. 2000) ("[T]wo structures that are equivalent in one environment may not be equivalent in another."). In this case, the '730 Patent does not simply teach that Block 34 synchronized the two streams by sampling both streams to a bit rate clock; it teaches that Block 34 synchronizes the streams to a bit rate clock using specific components (e.g., a CODEC, data collector, bit rate clock), each playing a specific role in the synchronization of the two streams. Appx173 5:20–62. Dr. Fernald

ignored these teachings, and his resulting equivalency analysis, therefore, fails.[2] *See IMS Tech.*, 206 F.3d at 1436 (noting the range of equivalent structures may be narrower "if the physical characteristics of the structure are critical in performing the claimed function in the context of the claimed invention").

### B. Dr. Fernald's "all logic designs are equivalent" opinions are insufficient as a matter of law to establish equivalency.

Lacking the evidence of the Bluetooth module's structure needed to understand how the Bluetooth module synchronizes the streams to a bit rate clock, GET asks this Court to endorse a theory of equivalency that requires no such evidence. Op. Br., 43. The Bluetooth module, like the Block 34, GET argues, is comprised of logic gates. So, because "persons of ordinary skill in the art view two logic designs that perform the same operations as equivalent, regardless of the exact gates and connections used in the logic designs[,]" GET needs no further evidence to show

[2] Dr. Fernald's obligation to consider how the relevant structure (i.e., the logic design at Block 34) as a whole performs the claimed synchronization function as part of his equivalency analysis should not be conflated with a more demanding obligation to identify an equivalent component in the accused Bluetooth module for every component, or even the key components, in the logic design at Block 34. *See infra* Argument I.C.

equivalence. Op. Br., 43. This Court should reject GET's theory for at least two reasons.

First, GET has no evidence or supported expert testimony to show that the accused Bluetooth module actually performs the same operation as Block 34, that is, synchronizing the streams to a bit rate clock—or even that the Bluetooth module includes a bit rate clock. *See infra* Argument II.B. Without that evidence, GET cannot establish that Block 34 and the accused Bluetooth module perform the same operation, and its argument collapses. *Id.* While GET knows the output of the Bluetooth module, i.e., two synchronized streams, GET knows nothing about how, or even if, it is the Bluetooth module that performs that synchronization. *Id.* GET cannot establish equivalency based on this kind of results-based analysis alone. *See, e.g.*, *Traxcell*, 15 F.4th at 1129 ("Traxcell didn't provide enough evidence for a reasonable jury to conclude that the accused structure performs the claimed function in 'substantially the same way' as the disclosed structure. . . . Showing identical function is not enough for literal infringement of a means-plus-function claim[.]").

Second, Dr. Fernald's "all logic designs are equivalent" opinion fails for another reason: it vitiates the "way" prong of the equivalency test. As

the district court observed, Dr. Fernald's opinion is one of interchangeability. Appx30; Appx75. But relying on interchangeability alone is "inconsistent with the function-way-result test" because "interchangeability 'goes to the function or result of [the] systems, and begs the issue of the way in which … [the] systems actually work.'" Appx75–76 (quoting *Toro Co. v. Deere Co.*, 355 F.3d 1313, 1324 (Fed. Cir. 2004)). Returning to this Court's decision in *Traxcell*, Dr. Fernald cannot just "focus[] on function and results but elid[e] the way those results are achieved." *Traxcell*, 15 F.4th at 1129. "The question [of equivalency] is about actual functionality-location differences" between Block 34 and the Bluetooth module. *VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332, 1344 (Fed. Cir. 2023). Whether a POSITA would have viewed any logic design that synchronizes two streams to a bit rate clock as equivalent suggests nothing more than the selection of the logic design is a design choice. But that "does not indicate whether, or begin to explain why, the options in the choice are substantially different or substantially the same[.]" *Id.*

