**2024-1686**

# United States Court of Appeals for the Federal Circuit

GENUINE ENABLING TECHNOLOGY LLC,

*Plaintiff-Appellant*,

*v.*

SONY CORPORATION, SONY INTERACTIVE ENTERTAINMENT LLC,

*Defendants-Appellees*.

*Appeal from the United States District Court for the District of Delaware, in Case No. 1:17-cv-00135-MSG*

## REPLY BRIEF OF APPELLANT

Devan V. Padmanabhan
Paul J. Robbennolt
Padmanabhan & Dawson, PLLC
9800 Shelard Parkway, Ste. 120
Minneapolis, MN 55441
Telephone: (612) 444-3601
devan@paddalawgroup.com
paul@paddalawgroup.com

*Attorneys for Appellant*

September 11, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2024-1686

**Short Case Caption** Genuine Enabling Technology LLC v. Sony Corporation

**Filing Party/Entity** Genuine Enabling Technology LLC

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 09/11/2024

Signature: */Paul J. Robbennolt/*

Name: Paul J. Robbennolt

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☐ X Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☒ None/Not Applicable |
| Genuine Enabling Technology LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Bayard, P.A. | Stephen B. Brauerman | Ronald P. Golden, III |
| Womble Bond Dickenson LLP | Dana Kathryn Severance | Fitzpatrick, Cell, Harper & Cinto |
| Giancarlo Scaccia | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☒ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iii

I. DR. FERNALD CORRECTLY ANALYZED THE RELEVANT STRUCTURE OF THE LOGIC DESIGN AT BLOCK 34 IN FIGURE 4A .......... 2

A. Dr. Fernald Correctly Identified the Components of Block 34 that Play a Role in Synchronizing the Data Streams .......... 2

B. Sony Has Not Identified any Relevant Components or Steps that Dr. Fernald Ignored .......... 5

II. DR. FERNALD CORRECTLY ANALYZED THE RELEVANT STRUCTURES OF THE ACCUSED CONTROLLERS AND COMPARED THEM TO BLOCK 34 TO ESTABLISH EQUIVALENCE .......... 9

A. Sony's Attacks on the Sufficiency of Dr. Fernald's Analysis Are Unfounded 10

B. Dr. Fernald's Analysis Did Not Depend on an "All Logic Designs Are Equivalent" Analysis .......... 14

C. This Court Should Reject Sony's New Argument That There is no Proof The Bluetooth Module of the Accused Controllers Has a Bit Clock or Synchronizes the Two Data Streams .......... 18

III. THIS COURT SHOULD REJECT SONY'S "ALTERNATIVE GROUNDS" FOR AFFIRMANCE .......... 22

A. This Court Should Not Consider Sony's "Alternative Grounds" for Affirmance Because They Are Not Dispositive .......... 22

B. Even If It Were to Consider Sony's Arguments, This Court Should Reject Sony's Alternative Grounds for Affirmance on the Merits .......... 24

1. Sony's Accused Controllers, as Sold, Satisfy the "Additionally Receiving the at Least One Input Signal" Limitation .......... 24

2. Sony's Sale of the Accused Products Constitutes Direct Infringement of Method Claim 14 .......... 28

CONCLUSION ..... 29

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS ..... 30

# TABLE OF AUTHORITIES


**Case** **Page(s)**

*Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*,
811 F.3d 1334 (Fed. Cir. 2016) ....................13

*Al-Site Corp. v. VSI Int'l, Inc.*,
174 F.3d 1308 (Fed. Cir. 1999) ....................16

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*,
145 F.3d 1303 (Fed. Cir. 1998) ....................16

*E.I. du Pont de Nemours & Co. v. MacDermid Printing Sols., L.L.C.*,
525 F.3d 1353 (Fed. Cir. 2008) ....................24

*Gemalto S.A. v. HTC Corp.*,
754 F.3d 1364 (Fed. Cir. 2014) .................... 10, 13

*In re Hayes Microcomputer Prods. Inc. Patent Lit.*,
982 F.2d 1527 (Fed. Cir. 1992) ....................12

*Hydril Co. LP v. Grant Prideco LP*,
474 F.3d 1344 (Fed. Cir. 2007) ....................24

*IMS Tech., Inc. v. Haas Automation, Inc.*,
206 F.3d 1422 (Fed. Cir. 2000) ....................16

*INVT SPE LLC v. International Trade Comm'n*,
46 F.4th 1361 (Fed. Cir. 2022) .................... 25, 26, 27

*MasterMine Software, Inc. v. Microsoft Corp.*,
874 F.3d 1307 (Fed. Cir. 2017) ....................27

*Overhead Door Corp. v. Chamberlain Grp., Inc.*,
194 F.3d 1261 (Fed. Cir. 1999) .................... 16, 17, 18

*Silicon Graphics, Inc. v. ATI Techs., Inc.*,
607 F.3d 784 (Fed. Cir. 2010)....................26

*Spigen Korea Co., Ltd. v. Ultraproof, Inc.*,
955 F.3d 1379 (Fed. Cir. 2020) ....................24

*Toro Co. v. Deere Co.*,
355 F.3d 1313 (Fed. Cir. 2004) ....................17

*Traxcell Techs., LLC v. Spring Comm'ns Co., LP*,
15 F.4th 1121 (Fed. Cir. 2021) ....................4

*UltimatePointer, L.L.C. v. Nintendo Co., Ltd.*,
816 F.3d 816 (Fed. Cir. 2016)....................27

*VLSI Tech. LLC v. Intel Corp.*,
87 F.4th 1332 (Fed. Cir. 2023) ....................13

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
520 U.S. 17 (1997)....................16