This Court's decision in *Overhead Door* does not save GET's argument. Op. Br., 44–45. To support its argument regarding structural equivalency, the plaintiff in *Overhead Door* came forward with

"considerable evidence . . . that one of ordinary skill in the art would find the [accused structure] insubstantially different from the [claimed structure][.]" *Overhead Door Corp. v. Chamberlain Grp., Inc.*, 194 F.3d 1261, 1269 (Fed. Cir. 1999). Specifically, the plaintiff's expert opined, with supporting evidence, that "'[it is a] fundamental and well understood tenet of the computer art [that] … '[a]ny software process can be transformed into an equivalent hardware process, and any hardware process can be transformed into an equivalent software process.''" *Id.* "This 'dualistic transformation,' known as the 'hardware/software' tradeoff, effectively means that the selection of a software pointer for a microprocessor versus a hardware switch to control a microprocessor-based system is simply a matter of design choice." *Id.* at 1269–70.

*Overhead Door* does not support GET's argument.

In *Overhead Door*, the plaintiff presented evidence of a one-to-one equivalency: for a given software process, it was well understood that there existed an equivalent hardware process into which it could be transformed. *Id.* at 1269. GET advances a far broader view of equivalency: for a given logic design for performing an operation, there are ***an infinite*** number of equivalent logic designs for performing that

operation. Op. Br., at 43–44. *Overhead Door* does not stand for such a grand proposition. The operations at issue in *Overhead Door* were identical, with one exception: one was implemented in software, and one in hardware. *Overhead Door*, 194 F.3d at 1269. Thus, the issue in *Overhead Door* was quite narrow: whether two structures that performed the claimed function, in the same way, were, nonetheless, not equivalent where one was implemented in software and one was implemented in hardware. *Id.* at 1269–70.

By contrast, under GET's standard, a digital logic design that performs an operation one way is equivalent to *any other digital logic design* that performs that operation, regardless of how it does so. Op. Br., 43. That remains true even if the two logic designs "have no gates in common." Op. Br., 37. GET's proposed standard goes well beyond not just the standard this Court endorsed in *Overhead Door*, but also the confines of the statute. *See Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1385 (Fed. Cir. 2009) ("A patentee cannot avoid providing specificity as to structure simply because someone of ordinary skill in the art would be able to devise a means to perform the claimed function. To allow that form of claiming under section 112, paragraph 6, would allow the

patentee to claim all possible means of achieving a function. That ordinarily skilled artisans could carry out the recited function in a variety of ways is precisely why claims written in 'means-plus-function' form must disclose the particular structure that is used to perform the recited function."). Thus, GET's reliance on *Overhead Door* fails.

### C. The district court did not demand a component-by-component analysis from Dr. Fernald.

As the above discussion confirms, the district court's analysis of the way prong of the equivalency test was proper: it ascertained the "way" the relevant structure performed the claimed function, considered whether Dr. Fernald had shown that the accused Bluetooth module operated in the same way as taught by the '730 Patent, and correctly determined he had not. *See supra* Argument I.A, I.B. While the district court expressly based its analysis on the specific teachings of the '730 Patent itself, GET contends the district court erred by requiring Dr. Fernald to establish equivalency on a component-by-component basis. Op. Br., 52. GET's argument fails on the facts and the law.

Factually, GET's claim ignores the district court's express refusals to require such an analysis. When SIE moved to exclude Dr. Fernald's opinions, one of its arguments for doing so was Dr. Fernald's failure to

"incorporate every component of Block 34 . . . in his equivalency analysis." Appx33. The district court rejected that argument precisely *because* "[a] component-by-component analysis of structural equivalence [is not required]." Appx33. The court reiterated its understanding of the law when it denied GET's motion for reargument. Appx70–71. When GET nonetheless argued the court had demanded such an analysis from Dr. Fernald, the district court responded unequivocally that it had done no such thing. Appx76. In sum, GET's retelling of the proceedings below finds no support in the record.