**Statutes**

35 U.S.C. § 271 (g) ....................29

Faced with undisputed evidence that both the logic design of Block 34 of the U.S. Patent No. 6,219,730 ("the '730 Patent") and the logic in the Bluetooth module of the Accused Controllers synchronize two data streams with one another, and do so in the same way—by sampling the data streams using a common bit clock—Appellees Sony Corporation and Sony Interactive Entertainment LLC (collectively, "Sony") insist that Genuine Enabling Technology LLC's ("Genuine Enabling") technical expert, Dr. Kenneth Fernald, cannot present sufficient evidence to support a finding of equivalence between the two structures because he does not have the schematics for the Bluetooth modules. This argument ignores Dr. Fernald's detailed analysis and evidence demonstrating the way in which the logic in the Bluetooth modules synchronizes the data streams. Through his investigation and testing, Dr. Fernald was able to confirm that the logic in the Bluetooth module has structures that synchronize the data streams in the same way as the data selector and CODEC of Block 34, even without having access to a schematic. Dr. Fernald's evidence, analysis, and conclusions are substantively undisputed.

Just as significantly, Dr. Fernald's equivalency opinions are supported by his detailed explanation of structural equivalency in the field of digital logic design. As Dr. Fernald explained, he did not have to see a schematic of the Bluetooth logic to determine that the logic was equivalent to the "logic design at Block 34": to persons of skill in the art of digital logic, logic designs that *perform the same*

*operation*—like the structures at issue here—are equivalent, regardless of the exact logic gates and connections used in the design. Not only did Sony not dispute Dr. Fernald's evidence on this point, Sony **admitted** that Dr. Fernald's testimony is based on "***foundational principles of circuit design***." Red Br. at 16.

Because Dr. Fernald's testimony is sufficient to support a determination of equivalency, this Court should reverse the district court's judgment of noninfringement and remand for trial.

# I. DR. FERNALD CORRECTLY ANALYZED THE RELEVANT STRUCTURE OF THE LOGIC DESIGN AT BLOCK 34 IN FIGURE 4A

## A. Dr. Fernald Correctly Identified the Components of Block 34 that Play a Role in Synchronizing the Data Streams

Contrary to Sony's assertions, Dr. Fernald correctly identified the components of Block 34 that are relevant to the synchronization function and properly analyzed how they performed that function. Blue Br. at 29-32. Two primary components play a role in synchronizing the two streams: the "data selector 50" "selects" or "samples" the two data streams using the "bit clock" (BCLK), thereby synchronizing the data streams to the bit clock. Appx1604-1605 at ¶¶ 124-126, *quoting* Appx173 at 5:41-43. Dr. Fernald further explained that the CODEC—which is not within Block 34 (Appx168)—also synchronizes the input stream to the same bit clock when it converts the input signal to the input stream. Appx1605 at n.39. Sony admits that Dr. Fernald's analysis is based on the '730

Patent's disclosure. Red Br. at 37 (Dr. Fernald "relied on the '730 Patent's detailed teachings to inform the opinions in his opening report").

Oddly, Sony's attacks on the specificity of Dr. Fernald's analysis of the synchronization function do not cite Dr. Fernald's detailed analysis, but cite instead exclusively to the district court's characterizations of Dr. Fernald's opinions. *See*, *e.g.*, Red Br. at 38 (citing only the district court's characterizations of Dr. Fernald's analysis for the proposition that "Dr. Fernald opined only that Block 34 synchronized the streams to a bit rate clock"). Dr. Fernald's actual analysis of Block 34—which Sony does not cite a single time in its Argument—sets forth a sufficiently detailed analysis of the synchronizing process as performed by the logic design at Block 34. *See* Appx1604-1605 at ¶¶ 124-126. Dr. Fernald has never "broadened" or offered a "revised recitation" of his opinions, Red Br. at 38, and Sony has never substantively disputed those opinions.[1]

Because Dr. Fernald properly identified the components of Block 34 that synchronize the two data streams, his equivalency analysis was not "impermissibly vague." Red Br. at 40, *citing Traxcell Techs., LLC v. Spring Comm'ns Co., LP*, 15

---

[1] Sony cites an excerpt from the district court's order stating that "Block 34 uses one bit-rate clock to drive two processes: one that generates the input stream using a CODEC and one that samples the user input stream using a data selector. The output of each process is therefore synchronized to the same bit-rate clock, and thus, the two outputs are synchronized." Red Br. at 38. Dr. Fernald has never contradicted that analysis, and therefore has never "broadened" his opinions.

F.4th 1121, 1129 (Fed. Cir. 2021) *Traxcell* is inapposite. In *Traxcell*, the patent disclosed a "very detailed algorithm" that constituted the disclosed structure. *Id.* This Court held that the equivalency analysis was insufficient as a matter of law because the expert did not address several steps in the required algorithm. *Id.* Here, there is no such "detailed algorithm" that describes the synchronization process. Sony is well aware of this fact; during claim construction, it initially asked the district court to construe the "framer" limitations at issue here to require as the corresponding structure "the specific encoding algorithm described and illustrated in the '730 Patent at 5:4-64 and Figs. 4A-4B." Appx188-189. After Genuine Enabling opposed the characterization of the relevant structure as an algorithm, Sony withdrew its proposed construction and advanced the construction that the district court ultimately adopted. Appx679.

Instead of a "detailed algorithm," the '730 Patent—as explained above—describes in a straightforward way how the two data streams are synchronized: "Both UI stream 24 and input stream SX are synchron[i]zed and encoded into a single signal RXD* by data selector 50 under control of signal SEL. … Data selector 50, normally selecting the input stream SX, otherwise samples UI stream 24 and stores its data into the UI-bit location of signal RXD*." Appx173 at 5:41-50. Unlike the expert in *Traxcell*, Dr. Fernald did not "ignore[] a significant fraction of this structure" in his analysis. Red Br. at 40. On the contrary, Dr.