Legally, GET's complaint against the district court rests on fundamental misunderstandings of the law. As already discussed, to establish equivalency, GET was required to show the Bluetooth module synchronized the streams in substantially the same way as Block 34, and with the requisite specificity taught by the '730 Patent. *See supra* Argument I.A. The '730 Patent teaches a specific way Block 34 synchronized the two streams, and that way involved several specific components. *Id.* All of these components are part of the relevant structure the court identified for performing the claimed synchronization function. *Id.* So what GET characterizes as a component-by-component analysis

was just the district court's straightforward application of the "way" prong of the equivalency test using the description provided by the '730 Patent itself.

GET does not dispute the district court was free to give greater weight "to individual components that play a central role" in performing the claimed synchronization. Op. Br., 54 (quoting *Solomon Techs., Inc. v. Int'l Trade Comm'n*, 524 F.3d 1310, 1317 (Fed. Cir. 2008)). Indeed, the role those components play provides the context in which equivalency must be viewed. *See IMS Tech.*, 206 F.3d at 1436 (noting the range of equivalent structures may be narrower "if the physical characteristics of the structure are critical in performing the claimed function in the context of the claimed invention"). Nonetheless, GET maintains the district court erred because it made no "finding that any individual component of the logic at block 34 in Figure 4A is indispensable or plays a central role in the synchronizing function, and there is no support for such a finding[.]" Op. Br., 54. Again, the record refutes GET's claim.

While the district court may not have used specific words from this Court's precedent, it plainly found that the '730 Patent teaches that certain components play a central role in the claimed synchronizing

process. Appx25–26; Appx31–32; Appx72–73; Appx75. It supported its findings with Dr. Fernald's own opinions. Appx25; Appx31. Thus, there is no merit to GET's claim on appeal that "the district court did not make any finding that any individual component of the logic at block 34 in Figure 4A is indispensable or plays a central role in the synchronizing function," and it should be rejected. Op. Br., 54.

Of course, that the district court found certain components to be of greater import to its analysis does not mean that Dr. Fernald was required to identify equivalent structures for each identified subcomponent in the Bluetooth module to establish equivalency. Nor did the district court demand that. Appx33; Appx70–71; Appx76. But by Dr. Fernald's own admission, the identified subcomponents play an outsized role in the "way" Block 34 synchronizes the two data streams. Appx25–26. So, the district court was right to require Dr. Fernald to explain why the way the Bluetooth module synchronized the two streams was substantially the same as the way the specific components of Block 34 synchronized the two streams. *See Solomon*, 524 F.3d at 1317–18 (affirming ALJ's finding of no equivalence where the accused structure lacked a component found in every embodiment of the invention); *IMS*

*Tech.*, 206 F.3d at 1436. Dr. Fernald failed to make this showing, and the court rightly excluded his analysis.

## II. The District Court Correctly Determined That GET Could Not Prove The Accused Bluetooth Module Was Structurally Equivalent To Block 34 And Granted Summary Judgment For SIE.

With Dr. Fernald's equivalency opinions correctly found insufficient as a matter of law to prove equivalence, SIE moved for summary judgment of noninfringement. Not only had GET failed to advance any evidence regarding the structure of the accused Bluetooth module, but it lacked the particularized testimony and linking argument the law requires to establish structural equivalency. Under these circumstances, the district court could reach only one conclusion: GET could not show a genuine dispute that SIE's Bluetooth module was equivalent to Block 34, and SIE was entitled to summary judgment of noninfringement.

The district court could have arrived at this result for another reason. Throughout the *Daubert* and summary judgment briefing, GET repeatedly attempted to reframe its equivalency contention in a more favorable light. The district court allowed this, giving GET the opportunity to present a "best case" version of its equivalency case. But in doing so, the district court accepted as true a critical fact that GET

lacked the evidence to establish: the accused Bluetooth modules synchronize the two data streams to a bit rate clock. Indeed, SIE's expert expressly debunked this claim, and GET's lack of evidentiary support for it was a key issue before the court at the hearing on GET's motion for reargument. Thus, the district court was not required to accept GET's contention as true, and this Court need not accept it as true on appeal. Without this contention, all of GET's objections to the district court's rulings fall apart.