Fernald addressed this description of the synchronization process, and the specific components identified as performing the synchronization, completely and fully. *See supra*, pp. 2-4; Blue Br. at 29-32.

Because—as Sony admits—Dr. Fernald's analysis of the way Block 34 synchronizes the two data streams is grounded in the teachings of the '730 Patent, Dr. Fernald's opinion testimony creates a fact issue that cannot be determined on summary judgment. Blue Br. at 56-60.

### B. Sony Has Not Identified any Relevant Components or Steps that Dr. Fernald Ignored

Sony accuses Dr. Fernald of "ignoring most of the steps that the '730 Patent teaches" regarding the synchronization of the two data streams, Red Br. at 39-40, but cannot identify a single relevant, specific "step" or component that Dr. Fernald did not address.

Sony tries to complicate the synchronization process by block-quoting much of column 5 of the '730 Patent, alleging that the patent "provides nearly a column explaining the process [of synchronization]." Red Br. at 37. But Sony does not explain or elaborate the text in its block quote, and a simple review of the text reveals that the vast majority has nothing to do with synchronization. For example, Sony quotes the statement that, "signal FS moves output information 54 serially into the codec, via pin DR, to be converted into output signal 52." Red Br. at 37, *quoting* Appx173 at 5:39-41. This is irrelevant to synchronization, instead relating

to an entirely different claimed function. *See*, *e.g.*, Appx174 at Claim 12 ("means for receiving an output stream from the computer via the communication means and means for converting the output stream into at least one output signal"). Several of the statements in Sony's block quote describe the conversion of the input signal into an input stream, which is done by the CODEC. *See*, *e.g.*, Red Br. at 37, *quoting* Appx173 at 5:35-39 ("Signal BCLK is divided by sixteen to become signal QH, which is latched into flip-flop FF1 to provide the codec's frame-sync signal FS converting input signal 31 into serial stream 33 coming out of the codec's pin DX"). This, too, relates to a completely different claimed function. *See*, *e.g.*, Appx174 at Claim 1, 7:66-67 ("converting means for receiving the at least one input signal and producing therefrom an input stream"). Still other passages in Sony's block quote describe the generation of the MCLK (master clock) and BCLK (bit clock) signals, rather than to the synchronization function. *See*, *.e.g.*, Red Br. at 37, *quoting* Appx173 at 5:59-62 ("In order to provide clocking signals, oscillator OSC of frequency around 1.8 MHz generates master clock MCLK running the codec. Clock generator 62 divides signal MCLK by sixteen to produce bit clock BCLK").

In fact, only one passage from Sony's block quote describes the synchronization process: "Both UI stream 24 and input stream SX are synchron[i]zed and encoded into a single signal RXD* by data selector 50 under

control of signal SEL. … Data selector 50, normally selecting the input stream SX, otherwise samples UI stream 24 and stores its data into the UI-bit location of signal RXD*." Red Br. at 37, *quoting* Appx173 at 5:41-50. Dr. Fernald analyzed this disclosure in detail, described its meaning to persons of ordinary skill in the art, and concluded that Block 34 synchronizes the two streams in this way: the "data selector 'samples UI stream 24 and stores its data into the UI-bit location,'" thereby "synchroniz[ing] each of the bits of the input stream and the user input stream … to the rising edge of the BCLK clock …, thereby synchronizing the two streams together." Appx1604-1605 at ¶¶ 124-126; Blue Br. at 31-32.[2] Sony has never substantively disputed Dr. Fernald's analysis, instead repeating conclusory assertions that Dr. Fernald's analysis is "overly generalized."

Notably, Sony does not identify any aspects of the relevant structure of Block 34 or the patent's description of how it synchronizes the two data streams that Dr. Fernald does not address. Sony refers to the "specific, detailed sequence of steps the framer's subcomponents carry out to synchronize the two streams," Red

---

[2] The data selector synchronizes both the user input stream and the input stream to the bit clock. Appx173 at 5:41-43. Dr. Fernald determined that the CODEC also synchronizes the input stream to the same bit clock when it converts the input signal into the input stream. Appx1605 at n.39. The CODEC is outside of Block 34, and therefore is not a part of the structure that the district court identified as performing the synchronizing function. Appx168 at Fig. 4A; Blue Br. at 52 n.7. Nevertheless, Dr. Fernald analyzed the CODEC for the sake of the completeness of his analysis.

Br. at 8, but does not list or describe those alleged steps, or the "subcomponents" that perform them, at all. Sony certainly does not identify any steps that are inconsistent with, or different from, Dr. Fernald's description of the "way" the framer synchronizes the two streams. In fact, the only relevant components or steps identified by Sony are those that Dr. Fernald discussed in his analysis:

| Components Identified by Sony | Components Analyzed by Dr. Fernald |
|---|---|
| "The '730 Patent … teaches that Block 34 synchronizes the streams to a bit rate clock using specific components (e.g., a **CODEC**, **data collector** [sic], **bit rate clock**), each playing a specific role in the synchronization of the two streams." Red Br. at 42 (emphasis added). | "Both UI stream 24 and input stream SX are synchronized [sic] and encoded into a single signal RXD* by **data selector 50** under control of signal SEL. 5:41-43."<br><br>"**Data selector 50**, normally selecting the input stream SX, otherwise samples UI stream 24 and stores its data into the UI-bit location of signal RXD*. 5:47-50."<br><br>"When the **data selector** 'samples UI stream 24 and stores its data into the UI-bit location,' it synchronizes the UI stream data to the **bit clock**, and hence to the similarly synchronized input stream …."<br><br>"The logic of block 34 synchronizes the input stream to **BCLK** by feeding **BCLK** to the **CODEC**, causing its output stream to clock on rising edges of **BCLK**."<br><br>Appx1605 at ¶¶ 125-126 and n.39 (emphasis added). |

Dr. Fernald identified the components of Block 34 that play a role in synchronizing the two streams—the data selector, bit clock, and CODEC—and explained the way in which those components synchronize the two data streams. That analysis comports with this Court's precedent.