### A. GET failed to present the particularized testimony and linking argument the law requires to support a finding of equivalence.

The district court was right to reject GET's argument at summary judgment that it could prove equivalence by showing that Block 34 and the Bluetooth module both synchronize data streams to a common bit-rate clock. Appx11–12. The existence of a bit-rate clock, standing alone, cannot support a finding of equivalence for at least two reasons.

First, GET's equivalency analysis, like Dr. Fernald's, improperly framed the '730 Patent's teachings of the "way" Block 34 synchronized the streams at too high of a level, lacking the specificity the law and '730 Patent requires. *See supra* Argument I.A; Appx9 (citing *Odetics*, 185 F.3d

at 1268); Appx12 (concluding GET's recitation of the "way" was framed "at such a high level of generality that it is impossible to tell how they are similar or different."). By framing the "way" so broadly, GET offered "essentially no information regarding how the accused Bluetooth module operates other than that a bit-rate clock is involved somehow" or "any explanation of how the Bluetooth module differs from block 34 or why a [POSITA] would view these unknown differences as 'insubstantial.'" Appx12 (citing *Valmont Indus., Inc., v. Reinke Mfg. Co.*, 983 F.2d 1039, 1043 (Fed. Cir. 1993)). Without such evidence or explanation, the district court concluded that no factfinder could conclude the Bluetooth module and Block 34 synchronize the two streams in substantially the same way. Appx12. The district court's conclusion is grounded in this Court's precedent.

"'Generalized testimony as to the overall similarity between the claims and accused infringer's product or process will not suffice.'" *Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1374 (Fed. Cir. 2014) (quoting *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996)). Instead, "particularized testimony and linking argument to show the equivalents" is a necessary prerequisite. *Id.* GET did not, and cannot, clear this lofty standard. By GET's own admission,

it intended to prove equivalency by showing *only* that both the accused Bluetooth module and Block 34 "synchronize data streams to a common bit-rate clock as opposed to some other method[.]" Appx11. This is exactly the type of generalized testimony addressing overall similarity between structures that has consistently been held insufficient to prove equivalency. *See, e.g.*, *Gemalto*, 754 F.3d at 1374; *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334 (Fed. Cir. 2016); *Texas Instruments*, 90 F.3d at 1568–69; *VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332, 1343 (Fed. Cir. 2023).

This Court's decisions in *Akzo* and *VLSI* are particularly instructive. In *Akzo*, Akzo's expert offered equivalency opinions mirroring the vagueness of Dr. Fernald's: The claimed and accused structures "perform the same function (maintain the pressure) and achieve the same result (maintaining sufficient pressure to prevent boiling of the aqueous medium) in substantially the same way (by collecting the dispersed material in a contained volume)[.]" *Akzo*, 811 F.3d at 1343. These opinions, this Court observed, were "broad and scant." *Id.* While Akzo's expert had shown some similarity in the ways the claimed and accused structures worked, he had "faile[d] to articulate

which construction of 'collecting' he invokes, much less articulate[d] ***how*** the differences between the two processes are insubstantial." *Id.* (emphasis added). As in *Akzo*, Dr. Fernald showed some generalized degree of similarity in the ways Block 34 and the accused Bluetooth module synchronize the streams, i.e., using an alleged bit-rate clock. However, Dr. Fernald did not "articulate how the differences between the two processes are insubstantial." *Id.* Indeed, he could not even say how they differed, let alone explain "why a [POSITA] would view these unknown differences as 'insubstantial.'" Appx12. Such "ambiguity and generality cannot create a genuine issue of material fact." *Akzo*, 811 F.3d at 1343.