## II. DR. FERNALD CORRECTLY ANALYZED THE RELEVANT STRUCTURES OF THE ACCUSED CONTROLLERS AND COMPARED THEM TO BLOCK 34 TO ESTABLISH EQUIVALENCE

Having analyzed Block 34, having identified which components play a role in synchronizing the data streams, and having determined the way in which those components synchronize the two data streams, Dr. Fernald then turned to the Accused Controllers to investigate whether they incorporate equivalent structure. Based upon his detailed investigation, analysis, and evidence, Dr. Fernald concluded that the logic in the Bluetooth modules of the Accused Controllers synchronizes the two data streams in the same way that the data selector and bit clock of Block 34 synchronize the two streams. Blue Br. at 32-40, 46-48. He determined that the logic of the Bluetooth modules synchronizes the input stream with the user input stream by synchronizing both streams to a common bit clock—the same way that the logic in Block 34 synchronizes the two streams. Blue Br. at 32. Moreover, like the data selector in Block 34, the logic in the Bluetooth modules synchronizes the two streams by sampling the data from the two streams using the bit clock. Blue Br. at 46-47. This analysis comports with this Court's precedent,

and is sufficient to support a jury finding of equivalence; it provides the "particularized testimony and linking argument" required to demonstrate equivalency. *See* Red Br. at 54, *quoting Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1374 (Fed. Cir. 2014).

### A. <u>Sony's Attacks on the Sufficiency of Dr. Fernald's Analysis Are Unfounded</u>

Faced with Dr. Fernald's detailed analysis and evidence, Sony resorts to deliberately mischaracterizing and minimizing Dr. Fernald's work and opinions. In its attempt to salvage summary judgment of noninfringement, Sony repeatedly argues that Dr. Fernald's conclusions were based solely on his determination that both Block 34 and the Bluetooth modules of the Accused Controllers have a bit clock: "The existence of a bit-rate clock, standing alone, cannot support a finding of equivalence …." Red Br. at 53. *See also id.* at 54 (Genuine Enabling "offered essentially no information regarding how the accused Bluetooth module operates other than that a bit-rate clock is involved somehow"), *quoting* Appx12.

This is simply untrue. Dr. Fernald's amply-supported analysis does, indeed, show that the logic in the Bluetooth modules, like Block 34, synchronizes the two data streams to a common bit clock. Blue Br. at 32-33; Appx1605-1610 at ¶¶ 127-135; Appx1810 at ¶ 20. But Dr. Fernald's analysis does not end there. Based on his investigation and analysis, he concluded further that the logic in the Bluetooth modules synchronizes the two data streams in the same way the data selector and

CODEC of Block 34 synchronize the data streams: by sampling the data streams using the bit clock. Appx1605 at ¶¶ 125-126 (the data selector and CODEC of Block 34 "sample both streams using a common bit clock, thereby synchronizing the streams to one another"); Appx1810-1811 at ¶¶ 19-21, Appx1815-1816 at ¶¶ 31-32 (the logic in the Bluetooth module synchronizes the data streams by sampling both streams using a common clock, just as the data selector and CODEC of Block 34 do). *See also* Appx1815-1816. at ¶¶ 31-32 ("the only way to synchronize a signal to a clock using digital logic is to sample the signal using the clock"); Appx1894-1895 at 63:23-64:17 (same).

Although Dr. Fernald was not required to conduct a component-by-component analysis,[3] *see* Blue Br. at 52-56, he unequivocally determined that the logic of the Bluetooth modules of the Accused Controllers incorporates a bit clock and has logic that is equivalent to the data selector and CODEC of Block 34. *See* Blue Br. at 55-56; Appx1809 at ¶ 18; Appx1887 at 56:2-25 (testimony that logic of the Bluetooth modules incorporates equivalents of the components of Block 34, including the clock generator, data selector, and CODEC). Dr. Fernald explained

[3] Sony's argument that the Court did not require a component-by-component analysis rings hollow. Blue Br. at 52-56. Despite the district court's statements otherwise, the district court granted summary judgment of noninfringement in large part because it believed Dr. Fernald could not identify specific components from Block 34 in the Bluetooth modules of the Accused Controllers. Blue Br. at 53; Appx6-7, Appx11.

that, "even though I did not specifically analyze the Sony accused products to see if they incorporated structures that were **specifically named** "data selector" or "CODEC," I absolutely **did** analyze the accused products to see if they incorporated any structure, by whatever name, that performs the relevant functions performed by the data selector and CODEC in Figure 4A. … I determined, based on my investigation and testing of the Sony accused products, that the logic in the Bluetooth modules synchronizes the user input stream with the input stream by synchronizing both streams to a common clock, just as the data selector and CODEC do in Figure 4A of the '730 Patent." Appx1809 at ¶ 18 (emphasis in original). Although Dr. Fernald did not have a schematic of the Bluetooth modules, and therefore did not know the exact logic gates and connections that performed those operations, he did not need that information because his investigation and analysis revealed the way in which the logic synchronized the data streams. Blue Br. at 55-56, *citing In re Hayes Microcomputer Prods. Inc. Patent Lit.*, 982 F.2d 1527, 1540 (Fed. Cir. 1992). In fact, he was able to determine how the data selector and CODEC of Block 34 synchronize the data streams, even though he did not have a circuit diagram of those components and therefore did not know the exact logic gates and connections that comprise them. Appx1806 at ¶ 8.

Dr. Fernald's detailed and supported analysis distinguishes this case from the cases cited by Sony, in which the equivalency evidence was held to be

insufficient. Red Br. at 55-57. In *Gemalto*, the expert provided no testimony regarding equivalence between cache memory and permanent memory. *Gemalto*, 754 F.3d at 1364. In this case, by contrast, Dr. Fernald provided detailed testimony explaining how the logic in the Bluetooth modules is equivalent to the logic design at Block 34, as understood by a POSA. Blue Br. at 32-40.