This Court again rejected a plaintiff's attempt to rely on vague, cursory expert opinion to prove equivalency in *VLSI*. *VLSI*, 87 F.4th at 1343–45. This time, the plaintiff's expert reduced a difference in how the claimed structure and accused product performed a request to change clock frequency to a "design choice." *Id.* at 1344. But equivalency is not established through evidence that the choice between two "ways" of performing the claimed function is a design choice; "[t]hat label does not indicate whether, or begin to explain why, the options in the choice are

substantially different or substantially the same: In both circumstances, the choice between the options is a design choice." *Id.* Instead, "[t]he question that must be addressed is whether the difference in the way the functionalities are actually allocated between devices is an insubstantial one." *Id.*

Comparing GET's evidence at summary judgment to the evidence presented in *VLSI*, the court correctly recognized that GET's "evidence that the differences between the claimed and accused structures is insubstantial is even less specific" than the evidence this Court found inadequate in *VLSI*. Appx13. GET "provided essentially no information about how the accused Bluetooth module differs from block 34 of Figure 4A, much less why any differences" were insubstantial. Appx13. And while Dr. Fernald did not use the label "design choice" like the expert in *VLSI*, GET's argument amounts to just that: it did not need to know the specific way the Bluetooth module synchronizes the streams to a bit rate clock because a POSITA would have recognized it was substantially the same as Block 34 "regardless of [any] differences" between them—in other words, nothing more than a design choice.

The district court allowed GET to present its best case for equivalency. It accepted GET's facts as true and drew all justifiable inferences in GET's favor. Analyzing all of this in light of this Court's case law, the district court made the right decision: no factfinder could find that SIE's Bluetooth module is equivalent to the claimed framer, and SIE was entitled to summary judgment. Appx14–15. This Court should affirm.

### B. GET's reliance on the presence of a bit rate clock in the accused Bluetooth module to show equivalency fails on the facts and the law.

GET's reliance on the presence of a bit rate clock in both Block 34 and the accused Bluetooth module fails for a second, more fundamental reason: It's not true. While GET advanced this claim as if it were true at summary judgment, GET had no evidence to support it, while Dr. Fernald simply claimed it was so. Without more, GET cannot show a genuine dispute that the Bluetooth module synchronizes the two streams to a bit rate clock, cannot establish the premise of its infringement case, and, therefore, cannot establish infringement.

GET does not dispute that there is no documentary evidence regarding the structure of the accused Bluetooth module or the steps it

takes to allegedly synchronize the streams to a bit rate clock. App12 ("Genuine Enabling has pointed to essentially no information regarding how the accused Bluetooth module operates[.]"); Appx27 (noting that "Dr. Fernald testified at his deposition that he 'didn't have the schematics for the Bluetooth chips'"); Appx69–70. For his part, Dr. Fernald relied heavily on the Bluetooth Specifications to support his opinions regarding how the accused Bluetooth module worked. Appx1605–1610. Almost every assertion Dr. Fernald made to support his opinion that the Bluetooth module synchronized the two streams to a bit rate clock was based on the Bluetooth Specifications. Appx1605–1610. But among his assertions, there are two Dr. Fernald could not support: (1) that the Bluetooth module's CRC and whitening "processes operate on a serial bitstream of the payload, indicating the payload is synchronized to a bit-rate clock" and therefore "necessarily synchronize the user input stream with the input stream[,]" and (2) that for those "processes to operate properly, the incoming 'data in' must be synchronized to the same bit rate clock[.]" Appx1606; Appx1608. Such bare assertions cannot create a genuine dispute sufficient to defeat summary judgment. *See Dominion Energy, Inc. v. Alstom Grid LLC*, 725 F. Appx' 980, 986 (Fed. Cir. 2018)

(ruling that expert's testimony was conclusory where "he did not cite any particular documents to support his position").