In *Akzo*, the way the accused device generated backpressure (the required function) was the "opposite" of the way the patented structure generated backpressure. *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1342-43 (Fed. Cir. 2016). The expert's "analysis" on equivalence consisted of a single sentence opinion that the function, way, and result were substantially the same, with no analysis or discussion. *Id.* at 1343. This Court held that the evidence of equivalency was insufficient. Here, by contrast, Dr. Fernald provided detailed evidence and analysis to support his equivalency opinions.

Finally, Genuine Enabling distinguished in its Brief *VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332 (Fed. Cir. 2023), relied on by the district court and cited by Sony here. [4] Blue Br. at 50-52. In *VLSI*, the plaintiff completely failed to address an admitted difference between the identified structure from the patent and the accused device. 87 F.4th at 1344. Based on the absence of "meaningful testimony"

[4] Sony did not discuss or even mention Genuine Enabling's treatment of *VLSI*. Red Br. at 55-57.

on the admitted difference, this Court affirmed summary judgment of noninfringement. *Id.* Here, as explained above, Dr. Fernald provided detailed testimony regarding the logic design at Block 34, the logic in the Bluetooth modules of the Accused Controllers, and the basis of his equivalency opinions.

### B. Dr. Fernald's Analysis Did Not Depend on an "All Logic Designs Are Equivalent" Analysis

As one basis for his equivalency opinion, Dr. Fernald provided detailed expert analysis and evidence establishing that, to persons of ordinary skill in the art of digital logic design, two logic designs *that perform the same operation* are equivalent, regardless of the specific logic gates and connections used therein.[5] Blue Br. at 34-38; Appx1585-1589 at ¶¶ 53-64. Dr. Fernald's testimony was undisputed below, and Sony does not dispute that testimony here. In fact, Sony makes an extraordinary admission, conceding that Dr. Fernald's analysis and opinions are based on "***foundational principles of circuit design***." Red Br. at 16 (emphasis added).

[5] The '730 patent confirms that Dr. Fernald need not know the exact logic gates in the Bluetooth module logic, because the patent does not disclose the logic gates in the data selector and CODEC. Blue Br. at 39. In fact, the data selector cannot have a fixed arrangement of logic gates; the '730 Patent discloses that Block 34 can be implemented by a USB controller in addition to the RS-232 controller depicted. Appx174 at 7:39-43; Appx1598-1599 at ¶ 114 (logic inside clock generator 62 and data selector 50 could be designed to accommodate any number of communication protocols).

Instead of addressing the substance of Dr. Fernald's testimony, Sony mischaracterizes that testimony by claiming that Dr. Fernald opines that "*however the Bluetooth module synchronizes the two streams*, it would have been understood to be equivalent." Red Br. at 2. On the contrary, Dr. Fernald knows precisely "how[] the [logic in] the Bluetooth module synchronizes the two streams": it does so by sampling data from the streams using a common bit clock, thus synchronizing both streams to the bit clock and therefore to each other. Appx1605-1610 at ¶¶ 127-135; Appx1810 at ¶ 20. This is not the only way that the two streams may be synchronized; for example, a device could directly synchronize the two streams to one another, rather than synchronizing both streams to a common bit clock. Appx1814-1815 at ¶ 30; Appx1894 at 63:2-22. Dr. Fernald has not opined that logic designs that perform such alternative operations to synchronize the streams are equivalent to the logic at Block 34. Nor did Dr. Fernald make "a blanket assertion that all structures are considered interchangeable if they achieve the same result." Red Br. at 22, *quoting* Appx29-30. As Dr. Fernald testified, there are structures other than digital logic circuits, such as analog signal processing circuitry, that could be used to synchronize the data streams; Dr. Fernald does not opine that such structures, which achieve the same result, are equivalent to the logic design at Block 34. Appx1814-1815 at ¶ 30. Dr. Fernald's opinion is specific

and supported: in the field of logic design, logic circuits that *perform the same operation* are considered equivalent by persons of skill.

Sony dismisses Dr. Fernald's digital-logic-circuit equivalence analysis on the basis that it addresses only "interchangeability," Red Br. at 44-45, but interchangeability is a key factor underlying a determination of equivalence. "[I]nterchangeability can be one of the hallmarks of an equivalent." *Overhead Door Corp. v. Chamberlain Grp., Inc.*, 194 F.3d 1261, 1270 (Fed. Cir. 1999), *citing Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 37 (1997) ("known interchangeability … for an element of a patent is one of the express objective factors … bearing upon whether the accused device is substantially the same as the patented invention"). "Evidence of known interchangeability between structure in the accused device and the disclosed structure has … been considered an important factor." *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1435-36 (Fed. Cir. 2000), *citing Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1316 (Fed. Cir. 1999); *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1308 (Fed. Cir. 1998). It is black letter law that evidence of interchangeability can support a finding of equivalency. *See*, *e.g.*, *IMS Tech.*, 206 F.3d at 1437 (reversing summary judgment of noninfringement because of expert testimony that a POSA would have recognized the interchangeability of a floppy disk drive and a tape cassette); *Al-Site*, 174 F.3d at 1316 (affirming jury verdict of

infringement based on expert testimony of known interchangeability of glue and rivets as "fastening means"); *Overhead Door*, 194 F.3d at 1270 (expert testimony that POSA considered software and hardware to be interchangeable creates a genuine issue of material fact).