Regardless, these two assertions, even when supported, cannot save Dr. Fernald's ultimate opinion that it is the Bluetooth module that synchronizes the two streams to a bit rate clock. At best, these assertions establish only that the two streams had to be synchronized to a bit rate clock ***sometime*** prior to undergoing CRC and whitening. Appx1606; Appx1608. Missing, though, is evidence that the streams' synchronization to the bit rate clock happens *in the Bluetooth module*. *Id.* Even Dr. Fernald admitted to the court it was "debatable" that the streams could have been synchronized "before they get to the Bluetooth [module]." Appx1901.

Predictably, Dr. Fernald claimed it is irrelevant if the streams are synchronized before arriving at the Bluetooth module because "they are not synchronized to the Bluetooth bit clock" that he had identified "until [they] reach[] the Bluetooth logic." Appx1901. While the streams could have been "synchronized one time and re-sychronized to something else," Dr. Fernald maintained that "the synchronization step that [he] identif[ied] . . . [he] *know[s]* happens in the Bluetooth logic." Appx1901.

But just because Dr. Fernald *says* he knows some synchronization happens in the Bluetooth module "does not make it true, especially when there is no record support" for it. *Dominion*, 725 F. App'x at 986. As noted above, Dr. Fernald admitted he had never seen the schematics for the Bluetooth module, which would have revealed whether or not a bit rate clock was present. Appx27. And Dr. Fernald's reasoning does not support his claim either. As just discussed, Dr. Fernald relied on the fact that the two streams were serialized as evidence the streams had been synchronized to a bit rate clock in the Bluetooth module. Appx1606; Appx1608. But at the hearing on GET's motion for reargument, when asked if the streams could have been synchronized before the Bluetooth module, he relied on the bit rate clock "he identified" as the evidence that the two streams had been synchronized to it. Appx1901. Dr. Fernald's reasoning is circular. He never "identified" a bit rate clock—he presumed its existence only because the streams were serialized. Appx1606; Appx1608. He then relied on the presumed existence of that same clock as evidence the streams were serialized in the Bluetooth module. SIE's expert, Dr. Welch, highlighted Dr. Fernald's error:

> Dr. Fernald's opinion [that the Bluetooth modules in the accused SIE controllers necessarily synchronize the user

> input stream with the input stream] is completely nonsensical. Dr. Fernald appears to presume the existence of a bit rate clock based on the fact that the payload data is serialized, but he fails to account for the fact that the Bluetooth payloads are serialized *prior to* being sent to the Bluetooth module.

Appx3055 (emphasis added).

Because Dr. Fernald's assertion that a bit rate clock was present in the Bluetooth module lacked support, the district court need not have credited his assertion. Without evidence the Bluetooth module includes a bit rate clock, GET cannot support the premise underlying its infringement theory, and the district court could have granted SIE's motion for summary judgment on that basis alone. But this Court "review[s] judgments, not opinions," so it is not bound by "the methodology used by the district court." *Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327, 1330 (Fed. Cir. 2008). The district court's judgment was correct. GET cannot show a genuine dispute that the accused Bluetooth module is an equivalent structure Block 34, either because GET has no evidence that the Bluetooth module includes a bit rate clock or because GET failed to establish how such synchronization is equivalent to the "way" Block 34 synchronizes the two data stream. Accordingly, this Court

should affirm the district court's grant of summary judgment of noninfringement for SIE.

## III. This Court Can Alternatively Affirm The District Court's Grant Of Summary Judgment Of Noninfringement Because SIE's Sale Of The Accused Products Does Not Constitute Direct Infringement.