The sole "interchangeability" case cited by Sony is inapplicable. Red Br. at 45, *citing Toro Co. v. Deere Co.*, 355 F.3d 1313, 1324 (Fed. Cir. 2004). In *Toro*, the structures at issue were two different mechanical devices: a cam and a solenoid. 355 F.3d at 1324.The plaintiff did not explain how each structure performed the required function or whether the differences between them were insubstantial. *Id.* In this case, in contrast, the structures at issue are *both* digital logic circuits. Dr. Fernald explained how both devices performed the synchronization function and determined that they were equivalent to one another. He also cited, in the words of Sony, "foundational principles of circuit design" establishing beyond dispute that, to POSAs, two logic designs that perform the same operation—like those at issue here—are equivalent. That evidence is sufficient to support a finding of equivalency and, therefore, infringement.

As explained in Genuine Enabling's Brief, *Overhead Door* is on all fours with this case. Blue Br. at 44-45. Like the expert in *Overhead Door*, Dr. Fernald presents "considerable evidence … that one of ordinary skill in the art would find" the logic in the Bluetooth modules insubstantially different from the logic at Block

34. *Overhead Door*, 194 F.3d at 1269. In *Overhead Door*, this Court reversed the district court's grant of summary judgment of noninfringement based in part on expert testimony that, in "the computing art," software processes can be equivalent to hardware processes when they perform the same function. *Id.* Similarly, here Dr. Fernald provided undisputed evidence regarding "foundational principles of circuit design" that, in the field of digital logic design, two digital logic designs that perform the same operation are equivalent.

Contrary to Sony's argument, *Overhead Door* did not address a "one-to-one equivalency." Red Br. at 46. On the contrary, the expert testimony in *Overhead Door* did not address just "one" software implementation. Rather, the testimony was broader, stating that any software implementation—and presumably there are countless ways to write a given software program—that is interchangeable with a hardware solution is equivalent to that hardware solution. 194 F.3d at 1269-1270.

### C. **This Court Should Reject Sony's New Argument That There is no Proof The Bluetooth Module of the Accused Controllers Has a Bit Clock or Synchronizes the Two Data Streams**

Sony argues for the first time in its Brief that Dr. Fernald cites no evidence to support his statements that the Bluetooth modules of the Accused Controllers have a bit clock and synchronize the data streams to that bit clock. Red Br. at 58-63. This argument is brand new; Sony did not raise this issue in its *Daubert* motion or its motion for summary judgment, and consequently the parties did not brief the

issue or present relevant evidence to the district court. *See* Appx1479-1503 (Sony's *Daubert* brief); Appx1709-1724 (Sony's *Daubert* reply brief); Appx1932-1955 (Sony's summary judgment brief); Appx2191-2206 (Sony's summary judgment reply brief). In fact, Sony did not dispute below that the Bluetooth modules synchronize the data streams to a common bit clock. Appx11 ("Genuine Enabling [states that the] Bluetooth module … synchronize[s] data streams to a common bit-rate clock …. **Sony does not dispute the factual accuracy of this assertion**" (emphasis added)). For that reason alone, this Court should reject Sony's argument.

This Court should also reject Sony's argument on the merits. As shown below, Dr. Fernald cites substantial evidence supporting his opinions that the logic of the Bluetooth modules synchronizes the data streams to a common bit clock. That evidence, and Dr. Fernald's testimony, at the very least creates a genuine issue of material fact that renders the district court's judgment of noninfringement erroneous.

Sony alleges that Dr. Fernald's opinions regarding synchronization in the Bluetooth modules are "not true" and are based on "no evidence." Red Br. at 58. This bold assertion simply ignores Dr. Fernald's detailed analysis and the evidence that supports it. Dr. Fernald cites extensively to the Bluetooth specification, Appx1605-1610 at ¶¶ 127-135, a technical document that describes the operation

of the Bluetooth modules in Sony's products, which are certified as compliant with the Bluetooth protocol. Appx2184 at ¶ 32. Dr. Fernald also cited his own testing of the Sony Accused Controllers, which revealed that the controllers use two particular Bluetooth packet types (2-DH1 and 3-DH1) that require that the data streams be synchronized in the Bluetooth module. Appx1606 at ¶ 129 (Accused Controllers use packet types that include data processes—CRC generation and whitening—that require synchronization of the data streams); Appx1593-1604 at ¶¶ 107-123 (testing and analysis of the data packets). Dr. Fernald's opinions are supported by both documentary and experimental evidence, and are clearly sufficient to create a genuine issue of material fact.

Sony cites two specific "assertions" that it claims Dr. Fernald could not support: (1) that the "Bluetooth module's CRC and whitening 'processes operate on a serial bitstream of the payload, indicating the payload is synchronized to a bit-rate clock'" and therefore necessarily requires synchronization, and (2) that, for those processes "to operate properly, the incoming 'data in' must be synchronized to the same bit rate clock." Red Br. at 59. But even a cursory review of Dr. Fernald's report reveals that his opinions on these points are more than "bare assertions." *Id.* The fact that the Bluetooth module's data processing steps "operate on a serial bitstream of the payload" is shown, as Dr. Fernald explains, in diagrams from the Bluetooth specification that Dr. Fernald reproduces in his report.

Appx1605-1607 at ¶¶ 127-130. Further, Dr. Fernald explains that the data processing steps implemented by the Bluetooth modules use shift registers, as demonstrated in one of the diagrams from the Bluetooth specification. Appx1607-1608 at ¶ 131. As Dr. Fernald explains, a person of ordinary skill would know that shift registers use a clock, so the data must be synchronized to that same clock. *Id.* *See also* Appx1887 at 56:11-17 ("The specification requires that there be a bit rate clock that is used to process the data with and that's the same clock that the two streams are synchronized to in the Bluetooth module"). Thus the Bluetooth specification—"documentary evidence"—demonstrates that the Bluetooth modules of the Accused Controllers must necessarily synchronize the data streams to the Bluetooth clock that is used to process the data. Dr. Fernald explains his analysis in detail. Appx1608-1610 at ¶¶ 132-135.