Whether SIE's Accused Products include the claimed framer found in every asserted claim was not the sole dispute before the district court at summary judgment. SIE advanced several additional arguments for why it was entitled to summary judgment of noninfringement. First, SIE contended that it did not directly infringe the asserted apparatus claims because SIE's Accused Products, as sold, did not include the specific input signal required by those claims: "[a] signal having an audio or higher frequency." Appx92. There is no genuine dispute that this signal is not present in the Accused Products as sold by SIE. Thus, because every limitation of each asserted apparatus claim is not present in the Accused Products when sold, SIE cannot be liable for direct infringement. Second, SIE contended it does not infringe method claim 14 because GET's infringement theory rests solely on SIE's sale of the Accused Products. The sale of an apparatus allegedly capable of performing a claimed

method, standing alone, is not a legally cognizable basis to support a finding of direct infringement.

Accordingly, this Court can separately affirm the district court's grant of summary judgment of noninfringement in SIE's favor as to every asserted claim. *Biafora v. U.S.*, 773 F.3d 1326, 1334 (Fed. Cir. 2014) (quoting *Bailey v. Dart Container Corp. of Michigan*, 292 F.3d 1360, 1362 (Fed. Cir. 2002).

### A. SIE does not directly infringe the asserted apparatus claims because the Accused Products, as sold by SIE, lack the input signal required by the claims.

The preambles of each of the asserted apparatus, which the parties agreed are limiting, require that the claimed user input apparatus be "additionally receiving at least one input signal."[3] Appx172. The district court construed the claimed input signal as "[a] signal having an audio or higher frequency," which GET does not challenge on appeal. GET identifies two distinct signals that it alleges satisfy this limitation: (1) motion control input signals sent from an Accused Controller to an Accused Console ("motion signals"); and (2) audio signals input by a user

[3] While each of the asserted apparatus claims uses slightly different terminology, Appx172 7:61–63, 8:54–56; Appx173 9:23–26, there is no dispute that the requirements of each claim are the same. Appx88–92.

of SIE's PS4 and DS4 into a microphone connected directly to the DS4 controller ("audio signals"). Appx3227. Neither of these signals is sufficient to support a finding of direct infringement against SIE.

GET never disputed that the motion signals and audio signals it identifies as the input signal limitation are not present in the Accused Products as sold by SIE. Appx1964–1992; Appx2270–2284. Nor has it disputed that both signals are not present unless and until an end user "pairs" an Accused Controller to an Accused Console and takes specific, independent steps to create those signals. Appx1964–1992; Appx2270–2284. Thus, because "'each and every limitation set forth in the claim'" does not appear in SIE's Accused Products, as sold, there can be no direct infringement. *LifeNet Health v. LifeCell Corp.*, 837 F.3d 1316, 1325 (Fed. Cir. 2016) (quoting *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310 (Fed. Cir. 2005)).

Nevertheless, GET maintains that SIE may be held liable for direct infringement because the "claims do not require the user input apparatus be 'actively receiving' an input signal to infringe." Appx2281. This is so, GET claims, because "[a]pparatus claims do not require that a function be performed actively in order to infringe[,]" so "SIE's Accused Products

infringe the asserted apparatus claims because they incorporate all of the structural limitations of the claims." Appx2281. GET misunderstands the apparatus claims and the law.

As a threshold matter, the requirements of the apparatus claims are clear: the user input apparatus must be "additionally receiving at least one input signal." Appx174. This does not impart a "functional" requirement to the claims: the claims are agnostic as to how that signal comes to exist, only that it does, in fact, exist. Appx174. Thus, the at least one input signal is a structural requirement that must exist for infringement to be found. *Cross Med.*, 424 F.3d at 1311.

While the claims do not require a function to be performed to satisfy the claim, the same cannot be said for GET's infringement theories. Regarding the motion signals, GET's infringement theory requires an end user of SIE's Accused Controllers to slam the Controller back and forth between their hand at a sufficient speed to cause the accelerometer to create a signal having an audio or higher frequency. Appx1947–1949. Similarly, to create the audio signal, an end user of SIE's Accused Controllers must plug a wired headset with a mic directly into the Accused Controller and speak into the microphone. Appx2199. That

GET's theories, rather than the claims, require these specific functions be performed to satisfy the at least one input signal limitation is fatal to its direct infringement claim, whether or not GET can establish the Accused Controllers are capable of receiving the at least one input signal under the limited circumstances GET claims. *See Cross Med.*, 424 F.3d at 1311 ("[T]he claim does not require that the interface be merely 'capable' of contacting bone; the claim has a structural limitation that the anchor seat be in contact with the bone. … Cross Medical again fails to recognize that [this] limitation … is absent until the screw and anchor are put in place [by the end user] during surgery.").