Dr. Fernald further explained the basis for his opinions during a hearing before the district court. Dr. Fernald testified that it is based on a "pretty fundamental rule of … synchronous logic design, which is what this is. And synchronous simply means that it's running on a clock." Appx1873-1874 at 42:25-43:8. *See also* Appx1871-1877 (testimony explaining basis for analysis). As Dr. Fernald testified, if the Bluetooth modules did not synchronize the data streams to a common bit clock, the products would fail and would not comply with the Bluetooth specification. Appx1874 at 43:9-13.

Sony cites Dr. Welch's expert testimony for the assertion that the data streams are synchronized before the data is transmitted to the Bluetooth modules. Red Br. at 61-62. Although Dr. Fernald testified that it is "debatable" whether the data streams are synchronized before the data reaches the Bluetooth modules, Appx1901, he also testified that the evidence unequivocally shows that the data streams are synchronized to the Bluetooth bit clock once the data is transmitted to the Bluetooth modules. Appx1901 at 70:11-16 (data streams "are not synchronized to the Bluetooth bit clock … **until it reaches the Bluetooth logic**" (emphasis added)). *See also* Appx1901 at 70:20-25 (data streams are synchronized to a common bit clock in the Bluetooth logic, even though they may be synchronized a second time as well). Dr. Fernald testified that he "knows" this synchronization occurs, but that testimony was not his ipse dixit; it was clearly based on his detailed analysis and investigation of the Sony Accused Controllers. *See supra*, pp. 18-21.

## III. THIS COURT SHOULD REJECT SONY'S "ALTERNATIVE GROUNDS" FOR AFFIRMANCE

### A. This Court Should Not Consider Sony's "Alternative Grounds" for Affirmance Because They Are Not Dispositive

Sony's alternative grounds for affirmance seek only a determination that Sony does not directly infringe; they do not address Genuine Enabling's indirect infringement allegations. Red Br. at 33 (Sony's "sale of the Accused Products,

standing alone, is insufficient to hold SIE liable for direct infringement"); *id.* at 63-69 (addressing only direct infringement allegations). Sony contends that these grounds are dispositive because Genuine Enabling "has not advanced indirect infringement allegations in this case," Red Br. at 34, but that assertion is demonstrably false. Genuine Enabling has asserted throughout this case that Sony indirectly (as well as directly) infringes. *See* Appx3255-3257 at ¶¶ 27-38 (Complaint alleging "second cause of action" for "induced infringement" and "third cause of action" for "contributory infringement"); Appx2412-2414 (expert opinion that Sony induced infringement and contributorily infringed); Appx2009, Appx2012-2013 (noting, in Genuine Enabling's statement of undisputed facts on summary judgment, that Genuine Enabling has alleged that Sony indirectly infringes). Sony is well aware that Genuine Enabling asserts claims for indirect infringement; Sony even moved for summary judgment on separate grounds—not raised here—on Genuine Enabling's indirect infringement claims. Appx1949 ("Sony is entitled to summary judgment on GET's claim of indirect infringement"); Appx1957 (reciting, in Sony's "Statement of Undisputed Facts," that Genuine Enabling has alleged "indirect infringement"). The district court did not reach those grounds for summary judgment. Appx15 at n.2.

Even if this Court were to agree fully with Sony regarding its "alternative grounds for affirmance," therefore, it could not affirm the district court's judgment

of noninfringement, because Genuine Enabling's claims of indirect infringement would remain. Accordingly, Sony's "alternative grounds" do not provide a basis for affirming the district court's judgment of noninfringement, so this Court need not address those arguments.[6]

### B. Even If It Were to Consider Sony's Arguments, This Court Should Reject Sony's Alternative Grounds for Affirmance on the Merits

#### 1. Sony's Accused Controllers, as Sold, Satisfy the "Additionally Receiving the at Least One Input Signal" Limitation

Sony contends that it does not directly infringe because its Accused Controllers are not actively "receiving [an] input signal" at the moment Sony sells the Accused Controllers.[7] Red Br. at 64-68. The Asserted Claims do not require that the user input apparatus be actively receiving an input signal to infringe. The "additionally receiving" language requires only that the user input apparatus be

---

[6] This Court's authority to affirm a district court judgment on alternative grounds "is discretionary, not mandatory." *Hydril Co. LP v. Grant Prideco LP*, 474 F.3d 1344, 1351 (Fed. Cir. 2007) (internal citations omitted). This Court may decline to consider alternative grounds for affirming to permit the district court to address those grounds in the first instance. *See E.I. du Pont de Nemours & Co. v. MacDermid Printing Sols., L.L.C.*, 525 F.3d 1353, 1363 n.7 (Fed. Cir. 2008); *Spigen Korea Co., Ltd. v. Ultraproof, Inc.*, 955 F.3d 1379, 1385 (Fed. Cir. 2020).

[7] Sony raised this argument for the first time in its summary judgment reply brief. Appx2280-2281. Sony did not ask the district court to construe the "additionally receiving" term to require that the device be actively receiving an input signal. Appx181-195. Nor did Sony's technical expert interpret the "additionally receiving" language to require that the user input device be actively receiving an input signal to infringe. *See*, *e.g.*, Appx3066-3068 at ¶¶ 392-394.

*capable of* receiving the input signal, not that the input signal be "present" at the time of sale.

"Our cases have held that sometimes a device only needs to be 'capable of operating' according to a claimed limitation, for a finding of infringement." *INVT SPE LLC v. International Trade Comm'n*, 46 F.4th 1361, 1371 (Fed. Cir. 2022). Whether the claims require capability or "actual performance of the recited function by the accused device depends on the claim language." *Id.* For example, "[p]ossibly the most straightforward example of this is the common distinction between method claims and apparatus claims." *Id.* Often, apparatus claims will describe capabilities without requiring that the functions be active, whereas method claims typically require actual performance of each claimed step. *Id.* Some apparatus claims, though, also require actual performance. *Id.* at 1371-72.