Even if the apparatus claims only required the at least one user apparatus to have the capability to receive the motion and audio signals underlying GET's theories, there would still be no direct infringement. Direct infringement could only be found in that case if the Accused Controller was "'reasonably capable' of performing the claimed function[.]" *INVT SPE LLC v. ITC*, 46 F.4th 1361, 1376 (Fed. Cir. 2022). Such reasonable capability "can[not] be established without any evidence or undisputed knowledge of an instance that the accused product performs the claimed function when placed in operation." *Id.* Here, GET

cannot show a genuine dispute that any end user of an Accused Controller ever caused it to receive the motion or audio signals required for infringement. Appx2200–2201. This Court, therefore, can affirm the district court's grant of summary judgment of noninfringement on this basis as well.

### B. SIE's sale of the Accused Products cannot, as a matter of law, form the basis for a claim of direct infringement of the asserted method claim.

GET's only basis for alleging that SIE directly infringes method Claim 14 is SIE's sale of the Accused Products. Appx3219. But "[m]ethod claims are 'not directly infringed by the mere sale of an apparatus capable of performing the claimed process.'" *Packet Intelligence LLC v. NetScout Sys., Inc.*, 965 F.3d 1299, 1314 (Fed. Cir. 2020) (quoting *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993)); *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1222 (Fed. Cir. 2014) ("[N]one of our decisions have found direct infringement of a method claim by sales of an ed user product which performs the entire method, and we decline to do so here."). Without more, GET's claim for direct infringement of Claim 14 fails. *Id.* Despite the unambiguity of this precedent, GET nonetheless contends SIE directly infringes Claim 14 "because [SIE] **programs** the

method in the consoles of the accused products to perform the required steps 'when executed' as the claim requires." Appx1984–1985.

GET's novel contention fails.

As a preliminary matter, GET's direct infringement claim rests solely on SIE's sale of the Accused Products, not SIE's use of the claimed method. Appx3219. GET cites no authority supporting its contention— nor is SIE aware of any such authority— and it is plainly contrary to controlling precedent. The mere capability of the Accused Products to perform the claimed method is not direct infringement, and the Accused Products cannot have that capability unless they are ***programmed*** with that capability. *Ericsson*, 773 F.3d at 1222.

Even if GET had raised a claim based on use, GET has no evidence that SIE programmed the Accused Products within the United States. Appx2201. GET must have such evidence to show direct infringement. 35 U.S.C. § 271(a); *see, e.g.*, *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1206 (Fed. Cir. 2010) (holding that no reasonable jury could find direct infringement of a method claim based only on activity outside the United States).

## CONCLUSION

For at least these reasons, this Court should affirm the district court's order granting SIE's motion for summary judgment of non-infringement.

*/s/ Clifford T. Brazen*
Adam P. Seitz
Clifford T. Brazen
ERISE IP, P.A.
7015 College Blvd., Suite 700
Overland Park, KS 66211
(913) 777-5600

*Counsel for Appellees*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. Cir. R. 32(b). This brief contains 13,482 words (including diagrams and images), excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b).

The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) or Federal Circuit Rule 28.1 and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2010 in 14-point Century Schoolbook font.

Dated: August 21, 2024

*/s/ Clifford T. Brazen*
Clifford T. Brazen
ERISE IP, P.A.
7015 College Blvd., Suite 700
Overland Park, KS 66211
(913) 777-5600

*Counsel for Appellees*