"Because of the nature of the technology, computer and software claims"—like those at issue here—"typically use functional language to define the invention." *Id.* at 1372. "Functional language is used to define and delimit otherwise generic or interchangeable general purpose computer hardware …. We have frequently construed such functional language as not requiring actual performance of those operative steps for infringement purposes." *Id.* at 1372-73.

The Accused Claims recite limitations that are clearly directed to capability. Claim 10, for example, recites a "user input means *for producing* a user input

stream," an "input means *for producing* the at least one input signal," and an "encoding means *for synchronizing* the user input stream with the input stream and *encoding* the same into a combined data stream." Appx174. These limitations do not require that the user input means actively produce a user input stream, or that the input means actively produce an input stream, or that the encoding means actively synchronize and encode the data streams to infringe. *See INVT*, 46 F.4th at 1373 (limitations using "for performing"-type language directed to capability). The "additionally receiving" language of the preamble is also directed to capability. "'[F]or performing'-type language … is not the only way for a computer-implemented claim to be directed to capability." *INVT*, 46 F.4th at 1373 (noting that a limitation reciting a "rasterization circuit … that rasterizes" is directed to capability, *citing Silicon Graphics, Inc. v. ATI Techs., Inc.*, 607 F.3d 784, 788 (Fed. Cir. 2010)). "[W]e have not required claims to adhere to a specific grammatical form to find that the claim is drawn to capability …." *Id.* at 1373. As shown above, the entire claim is directed to capability, including the recitation of an "input means" that is capable of "producing [an] input signal." It would be illogical to require the "user input apparatus … receiving" that same input signal to be actively receiving the signal in order to satisfy the claim.

The fact that the preamble does not use the "for performing" language does not mandate actual performance: "simple-present-tense words" like those in the

preamble can also be directed to capability. *INVT*, 46 F.4th at 1374. *See also MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1315-16 (Fed. Cir. 2017) ("Though claim 8 includes active verbs—presents, receives, and generates—these verbs represent permissible functional language used to describe capabilities of the 'reporting module.'"); *UltimatePointer, L.L.C. v. Nintendo Co., Ltd.*, 816 F.3d 816, 826-27 (Fed. Cir. 2016) (holding that "an image sensor … generating data" reflected the capability of the claimed device). The claims here recite a user input apparatus with the capability of receiving an input signal produced by an input means.

Contrary to Sony's assertions, Genuine Enabling's "infringement theories" do not convert the preamble language reciting capability to one that requires the "function to be performed to satisfy the claim." Red Br. at 66. Dr. Fernald's testing and analysis of the Accused Controllers, to which Sony refers, were designed to confirm that the Accused Controllers incorporate input means capable of producing an input signal and that they are user input devices capable of receiving that input signal. In fact, this evidence is sufficient to support a finding that the Accused Controllers are capable of producing and receiving an input signal. "To determine whether an accused device is a device with the 'capability' of performing the recited functions, it must be able to perform those functions when it is activated and put into operation." *INVT*, 46 F.4th at 1375. *See also id.* at 1376

(proving reasonable capability requires evidence or undisputed knowledge that the accused product performs the claimed function when placed in operation"). Dr. Fernald testing confirmed that the accelerometers and microphone of the Accused Controllers produce input signals of audio or higher frequencies that are received by the user input apparatus. Appx2494-2498. This evidence is sufficient to support a determination that the Accused Controllers are capable of receiving an input signal of audio or higher frequency.

2. Sony's Sale of the Accused Products Constitutes Direct Infringement of Method Claim 14

Sony asserts that Genuine Enabling's allegations that Sony directly infringed method claim 14 fail because the sale of an end product which performs the claimed method does not constitute direct infringement. Red Br. at 68. This mischaracterizes Genuine Enabling's infringement claim. Claim 14 is directed to a "programming method"; Genuine Enabling alleges that one who programs a computer to perform the recited steps directly infringes the claim. Appx2012 at ¶ 21.

Sony asserts that it does not program its Accused Products in the United States, and therefore cannot be liable for direct infringement of Claim 14. Red Br. at 69. This position, however, ignores 35 U.S.C. § 271 (g), which provides that a party that sells in the United States "a product which is made by a process patented in the United States shall be liable as an infringer …." 35 U.S.C. § 271(g). Genuine

Enabling alleges that Sony's sale in the United States of its Accused Controllers, which were programmed outside of the United States using the method claimed in Claim 14, constitutes direct infringement of Claim 14. Thus, there is no basis for this Court to affirm the district court's judgment of noninfringement based on Sony's arguments regarding Claim 14.

## CONCLUSION

For the reasons stated above, the Court should reverse the district court's grant of summary judgment and remand for trial.

Respectfully submitted,

Dated: September 11, 2024

PADMANABHAN & DAWSON, P.L.L.C.

/s/ *Paul J. Robbennolt*

Paul J. Robbennolt
Devan V. Padmanabhan
9800 Shelard Parkway
Suite 120
Minneapolis, MN 55441
Telephone: (612) 444-3601
Facsimile: (612) 444-3195
devan@paddalawgroup.com
paul@paddalawgroup.com

*Attorneys for Plaintiff-Appellant Genuine Enabling Technology LLC*

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e)

_X_ The brief contains 6,976 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6)

_X_ The brief has been prepared in a proportionally spaced typeface using MS Word 2018 in a 14 point Times New Roman font or

____ The brief has been prepared in a monospaced typeface using ________ ______in a ___ characters per inch_________ font.

September 11, 2024

/s/ *Paul J. Robbennolt*
Paul J. Robbennolt
PADMANABHAN & DAWSON, PLLC
*Counsel for Plaintiff-Appellant*